ACCEPTED
03-15-00505-CV
7568197
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/27/2015 5:20:33 PM
JEFFREY D. KYLE
CLERK

## No. 03-15-00505-CV

## IN THE THIRD COURT OF APPEALS OF TEXAS

**DAVID A. ROGERS**
**Appellant**
**v.**

**GREGORIO "GREG" CASAR,**
**Appellee**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/27/2015 5:20:33 PM
JEFFREY D. KYLE
Clerk

**Appeal from the 201st District Court**
**Travis County, Texas**

## BRIEF OF APPELLANT

David Rogers
Texas Bar No. 24014089
Law Office of David Rogers
1201 Spyglass Suite 100
Austin, TX 78746
Telephone: (512) 923-1836
Fax: (512) 201-4082

ATTORNEY FOR APPELLANT

**ORAL ARGUMENT NOT REQUESTED**

No. 03-15-00505-CV

---

# IN THE THIRD COURT OF APPEALS OF TEXAS

---

**DAVID A. ROGERS,**
**Appellant**
v.

**GREGORIO "GREG" CASAR,**
**Appellee**

---

**Appeal from the 201st District Court**
**Travis County, Texas**

---

**BRIEF OF APPELLANT**

---

David Rogers
Texas Bar No. 24014089
Law Office of David Rogers
1201 Spyglass Suite 100
Austin, TX 78746
Telephone: (512) 923-1836
Fax: (512) 201-4082

ATTORNEY FOR APPELLANT

---

**ORAL ARGUMENT NOT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

The following is a complete list of all parties, as well as the names and addresses of all counsel:

PARTIES

**Appellants/Plaintiffs:**

Mark Cohen
805 W. 10th Street, Suite 100
Austin, Tx. 78701
512-474-4424
512-472-5444 (f)
Mark@cohenlegalservices.com
www.CohenLegalServices.com
*Attorney for Appellant Dr. Laura Pressley*

David A. Rogers
Texas Bar No. 24014089
1201 Spyglass Drive, Suite #100
Austin, Texas 78746
512-923-1836 — Telephone
512-201-4082 — Facsimile
Email: Firm@DARogersLaw.com
*Pro Se*

**Appellees/Defendants:**

Charles 'Chuck' Herring Jr. 09534100
cherring@herring-irwin.com
Jess Irwin - 10425700
jess@herring-irwin.com
Lauren Ross – 24092001
laurenbross@herring-irwin.com
Herring & Irwin, L.L.P.
1411 West Avenue, Ste 100
Austin, TX  78701
Phone: 512-320-0665
Fax: (512) 519-7580

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
(512) 476-6000
(512) 476-6002- Facsimile
ATTORNEYS FOR APPELLEE,
GREGORIO "GREG" CASAR

**TABLE OF CONTENTS**

Identity of Parties and Counsel…………………………………………iii

Table of Contents……………………………………………………….v

Index of Authorities……………………………………………….…vi

Statement on Oral Argument………………………………….…………1

Statement of the Case…………………………………..………………1

Statement of Facts…………………………………………………5

Issues Presented…………………………………………………5

Summary of Argument……………………………………………7

Argument……………………………………………………….…8

Prayer………………………………………………………………..18

Certificate of Service…………………………………………..………18

Certificate of Compliance…………………………………….…19

# INDEX OF AUTHORITIES

## TEXAS SUPREME COURT

*Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 553-54 (Tex. 2000)……………15
*City of Tyler v. Beck,* 196 S.W.3d 784, 787 (Tex. 2006) …………………………12
*In Re Users System Services, Inc., USSI Computer Services, Inc.,* 22 S.W.3d 331, 336 (Tex. 1999) …………………………………………………..…12
*Low v. Henry*, 221 S.W.3d 609, 622 n.5 (Tex. 2007) ……………..….8, 9, 10, 17
*R.R. Comm 'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S. W3d 619, (Tex. 2011) …………………………………….….…………9
*Tarrant Appraisal Dist. v. Moore*, 845 S. W2d 820, 823 (Tex. 1993)……………9
*Tex. Ass'n of Business v. Texas Air Control Bd*., 852 S.W.2d 440 (1993)..10, 11, 16
*Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)…………………………………………………………………11
*Tex. Dep't of Protective and Regulatory Services v. Mega Child Care*, 145 S.W.3d 170, 177 (Tex. 2004). ………….…………………………………………9

## TEXAS COURTS OF APPEALS

*Barnes v. Sulak,* 2002 Tex. App. LEXIS 5727 (Tex.App. – Austin 2002) ……..13
*Ebert v. Day,* 2004 Tex. App. LEXIS 11043 (Tex.App. – Austin 2004) …….... 12
*Harris County Appraisal District, v. KMI Yorktown LP*, 2010 Tex. App. LEXIS 3201 (Tex.App. – Houston [1st Dist.] 2010)… …………………………………..15
*Heritage Gulf Coast Props. v. Sandalwood Apts., Inc*., 416 S.W.3d 642 (Houston [14th Dist.] 2013)…………………………………………….…9
*In re Marriage of Landry,* 2014 Tex. App. LEXIS 3954 (Tex.App. – Waco 2014) ……………………………………………………………14
*In re News Am. Publ'g,* 974 S.W.2d 97, 103 (Tex.App. – San Antonio 1998) …..15
*In the Interest of K.L.R.,* 162 S.W.3d 291, 299 (Tex.App. – Tyler 2005) ……….12
*In the Interest of T.K.W.*, 2010 Tex. App. LEXIS 1040, *11, 2010 WL 546584 (Tex. App. San Antonio Feb. 17, 2010)……………………………………………16
*Joyner v. Comm'n for Lawyer Discipline,* 102 S.W.3d 344 (Tex.App. – Dallas 2003) ………………………………………………………………15
*McCarty v. Rooney,* 2000 Tex. App. LEXIS 3408 n. 1 (Tex.App. – Houston [14th Dist.] 2000) ………………………………………………………………14
*Morin v. Boecker,* 122 S.W.3d 911, 914 (Tex.App. – Corpus Christi 2003) …….14
*Palmer v. Cantrell,* 747 S.W.2d 39, 41 (Tex.App. – Houston [1st Dist.] 1988) ….14
*Randolph v. Jackson Walker, L.L.P.,* 29 S.W.3d 271 (Tex. App.-Houston [14th

Dist.] 2000, pet. denied)……………………………………………..……16

*Shook v. Shook,* 2010 Tex. App. LEXIS 3864 (Tex.App. – Houston [1st Dist.] 2010) ……………………………………………………………………...11

*Sunbeam Envtl. Servs. v. Tex. Workers' Comp. Ins. Facility,* 71 S.W.3d 846, 851 (Tex.App. – Austin 2002) …………………………………………………...15

**STATUTES**

Texas Civil Practice and Remedies Code Chapter 10 ………………4, 6, 9, 10

**TEXAS RULES OF CIVIL PROCEDURE**

Texas Rule of Civil Procedure 8 …………………………4, 5, 7, 8, 11, 12, 13
Texas Rule of Civil Procedure 13 ………………………………………4, 9

**TO THE HONORABLE THIRD DISTRICT COURT OF APPEALS:**

1.      Appellant, David A. Rogers (hereinafter "Rogers"), hereby pleads that the honorable Court of Appeals reverse the sanctions order of the district court and render an decision denying Appellee's motion for sanctions against Rogers, and in support of this appeal shows this honorable Court as follows:

## Statement on Oral Argument

2.      As this case is not legally complex, and as the facts are straightforward, Rogers does not request oral argument.   In the event the Court finds that oral argument would be helpful, Rogers requests to participate in such argument.

## Statement of the Case

3.      Appellant is David A. Rogers (hereinafter "Rogers").

4.      Laura Pressley is a contestant of the 2014 run-off election for the District 4 City Counsel seat of Austin, Travis County, Texas.   Ms. Pressley (hereinafter "Pressley") is an appellant of said contest in this consolidated appeal, Appeal Number 03-15-00368-CV.

5.      Gregorio "Greg" Casar (hereinafter ("Appellee") won the 2014 run-off election for the District 4 City Counsel seat of Austin, Travis County, Texas. Appellee is the contestee in the Pressley's contest of the of the 2014 run-off election.

6.     As noted in Pressley's brief (p. 3), the record is long and confusing.[1]  On January 30, 2015 Pressley, through Rogers, filed her Original Contest of Election, Motion to Modify Discovery Deadlines, and Requests for Disclosure and Production of Documents for the Office of the Austin City Council, District 4. (070215 CR 3-40)

7.     On April 16, 2015, Pressley filed Contestant's Notice of Designation of Lead Counsel. (070215 CR 447-48).  Therein, Pressley designated Mark Cohen, Esq., as lead counsel in the election contest in the trial court below, replacing Rogers as lead counsel and demoting him to co-counsel.  Shortly after Cohen's designation, Pressley was deposed by Casar's trial counsel.  Cohen defended that deposition.  During that deposition, Pressley did not specifically name persons who were disenfranchised by the closure and consolidation of election precincts. (070215 CR 603-606)

8.     On April 20, Pressley filed her Fifth Amended Contest.  (072915 Sup.CR 339-376)  Thereon, Mr. Cohen, then lead counsel, is listed in the signature block. (072915 Sup.CR 375)  On April 23, 2015, Casar filed his Motion to Strike Pleadings (the Fifth Amended Contest) and for Sanctions. (070215 Sup.CR 479-

---

[1] References to the record in Rogers brief will be by the date of the record and page number therein.

[2] In Casar's Amended Motion for Sanctions, filed 5-22-2015, Casar complained of the 6th Amended Contest, which omitted some of the materials complained of in the 5th Amended Contest.  (080715 CR 3-7) Similar complaints were made in the Second and Third Amended Motion for Sanctions, filed 6-12-2015. (080715 CR 8-12)  (072915 CR 1934-1939)

[3] Rogers includes by reference here the specific arguments made in his response to the Third Amended Motion for Sanctions.  (172915 CR 1940-1947.)

*Low v. Henry*, 221 S.W.3d 609, 622 n.5 (Tex. 2007)

487) This was Casar's first motion for sanctions. The motion specifically and clearly referenced only the Fifth Amended Contest. (070215 Sup.CR 482-483) On April 24, 2015, Mr. Cohen communicated via email with the trial court and opposing counsel negotiating and coordinating discovery. (070215 CR 4497)

9. On May 4, 2015, Pressley served her Notice Of Deposition On Oral Testimony Of A Representative Of Travis County Clerk's Office. (070215 CR 4488-4492) Thereon, Mr. Cohen is listed in the signature block. (070215 CR 4497-4500)

10. On May 11, 2015, Mr. Cohen conducted the deposition of Dana Debeauvoir, Travis County Clerk in charge of elections. (070215 CR 1881-2013) Rogers neither attended (070215 CR 1882) nor conducted (070215 CR 2012-2013) the deposition of the Travis County Clerk.

11. On May 18, 2015, Mr. Cohen emailed opposing counsel regarding the privilege log opposing counsel provided. (070215 CR 4531) On May 19, 2015, Pressley filed her Sixth Amended Contest. (070215 CR 860-1880). Thereon, Mr. Cohen is listed in the signature block. (070215 CR 913). On May 20, 2015, Appellant filed her Motion to Compel. (070215 CR 4501-4510) Thereon, Mr. Cohen is listed in the signature block. (070215 CR 4507-4508)

12. On May 26, 2015, Pressley filed her Contestant's Response to Contestee's Motion to Strike Pleadings and for Sanctions (072915 Sup.CR 1525-1933). Mr.

Cohen is again listed in the signature block. (072915 Sup.CR 1531)  Also, on May 26, 2015, Pressley filed her Contestant's Response to Third Party's Motion for Protective Order.   (070215 CR 4606-4617) Mr. Cohen is again listed in the signature block.  (070215 CR 4615)

13.    Rogers asserts that the trial court, Honorable Dan Mills presiding, erred in granting sanctions against Rogers.  Texas Rule of Civil Procedure 8 makes clear that the lead attorney is the party responsible for the pleadings.  The motion for sanctions was based on the factual allegations asserted in the 5th and 6th Amended Contests.[2]  At the time the allegedly violative pleadings were filed, Cohen was the attorney-in-charge of the case responsible for the filings, not Rogers.  Consequently, as a matter of law, Rogers was not responsible for those filings for purposes of imposing sanctions.

14.    Rogers further asserts that the trial court, Honorable Dan Mills presiding, erred in granting sanctions against Rogers based on the allegations in the pleadings and the responses to Contestee's motion for no evidence summary judgment because said allegations were sufficiently supported by evidence to comply with Texas Civil Practice and Remedies Code Chapter 10 and Texas Rule of Civil Procedure 13 and defeat Appellee's no evidence motion for summary

---

[2] In Casar's Amended Motion for Sanctions, filed 5-22-2015, Casar complained of the 6th Amended Contest, which omitted some of the materials complained of in the 5th Amended Contest.  (080715 CR 3-7) Similar complaints were made in the Second and Third Amended Motion for Sanctions, filed 6-12-2015. (080715 CR 8-12)  (072915 CR 1934-1939)

judgment.[3]  Consequently, as a matter of law, Rogers was not subject to sanctions.

## Statement of Facts

15.    Rogers adopts, incorporates, and includes by reference Pressley's Statement of Facts set forth in Pressley's Appeal Brief as if fully set forth herein.  Rogers adds below the following facts set forth in the record.

16.    On June 3, 2015, Mr. Cohen emailed Rogers, terminating Rogers' representation of Pressley.  In response to Mr. Cohen's email, Rogers, that same day requested confirmation from Pressley.  Pressley confirmed that she authorized Mr. Cohen's email terminating Rogers as her representative.  (080715 CR 13-15)

17.    On June 15, 2015, Mr. Cohen filed the Notice of Accelerated Appeal on behalf of Pressley.   (070215 CR 5224-25)  This honorable Court recognized his position as the attorney responsible for Pressley's case.  (070215 CR 5226)

## Issues Presented

18.    Issue 1.  Was the Court without jurisdiction to order sanctions against an attorney other than the attorney in charge based solely on pleadings filed?

19.    Issue 2.  Did the trial court abuse its discretion by imposing sanctions without regard to Texas Rule of Civil Procedure 8?  Did the court err in granting sanctions against Rogers based on the factual allegations asserted in the 5th and

---

[3] Rogers includes by reference here the specific arguments made in his response to the Third Amended Motion for Sanctions.  (172915 CR 1940-1947.)

6th Amended Contests, when those Amended Contests were filed after Pressley replaced Rogers as attorney-in-charge by designating Cohen as lead counsel?

20. Issue 3. Did the Court abuse its discretion in setting the amount of the sanctions without finding a direct nexus between the improper conduct and the sanction imposed, and without finding bad faith on Rogers' part?

21. Issue 4. Was the right to seek sanctions foreclosed and barred by the language of the only final judgment during the court's plenary power, or by the Rule 11 agreement that all issues between the parties were resolved for purposes of imposing sanctions?

22. Issue 5. Did the trial court commit reversible error by granting appellee's motion for no evidence summary judgment?

Sub Issue 1. Did the trial court commit reversible error by preventing appellant from obtaining discoverable documents?

Sub Issue 2. Did the trial court err by imposing sanctions after it erred by granting a no-evidence motion for summary judgment without reading the summary judgment evidence?

Sub Issue 3. Did the trial court commit reversible error by imposing sanctions after it erred granting appellee's motion for no evidence summary judgment when appellant produced more than a scintilla of evidence?

23. Issue 6. Did the trial court err by awarding sanctions against Rogers under

Chapter 10 of the Civil Practices and Remedies Code?

## Summary of Argument

24.    Rogers filed the original election contest.  Beginning with the April 16, 2015 Notice of Designation of Lead Counsel, Mark Cohen was the attorney-in-charge, responsible for all subsequent filings in the case.  TEX. R. CIV. PRO. 8.  Rule 8 states:

> RULE 8. ATTORNEY-IN-CHARGE On the occasion of a party's first appearance through counsel, the attorney whose signature first appears on the initial pleadings for any party shall be the attorney-in-charge, unless another attorney is specifically designated therein. Thereafter, *until such designation is changed by written notice to the court and all other parties in accordance with Rule 21a, said attorney-in-charge shall be responsible for the suit as to such party.* All communications from the court or other counsel with respect to a suit shall be sent to the attorney-in-charge.

*(Emphasis added.)*

24.    Casar therefore lacked standing to move for sanctions against Rogers based on post April 16, 2015 pleadings because Rogers was no longer the attorney-in-charge of Pressley's election contest.  Casar lacked standing to seek sanctions from Rogers.  Standing is essential to a court's jurisdiction. The trial court therefore lacked jurisdiction to award sanctions against Rogers.  The trial court could not sanction Rogers on that basis.

25.    Though this jurisdictional challenge was not raised below, a court's

jurisdiction may be challenged for the first time on appeal.

26.     Based on the documents presented to the trial court, there was no basis for awarding attorney's fees against Rogers related to filing the Fifth or Sixth Amended Contest or Contestant's Response to Contestee's Motion for Summary Judgment, all filed after Cohen was designated as lead counsel.

27.     Rogers adopts Pressleys' Brief, excepting Pressley's arguments on pages 57-58 regarding the third *Low*[4] factor.  Pressley's claims, both before and after the date Cohen became lead counsel were sufficiently supported by fact and law and adequate investigation was made under the existing circumstances.  The multiple amendments are proof that Pressley's counsel were responsive to the obligation to promptly amend pleadings as new facts were uncovered.

28.     Rogers requests this honorable Appeals Court reverse and render, denying Casar's motion for sanctions against Rogers.


**Argument**

*Issues 4-6*

29.     Rogers adopts, incorporates, and includes by reference the facts, record citations, case law citations, and arguments set forth in Pressley's Appellant's Brief in Appeal No. 03-15-00368-CV as to Issues 4-6 of Rogers Brief of Appellant in

---

[4] *Low v. Henry*, 221 S.W.3d 609, 622 n.5 (Tex. 2007)

Appeal No. 03-15-00505 except for, and particularly excluding, Pressley's arguments on pages 57-58 regarding the third *Low*[5] factor.

30.    All claims of Pressley asserted by Rogers during the course of this election contest were sufficiently supported by fact and law, in compliance with Texas Rule of Civil Procedure 13, to meet the pleading requirements, and defeat Appellee's no-evidence summary judgment, and, therefore, preclude the imposition of sanctions against Rogers pursuant to Texas Civil Practice and Remedies Code Chapter 10.[6]

31.    Furthermore, "The mere fact that a trial court granted summary judgment or a jury rejected a plaintiff's claim doesn't justify sanctions under CPRC 10.01." *Heritage Gulf Coast Props. v. Sandalwood Apts., Inc.*, 416 S.W.3d 642, 663 (Houston [14th Dist.] 2013). This is directly contrary to the theory advanced by Casar: "In the present case, the Court granted Mr. Casar's no-evidence summary judgment motion. Thus, the Court has already held that Ms. Pressley failed to present evidence raising a genuine issue of material fact. This ruling shows that Ms. Pressley failed to meet the § 10.001(3) evidentiary-support requirement." (072915 CR 2025) Casar baldly claims that every successful no-evidence

---

[5] *Low v. Henry*, 221 S.W.3d 609, 622 n.5 (Tex. 2007)

[6] Rogers also refers this honorable Court to the arguments in Pressley's Sixth Amended Contest (070215 CR 904 to 909) for the proposition that agency interpretation cannot supercede the literal text of the statute as the will of the Legislature citing *R.R. Comm 'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S. W3d 619, 625 (Tex. 2011); *Tarrant Appraisal Dist. v. Moore*, 845 S. W2d 820, 823 (Tex. 1993)); *Texas Dep't of Protective and Regulatory Services v. Mega Child Care*, 145 S.W.3d 170, 177 (Tex. 2004).

summary-judgment gives rise to a CPRC 10.001(3) action for sanctions. This is plainly not the law.

32. Pressley's argument regarding the third *Low* factor is addressed in Rogers' appellant's brief below.

*Issue 1: Lack of Jurisdiction*

33. Rogers asserts the trial court lacked jurisdiction to award sanctions against him because Casar lacked standing obtain sanctions against Rogers.

Standing and Jurisdiction

34. The Texas Supreme Court, in *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 444-46 (1993), explained the relationship between standing and subject matter jurisdiction:

> Subject matter jurisdiction is essential to the authority of a court to decide a case. Standing is implicit in the concept of subject-matter jurisdiction. . . . Under the Texas Constitution, standing is implicit in the open courts provision, which contemplates access to the courts only for those litigants suffering an injury. . . . Because standing is a constitutional prerequisite to maintaining a suit under both federal and Texas law, we look to the more extensive jurisprudential experience of the federal courts on this subject for any guidance it may yield. Under federal law, a lack of standing deprives a court of subject matter jurisdiction because standing is an element of such jurisdiction. Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties. Because we conclude that standing is a component of subject matter

jurisdiction, it cannot be waived and may be raised for the first time on appeal. . . . Because standing is a component of subject matter jurisdiction, we consider TAB's standing under the same standard by which we review subject matter jurisdiction generally. That standard requires the pleader to allege facts that affirmatively demonstrate the court's jurisdiction to hear the cause.  The general test for standing in Texas requires that there "(a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought."

Texas Rule of Civil Procedure 8

35.    Questions of law are reviewed by the appellate court *de novo*.[7]    In *Shook v. Shook,* 2010 Tex. App. LEXIS 3864 (Tex.App. – Houston [1st Dist.] 2010), the court, considering the application of Texas Rule of Civil Procedure 8, held:

> The dispositive issue in this appeal deals with the application of the rules of civil procedure to undisputed facts, which is a question of law we review de novo. *See Moore v. Wood,* 809 S.W.2d 621, 623 (Tex. App.--Houston [1st Dist.] 1991, no writ) (holding rules of statutory construction also apply to rules of procedure).

36.    Rogers asserts that Casar did not have a right to relief against him for sanctions.  Texas Rule of Civil Procedure 8 states, in pertinent part:

> RULE 8. ATTORNEY-IN-CHARGE On the occasion of a party's first appearance through counsel, the attorney whose signature first appears on the initial pleadings for any party shall be the attorney-in-charge, ***unless another attorney is specifically designated therein.*** Thereafter, until such designation is changed by written notice to the court and all other parties in accordance with Rule 21a, said attorney-in-charge shall be responsible for the suit as to such party.  (**Emphasis added**)

---

[7] *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)

<u>Lead Counsel Designation</u>

37.     On January 30, 2015, Pressley filed her Original Contest of Election signed by Rogers. (070215 CR 3-40)   Pursuant to Rule 8, Rogers, upon filing of the original petition, was the attorney-in-charge of Pressley's case in state court.   On April 16, 2015, Pressley filed Contestant's Notice of Designation of Lead Counsel signed by Mark Cohen. (070215 CR 477-78).   Therein, Pressley designated Mark Cohen, as lead counsel in the election contest in the trial court below, replacing Rogers as lead counsel and demoting him to co-counsel.   *See City of Tyler v. Beck,* 196 S.W.3d 784, 787 (Tex. 2006) ("*Rule 8 of the Texas Rules of Civil Procedure* provides that "[a]ll communications . . . with respect to a suit shall be sent to the *attorney-in-charge*," and that any change of that designation must be made by written notice to the court and the other parties. *TEX. R. CIV. P. 8*"); *In Re Users System Services, Inc., USSI Computer Services, Inc.,* 22 S.W.3d 331, 336 (Tex. 1999) ("Rule 8 of the Texas Rules of Civil Procedure makes a party's 'attorney-in-charge' 'responsible for the suit as to such party'. . . "); *In the Interest of K.L.R.,* 162 S.W.3d 291, 299 (Tex.App. – Tyler 2005)(" . . . [T]he attorney whose signature first appears on the initial pleadings for any party shall be the attorney-in-charge, unless another attorney is specifically designated therein."); *Ebert v. Day,* 2004 Tex. App. LEXIS 11043 (Tex.App. – Austin 2004)(citing *TEX. R. CIV. P. 8).*

38.    In this case, a designation in writing was filed by Pressley making Mr. Cohen the lead counsel, and, therefore, attorney-in-charge. Tex. R. Civ. P. 8.  Mr. Cohen's name and bar card number appear in every subsequent pleading and other document filed after April 16, 2015 with the trial court in this case.  Although Mr. Cohen did not sign all the documents filed in this case, his appearance in the signature block shows that he continued to function as the attorney-in-charge of the case.  *Barnes v. Sulak,* 2002 Tex. App. LEXIS 5727 (Tex.App. – Austin 2002) ("The designation of an *attorney-in-charge* serves primarily to alert the court and other parties who is *responsible* for the conduct of the lawsuit for that party . . . . [T]he county attorney, was listed in the signature block, giving the motion the imprimatur of the designated *attorney-in-charge*.")

39.    Once he was designated, Mr. Cohen exercised his authority as lead counsel. On April 20, Mr. Cohen filed Contestants' Fifth Amended Original Contest Of Election, Motion to Modify Discovery Deadlines, and Requests For Disclosure for the Office of the Austin City Council, District 4.  072915 CR 339-376)  On April 24, 2015, Mr. Cohen negotiated the terms of discovery in this accelerated proceeding. (070215 CR 4497-4500).  On May 4, 2015, Mr. Cohen issued a deposition notice to the primary witness, the Travis County Clerk.  (070215 CR 4488-4490)   On May 11, 2015, Mr. Cohen deposed the Travis County Clerk. (070215 CR 4543 - 4576).

40.    On May 19, 2015, Mr. Cohen filed Pressley's Sixth Amended Contest (070215 CR 860 – 915).   During the May 26, 2015 hearing on summary judgment, the trial court recognized Mr. Cohen as lead counsel in the case.  (RR Vol. 3, page 4, lines 11-12)  Moreover, when the trial court asked who was speaking on behalf of Pressley, Mr. Cohen said, "I will".[8]  (RR Vol. 3, page 14, lines 14-17)   Mr. Cohen terminated Rogers' representation of Pressley, which she confirmed.  (080715 CR 13-15)

41.    Courts around the state have consistently recognized the responsibilities of the attorney-in-charge based on being so designated.  *See Morin v. Boecker,* 122 S.W.3d 911, 914 (Tex.App. – Corpus Christi 2003) ("Rule 8 designates an 'attorney-in-charge' so that the 'attorney-in-charge . . . [can] be [held] responsible for the suit as to such party.'"); *Palmer v. Cantrell,* 747 S.W.2d 39, 41 (Tex.App. – Houston [1st Dist.] 1988) ("Where a single adverse party is represented by two attorneys who are not associated in a firm, we believe that it is sufficient to serve the attorney who is designated as lead counsel because he has 'control in the management of the cause. . . .'"); *McCarty v. Rooney,* 2000 Tex. App. LEXIS 3408 n. 1 (Tex.App. – Houston [14th Dist.] 2000)(quoting Rule 8); *In re Marriage of*

---

[8] Rogers asserts that Pressley's argument regarding the trial court reviewing the summary judgment evidence (RR Vol. 3, p. 20, line 22 through p. 21, line 22) may have also been the case with other non-dispositive and non-discovery related filings in the case.  Despite the April 16 Notice of Designation of Lead Counsel, the trial court did not appear to recognize Mr. Cohen as lead counsel.  (RR Vol. 3, p. 14, line 14 – 16)("But what I want to ask Mr. Cohen that I don't know -- Mr. Rogers is here. I don't know who is going to speak for Dr. Pressley.") Nevertheless, Mr. Cohen announced his position at this hearing, *infra*.

*Landry,* 2014 Tex. App. LEXIS 3954 (Tex.App. – Waco 2014)(quoting Rule 8); *Joyner v. Comm'n for Lawyer Discipline,* 102 S.W.3d 344, 347 (Tex.App. – Dallas 2003)(". . . [A]ttorney whose signature first appears on initial pleadings for any party "shall be the attorney-in-charge, unless another attorney is specifically designated therein," "said attorney-in-charge shall be responsible for the suit as to such party,"); *In re News Am. Publ'g,* 974 S.W.2d 97, 103 (Tex.App. – San Antonio 1998)(citing Rule 8); *Sunbeam Envtl. Servs. v. Tex. Workers' Comp. Ins. Facility,* 71 S.W.3d 846, 851 (Tex.App. – Austin 2002)(citing Rule 8); *Shook, id.*

42.    Casar sought sanctions based on Pressley's Fifth and Sixth Amended Original Contests.  (072915 Sup.CR 1934-1938)  Mr. Cohen was the attorney-in-charge of the filing of Pressley's Fifth and Sixth Amended Original Contests. Casar lacked standing to seek or receive sanctions from Rogers for filing Pressley's Fifth or Sixth Amended Original Contest when Mr. Cohen was, by virtue of the prior pleadings on file in the case, responsible for the filing of both the Fifth and Sixth Amended Contests.

43.    "Standing is a component of subject-matter jurisdiction that cannot be waived." *Harris County Appraisal District, v. KMI Yorktown LP*, 2010 Tex. App. LEXIS 3201 (Tex.App. – Houston [1st Dist.] 2010)(quoting *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 553-54 (Tex. 2000)). "If a party has no standing, a trial court has no subject-matter jurisdiction to hear the case." *Id.*  Casar did not have

standing to recover sanctions against Rogers, and, thus, the trial court lacked jurisdiction, to award sanctions against Rogers.

44.     Pursuant to Texas Rule of Civil Procedure 8, based on Pressley's April 16, 2015 designation of Mr. Cohen as lead counsel, Rogers was not the attorney responsible as a matter of law.  Sanctions against Rogers were not authorized.

*Issue #2: Abuse of Discretion in Awarding of Sanctions*

45.     Rogers asserts the abused its discretion in awarding sanctions against him because Casar lacked standing to seek sanctions against Rogers.  "A trial court's award of sanctions is reviewed under an abuse of discretion standard. To determine if there is an abuse of discretion, we must look to see if the court acted without reference to any guiding rules and principles." *In the Interest of T.K.W.*, 2010 Tex. App. LEXIS 1040, *11, 2010 WL 546584 (Tex. App. San Antonio Feb. 17, 2010) (internal citations omitted.)   "A trial court abuses its discretion in imposing sanctions if it bases its order on an incorrect view of the law or an erroneous assessment of the evidence." *Randolph v. Jackson Walker, L.L.P.*, 29 S.W.3d 271, 276 (Tex. App.-Houston [14th Dist.] 2000, pet. denied).

46.     As the Texas Supreme Court wrote in *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (1993): "The general test for standing in Texas requires that there '(a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought.'"

47. There was no real controversy between the parties that could be resolved by the motion for sanctions, because Casar's controversy was against the party responsible for the Fifth and Sixth Amended Petitions, which, as a matter of TRCP 8, was Cohen, not Rogers. A judicial declaration about the conduct of Rogers would not resolve the controversy between Casar and Cohen. Casar therefore had no standing to seek sanctions against Rogers for the filing of the Fifth and Sixth Amended Contests. The ruling by the trial court, therefore, exceeded its jurisdiction and was an abuse of discretion.

*Issue #3: Abuse of Discretion in the Amount of Sanctions*

48. "To determine if the sanctions were appropriate or just, the appellate court must ensure there is a direct nexus between the improper conduct and the sanction imposed. Generally, courts presume that pleadings and other papers are filed in good faith. The party seeking sanctions bears the burden of overcoming this presumption of good faith." *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). (internal citations omitted.)

49. In this case, the court did not find a nexus between improper conduct by Rogers and a sanction of $50,000. Additionally, though the Court expressly found that Pressley acted in bad faith[9] (080715 CR 47), it made no such finding with

---

[9] The trial court found bad faith by Pressley in "false allegations of criminal activity against Travis County Director of Elections Michael Winn," though, in fact, no such allegations were made or appear anywhere in the record of this case. *See* Pressley Appellate Brief at p. 50-51,

regard to Rogers. The Court must find, therefore, that Casar did not overcome the presumption of good faith as to Rogers. Therefore, any sanction at all is unjust.

50. Rogers prays that this Court reverse and render, denying Casar's request for sanctions in its entirety.

**Prayer**

51. Rogers respectfully requests that the Court reverse the sanctions order of the District Court in all things and render a judgment denying the sanctions awarded by the District Court against him.

<div align="center">RESPECTFULLY SUBMITTED,</div>

_/s/ David Rogers_
DAVID ROGERS
Law Office of David Rogers
State Bar No. 24014089
1201 Spyglass Drive, Suite 100
Austin, TX 78746 (512) 923-1836
(512) 201-4082 (fax)
Firm@DARogersLaw.com

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

I hereby certify that a true and correct copy of the foregoing Motion was served upon Counsel of record for Appellants via the Court's online filing system on this 21[th] day of October, 2015.

Kurt Kuhn
State Bar No. 24002433
KUHN HOBBS PLLC
3307 Northland Drive, # 310

---

paragraph 7.

Austin, Texas 78731
(512) 476-6000 Telephone
(512) 476-6002 Facsimile
Kurt@KuhnHobbs.com


Charles 'Chuck' Herring Jr.
State Bar No. 09534100
Herring & Irwin, L.L.P.
1411 West Avenue, Ste 100
Austin, TX 78701
(512) 320-0665 Telephone
(512) 519-7580 Facsimile
cherring@herring-irwin.com
**ATTORNEYS FOR APPELLEE GREGORIO "GREG" CASAR**

Mark A. Cohen / SBN: 04508400
805 West 10th Street, Suite 100
Austin, Texas 78701
(512) 474-4424 Telephone
(512) 472-5444 Facsimile
mark@cohenlegalservices.com
***ATTORNEY FOR APPELLANT***
***DR. LAURA PRESSLEY***


    */s/    David Rogers*
DAVID ROGERS
Pro Se

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i), I hereby certify that this document contains 4182 words.


    */s/  David Rogers*
David Rogers
SBN 24014089

Law Office of David Rogers
1201 Spyglass Suite 100
Austin, TX 78746
(512) 923-1836
(512) 201-4082 [Facsimile]

D-1-GN-15-000374

No. _____

| | | |
|---|---|---|
| LAURA PRESSLEY<br>Contestant<br>v.<br><br>GREGORIO "GREG" CASAR<br>Contestee | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br><br><br>OF TRAVIS COUNTY, TEXAS<br><br>201ST _____th JUDICIAL DISTRICT |

### CONTESTANTS' ORIGINAL CONTEST OF ELECTION, MOTION TO MODIFY DISCOVERY DEADLINES, AND REQUESTS FOR DISCLOSURE AND PRODUCTION OF DOCUMENTS FOR THE OFFICE OF THE AUSTIN CITY COUNCIL, DISTRICT 4

NOW COMES, Laura Pressley, Contestant, and files this Original Petition for Election Contest for the Office the Austin City Council, District 4 (Petition) against Gregorio "Greg" Casar, Contestee. The election was held on December 16, 2014 and canvassed on December 30, 2014. In support of this election contest, Dr. Pressley will respectfully show as follows:

### I. Discovery

1. The contestant intends that discovery be conducted under level three, a custom discovery plan for election contest devised with the approval of the court.

2. Pursuant to Texas Rule of Civil Procedure 194, and the motion set forth below, the plaintiff requests that the defendants, within fifteen days of the service of this document, disclose the information and material described in Rule 194.2.

### II. Summary

3. This contest is based on deprivation of voting rights of voters in two high population polling locations which were improperly closed, irregularity in votes counted or not counted, and a failure to comply with the Texas Election Code requirement for storing, retrieval and printing of images of

*Pressley v. Casar OP Contest*                                                                 *p.1*

3

ballots cast in electronic voting machines. Travis County uses electronic voting machines from Hart Intercivic to conduct elections within the county.[1] The result of these multiple irregularities is that the result cannot be known, and the Court must order a new election. Dr. Pressley requests that such an election be timely set, and conducted in compliance with the Texas Election Code and the Secretary of State's regulations governing elections.

### III. Parties

4.         Contestant, Laura Pressley is a resident of Austin City Council District 4, Travis County, Texas. She is a candidate in the Austin City Council District 4 Run Off Election on December 16, 2014.

5.         Contestee, Gregorio "Greg" Casar is a resident of Austin City Council District 4, Travis County, Texas. He was a candidate in the Austin City Council District 4 Run Off Election on December 16, 2014. Casar may be served with process at his principal place of business, 301 W. 2nd Street, Austin, Texas, 78701.

6.         The election results were canvassed on December 30, 2014 and Mr. Casar was declared the victor.

7.         A manual recount of all early voting, election day, and provisional cast vote records, and

---

[1] Voters in different parts of the state utilize a number of different voting systems, all of which must first be certified by the Secretary of State. Tex. Elec. Code § 122.001, .031. ... Once a system is The eSlate, a paperless DRE manufactured by Hart Intercivic, is one of a handful of DREs the Secretary has certified. **[6]** *See Voting Systems*, Texas Secretary of State, http://www.sos.state.tx.us/elections/laws/votingsystems.shtml. Voters arriving at the polls in counties using the eSlate are given a unique access code. The voter enters the code into the eSlate, which then displays the ballot. Voters turn a dial to highlight their ballot choice and then press "enter" to make a selection. After a voter completes his selections, the eSlate displays a ballot summary page. If the voter's choices are correctly displayed, the voter presses the "cast ballot" button, and the vote is recorded. *See Voter Instructions*, Travis County, http://www.co.travis.tx.us/county_clerk/election/eSlate/pdfs/English_Flyer_050923.pdf. Travis County purchased the eSlate system in 2001 and has used it since 2003.
*Andrade v. NAACP of Austin*, 345 S.W.3d 1, 4, 5-6 (Tex. 2011) (footnotes omitted.)

mailed-in ballots was performed on January 6 2015.[2] The results of the election were unchanged and Mr. Casar remained the victor for the Run Off election and was sworn into office on January 6, 2014. He has been notified of the filing of this action by a delivery of a copy of this Petition in accordance with TEX. ELEC. CODE § 21.003(b).

## IV. Jurisdiction and Venue

8.       Jurisdiction and venue in this case are proper and mandatory in Travis County because the office being sought is for a district entirely within the boundaries of Travis County under the Texas Elections Code, Section 232.006.

## V. Facts

9.       City of Austin District 4, comprised of 18 voting precincts, is located entirely in Travis County.

Early Voting

10.      Early Voting for the Run Off Election for District 4 of the Austin City Council was held on December 1 through December 12, 2014.[3] During Early Voting from December 1 through December 12th, the Travis County Clerk's Office released daily Reports for voters that voted via Ballot By Mail, and Early Voting.

11.      During Early Voting, many election irregularities occurred. According to Travis Count Election Division director Michael Winn, no Zero Tapes[4] were printed for machines used in Early

---

[2] Though the County Clerk termed the action a "manual recount," because the event as it occurred did not satisfy statutory criteria, Pressley does not concede that what occurred was actually a statutory manual recount as defined by the Texas Election Code.

[3] In a typical election, election officials create ballots using Ballot Origination Software System ("BOSS"). The ballot definitions are fed by the Judge's Booth Controller ("JBC") to the eSlates attached to it.

[4] A "zero tape" is run on the Judge's Booth Controller ("JBC") to ensure no votes reside in the system. When voters arrive they are given a JBC-generated PIN number that they enter on the

Voting to verify that prior to the first votes being cast, no votes were pre-registered on the machines.[5] This failure is in violation of Texas Secretary of State requirements. *See* Texas Secretary of State Advisory 2012-03, 6(g)(vi), 6(k)(iii) http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

Election Day

12.     Election Day was December 16, 2014.   Many election irregularities occurred.

13.     **Voters seeking to vote at high-volume locations were improperly denied the right to cast their vote.**  Disenfranchisement of District 4 voters occurred as a result of the closing of the two highest volume District 4 voting locations on the Run Off Election Day, December 16, 2014.  The Highland Mall voting location at 6601 Airport Blvd was open during the General Election on November 4, 2014 and saw some of the highest volume of voters in District 4.  This location was closed for the December Run Off election and was moved to the far less convenient Travis County Tax Office (5501 Airport Blvd).  The Pressley campaign received multiple reports of voters being upset and confused because the voting location had been moved.  The second highest voting precinct and polling location in District 4 for the November General Election, was Precinct 222 at Cooke Elementary (1511 Cripple Creek).  That Precinct is comprised of more than 25% senior voters who are 60 years and older.  It was closed on Election Day for the December Run Off.  It was combined with the fourth lowest voter turnout location in District 4, Precinct 268, Grant AME Worship Center at 1701 Kramer Lane.   The Pressley campaign received reports that voters

---

eSlate. They then vote and the votes are stored on the eSlate, Mobile Ballot Boxes (MBB), and JBC.
[5] Travis County received a waiver of the state requirement for such tapes for the general election *only* in a letter dated September 30, 2014, based on the burden of the extremely long statewide ballot.  *See* attached September 30, 2014 letter from Texas Secretary of State.
The run-off election ballot includes only City Council and Mayoral candidates.  The run-off was restricted to two candidates in the races requiring a run-off, unlike the first round, in which as many as twelve candidates participated in some races.

*Pressley v. Casar OP Contest*                                                                 *p.4*

showed up to Cooke Elementary for the December Run Off on Election Day and were upset and confused and did not subsequently show up to vote at the Kramer location. This is voter disenfranchisement of the two most critical, highest volume voting locations in District 4. For example, there are 2,971 registered voters in Precinct 222 and only 545 voted in the December election.[6] This action by the Travis County Clerk had a disproportionate effect on minorities, working people, and elderly voters of District 4, which is one of the Hispanic-opportunity districts in the City of Austin. As a result, **some voters registered at those locations were improperly denied the right to cast their vote**.

14. No zero tapes were printed at the countywide locations when the polls opened. The Secretary of State ("SOS") has procedures requiring these activities. *See* Texas Secretary of State Advisory 2012-03, 6(g)(vi), http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

15. On Election Day, no results tapes were printed at the countywide locations when closing the polls. The SOS procedures require the printing of closing results tapes, also. Texas Secretary of State Advisory 2012-03, 6(k)(iii) http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

16. On Election Day, Pressley campaign official poll watchers were denied access to signing results tapes at two polling locations, Gus Garcia and Randall's at Research Blvd. This violates Secreatry of State regulations requiring that poll watchers be allowed to sign such tapes. "The presiding election judge, an election clerk, and not more than two watchers, if one or more watchers are present, shall sign the results tape(s)." Texas Secretary of State Advisory 2012-03, 6(k)(i) http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

---

[6] Polling location charts for November and December are attached.

17.     On Election Day, Pressley campaign official poll watchers not allowed access at Dobie Middle School, where the most important ballots (for the Graham, Gus Garcia, and Virginia Brown precincts) were placed in transit to central counting. Those boxes were the largest and strongest Pressley boxes.

18.     On Election Day, poll watchers were improperly denied access to Central Counting activities with Mobile Ballot Boxes ("MBB"), Tally activities, and the like.[7]

The Canvass

19.     On Tuesday, December 30, 2014, the Mayor of Austin and the Austin City Council

_____

[7] Hart's eSlate System
Hart's electronic (DRE) voting system is known as eSlate. The eSlate system is comprised of several distinct components.
The Ballot Origination Software System ("BOSS") is used by election officials to define and create individualized electronic ballots. Data is entered once into BOSS and then flows through all components of the eSlate system.
The Mobile Ballot Box ("MBB") is a reusable, portable flash memory card. It is used to store and transfer election information. When inserted into the Judge's Booth Controller, the MBB supplies election information and ballot styles, it stores an electronic representation of how votes were cast. Once voting has concluded the MBB is removed and its contents are tallied by the Tally software.
The Judge's Booth Controller ("JBC") is the "brain" that manages the system, enabling poll workers to know which voting booths are in use at any time. The JBC issues access codes for the voters' use. It can control up to 12 daisy-chained eSlate units.
eSlate refers to the system generally and to the device that voters use to cast ballots, unless using paper ballots, in which case Ballot Now is used. The eSlate may be equipped with a disabled access unit ("DAU") for use by disabled voters. The eSlate units are physically connected to the JBC, which stores cast-vote records.
Tally is a software application that reads, stores, and tabulates the cast-vote records from the MBB (the portable flash card that transferred the cast-vote records from the JBC). Tally tabulates all early voting, absentee, and election day results, and produces various reports.
Rally is a software application that is capable of reading, storing, and transferring cast-vote data from polling places or collection centers with respect to early returns.
The System for Election Records and Verification Operations ("SERVO") software is an election records archiving and asset management system. SERVO is designed to recover data from equipment in the case of a lost or damaged MBB. SERVO also is designed for various recount purposes.
Ballot Now is a digital-scan paper ballot system that manages the printing, scanning, and resolution of mailed-in paper ballots. It also records the electronic cast vote records to an MBB to be read and tabulated with Tally.

conducted an initial official canvass and certification for the Election Day results for all races on the ballot, including City of Austin District 4. The canvassed and certified totals for District 4 were Laura Pressley 1,563, Gregorio "Greg" Casar 2,854 for a total of 4,417 votes cast.

20.     Comparison of the canvassed results with the Early Voting voter reports showed inconsistencies in the results. Travis County reported that 2,651 total voters voted in Early Voting in District 4. Reviewing the voter ID's, 437 entries existed for those submitting Ballot by Mail (BBM). There were at least 28 duplicate entries for BBM. **At least 28 mail-in votes appear to have been counted twice**. *See* Appendix A.

21.     Once duplicate BBM's were removed, 2,622 voter names remained that voted in Early Voting according to the Early Voting lists from Travis County that were distributed prior to Election Day, December 16, 2014. Based on Travis County's Canvassed and Recount results for those that voted for Greg Casar, or Laura Pressley or Under Voted, the total number of ballots cast for Early Voting is 2,701. Therefore, **there are 79 more ballots than voters for Early Voting**. These 79 extra ballots are distributed among 15 of the 18 precincts of the District 4 Race. (One precinct, with one eligible voter, showed no votes.) *See* Appendix B.

22.     An initial review the 2,622 Early Voting voter names and addresses with returned mail, about 14 of the voters had moved or no longer resided in District 4 and were not eligible to vote in the District 4 Run Off Election. Therefore, **at least 14 ineligible voters cast votes in this contest**.

Statistical Improbabilities

23.     A analysis of the voting results show a pattern of mathematical anomalies which is highly unlikely to occur naturally. For the nine (9) precincts in District 4 with more than 200 voters, the highest volume of voters, the ratio of votes that the Contestant received compared to Contestee is the same ratio in the November General Election (with a total of 8 candidates) as it was in the

December Run Off Election (with 2 candidates), 35.1% vs 35.0% respectively. In addition, the average of the percentages of the unweighted precincts that the Contestant received compared to Contestee, in the November General Election and the December Run Off, are also equal at equal 35.1% and 35.1%, respectively. No other race in the City is within a 10x such a close non-variation, and only two races are within 100x such a variation. *See* Appendix C.

24. Such a result strongly suggests hardware problems, software problems, procedural issues or mishandling of machines which may have caused errors in tabulation or reporting.

25. A similar issue was observed for Early Voting (which typically experiences ½ the total voting for an election). For the precincts with more than 100 voters, the highest volume of early voters, the ratio of votes that the Contestant received compared to Contestee is the same ratio in the Early Voting in the November General Election (with a total of 8 candidates) as it was in the Early Voting in the December Run Off Election (with 2 candidates), 36.7% vs 36.7% respectively. Again, no other race in the City is within a 10x such a close non-variation, and only two races are within 100x such a variation. *See* Appendix D.

26. Such a result strongly suggests hardware problems, software problems, procedural issues or mishandling of machines which may have caused errors in tabulation or reporting.

27. Contestant is concerned there may have been some hardware issues, software malfunctions or mishandling that may have caused errors in the tabulation of the results. Additionally, some number of ineligible voters appear to have cast votes.

The Recount

28. Given the highly improbable statistical anomalies, the duplicate Ballot by Mail entries, and that there are more ballots than number of voters for Early Voting (overvotes), Contestant requested a manual recount of the District 4 Election with the goal of reconciling the

discrepancies.

29.     On January 4, 2015, the Mayor of Austin and City Clerk approved Contestant's amended petition requesting a manual recount of actual stored balloting System. Contestant's amended petition included a request to reconcile the ballots cast with the number of voters documented on the sign in sheets and combination forms for District 4 for the countywide polling locations and Precincts to ensure accurate reporting of results. The number of voters recorded and the number of votes recorded did not match.

30.     On January 5, 2015, prior to the Recount, Pursuant to TEX. ELEC. CODE § 213.016, "PRINTING IMAGES OF BALLOTS CAST USING DIRECT RECORDING ELECTRONIC VOTING MACHINES," Dr. Pressley communicated over the phone with the Director of Travis County Elections Division. Pressley informed the Director that she desired to be present during the printing of images of ballots cast. "Each candidate is entitled to be present and to have representatives present in the same number as prescribed by Section 213.013(b) for a recount during the printing of the images." An email was sent to The Travis County Clerk and copied to the Texas Secretary of State's Office, to the same effect.

31.     On January 6, 2015, a manual recount was conducted and additional irregularities ensued with regard to and during the recount.

No Ballot images

32.     On Tuesday, January 6, 2015, at 11:00am when the recount was to begin, the Travis County Clerk and the Recount Committee relayed to Contestant and her official recount watcher, Karen Renick, the images of ballots cast were not available, would not be printed, and would not

be used for the recount.[8] Dr. Pressley expressly stated, in her "Petition Requesting a Recount," and "Amended Petition Requesting a Recount" that "[w]e are requesting a manual recount of the results using the actual, stored, ballot images." Pressley also expressly requested "a manual (by-hand) count." "[T]he election code expressly provides for the 'printing of images of ballots cast using direct recording electronic voting machines for the purpose of a recount.' *See id.* § 213.016." *Andrade v. NAACP of Austin*, 287 S.W.3d 240, 258 (Tex. App. Austin 2009), *rev'd on other grounds* by *Andrade v. NAACP of Austin*, 345 S.W.3d 1 (Tex. 2011). Failure to print images of ballots violates this provision of the election code.

Printing errors

33.     Prior to the start of the Recount, Travis County selected the data files to print and pre-print an aggregated data file of Cast Vote Records (CVR's). The pre-printed CVR's contained a subset of the data that a District 4 ballot contains. Upon starting the recount on January 6, 2014 around 11:00am, Contestant relayed to the Travis County Clerk and the Recount Committee, that the lack of providing printed images of ballots cast were a violation of TEX. ELEC. CODE § 213.016.

34.     Cast Vote Records are not "images of ballots cast." Ballots are defined in Texas Election Code Chapter 52, Subchapter C.[9] Section 52.075 of the Subchapter also allows the Secretary of

---

[8] *See* attached Affidavit of Karen Renick

[9] For the purposes of this suit, the most salient portions of that subchapter are Sec. 52.003 and Sec. 52.070.

Sec. 52.003. PLACING CANDIDATE'S NAME ON BALLOT. (a) Except as otherwise provided by law, the authority responsible for having the official ballot prepared shall have placed on the ballot *the name of each candidate*:…

Sec. 52.070. VOTING SQUARE AND INSTRUCTION FOR CANDIDATES. (a) A square for voting shall be printed to the left of *each candidate's name* on a ballot.

(b) Immediately below "OFFICIAL BALLOT," the following instruction shall be printed: "Vote for the candidate of your choice in each race by placing an 'X' in the square beside the candidate's

State to "prescribe the form and content of a ballot" for electronic voting machines.

35.    At the same meeting, Dr. Pressley stated that the pre-printing of recount records and starting the recount process was also a violation of 213.016 and 213.009(c), respectively. A member of the recount committee responded to one of the recount watchers: "They started all this on Sunday [January 4, 2015]."

36.    Pressley warned the County Clerk that the irregularities, of not printing the images of ballots cast, were in violation of the approved amended Petition for Recount and the CODE and was grounds for an Incident Report. Printing the CVR data files were in essence, reprinting the previous results obtained on Election night. A CVR is essentially nothing more than a tally sheet – it does not "count" the images of ballots – it merely reprints the tally. It was not recounting the source data of the images of the ballots cast, and as such it is not a meaningful check on the original count.[10] Using the CVR instead of ballot image also appears to violate Texas Election

---

name."

…

(e) A square shall be printed to the left of each line provided for write-in voting under Section 52.066(c), but failure to place a mark in the square does not affect the counting of a write-in vote. (*emphasis* added.)

[10] Secretary of State is somewhat unclear on this issue. While "images of ballots cast" could be considered as a subset of the category "cast vote records," the CVRs in this case are not, in fact, images. In logical terms, the expression would be that just because all A are B does not mean all B are A. (Dogs are animals, but not all animals are dogs.) In its 2014 Electronic Voting System Procedures bulletin, posted online at http://www.sos.state.tx.us/elections/laws/electronic-voting-system-procedures.shtml, the SOS appears to not clearly differentiate cast vote records from ballot images. *See, e.g.*, Section 8:

**Section 8 – Requested Recounts (if necessary)**
**Requested Recount on DRE Voting Systems (Pursuant to TEC § 214.071):**
1. The candidate requesting a recount may request that the recount be done electronically or manually.
2. For an electronic recount, the persons specifically permitted by law to be present at the recount are also authorized to be present as the election media are reloaded into the central accumulator system.
3. For a manual recount of a DRE election, the Recount Coordinator shall organize the printing of cast vote records (ballot images) for the affected race or issue.

Code 214.049 (e): "If electronic voting system ballots are to be recounted manually, the original ballot, rather than the duplicate of the original ballot, shall be counted."

37.     Contestant requested to conditionally proceed with the Recount and re-print the available CVR data files.

38.     Pursuant to TEX. ELEC. CODE § 213.007, the machines, materials, programs, and records may be available to the Recount Committee.   Pursuant to TEX. ELEC. CODE § 213.013(h), each person entitled to be present at a recount is entitled to observe recount activities. Contestant was not allowed to view the full recount process and how the recount data was selected from the electronic voting machines.  The CVR data files were identified, isolated and pre-selected prior to the beginning of the Recount. Contestant requested to view the source and properties of the CRV files, such as dates of the CRV files and origination, and was denied by the Recount Committee Member, the Travis County Director of Elections.

Precinct Returns

39.     Pursuant to TEX. ELEC. CODE § 214.002, counting procedures for a recount shall be certified in the same manner as the original count.  Pursuant to TEX. ELEC. CODE §

---

4.The Recount Coordinator shall notify the parties in the recount of the date, place, and time the printing of cast vote records (ballot images) will take place.

5.The full recount committee is not required to be present at the printing of cast vote records (ballot images) and the Recount Chair shall determine how many members should be present. The persons specifically permitted by law to be present at the recount are entitled to be present as the cast vote records (ballot images) are printed and to have the same number of representatives as allowed for the recount.

6.If the manual recount does not take place immediately after the printing of the cast vote records (ballot images), the printed cast vote records (ballot images) shall be locked and secured until the recount takes place.

7.A manual count of the printed cast vote records (ballot images) shall be conducted in the same manner as a recount of hand-counted paper ballots.

After the recount is complete, the printed cast vote records (ballot images) shall be secured and preserved for the appropriate preservation period for maintaining election records.

65.014(b)(1), the procedures for preparing the original precinct returns must state the total number of voters who voted at the polling location as indicated by the poll list. Poll lists were not apparently reviewed by the Recount Committee during the recount. Dr. Pressley requested the poll lists to be reviewed and the number voters per precinct be reconciled with those documented on the polling location combination sign-in forms. Pressley requested those numbers be reconciled with the recount results, because of Early Voting voter lists discrepancies identified in the Recount Petition. The request was denied by the Travis County Clerk, the Chair of the Recount Committee, and the Director of Travis County Elections. The request was also specifically made prior to the recount in the Amended Petition for Recount.

40.     Pursuant to TEX. ELEC. CODE § 213.012, the committee chair prepared a report of the vote count. The chair wrote "The numbers of voters matched the number of ballots cast," and signed the report. During the Recount, the numbers of voters on voter lists were not reconciled with the ballots recounted by the chair.

41.     On January 6, 2015, the recount was conducted and completed. After the recount, the totals were unchanged as compared to the original canvassed results. The totals were Laura Pressley 1,563, Gregorio "Greg" Casar 2,854 for a total of 4,417 votes cast.

42.     Reconciliation of voter signatures on rolls at polling locations and total ballots cast has not been completed. An election contest is the only available remedy to explore the discrepancy between the the number of ballots counted and the number voter names and signatures in the precincts.

43.     Various records will need to be obtained from Travis County election officials to ensure that all the information is obtained and available to be analyzed to ensure that all votes that should have been counted were counted and, in the alternative, that all illegal votes which should not have

been counted are correctly removed from the vote totals.

44. The sum total of those voting irregularities exceeds the number of votes by which the election was decided.

45. Because no images of ballots cast can be retrieved, printed and count, Travis County cannot unequivocally determine the outcome of the election, and the election is void. As a matter of law, the Court must therefore order a new election. TEX. ELEC. CODE § 232.041.

## VI. Petition Timely Filed

46. This Election Contest is brought in accordance with the provisions of TEX. ELEC. CODE § 232.008, which requires the Original Petition to be filed with the District Court not later than the 30th day after the date the official result of the contested election is determined.

47. On Tuesday, December 30th, the Mayor and City Council of Austin conducted an official canvass and certification of the Run Off results for all races on the December 16, 2014 ballot, including District 4. However a recount was conducted on January 6, 2015 and those results did not change. The deadline for submission of a petition in an election contest is January 29, 2015. Therefore, this petition is timely filed.

## VII. CONDITIONS PRECEDENT

48. All conditions precedent have been performed or have occurred.

## VIII. MOTION TO MODIFY STANDARD DISCOVERY PROCEDURES

49. Pursuant to Texas Rule of Civil Procedure 191.1, Contestants request that the Court sign an order shortening the time allowed for Contestee to comply with the discovery requests set forth below to no more than fifteen days.

50. Pursuant to Texas Rule of Civil Procedure 191.1, Contestants request that the Court sign an order shortening the time allowed for Contestee and third-party witnesses, voters, the City of

Austin and Travis County, to comply with the discovery requests set forth below in paragraph to no more than ten days, and that the period of notice required for Deposition on Written Questions be reduced to ten days.

51.     Contestants further requests that the Court sign an order requiring that Contestee's response to the request for disclosure, and all other responses and answers in this case be hand-delivered, faxed or emailed.

52.     The foregoing modifications to standard discovery procedures are necessary because of the accelerated procedures that apply to this primary election contest. For example, the trial would be over before the disclosures and documents were due if the standard discovery deadlines remain applicable. The foregoing reasons constitute good cause for the requested relief.

<div align="center">

**REQUESTS FOR PRODUCTION**

</div>

53.     Contestant requests that the Travis County produce promptly for inspection and copying, all voter sign-in sheets of the City of Austin election, December 16, 2014, including early voting sign-in sheets.

54.     Contestant requests that Travis County produce promptly for inspection and copying, all voter registration records, including but not limited to voter registration cards, that were validly accepted in the City of Austin, Texas, District 4, as of the date of the election, December 16, 2014.

55.     Contestant requests that Travis County produce promptly for inspection and copying, all voter registration lists that were validly accepted in the City of Austin, Texas, District 4, as of the date of the election, December 16, 2014.

56.     Contestant requests that Travis County produce promptly for inspection and copying, all related absentee and/or mail-in votes of the election, December 16, 2014.

57.     Contestant requests that Travis County produce promptly for inspection and copying, all related images of ballots cast of the election, December 16, 2014, including early voting.

58.     Contestant requests that Travis County produce promptly for inspection and copying, all serial numbers of all MBBs per precinct used in December 16, 2014 election.

59.     Contestant requests that Travis County produce promptly for inspection and copying, all Names of personnel who programmed, serviced, or delivered the electronic voting machines for all 2013 and 2014 elections.

60.     Contestant requests that Travis County produce promptly for inspection and copying, all names of any personnel, employed by the county or by any private contractor, who were employed in any capacity conducting or preparing for the conduct of the December 16, 2014 election.

61.     Contestant requests that Travis County produce promptly for inspection and copying, all physical addresses where records of all election data is located, paper or electronic.  Physical address here shall be construed to include not only street addresses and room numbers, but physical locations on hard drives of electronic data.

62.     Contestant requests that Travis County produce promptly for inspection and copying, all media upon which election data is located, including but not limited to floppy disks, hard disk's, CD-rom's , USB memory sticks, pcmcia flash memory cards and similar devices.

63.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election, all precinct voting machine results tapes, all central tabulation results, all incident reports and phone logs, all audit logs, including system logs and event logs from precinct voting machines and election management computers and any other computer used in the election, all File Allocation Tables for all computers used

in the election including precinct voting machines and election management computers, all records for voting machines serviced or replaced during the voting period, all cardkey access logs, or, if cardkeys are not used, written access logs for the rooms housing election management computers, and for rooms housing the voting machines and ballots.

64.     Contestant requests that Travis County produce promptly for inspection and copying, all e-mail traffic sent to or from any electronic voting system owner, employee or contractor by any county employee or elected official for the past year, documents showing failures of voting machines, including but not limited to troubleshooter reports documenting malfunctions and repairs, chain of custody logs containing voting machine assignments to each polling place and the list of seal numbers affixed and checked in, access records for any laptops used during the 2014 City Council elections period, from November 1, 2010 to December 31, 2014.

65.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election, Copies of return mail/vacancy/forwarded addresses lists for District 4 registered voters from 2012 – 2014.  Include VID, address, name, date information was received.

66.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election, all written procedures for purging voters from Travis County Voter lists with respect to but not limited to deceased voters, felons, voters who have change of address, vacant addresses, etc.   Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election electronic copies of purged voter lists from 2010 – 2014, including Voter Identification ("VID"), address, name, Date of Birth, and date purged.

67.     Contestant requests that Travis County produce promptly for inspection and copying, for

the December 16, 2014 election the District 4 December Run Off Ballot by Mail ballots for all precincts and the ability to make scanned/electronic copies of selected ballots. Contestant specifically requests that she or her representatives be presented with the originals of these documents, in addition to any photocopies Travis County may wish to provide.

68. Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election documents identifying the names, VID and addresses of District 4 voters that cast provisional ballots and those that were accepted and/or rejected for the December Run Off election. Contestant further requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election the "images of ballots" of the rejected ballots.

69. Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election those documents containing voters names, VID, and addresses in District 4 that requested Ballot by Mail and those that returned Ballots by Mail for the December Run Off.

70. Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election any rejected requests for Ballot by Mail.

71. Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election, documents identifying all election workers for all countywide polling locations, substations, and Central Counting for Early Voting, Election Day voting, Mobile voting (including but not limited to Election Judges, alternate judges, technicians, poll watches, etc.) for the December Run Off.

72. Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election Tally sheets, dates, workers and returns reported for the polling locations and/or precincts that were audited for the number of voters and the number of ballots

cast for the December and November elections.

73.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election any lists or spreadsheets used by poll workers, technicians, and similar persons for documenting issues at each of the polling locations for the December Run Off (including but not limited to computer errors, mismatch in voter numbers, fleeing voters, other irregularities, etc.).

74.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election any manuals used for training Elections Division workers including but not limited to security, maintenance, operation, segregation, archival, backup, of all Hart Voting system equipment.

75.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election all spreadsheets, Logs and checklists used to document performance and adherence of Election Division workers to training manuals and procedures including, but not limited to, security, maintenance, operation, segregation, archival, backup of all Hart Voting system equipment for the November and December elections.

76.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election and internal and public reports from Elections Division Management regarding strengths and weaknesses in the current voting systems employed by Travis County and how they can be improved with newer models, technology, processes, and the like.

77.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election and the November 4, 2014 election, including early voting,  all Zero Tapes for voting equipment (including Equipment ID) used that were printed *more than 2*

*hours prior* for Early Voting, Mobile Voting, Election Day voting, and processing of Ballot by Mail ballots.

78.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election and the November 4, 2014 election, including early voting, all Zero Tapes for voting equipment (including Equipment ID) used that were printed *directly prior to opening the polls* for Early Voting, Mobile Voting, Election Day voting, and processing of Ballot by Mail ballots.

79.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election and the November 4, 2014 election, including early voting,  all Results/Tally Tapes for voting equipment (including Equipment ID) used that were printed *after closing the polls* for Early Voting, Mobile Voting, Election Day voting, and processing of Ballot by Mail ballots.

80.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election, including early voting, all troubleshooting or incident reports for all Hart Voting System equipment for Early Voting, Mobile Voting, Election Day voting.  Please include in production electronic copies of all certification records for all voting equipment and software.

81.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election and the November 4, 2014 election, including early voting,  lists of the Mobile Ballot Boxes used, their ID's, and what polling location they were used at (including but not limited to each countywide polling location for Early Voting, Election Day voting, mobile polling location, and Ballot by Mail processing).

82.     Contestant requests that Travis County produce promptly for inspection and copying, all

documents showing communications from the City of Austin, the Secretary of State, and the Travis County Elections Division, Hart InterCivic, vendors, etc. regarding the District 4 December Run off Elections including but not limited to emails, memos, correspondence, texts, IM's, video conferencing, Power Points, dated from 1-1-2015 through the current date.

83.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election and the November 4, 2014 election, including early voting,  all correspondence from the Secretary of State regarding administrative waivers for the November and December elections in Travis County.

84.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election and the November 4, 2014 election, including early voting, any documents identifying those associated with the District 4 Recount (including but not limited to committee members, managers, workers, technicians, etc.) and their titles, roles, and date and hours worked from the dates 1/2 – 1/6.

85.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election and the November 4, 2014 election, including early voting,  any documents showing contacts with Hart InterCivic and Travis County relating to the preventive maintenance, operation, and  duties of the Travis County  to ensure no voids in warranty occur for all components of the Hart Voting Systems (including but not limited to hardware and software for computers, eSlate, MBB, JBC, Tally, Rally, SERVO, etc.).

86.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election and the November 4, 2014 election, including early voting,  all Hart InterCivic operating instruction manuals for the major Hart Voting System components: Tally, SERVO, eSlate, JBC, Rally, MBB, etc.

87.     Contestant requests that Travis County produce promptly for inspection and copying, for the December 16, 2014 election and the November 4, 2014 election, including early voting, any documents showing respective and relevant identification numbers and/or serial numbers for all the Hart equipment (Tally, SERVO, eSlate, JBC, Rally, MBB, etc.) used in the November and December election for Early Voting, Election Day voting, Mobile Voting, and processing Ballot by Mail ballots.

## IX.     ELECTION CONTEST—SPECIAL LAWS AND RULES APPLY

88.     In order that Contestee not be left unaware of the special shorted rules that apply in this case, Contestants set forth the following excerpt from the Texas Election Code:

> Sec. 231.004.  DISQUALIFICATION OF DISTRICT JUDGE.
> (a) The judge of a judicial district that includes any territory covered by a contested election that is less than statewide is disqualified to preside in the contest.
> (b) If a contest is filed in which a judge is disqualified under Subsection (a), the district clerk shall promptly call the filing to the attention of the judge.  The judge shall promptly request the presiding judge of the administrative judicial region to assign a special judge to preside in the contest.
> (c) A judge who resides in the territory covered by a contested election is not eligible for assignment as a special judge for the contest.
>
> Sec. 233.007.  FILING PERIOD FOR ANSWER.
> (a) A contestee must file an answer to the contestant's petition not later than:
>> (1) 10 a.m. of the 10th day after the date of service of citation on the contestee or 10 a.m. of the fifth day after the date the official result of the contested election is determined, whichever is later, if the contested election is less than statewide;  or
>> (2) 10 a.m. of the 20th day after the date of service of citation, if the contested election is statewide.
> (b)  The citation must command the contestee to answer by the specified deadline.
> Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.

## X. REQUEST FOR RELIEF

89.     The contestants seeks relief under the Texas Elections Code, Chapter 232, and ask that the Court declare that the election results cannot be determined under Election Code Section

232.041 ask that the Court order a new election.

90.     The contestant requests a new election using paper ballots based on the limitations that Travis County employs a hardware and software configuration of the Hart Voting Systems, that cannot produce an image of a ballot cast, in violation of state law.

91.     Therefore, based on the foregoing, the contestant requests that the contestee be cited to appear and answer, and that the Court grant the relief sought by the plaintiff and award it attorney fees, prejudgment and postjudgment interest, costs of suit, and all other relief, in law and in equity, to which it may be entitled.

Respectfully submitted,

David Rogers
LAW OFFICE OF DAVID ROGERS

By:     __/s/ David Rogers_____
David A. Rogers
Texas Bar No. 24014089
1201 Spyglass Drive, Suite #100
Austin, Texas 78746
512-923-1836 — Telephone
512-201-4082 — Facsimile
Email: Firm@DARogersLaw.com
*Attorney for Contestant Dr. Laura Pressley*

No. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY<br>Contestant | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§<br>§ | |
| GREGORIO "GREG" CASAR<br>Contestee | §<br>§<br>§<br>§<br>§ | OF TRAVIS COUNTY, TEXAS<br><br>201st JUDICIAL DISTRICT |

## CONTESTANT'S NOTICE OF DESIGNATION OF LEAD COUNSEL

TO THE HONARABLE JUDGE OF SAID COURT:

Now comes Laura Pressley, Contestant herein and hereby notifies the Court and the Parties that she has designated Mark Cohen as her Lead counsel to represent her in this case. David Rogers will remain in the case as her Co- Counsel.

Respectfully Submitted,

Mark Cohen, SBN: 04508400
805 W. 10th, #100
Austin, Texas 78701
(512) 474-4424     Phone
(512) 472-5444     Facsimile
mark@cohenegalservices.com

**ATTORNEY FOR CONTESTANT**

### CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served by efile and/or facsimile to the following persons on this 16th day of April, 2015.

Charles 'Chuck' Herring Jr. 09534100
cherring@herring-irwin.com
Jess Irwin - 10425700
jess@herring-irwin.com
Lauren Ross – 24092001
laurenbross@herring-irwin.com
Herring & Irwin, L.L.P.
1411 West Avenue, Ste 100
Austin, TX 78701

477

Phone: 512-320-0665
Fax: (512) 519-7580

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
(512) 476-6000
(512) 476-6002- Facsimile
ATTORNEYS FOR CONTESTEE,
GREGORIO "GREG" CASAR

Mark Cohen

478

1

CAUSE NO. D-1-GN-15-000374

LAURA PRESSLEY, ) IN THE DISTRICT COURT

  Contestant, )

   )

VS. ) TRAVIS COUNTY, TEXAS

   )

GREGORIO "GREG" CASAR, )

  Contestee. ) 201ST JUDICIAL DISTRICT

*********************************************

ORAL AND VIDEOTAPED DEPOSITION OF

LAURA PRESSLEY

April 16, 2015

*********************************************

ORAL AND VIDEOTAPED DEPOSITION OF LAURA PRESSLEY, produced as a witness at the instance of the Contestee, and duly sworn, was taken in the above-styled and numbered cause on the 16th of April, 2015, from 9:39 a.m. to 3:52 p.m., before Heidi Morrison, CSR, RPR, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Travis County Clerk's Office, Conference Room 222, 1000 Guadalupe, Austin, Texas 78701, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

EXHIBIT 8

Q    -- roughly.

A    We had many volunteers.  We had many paid staff.  I don't have the exact number.  Maybe ten.

Q    But it's -- so any one of the ten could have gone down to speak at council and say "No, we don't think you should close Highland Mall" or "We object to it" or "We think you should do something different." Any one of your ten on your campaign staff could have done that?

A    We could have.

Q    And no one did it, as far as you know?

A    No.

Q    Now, you say in your pleading that somebody complained about the closing of the location?

A    Yes.

Q    Who complained?

A    Well, we had people complain about --

Q    I want names.

A    Oh, you want names.  So I don't have the names in front of me.  I have not -- don't have my records in front of me for the names.

Q    Does your lawyer have a list of the names?

A    No.  He does not have a list of names right now.

Q    I said he and pointed at him.  You have two

11:47:50

11:48:06

11:48:18

11:48:31

11:48:46

11:48:57

114

MR. COHEN:  If you asked --

MR. HERRING:  I've asked the question --

MR. COHEN:  I know.

MR. HERRING:  You haven't read them.

MR. COHEN:  And I haven't read them yet. I don't mean to be tricky.

MR. HERRING:  Let's ask the -- the other guy.

MR. ROGERS:  If I can get it, I'll get it to you.

Q    (By Mr. Herring)  Okay.  Anybody else?

A    At this time, no.

Q    Now, of those people you referred to, can you tell me how many of them, if you understand it, were prevented from voting?

A    I do not know right now.

Q    You -- can you tell me the name of anyone who was prevented from voting by the change in a voter location?

A    We gave a list of potential voters that did not vote in the runoff.  And so those are -- that's a -- a partial list.  We've provided that.

Q    I think my question's a lot narrower than what you just answered.  My question is:  Do you have a list of people -- not the broad -- the broad list of people

115

who might not have voted, not the list of people who

told somebody, "Well, I'm upset or confused by this

change of one of these voting locations," but people who

actually were prevented from voting because of the

change in one of those three?

A    So right now, at this time, I don't have a

list.

MR. COHEN:  How much more do you think

you have?

MR. HERRING:  A good bit.

MR. COHEN:  Good bit?  Okay.  So --

MR. HERRING:  What time?

MR. COHEN:  It's 12:00.  I can't go too

much longer.

MR. HERRING:  Let's take a break.  You

want a lunch break?

MR. COHEN:  Would we?

MR. HERRING:  Up to you.

MR. COHEN:  Yeah.

MR. HERRING:  I'll go straight through,

but we'll take a break if you want to.

MR. COHEN:  Well, that's why I asked you.

If it's going to be an hour, I can stand it.  If it's

going to be --

MR. HERRING:  It's going to be more than

134

election.  You know you knew about it before the runoff?

A     Yes, yes, yes.

Q     And how did you become aware of it?

A     I don't recall.

Q     Did you discuss it with Mike Winn?

A     I don't recall.  I remember getting it through e-mail from one of our supporters.  And I don't remember the date I got it through e-mail.

Q     Do you know whether zero tapes were ever printed?

A     When?

Q     For -- let's say for the runoff election.

A     I don't know if they were ever printed.  We've not -- we've asked for that in discovery, so we're looking forward to that data.

Q     Get that back so I don't lose it.

So you don't know if they were printed, or if they were printed, where they were printed or when?

A     I don't know.  That's right.

Q     And then, similarly, you have an allegation that no results --

A     Yes.

Q     -- tapes were printed at the countywide locations when closing the polls?

13:42:17

13:42:30

13:42:49

13:43:01

13:43:12

13:43:24

No. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| | § | 201st JUDICIAL DISTRICT |

### CONTESTANTS' FIFTH AMENDED ORIGINAL CONTEST OF ELECTION, MOTION TO MODIFY DISCOVERY DEADLINES, AND REQUESTS FOR DISCLOSURE FOR THE OFFICE OF THE AUSTIN CITY COUNCIL, DISTRICT 4

**TO THE HONORABLE JUDGE OF SAID COURT**

NOW COMES, Laura Pressley, Contestant, and files this Fifth Amended Original Petition for Election Contest for the Office the Austin City Council, District 4 (Petition) against Gregorio "Greg" Casar, Contestee.[1] This Amended Pleading is in response to the court's order sustaining special exceptions to which the Contestant disagrees. It is filed assuming the Court's Order providing the April 20, 2015 Deadline to replead assumed Contestant would have reviewed documents ordered to be produced by the Travis County Clerk's Office. This has not happened yet so some of the information the Court assumed in its order Contestant would have available in time to completely meet the order on special exception is still not available at this time. Contestant anticipates filing another amended pleading with more specific allegations as soon as it has had sufficient time to do so. The election was held on December 16, 2014 and canvassed

---

1 This Fifth Amended Petition is filed in Response to Contestee Gregorio "Greg" Casar's Answer and Special Exceptions to Contestant's Original Contest of Election, and the Court's order of April 13, 2015 regarding those Special Exceptions.

*Pressley v. Casar Fifth Amended OP Contest*          *p.1*

on December 30, 2014. In support of this election contest, Dr. Pressley will respectfully show as follows:

## I. DISCOVERY

1. The contestant intends that discovery be conducted under level three, a custom discovery plan for election contest devised with the approval of the court.

## II. REQUEST FOR DISCLOSURE

2. Pursuant to Texas Rule of Civil Procedure 194, and the motion set forth below, the plaintiff requests that the defendants, within thirty days of the service of the Original Petition, disclose the information and material described in Rule 194.2.

## III. SUMMARY

3. This contest is based on the facts that illegal votes were counted, election officers prevented eligible voters from voting, election officers failed to count legal votes, and election officers made mistakes that resulted in an election outcome which is not the true outcome. Thus, deprivation of voting rights of voters in several high population polling locations which were improperly closed, irregularity in votes counted or not counted, and a failure to comply with the Texas Election Code requirement for storing, retrieval and printing of "images of ballots cast" in electronic voting machines occurred and negatively affected the outcome for Pressley. Particularly, the improper closure, consolidation and moving of the voting locations alone appears to have reduced the vote considerably more than the margin reported in the canvass of the election.[2]

4. Additionally, Travis County uses electronic voting machines from Hart Intercivic to conduct

---

[2] This is sufficient to "materially affect[] the election results." *Gonzalez v. Villarreal*, 251 S.W.3d 763,773,777-78 (Tex. App.-Corpus Christi 2008, pet. dism'd w.o.j.) (quoting *Tiller v. Martinez*, 974 S.W.2d 769, 772 (Tex. App.—San Antonio 1998, pet. dism'd w.o.j.) (emphasis added); *accord Reese v. Duncan*, 80 S.W.3d 650, 655-56 (Tex. App.-Dallas 2002, pet. denied).

elections within the county.[3] Pressley requests that the court compel Travis County election officers to print the "images of ballots cast" as required under the Texas Election Code.[4] (TEX. ELEC. CODE §213.016). Without these statutorily-required "images of ballots cast" it is impossible for the Court to determine the actual election outcome, as the only actual ballots – the mail-in ballots – are exactly and perfectly tied between the two candidates. The Travis County Clerk has asserted that the system Travis County uses cannot print "images of ballots cast." Images of ballots cast" is not the same as "cast vote records." The Court, consequently, must reject any "cast vote records" produced and tallied by such machines. The result of these multiple irregularities is that the result cannot be known, and the Court must order a new election. Dr. Pressley requests that such an election be timely set, and conducted in compliance with the Texas Election Code and the Secretary of State's regulations governing elections.

5.    "The purpose of the election code is to ensure that the true will of the voters is 'fairly expressed' and that the evidence of that expression is 'properly preserved.' *Prado* [*v. Johnson*, 625 S.W.2d 368

---

[3] Voters in different parts of the state utilize a number of different voting systems, all of which must first be certified by the Secretary of State. Tex. Elec. Code § 122.001, .031. ... Once a system is certified, local political subdivisions may adopt it for use in elections. *Id*. § 123.001. ...
The eSlate, a paperless DRE manufactured by Hart Intercivic, is one of a handful of DREs the Secretary has certified. *See Voting Systems*, Texas Secretary of State, http://www.sos.state.tx.us/elections/laws/votingsystems.shtml. Voters arriving at the polls in counties using the eSlate are given a unique access code. The voter enters the code into the eSlate, which then displays the ballot. Voters turn a dial to highlight their ballot choice and then press "enter" to make a selection. After a voter completes his selections, the eSlate displays a ballot summary page. If the voter's choices are correctly displayed, the voter presses the "cast ballot" button, and the vote is purportedly recorded. *See Voter Instructions*, Travis County, http://www.co.travis.tx.us/county_clerk/election/eSlate/pdfs/English_Flyer_050923.pdf. Travis County purchased the eSlate system in 2001 and has used it since 2003.
*Andrade v. NAACP of Austin*, 345 S.W.3d 1, 4, 5-6 (Tex. 2011) (footnotes omitted.)
[4] *See* attached Appendix 10, September 30, 2014 letter from Texas Secretary of State. In this letter, Keith Ingram, Director of Elections for the Texas Secretary of State's office, specifically states "in the [Hart Voting System], ballot images remain on the voting machines themselves for recounts, contests, and other post-election reviews until archived by the county for the following election." p.2, second to last paragraph, last sentence.

(Tex. Civ. App.--San Antonio 1981, writ dism'd w.o.j.))], 625 S.W.2d at 369-70." *Gonzalez v. Villarreal*, 251 S.W.3d 763, 778 (Tex. App.-Corpus Christi 2013). The failures and mistakes illustrated in this Contest show that the will of voters was thwarted, the evidence of that expression was **not** properly preserved and thus, the true outcome cannot be determined.[5]

6.      While some actual ballots were preserved – the mail-in ballots, in which the candidates are perfectly tied – the vast majority of ballots and the evidence of the voters' intent were not preserved. According to the Travis County Clerk, there are no "images of ballots cast" that the court can review. Therefore, if "images of ballots cast" cannot be produced, we request the court to order a new election.

### IV. PARTIES

7.      Contestant Laura Pressley is a resident of Austin City Council District 4, Travis County, Texas. She was a candidate in the Austin City Council District 4 Run Off Election on December 16, 2014.

8.      Contestee Gregorio "Greg" Casar is a resident of Austin City Council District 4, Travis County, Texas. He was a candidate in the Austin City Council District 4 Run Off Election on December 16, 2014. Casar has been served and has answered in this cause.

9.      The election results were canvassed on December 30, 2014 and Mr. Casar was declared the victor.

10.      A "manual recount" of all early voting, election day, provisional, and mailed-in ballots was attempted on January 6, 2015.[6] The mail-in ballots were exactly tied between the candidates, at 240

---

[5] The requirement to preserve "images of ballots cast" in the statute is fundamental to preserving the evidence of the will of the voters. By failing to preserve that evidence, the County has destroyed evidence of the expression of the will of the voters and forced the court to call a new election.

[6] Though the County Clerk termed the action a "manual recount," because the event as it occurred

each, for a total of 480 votes.[7] The attempted recount was a nullity and a real recount was made impossible in that the attempted recount violated state law and was incorrectly performed using of the "cast vote records" in lieu of "images of ballots cast" combined with the actual mail in ballots. Based on the counting of "cast vote records" and mail in ballots, as could be predicted, the invalid recount did not change the reported results of the election and the original declaration of Mr. Casar as the victor for the run off election did not change. Casar was sworn into office on January 6, 2014. He has been notified of the filing of this action by a delivery of a copy of this Petition in accordance with TEX. ELEC. CODE § 21.003(b).

## V. JURISDICTION AND VENUE

11.    Jurisdiction and venue in this case are proper and mandatory in Travis County because the office being sought is for a district entirely within the boundaries of Travis County under the Texas Elections Code, Section 232.006.

## VI. FACTS

### Travis County Election Officials Prevented Eligible Voters from Voting

12.    City of Austin District 4, comprised of 18 voting precincts, is located entirely in Travis County. Early Voting and Election Day was December 1-12, and 16, 2014, respectively. **Voters seeking to vote at high-volume locations were improperly denied the right to cast their vote.** Disenfranchisement of District 4 voters occurred as a result of the closing of the highest volume District 4 voting locations in the Run Off during Early Voting and Election Day, December 16,

---

did not satisfy statutory criteria, Pressley does not concede that what occurred was actually a statutory manual recount as defined by the Texas Election Code.

[7] These were the only actual ballots counted during the "manual recount." The mail-in ballots were more than 10% of the total ballots cast in the election. The allegation of the county is that, despite the perfect tie in mail-in ballots, Casar beat Pressley by a 2-to-1 margin in the remaining ballots. This is a variation in election results that is highly improbable and unrecorded to Contestant's knowledge.

2014.

13.    The Highland Mall voting location at 6601 Airport Blvd was open during the General Election for Early Voting and Election Day on October 20-31, and November 4, 2014, respectively and saw some of the highest volume of voters in District 4.  This location was the designated voting location for Precinct 142 and was an important and convenient voting location for Precinct 156 and others nearby. It was closed for the December Run Off election for Early Voting and Election Day.  It was moved to the far less convenient Travis County Tax Office at 5501 Airport Blvd (*See* Appendix 1).  The Pressley campaign received multiple reports of voters being upset and confused because the voting location had been moved.

14.    Specifically, reports were received by Contestant on Election Day, December 16th, from voters while Contestant was phone banking. District 4 voter, Thomas Crawford showed up at Cooke Elementary to vote, and reported no signs were posted to indicate where the polling location had been moved.  Similar reports were received by Brad Parsons, a campaign volunteer, who was phone banking on Election Day.  Campaign supporter, Matthew Palmer reported that Highland Mall was closed and it was a problem for voters.   Based on information and belief, Contestant asserts that said confusion was a result of failure to post, or premature removal of, a notice at Cooke Elementary, Precinct 222, of the relocation of the polling place.

15.    Upon reviewing voter rolls for Pct 156 and 142, published by Travis County, Appendix 2 shows names, addresses and precincts of **365 voters** of Pcts 156 and 142 that we allege were disenfranchised.  These **365 voters** were identified based on their voting histories which include but are not limited to voting in General Elections, City of Austin Council Elections, and Primary Elections.  The extensive voting histories of these **365 voters** show they are the most consistent voters in Precincts 142 and 156 and surprisingly did not vote in the City Council Run off election

in 2014. In addition, the Pressley campaign verified additional voters, multiple times, as very strong Pressley supporters (by block walking/phone banking/yard signs posted), who were waiting to vote on Election Day. These voters total **73**. Therefore, Contestant alleges a total of **438 voters** in Precincts 142 and 156 were disenfranchised.

16. To enhance the accuracy of this list, additional information (detailed voter information of precincts, ballot styles, voting histories, and voting locations for those voting in the General and Run off elections), has been requested through discovery from Travis County. Upon receipt and review of discovery responses from Travis County, Contestant may identify additional voters and improve the accuracy of this list. Also, for trial, Contestant is in the process of collecting affidavits regarding disenfranchisement specifics from these voters.

17. The second highest voting precinct and polling location in District 4 for the November General Election was Precinct 222 at Cooke Elementary located at 1511 Cripple Creek. That Precinct is comprised of more than 25% senior voters who are 60 years and older. It was closed during Election Day for the December Run Off (*See* Appendix 1). It was combined with the fourth lowest voter turnout location in District 4, Precinct 268, Grant AME Worship Center at 1701 Kramer Lane.

18. The Pressley campaign received reports from Rob Hale, a resident and voter in Pct 222. As usual, he and other Pct 222 voters showed up to Cooke Elementary for the December Run Off on Election Day and were confused as to why Cooke Elementary was closed for voting for Pct 222. He helped senior voters look up an alternative location in which to vote on Kramer Lane. When he arrived at the Kramer location, he waited for the senior voters and they did not arrive. In addition, he had a relative that showed up at Cooke Elementary to vote, and the relative reported no signs were posted to indicate where the polling location had been moved.

19.     Upon reviewing Pct 222 voter rolls published by Travis County, Appendix 3 shows names, addresses and precincts of **248 voters** that we allege were disenfranchised. These **248 voters** have voting histories which include but are not limited to voting in General Elections, City of Austin Council Elections, and Primary Elections. The extensive voting histories of these **248 voters** show they are the most consistent voters in Precinct 222 and they surprisingly did not vote in the City Council Run off election in 2014. In addition, the Pressley campaign verified additional voters, multiple times, as very strong Pressley supporters (by block walking/phone banking/yard signs posted), which were waiting to vote on Election Day. These voters total **71**. Therefore, Contestant alleges a total of **319 voters** in Precinct 222 alone were disenfranchised.

20.     To enhance the accuracy of this list, additional information (such as detailed voter information such as precincts, ballot styles, voting histories, and voting locations for those voting in the General and Run off elections), has been requested through Discovery from Travis County. Upon receipt and review of Discovery responses from Travis County, Contestant may identify additional voters and improve the accuracy of this list. Also, for trial, Contestant is in the process of collecting affidavits regarding disenfranchisement specifics from these voters.

21.     Another voting location open during the General Election but closed for the District 4 Run off was Precinct 133, which was open for the General Election at Blanton Elementary located at 5408 Westminster. It was combined with the non-District 4 Precinct 130, at Memorial UMC.

22.     The Pressley campaign received reports from Pct 133, Election Judge, Arthur Turner, a resident and voter in Pct 133. During Election Day, voters from Pct 133, showed up at Blanton Elementary to vote in the Run Off and were confused and upset as to why Blanton Elementary was closed for voting for Pct 133. Mr. Turner had multiple calls from upset voters who did not know where to vote.

23.     Upon reviewing Pct 133 voter rolls published by Travis County, Appendix 4 shows names, addresses and precincts of **116 voters** Contestant alleges were disenfranchised.  These **116 voters** have voting histories which include but are not limited to voting in General Elections, City of Austin Council Elections, and Primary Elections.  The extensive voting histories of these **116 voters** show they are the most consistent voters in Precinct 133 and they surprisingly did not vote in the City Council Run off election in 2014.

24.     To enhance the accuracy of this list, additional information (such as detailed voter information such as precincts, ballot styles, voting histories, and voting locations for those voting in the General and Run off elections), has been requested through discovery from Travis County.  Upon receipt and review of discovery responses from Travis County, Contestant may identify additional voters and improve the accuracy of this list.  Also, for trial, Contestant is in the process of collecting affidavits regarding disenfranchisement specifics from these voters.

25.     Three additional polling locations were closed for the Run off election for District 4 (Pcts 209, 258, and 260).  Upon reviewing the voter rolls for these precincts published by Travis County, Appendix 5 shows names, addresses and precincts of **235 voters** that we allege were disenfranchised.  These **235 voters** have voting histories which include but are not limited to voting in General Elections, City of Austin Council Elections, and Primary Elections.  The extensive voting histories of these **235 voters** show they are the most consistent voters in Precincts 209, 258, and 260 and they surprisingly did not vote in the City Council Run off election in 2014.

26.     The total number of closed/moved/combined precincts in District 4 for the Run off comes to a total of 7 Precincts out of 17 voting precincts in District 4.  Therefore, 41% of District 4's polling locations were closed, combined or moved for the December Austin City Council Run off.  Appendix 6.  This caused a much lower than expected turnout for Election Day for  District 4.

27. To summarize, typically Election Day and Early Voting turn out is very similar. Early Voting for the District 4 Run Off race saw approximately 2,646 voters and on Election Day only 1,771 turned out. Due closing/ moving/ combining of 41% of District 4 Polling locations, voters were confused and disenfranchised and Election Day voters were about 875 short.

28. The County's actions of closing multiple, key, high volume polling locations had a disproportionate effect on minorities, working people, and elderly voters of District 4—one of the Hispanic-opportunity districts in the City of Austin. Four of Pressley's strongest voting locations/boxes that showed over 50% for Pressley (222, 156, 133, 258), as evidenced by the only remaining ballots, Mail in Ballot results, were moved or closed for the Run Off election (*See* Appendix 6).


29. As a result of these aggressive and improper closures, voters registered at those locations were improperly denied the right to cast their vote. The closure of these pro-Pressley precincts was unfair and undermined the true outcome of the election. **A conservative count of disenfranchised voters resulting from the improper closure/moving/combining of precincts 133, 142, 156, 209, 222, 258, and 260 is 1,108. This value is consistent with the low voter turnout on Election Day as compared to Early Voting.** Upon evaluation of discovery responses from Travis County, a more accurate number may be provided. Also, for trial, Contestant is in the process of obtaining testimony regarding disenfranchisement specifics from these voters.


**Travis County Election Officials Allowed Ineligible Voters to Cast Votes (Illegal Votes)**

30. A thorough review the 4,414 Early Voting and Election Day voter names and addresses with returned mail, and the National Change of Address database (NCOA), and voter registration

records available online, 64 of the voters had moved, no longer resided in District 4, or had some other residency issues, and may not have been eligible to vote in the District 4 Run Off Election. Therefore, **at least 64 ineligible voters cast votes in this election due to residency issues**. A more detailed review of the voter registrar information provided by Travis County is needed with regard to Provisional Ballots, statements of residence, etc. Upon evaluation of Discovery responses from Travis County, a more accurate number may be provided. A list of the 64 voter's Voter ID's and precincts are found in Appendix 7.

31.     With regard to additional categories for illegal votes, it is unlikely that voters that are not interested in voting in a General Election will be interested in voting in a Run Off election. After reviewing Travis County voter rolls (https://tax-office.traviscountytx.gov/voter-data), for the General Election and the Run Off, **156 voters** voted in the Run Off that did not vote in the General Election. Many are Ballot by Mails and a large number voted at specific locations. These are potentially illegal votes and we ask the court to allow Contestant time to review and evaluate various Discovery responses from Travis County voting records including, but not limited to, Ballot by Mail, voter registration cards, polling location sign in sheets, and residency records, etc. to validate the votes were cast legally. A List of these voters are found in Appendix 8.

### More Ballots Than Voters During Early Voting (Illegal Votes)

32.     On Tuesday, December 30, 2014, the Mayor of Austin and the Austin City Council conducted an initial official canvass and certification for the Election Day results for all races on the ballot, including City of Austin District 4. The canvassed and certified totals for District 4 were Laura Pressley 1,563, Gregorio "Greg" Casar 2,854 for a total of 4,417 votes cast.

33.     The canvassed results were inconsistent with the Early Voting voter reports. Travis County reported that 2,651 total voters voted in Early Voting in District 4. Reviewing the voter ID's, 437

entries existed for those submitting Ballot by Mail (BBM). There were at least 28 duplicate entries for BBM. **At least 28 mail-in votes appear to have been counted twice or three times**. *See* Appendix 6, Duplicate Ballot by Mail Entries.

34.    Once duplicate BBM's were removed, 2,622 voter names remained that voted in Early Voting according to the Early Voting lists from Travis County that were distributed prior to Election Day, December 16, 2014. Based on Travis County's Canvassed and Recount results for those that voted for Greg Casar, or Laura Pressley or Under Voted, the total number of ballots cast for Early Voting is 2,701. Therefore, **there are 80 more ballots than voters for Early Voting**. These 80 extra ballots are distributed among 15 of the 18 precincts of the District 4 Race.[8] (One precinct, with one eligible voter, showed no votes.) *See* Appendix 7, Early Voting Discrepancies.

### Statistical Improbabilities

35.    An analysis of the voting results show a pattern of mathematical anomalies which is highly unlikely to occur naturally. (*See* Appendix 8, pages 1-3.) For the nine (9) precincts in District 4 with more than 200 voters,[9] the highest volume of voters, the ratio of votes that the Contestant received compared to Contestee is the same ratio in the November General Election (with a total of 8 candidates) as it was in the December Run Off Election (with 2 candidates), 35.1% vs 35.0% respectively. In addition, the average of the percentages of the unweighted precincts that the Contestant received compared to Contestee, in the November General Election and the December Run Off, are also equal at 35.1% and 35.1%, respectively. No other Council race in the history of electronic voting in the City (2003 – current) has shown such a tight non-variation between a

---

[8] In the original petition, this number was identified as 79. One precinct, 211, had a single vote undervote. *See* Appendix 7, Early Voting Discrepancies." Additionally, there are an unknown number of ballot by mail overvotes, invalid voter registrations, ineligible voters and election day overvotes.

[9] These precincts account for more than 80% of the vote in the District.

general election and a run off. Since 2003, of the total eleven Council races that went into a run off, seven races have greater than 10x variation and 3 show greater than 100x variation. *See* attached Appendix 8, Comparison of Election Returns.

36. The fact that so many precincts showed exactly the same and unchanged results for the General Election and the Run Off is indicative of mistakes made by Travis County election officers. These mistakes are likely related to and are due to, but not limited to, the handling of voter hardware, software, etc.

37. From Travis County Voter Rolls, though over 4,000 voters were different between the General and Run Off elections, the unique and unlikely occurrence that the results remain unchanged and which has not occurred in the last 11 years in Travis County for any other Run Off candidate or election is highly improbable. The occurrence is surprising, is strictly isolated to District 4, and is indicative of human error. Because so many high volume District 4 precincts showed exactly the same percentage results for Pressley and Casar, it is possible that some memory cards or counting software used in the General Election were mistakenly reused in error for the Run Off.

38. Contestee Casar alleges the factual and statistically improbable election results for the General Election and the Run Off "are unsurprising." This is indicative of emotional wishful thinking rather than a clear-eyed analytical assessment of evidence and data. Additionally, Casar offers vague and irrelevant references and personal attacks from a politically biased news source, the far-left Austin Chronicle. The Chronicle endorsed and directly campaigned for Contestee Casar. Additionally, the Chronicle has little to no scientific expertise on staff that is qualified to offer expert testimony on complex topics of mathematics, chemistry, physics and engineering, which they attempt to report and critique.

39. Conversely, Contestee Dr. Laura Pressley holds a Ph.D. in Physical Chemistry from the

University of Texas at Austin and holds a minor in mathematics and has worked in the semiconductor and technology industry as a process engineer and senior manager in Austin for over 26 years. She has led defect and yield enhancement engineering teams in Austin, Asia, and Europe and is an expert in mathematical and statistical data analysis. She has successfully led projects that have reduced corporate waste on the order of multimillion dollars, quarter after quarter. *See* Politifact article that that discusses Dr. Pressley's chemistry and engineering related statements made during the campaign: http://tinyurl.com/lmey73z. Her community involvement has included being the Chair Elect of the SafePlace, on the Executive Committee of the Austin Neighborhoods Council, President of her neighborhood association and a team leader of the Restore Rundberg Revitalization Team. Her main campaign messages were related to reducing waste and debt at City Hall and implementing a City of Austin Homestead Exemption. Attached is a 2014 campaign mailer that compares Dr. Pressley's experience and City Council policy goals with Contestant Casar (Appendix 9.)

**Procedures Were Violated and Illegal Votes Appear to Have Been Counted**

40.      Several election safeguards and procedures defined by the Legislature and the Secretary of State that are intended to prevent human errors were mistakenly not followed by Travis County. The mistakes and failure to adhere to the Secretary of State's procedures led to and caused illegal votes to be counted.

41.      With regard to the counting of illegal votes, during Early and Election Day Voting, many election irregularities occurred and mistakes were made by Travis County election officers. According to Travis County Election Division director Michael Winn, no Zero Tapes[10] were printed for machines to verify that directly prior to the first votes being cast, no votes were pre-registered on

---

[10] A "zero tape" is run on the Judge's Booth Controller ("JBC") to ensure no votes reside in the system. When voters arrive they are given a JBC-generated PIN number that they enter on the eSlate. They then vote and the votes are stored on the eSlate, Mobile Ballot Boxes (MBB), and JBC.

the machines.[11]  This failure is in violation of Texas Secretary of State requirements.  The Travis County officers violations affected the outcome of the election because votes may have remained on the voting equipment from prior activities.  *See* Texas Secretary of State Advisory 2012-03, 6(g)(vi), 6(k)(iii) http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

42.     Given so many high volume District 4 precincts showed exactly the same percentage results for Pressley and Casar, it is possible that some memory cards or counting software used in the General Election were mistakenly reused in error for the Run Off.  (*See* Appendix 8.)

43.     In addition, with regard to illegal votes being counted, on Election Day, no results tapes were printed at the countywide locations when closing the polls.  The SOS procedures require the printing of closing results tapes, also.  This failure is in violation of Texas Secretary of State requirements.  The Travis County officers violations affected the outcome of the election because votes may have remained on the voting equipment from prior activities.  *See* Texas Secretary of State Advisory 2012-03, 6(g)(vi), 6(k)(iii) http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).  On Election Day, Pressley campaign official poll watchers were denied access to results tapes for signing purposes at two polling locations, Gus Garcia and Randall's at Research Blvd.  Official poll watchers that were denied access are the following:

    a)  Rae Nadler-Olenick was denied access to Results/Tally Tapes on December 16, 2014 at polling location Randalls at Braker and Research.  Results Tapes were not printed as required by Secretary of State procedures (http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml).  This affected the

---

[11] Travis County received a waiver of the state requirement for such tapes for the general election *only* in a letter dated September 30, 2014, based on the burden of the extremely long statewide ballot.  *See* attached Appendix 10, September 30, 2014 letter from Texas Secretary of State. The run-off election ballot includes only City Council and Mayoral candidates.  The run-off was restricted to two candidates in the races requiring a run-off, unlike the first round, in which as many as twelve candidates participated in some races.

*Pressley v. Casar Fifth Amended OP Contest*          *p.15*

outcome of the Run off election in that errors in counting, ballots cast, and voters signing in, and maintaining security protocols may have occurred.

b) Paul Williams was denied access to Results/Tally Tapes on December 16, 2014 when the polls closed at Gus Garcia polling location. Results Tapes were not printed as required by Secretary of State procedures (http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml). This affected the outcome of the Run off election in that errors in counting, ballots cast, and voters signing in, and maintaining security protocols may have occurred.

c) Sergio and Claire Martinez were denied access to Dobie Middle School, SubStation on December 16, 2014 and were not able to monitor for election materials coming from Gus Garcia. This affected the outcome of the Run off election in that errors in counting, maintaining security protocols may have occurred.

44. This violates Secretary of State regulations requiring that poll watchers be allowed to sign such tapes. "The presiding election judge, an election clerk, and not more than two watchers, if one or more watchers are present, shall sign the results tape(s)." The Travis County officers violations affected the outcome of the election because votes may have remained on the voting equipment from prior activities or excess votes may have been added before or after the close of the polls and the lack of "images of ballots cast" makes the results impossible to verify. Texas Secretary of State Advisory 2012-03, 6(k)(i) http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

45. On Election Day, Pressley campaign official poll watchers not allowed access at the polling substation at Dobie Middle School, where the most important ballots (for the Graham, Gus Garcia, and Virginia Brown precincts) were placed in transit to central counting. Those boxes were the largest and strongest Pressley boxes, as evidenced by the ballot by mail recount results. (*See* Appendix 3.) This failure is in violation of Texas Secretary of State requirements. The Travis County officers' violations affected the outcome of the election because votes may have remained on the voting equipment from prior activities. *See* Texas Secretary of State Advisory 2012-03, 6(g)(vi), 6(k)(iii) http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

46.    On Election Day, poll watchers were improperly denied access to Central Counting activities with Mobile Ballot Boxes ("MBB"), Tally activities, and the like.[12]   This failure is in violation of Texas Secretary of State requirements.   The Travis County officers violations affected the outcome of the election because votes may have remained on the voting equipment from prior activities or been added improperly later.   *See* Texas Secretary of State Advisory 2012-03, 6(g)(vi), 6(k)(iii) http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

---

[12] Hart's eSlate System
Hart's electronic (DRE) voting system is known as eSlate. The eSlate system is comprised of several distinct components.
The Ballot Origination Software System ("BOSS") is used by election officials to define and create individualized electronic ballots. Data is entered once into BOSS and then flows through all components of the eSlate system.
The Mobile Ballot Box ("MBB") is a reusable, portable flash memory card. It is used to store and transfer election information. When inserted into the Judge's Booth Controller, the MBB supplies election information and ballot styles, it stores an electronic representation of how votes were cast. Once voting has concluded the MBB is removed and its contents are tallied by the Tally software.
The Judge's Booth Controller ("JBC") is the "brain" that manages the system, enabling poll workers to know which voting booths are in use at any time. The JBC issues access codes for the voters' use. It can control up to 12 daisy-chained eSlate units.
eSlate refers to the system generally and to the device that voters use to cast ballots, unless using paper ballots, in which case Ballot Now is used. The eSlate may be equipped with a disabled access unit ("DAU") for use by disabled voters. The eSlate units are physically connected to the JBC, which stores cast-vote records.
Tally is a software application that reads, stores, and tabulates the cast-vote records from the MBB (the portable flash card that transferred the cast-vote records from the JBC). Tally tabulates all early voting, absentee, and election day results, and produces various reports.
Rally is a software application that is capable of reading, storing, and transferring cast-vote data from polling places or collection centers with respect to early returns.
The System for Election Records and Verification Operations ("SERVO") software is an election records archiving and asset management system. SERVO is designed to recover data from equipment in the case of a lost or damaged MBB. SERVO also is designed for various recount purposes.
Ballot Now is a digital-scan paper ballot system that manages the printing, scanning, and resolution of mailed-in paper ballots. It also records the electronic cast vote records to an MBB to be read and tabulated with Tally.

*Pressley v. Casar Fifth Amended OP Contest*                                                      *p.17*

# The Recount

## Illegal Votes Counted

47.     Because of the previously noted, highly improbable statistical anomalies[13], the duplicate Ballot by Mail entries, and the fact that there are more ballots than number of voters for Early Voting (overvotes), Contestant requested a manual recount of the District 4 Election with the goal of reconciling the discrepancies.

48.     Contestant claims the recount evidence and findings are critically material to this case and the allegations are legally relevant to this election contest.

49.     The recount failed to *only* count legal votes because "images of ballots cast" were not provided and counted.   Printing the "cast vote record" or "CVR" data files was in essence reprinting the previous electronically counted results obtained on Election night.   A CVR prints data from a data file to a template; it does not count the "images of ballots cast" – it merely reprints the tally on separate sheets of paper.   It was not recounting the source data of the "images of ballots cast," and as such it is not a meaningful check on the original count.[14]   Using the CVR

---

[13] *See* Appendix 8.

[14] The Secretary of State is somewhat unclear on this issue.  While "images of ballots cast" could be considered as a subset of the category "cast vote records," the CVRs in this case are not, in fact, images.  In logical terms, the expression would be that just because all A are B does not mean all B are A.  (All dogs are animals, but not all animals are dogs.)  In its 2014 Electronic Voting System Procedures bulletin, posted online at http://www.sos.state.tx.us/elections/laws/electronic-voting-system-procedures.shtml, the SOS appears to not clearly differentiate cast vote records from ballot images.  *See, e.g.*, Section 8:

**Section 8 – Requested Recounts (if necessary)**
**Requested Recount on DRE Voting Systems (Pursuant to TEC § 214.071):**
1. The candidate requesting a recount may request that the recount be done electronically or manually.
2. For an electronic recount, the persons specifically permitted by law to be present at the recount are also authorized to be present as the election media are reloaded into the central accumulator system.
3. For a manual recount of a DRE election, the Recount Coordinator shall organize the printing of cast vote records (ballot images) for the affected race or issue.

instead of ballot image also appears to violate Texas Election Code 214.049 (e): "If electronic voting system ballots are to be recounted manually, the original ballot, rather than the duplicate of the original ballot, shall be counted." Ballots are defined in Texas Election Code Chapter 52, Subchapter C.[15]

50.    On Sunday January 4, 2015, prior to the Recount, Pursuant to TEX. ELEC. CODE § 213.016, "PRINTING IMAGES OF BALLOTS CAST USING DIRECT RECORDING ELECTRONIC VOTING MACHINES," Dr. Pressley communicated over the phone with the the Travis County Clerk. Pressley informed the Clerk that she desired to be present during the printing of images of ballots cast. "Each candidate is entitled to be present and to have representatives present in the

a.    The Recount Coordinator shall notify the parties in the recount of the date, place, and time the printing of cast vote records (ballot images) will take place.
b.    The full recount committee is not required to be present at the printing of cast vote records (ballot images) and the Recount Chair shall determine how many members should be present. The persons specifically permitted by law to be present at the recount are entitled to be present as the cast vote records (ballot images) are printed and to have the same number of representatives as allowed for the recount.
c.    If the manual recount does not take place immediately after the printing of the cast vote records (ballot images), the printed cast vote records (ballot images) shall be locked and secured until the recount takes place.
d.    A manual count of the printed cast vote records (ballot images) shall be conducted in the same manner as a recount of hand-counted paper ballots.
After the recount is complete, the printed cast vote records (ballot images) shall be secured and preserved for the appropriate preservation period for maintaining election records.
[15] For the purposes of this suit, the most salient portions of that subchapter are Sec. 52.003 and Sec. 52.070.
Sec. 52.003. PLACING CANDIDATE'S NAME ON BALLOT. (a) Except as otherwise provided by law, the authority responsible for having the official ballot prepared shall have placed on the ballot *the name of each candidate*:...
Sec. 52.070. VOTING SQUARE AND INSTRUCTION FOR CANDIDATES. (a) A square for voting shall be printed to the left of *each candidate's name* on a ballot.
(b) Immediately below "OFFICIAL BALLOT," the following instruction shall be printed: "Vote for the candidate of your choice in each race by placing an 'X' in the square beside the candidate's name."
...
(e) A square shall be printed to the left of each line provided for write-in voting under Section 52.066(c), but failure to place a mark in the square does not affect the counting of a write-in vote. (*emphasis* added.)

same number as prescribed by Section 213.013(b) for a recount during the printing of the images."

The next day, January 5, 2015, Pressley sent an email to the Travis County Clerk and copied to the Texas Secretary of State's Office, to the same effect.

51. In addition, on January 5, 2015, Dr. Pressley communicated over the phone with the Director of Travis County Elections Division. Pressley informed the Director that she desired to be present during the printing of images of ballots cast. An email was sent to The Travis County Clerk and copied to the Texas Secretary of State's Office, to the same effect.

52. On 6, 2015, a "manual recount," which did not use "images of ballots cast" for the "direct recording electronic voting machines," was conducted and additional irregularities ensued with regard to and during the recount.

**No "Images of Ballots Cast" for Recount—Illegal Votes Counted**

53. On Tuesday, January 6, 2015, at 11:00 a.m. (*See* Appendix 12) when the recount was to begin, the Travis County Clerk and the Recount Committee relayed to Contestant and her official recount watcher, Karen Renick, that images of ballots cast were not available, would not be printed, and would not be used for the recount.[16] Dr. Pressley expressly stated, in her "Petition Requesting a Recount," and "Amended Petition Requesting a Recount" that "[w]e are requesting a manual recount of the results using the actual, stored, ballot images." (See Appendix 11.) Pressley also expressly requested "a manual (by-hand) count." "[T]he election code expressly provides for the 'printing of images of ballots cast using direct recording electronic voting machines for the purpose of a recount.' *See id.* § 213.016." *Andrade v. NAACP of Austin*, 287 S.W.3d 240, 258 (Tex. App. Austin 2009), *rev'd on other grounds* by *Andrade v. NAACP of Austin*, 345 S.W.3d 1 (Tex. 2011). Failure to print images of ballots violates this provision of the

---

[16] *See* attached Appendix 13, Affidavit of Karen Renick, with Exhibits 1 & 2.

election code.

## Printing errors

54.    Prior to the start of the Recount, Travis County selected the data files to print and pre-printed an aggregated data file of Cast Vote Records ("CVRs"). The pre-printed CVRs contained a fractional subset of the data that a District 4 ballot contains. Upon starting the recount on January 6, 2014 around 11:00am, Contestant relayed to the Travis County Clerk and the Recount Committee, that not providing printed images of ballots cast was a violation of Tex. Elec. Code § 213.016.

55.    Cast Vote Records are not "images of ballots cast." Ballots are defined in Texas Election Code Chapter 52, Subchapter C.[17]

56.    At the same meeting, Dr. Pressley stated that the pre-printing of recount records and starting the recount process was also a violation of 213.016 and 213.009(c), respectively. A member of the recount committee responded to one of the recount watchers: "They started all this on Sunday [January 4, 2015]."

57.    Pressley warned the County Clerk that the irregularities, of not printing the images of

---

[17] For the purposes of this suit, the most salient portions of that subchapter are Sec. 52.003 and Sec. 52.070.
Sec. 52.003. PLACING CANDIDATE'S NAME ON BALLOT. (a) Except as otherwise provided by law, the authority responsible for having the official ballot prepared shall have placed on the ballot *the name of each candidate*:…
Sec. 52.070. VOTING SQUARE AND INSTRUCTION FOR CANDIDATES. (a) A square for voting shall be printed to the left of *each candidate's name* on a ballot.
(b) Immediately below "OFFICIAL BALLOT," the following instruction shall be printed: "Vote for the candidate of your choice in each race by placing an 'X' in the square beside the candidate's name."
…
(e) A square shall be printed to the left of each line provided for write-in voting under Section 52.066(c), but failure to place a mark in the square does not affect the counting of a write-in vote. (*emphasis* added.)

ballots cast, were in violation of the approved amended Petition for Recount and the Texas Election Code and was grounds for an Incident Report. Printing the CVR data files was in essence reprinting the previous electronically counted results obtained on Election night. A CVR is a printing of a data file to a template – it does not "count" the images of ballots – it merely reprints the tally on separate sheets of paper. It was not recounting the source data of the "images of ballots cast," and as such it is not a meaningful check on the original count.[18] Using the CVR instead of ballot image also appears to violate Texas Election Code 214.049 (e): "If electronic voting system ballots are to be recounted manually, **the original ballot**, rather than the duplicate

_____

[18] Secretary of State is somewhat unclear on this issue. While "images of ballots cast" could be considered as a subset of the category "cast vote records," the CVRs in this case are not, in fact, images. In logical terms, the expression would be that just because all A are B does not mean all B are A. (All dogs are animals, but not all animals are dogs.) In its 2014 Electronic Voting System Procedures bulletin, posted online at http://www.sos.state.tx.us/elections/laws/electronic-voting-system-procedures.shtml, the SOS appears to not clearly differentiate cast vote records from ballot images. *See, e.g.*, Section 8:

**Section 8 – Requested Recounts (if necessary)**
**Requested Recount on DRE Voting Systems (Pursuant to TEC § 214.071):**
4. The candidate requesting a recount may request that the recount be done electronically or manually.
5. For an electronic recount, the persons specifically permitted by law to be present at the recount are also authorized to be present as the election media are reloaded into the central accumulator system.
6. For a manual recount of a DRE election, the Recount Coordinator shall organize the printing of cast vote records (ballot images) for the affected race or issue.
a. The Recount Coordinator shall notify the parties in the recount of the date, place, and time the printing of cast vote records (ballot images) will take place.
b. The full recount committee is not required to be present at the printing of cast vote records (ballot images) and the Recount Chair shall determine how many members should be present. The persons specifically permitted by law to be present at the recount are entitled to be present as the cast vote records (ballot images) are printed and to have the same number of representatives as allowed for the recount.
c. If the manual recount does not take place immediately after the printing of the cast vote records (ballot images), the printed cast vote records (ballot images) shall be locked and secured until the recount takes place.
d. A manual count of the printed cast vote records (ballot images) shall be conducted in the same manner as a recount of hand-counted paper ballots.
After the recount is complete, the printed cast vote records (ballot images) shall be secured and preserved for the appropriate preservation period for maintaining election records.

of the original ballot, shall be counted." **(Emphasis added.)**

58. Contestant requested to conditionally proceed with the Recount and re-print the available CVR data files.

59. Pursuant to TEX. ELEC. CODE § 213.007, the machines, materials, programs, and records may be available to the Recount Committee. Pursuant to TEX. ELEC. CODE § 213.013(h), each person entitled to be present at a recount is entitled to observe recount activities. Contestant was not allowed to view the full recount process and how the recount data was selected from the electronic voting machines. The CVR data files were identified, isolated and pre-selected prior to the beginning of the Recount. Contestant requested to view the source and properties of the CVR files, such as dates of the CVR files and origination, and was denied by the Recount Committee Member, the Travis County Director of Elections, Michael Winn.

**Recount Precinct Returns—Illegal Votes Counted**

60. Pursuant to TEX. ELEC. CODE § 214.002, counting procedures for a recount shall be certified in the same manner as the original count. Pursuant to TEX. ELEC. CODE § 65.014(b)(1), the procedures for preparing the original precinct returns must state the total number of voters who voted at the polling location as indicated by the poll list. Poll lists were not apparently reviewed by the Recount Committee during the recount. Dr. Pressley requested the poll lists to be reviewed and the number voters per precinct be reconciled with those documented on the polling location combination sign-in forms. Pressley requested those numbers be reconciled with the recount results, because of Early Voting voter lists discrepancies identified in the Recount Petition. The request was denied by the Travis County Clerk, the Chair of the Recount Committee, and the Director of Travis County Elections. The request was also specifically made prior to the recount in the Amended Petition for Recount (*See* Attached Appendix 11, Amended Petition for Recount.)

61.     Pursuant to Tex. Elec. Code § 213.012, the committee chair prepared a report of the vote count.  The Travis County Clerk and the Director of the Elections Division repeatedly informed Dr. Pressley that "it was not the scope of the Recount" to reconcile the ballots with the number of voters.  The chair wrote, "The numbers of voters matched the number of ballots cast," and signed the report (*See* Attached Appendix 14, "Recount Affidavit of Jay Brim").  During the Recount, the numbers of voters on voter lists were not publicly reconciled with the ballots recounted by the chair.   Dr. Pressley commented to the chair, "Matching the numbers was not supposedly done today," and no explanation was provided by the chair.

62.     On January 5, 2015,  the Mayor of Austin and City Clerk approved Contestant's  amended petition requesting a manual recount of actual stored "images of ballots cast."[19]  Contestant's amended petition included a request to reconcile the ballots cast with the number of voters documented on the sign in sheets and combination forms for District 4 for the countywide polling locations and Precincts to ensure accurate reporting of results.  The <u>number of voters recorded</u> and the <u>number of votes recorded did not match</u>.

### Ballot by Mail Ballots Are The Only Legal Ballots That Are Properly Preserved

63.     This is why printing the "images of the ballots cast" is critical.  The ballot in the General Election was very different (8 candidates) from the ballot in the Run Off (2 candidates).  If some memory cards or counting software were reused by mistake, then the "images of the ballots cast" will instantly and unmistakably distinguish the true votes from the illegal votes.  This is the intent of the

---

[19] Texas Election Code §213.016.
Sec. 213.016. PRINTING IMAGES OF BALLOTS CAST USING DIRECT RECORDING ELECTRONIC VOTING MACHINES.  During any printing of images of ballots cast using direct recording electronic voting machines for the purpose of a recount, the full recount committee is not required to be present.  The recount committee chair shall determine how many committee members must be present during the printing of the images.  Each candidate is entitled to be present and to have representatives present in the same number as prescribed by Section 213.013(b) for a recount during the printing of the images.

"images of ballots cast" language of the law. Which ballots were counted is the question that can be answered only by review of the "images of ballots cast."

64.     The mandatory nature of this requirement becomes clear in context.

> [W]e believe that violations of certain recording provisions by election clerks can certainly undermine the purpose of the election code and obscure the true will of the qualified voters.

*Gonzalez v. Villareal*, 251 S.W.3d at 778

65.     Failure to retain "image of ballots cast," "ballots" and or "ballot originals" is precisely such a violation, because there is no clear and unequivocal record of the voter's intent, absent such an image.

66.     Given the facts and the election mistakes made by Travis County election officers, all of the **4,023 votes** that show to be cast in person, are in question and must be verified. Therefore, we ask the Court to compel Travis County to print and tally the "images of ballots cast" for the District 4 Run Off so the court may ascertain whether the outcome as shown by the canvass is not the true outcome because illegal votes were counted. The list of the **4,023 voters** and their Voter ID's are provided in Appendix 15.

67.     The recount included the Ballot by Mail ballots, and those specific results for Pressley and Casar were determined.[20] Ballot by Mail Votes were cast in seventeen of the eighteen precincts of District 4.[21] Pressley received 240 votes and Casar received 240 votes of the 480 total votes cast for either candidate for the Ballot by Mail ballots. Pressley received *exactly* 50% of the votes.

68.     The Ballot by Mail result is very different from the 33.3 and 33.8% Pressley is reported to have received for early voting and election day voting from the "cast vote records" – a variation from mail-in votes and non-mail-in votes of almost 20% (*See* attached Appendix 3, "Recount

---

[20] *See* attached Appendix 3, "Recount Results."

[21] One precinct, with a population of a single voter, showed no votes.

Results").

69.     The only actual "ballots" that were preserved and counted during the recount show Pressley and Casar split the vote exactly in half. Moreover, 10 of the 18 precincts showed 50% or more of the vote for Pressley. The Ballot by Mail ballots that were cast for either candidate (total of 480 votes) were over 10% of the total ballots cast for the Run Off election.

70.     The 480 Ballot by Mail ballots are the only " ballots," as that term is defined in the Election Code, which were available and counted during the recount.   Therefore, the election should have been re-canvassed only with the 480 Ballot by Mail "ballots" and not the results including the 4,023 illegally recounted "cast vote records."

71.     This is an additional reason for the court to compel the Travis County Clerk to comply with TEX. ELEC. CODE § 213.016[22] and 214.049 (e)[23] to print and count the statutorily required "images of ballots cast" and ascertain whether the previous outcome of the election is not the true outcome.

72.     On January 6, 2015, the recount was conducted and completed.   After the recount, the totals were unchanged as compared to the original canvassed results.   The totals were Laura Pressley 1,563, Gregorio "Greg" Casar 2,854 for a total of 4,417 votes cast.

73.     Reconciliation of voter signatures on rolls at polling locations and total ballots cast has not been completed.   An election contest is the only available remedy to explore the discrepancy between the number of ballots counted and the number of voter names and signatures in the precincts.

74.     The sum total of all voting irregularities identified herein exceeds the number of votes by

---

[22] "PRINTING IMAGES OF BALLOTS CAST USING DIRECT RECORDING ELECTRONIC VOTING MACHINES"
[23] "If electronic voting system ballots are to be recounted manually, the original ballot, rather than the duplicate of the original ballot, shall be counted."

which the election was decided.

75. If no "images of ballots cast" can be retrieved, printed and counted, Travis County cannot unequivocally determine the outcome of the election. The Court may order each of the more than 4,000 voters who voted in person to testify as to how they voted, pursuant to Texas Election Code Sec. 221.010. "SECONDARY EVIDENCE FOR UNAVAILABLE BALLOTS. If an examination of ballots is needed in an election contest and the ballots are lost, destroyed, or otherwise beyond the reach of the tribunal, the voters who cast the ballots may testify as to how they voted."

76. In the alternative, if Travis County cannot produce "images of ballots cast" to be printed and counted, then Travis County cannot unequivocally determine the outcome of the election, and the election is void. As a matter of law, the Court must therefore order a new election. TEX. ELEC. CODE § 232.041.[24]

## VII. PETITION TIMELY FILED

77. This Election Contest is brought in accordance with the provisions of TEX. ELEC. CODE §232.008, which requires the Original Petition to be filed with the District Court not later than the 30th day after the date the official result of the contested election is determined.

78. On Tuesday, December 30th, the Mayor and City Council of Austin conducted an official canvass and certification of the Run Off results for all races on the December 16, 2014 ballot, including District 4. However a recount was conducted on January 6, 2015 and those results did not change. The deadline for submission of a petition in an election contest is January 29, 2015. The original petition was filed on or before that date and was timely filed.

---

[24] Sec. 232.041. NEW ELECTION ORDERED IF CONTESTED ELECTION VOID. In an election contest in which the contested election is declared void, the court shall include in its judgment an order directing the appropriate authority to order a new election.

## VIII. CONDITIONS PRECEDENT

79.    All conditions precedent have been performed or have occurred.


## IX. VIOLATIONS OF LAW

*Texas Election Code Violation*

<u>Lack of Notice of Relocation of Polling Place</u>

82.    The facts asserted above are included herein by reference. Contestant claims that voters were disenfranchised due to the failure of Travis County to provide and/or maintain an adequate notice at the general election polling place (Highland Mall and other voting locations identified herein) detailing the relocation of the polling place to the Travis County offices for the runoff election in December 2014. Such failure to provide notice of relocation of the polling place for the runoff election is a violation of Texas Election Code § 43.062. Section 43.062 states:

> Sec. 43.062. NOTICE AT PREVIOUS POLLING PLACE. If the location of the polling place for an election precinct is different from the location used for the precinct in the preceding election ordered by the same authority, the authority responsible for giving notice of the election shall, if possible, post notice at the entrance to the previous polling place stating that the location has changed and providing the location of the new polling place.
>
> Added by Acts 2001, 77th Leg., ch. 802, Sec. 1, eff. Sept. 1, 2001.

Contestant seeks an order requiring a vacation of the runoff election and an order requiring a properly noticed runoff election be held forthwith.


<u>Failure to Provide "Images of Ballots Cast"</u>

83.    Contestant asserts that the December 2014 runoff fails to comply with the statutory requirements of the Texas Election Code Chapters 128 and 213. Section 128.001 states:

> Sec. 128.001. COMPUTERIZED VOTING SYSTEM STANDARDS.

(a) The secretary of state shall prescribe procedures to allow for the use of a computerized voting system. The procedures must provide for the use of a computerized voting system with:

(1) multiple voting terminals for the input of vote selections on the ballot presented by a main computer; and

(2) a main computer to coordinate ballot presentation, vote selection, *ballot image storage*, and result tabulation.

84. Section 213.016 states:

Sec. 213.016. PRINTING IMAGES OF BALLOTS CAST USING DIRECT RECORDING ELECTRONIC VOTING MACHINES.

During any printing of *images of ballots cast* using direct recording electronic voting machines for the purpose of a recount, the full recount committee is not required to be present. The recount committee chair shall determine how many committee members must be present during the printing of the images. Each candidate is entitled to be present and to have representatives present *during the printing of the images* in the same number as Section 213.013(b) prescribes for watchers for a recount.

Added by Acts 2003, 78th Leg., ch. 583, Sec. 2, eff. Sept. 1, 2003.
Amended by:
        Acts 2009, 81st Leg., R.S., Ch. 1235 (S.B. 1970), Sec. 22, eff. September 1, 2009.

85. As asserted above, the Travis County Clerk cannot provide "images of ballots cast" for purposes of a recount in the December runoff election as required by the Texas Election Code. Because the Travis County Clerk cannot produce "images of ballots cast", the ballots cast on the electronic voting machines cannot be verified. Contestant seeks an order from this case vacating the December 2014 runoff election. Since the only verifiable votes in the December runoff are the ballots by mail, said votes resulting in a tie in the runoff, Contestant seeks an order from this Court directing that another runoff election be conducted and that the Travis County Clerk provide "images of ballots cast" in such a runoff election for purposes of allowing all affected parties to verify the results of said runoff in compliance with the above-referenced provisions of

the Texas Election Code.

*Violation of Section 2 of the Federal Voting Rights Act*

86.    Contestant asserts that failure to provide notice at the general election polling place of the relocation of the polling place for the runoff has a disproportionate impact on minority voters in violation of Section 2 of the Voting Rights Act. 42 U.S.C. §§ 1973b(f), 1973l(c)(3)) (now 52 USC 10303) bars voting discrimination against certain language minorities--specifically, persons of American Indian, Asian American, Native Alaskan, and Spanish heritage.  Members of the protected class of Spanish heritage in Precincts 142 and 156 (Appendix 1) were disenfranchised by the confusion created by the lack of notice of the change in polling place for the December 2014 runoff election.  Contestant seeks an injunction from this Court pursuant to 42 U.S.C. §1983 vacating the runoff election and requiring a new runoff election forthwith.

## IX. MOTION TO MODIFY STANDARD DISCOVERY PROCEDURES

87.    Pursuant to Texas Rule of Civil Procedure 191.1, Contestants request that the Court sign an order shortening the time allowed for Contestee to comply with the discovery requests set forth below to no more than fifteen days.

88.    Pursuant to Texas Rule of Civil Procedure 191.1, Contestants request that the Court sign an order shortening the time allowed for Contestee and third-party witnesses, voters, the City of Austin and Travis County, to comply with the discovery requests set forth below in paragraph to no more than ten days, and that the period of notice required for Deposition on Written Questions be reduced to ten days.

89.    Contestants further requests that the Court sign an order requiring that Contestee's

response to the request for disclosure, and all other responses and answers in this case be hand-delivered, faxed or emailed.

90.    The foregoing modifications to standard discovery procedures are necessary because of the accelerated procedures that apply to this election contest. The foregoing reasons constitute good cause for the requested relief.

## X. RESPONSE TO SPECIAL EXCEPTIONS

### Introduction

91.    Dr. Pressley has found indisputable election irregularities and mistakes that were made in conducting the District 4 election held on December 16, 2014 that show the outcome as shown by the final canvass is not accurate and she is bringing this election contest. Because illegal votes were counted, eligible voters were prevented from voting, legal votes were not counted, and Travis County election officers made errors and mistakes, Dr. Pressley is asking, pursuant to Section 221.003 (a), for the "court to ascertain whether the outcome of the District 4 Run Off election, as shown by the canvass, is not the true outcome." If a contestant is prevented by the county clerk from proving the actual number of legal votes by the clerk's act of not preserving or requiring or counting images of the ballots actually cast there is no way to conclude the clerk reported the true outcome . Without the images of the actual ballots there is not a true outcome and the run-off election must be repeated preserving the images of the ballots cast as provided and required by state law.

92.    Contestee alleges Dr. Pressley is attacking the entire state-wide electronic-voting system. In fact, the contest is limited solely to the discrete errors made by the Travis County Clerk's office in this single election. All counties are capable of complying with the law and preserving images of the actual ballots cast by a voter. Travis county just elected to ignore that law and the sound public

policy behind it. It cannot certify a true outcome by reason of its own misconduct in this election that is at issue in this case.

93. Weaknesses in the Travis County Election systems are well known and have been extensively identified. Several years ago, Travis County Clerk Dana DeBeauvoir herself convened a Travis County Clerk Election Study Group to evaluate Travis County's current voting system and make recommendations for future systems. (http://www.traviscountyclerk.org/eclerk/content/images/presentations_articles/pdf_tc_elections_E SG_Report_2009.pdf) Clerk DeBeauvoir had determined that a study group was needed to address public concerns about electronic voting and to ensure ample time to plan for an upgrade or replacement of the existing system and "its most significant recommendation is that Travis County move away from an all-electronic voting system to one that offers electronically-counted paper ballots." Clerk DeBeauvoir is on record stating the need to redesign and replace Travis County's voting systems: (http://www.traviscountyclerk.org/eclerk/content/images/presentations_articles/pdf_tc_elections_2 013.07.26_star.pdf and https://www.supportthevoter.gov/files/2013/09/Dana-Debeauvoir-STAR-Voting-System-Diagram.pdf and "Three years ago, DeBeauvoir decided that something had to change. "I said, 'Okay, I'm fed up. I'm going to design my own system.'" Part of her frustration stemmed from complaints lodged against the county that she felt blamed officials for things beyond their control."( https://www.texastribune.org/2014/07/09/travis-county-forges-new-territory-voting-machines/):

94. Given the specific voting irregularities outlined herein, Dr. Laura Pressley fully supports the Clerk's search for a more accountable and election system. One critical component that the Travis County system is lacking is that Texas Election Code allows for a manual recount using

"images of ballots cast." When Pressley requested a manual recount using "images of ballots cast" for the District 4 Run Off election, Travis County is on record stating they cannot comply. Interestingly, in January 2015, Pressley was informed both by DeBeauvoir and former Travis County Judge Bill Aleshire that no other candidate in Travis County's history had requested a manual recount of "images of ballots cast." A review of reported cases shows no indication that any candidate in the state has requested such a statutorily-allowed recount. This contest, therefore, to the extent it decides issues regarding this mandate and this language, is a case of first impression.[25]

---

[25] The court will, of course, be guided by the Texas Supreme Court's view of statutory language, which is not as fluid as that of federal courts or other state courts.

> **If** the statutory text is **unambiguous**, a court **must** adopt the interpretation supported by the statute's **plain language** unless that interpretation would lead to absurd results. *See Tune v. Tex. Dep't of Pub. Safety*, 23 S.W.3d 358, 363 (Tex.2000) ("We must enforce the **plain meaning** of an unambiguous statute."); *RepublicBank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex.1985) ("Unless a statute is ambiguous, we must follow the **clear language** of the statute."); *Brazos River Auth. v. City of Graham*, 163 Tex. 167, 354 S.W.2d 99, 109 n. 3 (1962) ("[O]perating as we are under a strict theoretical division of governmental powers, it would take a bit of doing on the part of the judiciary to say, **in the absence of ambiguous and uncertain statement or patent and manifest absurdity**, that **the Legislature intended something different from the clear import of the words** chosen by it...."); *Gilmore v. Waples*, 108 Tex. 167, 188 S.W. 1037, 1039 (1916) (The literal meaning of a statute may be disregarded "only where it is **perfectly plain** that the **literal sense** works an **absurdity or manifest injustice**.").

*Texas Dep't of Protective and Regulatory Services v. Mega Child Care*, 145 S.W.3d 170, 177 (Tex. 2004). (emphasis added.)

*See also AIC Mgmt. v. Crews*, 246 S.W.3d 640 (Willet, J., concurring) (internal citations omitted) (citing to *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 652 n.4 (Tex. 2006) and 542 U.S. 241, 267, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004) (Scalia, J., concurring in the judgment).

> This Court recognizes that legislative intent is best embodied in legislative language. We recently cautioned that "over-reliance on secondary materials should be avoided, particularly where a statute's language is clear. If the text is unambiguous, we must take the Legislature at its word and not rummage around in legislative minutiae."

95.    With regard to the fact that Travis Count's use of one version of the Hart InterCivic eSlate system may violate the Texas Election Code requirements for storing, retrieving, and printing of "images of ballots cast," we respectfully assert any regulatory redefinition equating "images of ballots cast" with "cast vote records" exceeds the statutory grant of authority.[26] Given that the term "ballot" is defined in the Texas Election Code and "images of ballots cast" is referenced with regard to recounts and "cast vote records" are not, the Texas Election Code trumps the Secretary of State's administrative definitions.

96.    Addressing the various pieces of evidence that became available and the irregularities that occurred during the recount is important in the analysis and evaluation of this election contest. The recount evidence is critically material to this case and the allegations are legally relevant to this election contest.  Moreover, it is in the recount failures that Travis County's failure to use equipment up to statutory standards becomes clear.

97.    The legal question raised by an election contest is whether the outcome of the contested District 4 election is not, or cannot be conclusively determined to be, the true outcome. Specifically, Dr. Pressley has found that illegal votes were counted, Travis County Elections Division prevented eligible voters from voting, failed to count legal votes, and engaged in other irregularities that materially affected the election results.  Moreover, because of the failure of Travis County to maintain "images of ballots cast", the outcome cannot be determined to be the

---

Faced with clear statutory language, "the judge's inquiry is at an end."  It may be a widespread practice to mine the minutiae of legislative records to discern what lawmakers had in mind, but as we have held, relying on these materials is verboten where the statutory text is, as here, absolutely clear.

[26] We cannot construe the rule in a manner that is **inconsistent** with the **statute**. *See, e.g., Centerpoint Energy, Inc. v. Public Util. Comm'n*, 143 S.W.3d 81, 85 (Tex. 2004) (observing that rule is invalid if it violates statutory provision); *Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 657-58 (Tex. 2004)
*Tex. Mut. Ins. Co. v. Vista Cmty. Med. Ctr.*, LLP, 275 S.W.3d 538, 557, 2008 Tex. App. LEXIS 8602, 45 (Tex. App. Austin 2008) (emphasis added.)

true outcome.

## Case Law Presented by Contestee is largely irrelevant

### *Andrade v. NAACP*, 345 S.W. 3d 1 (Tex. 2011)

98.     Contestee Casar's ORIGINAL ANSWER AND SPECIAL EXCEPTIONS TO CONTESTANT'S ORIGINAL CONTEST OF ELECTION references the *Andrade v. NAACP* case, seeks to apply it to the instant case, and states that "the Secretary of State's certification of eSlate for use by Travis County did not violate equal protection rights of voters using electronic voting system."

99.     Contestee Casar misinterprets Contestant Dr. Pressley's claims in this case.   She does not assert a claim of violation of equal protection as it relates to electronic voting systems.   Rather, Contestant Dr. Pressley asserts that illegal votes were counted, election officers prevented eligible voters from voting, election officers failed to count legal votes, and election officers made mistakes that resulted in an election outcome which is not the true outcome and did not preserve images of ballots to be used as acheck on the computer results which prevented a determination that the election and the  recount was a true outcome.  Thus, the *Andrade* case is irrelevant.

100.     Contestee Dr. Pressley's election contest claims were not asserted in *Andrade v. NAACP* and Dr. Pressley has been directly harmed by Travis County's conduct during the District 4 election and she has been directly harmed by the County's inability to ascertain the true outcome because "ballots," "original ballots" and/or "images of ballots cast" cannot be counted.

### *Tex. Democratic Party v. Williams*, 285 Fed. Appx. 194, 195 (5th Cir. 2008)

101.     In CONTESTEE'S  ORIGINAL ANSWER AND SPECIAL EXCEPTIONS TO CONTESTANT'S ORIGINAL CONTEST OF ELECTION he references *Tex. Democratic Party v. Williams,* and applies it to our case with regard to "the eSlate did not violate voters' rights under

the First and Fourteenth Amendments to the United States Constitution."

102.     Contestee Casar misinterprets Contestant Dr. Pressley's claims in this case.  She does not assert claims of violations of the First and Fourteenth Amendments to the United States Constitution as it relates to electronic voting systems.     Rather, Contestant Dr. Pressley asserts, illegal votes were counted, election officers prevented eligible voters from voting, election officers failed to count legal votes, and election officers made mistakes that resulted in an election outcome which is not the true outcome and they did not preserve the images of ballots which is a possible function of the eSlate program.

103.     Additionally, as a matter of law, Dr. Pressley claims that "cast vote records" do not meet the statutory requirements of "ballots," "original ballots" and/or "images of ballots cast."  Therefore, if "images of ballots cast" were not preserved, **and thus** cannot be retrieved, printed and counted, then Travis County cannot unequivocally determine the outcome of the election.

## Conclusion

104.     Therefore, based on the foregoing, the Contestant requests the run-off election be declared void, a new run-off be held at which images of the ballots actually cast be preserved using procedures compliant with the Texas Election Code for use in the event of a contest, the Court award reimbursement for the cost of her election contest, recount fees, and that the Court grant all other and further relief, in law and in equity, to which she may be entitled.

Respectfully submitted,

David Rogers
LAW OFFICE OF DAVID ROGERS

By:     __/s/ David Rogers_____
David A. Rogers
Texas Bar No. 24014089
1201 Spyglass Drive, Suite #100
Austin, Texas 78746
512-923-1836 — Telephone
512-201-4082 — Facsimile
Email: Firm@DARogersLaw.com

Mark Cohen
805 W. 10th Street, Suite 100
Austin, Tx. 78701
512-474-4424
512-472-5444 (f)
Mark@cohenlegalservices.com
www.CohenLegalServices.com
*Attorney for Contestant Dr. Laura Pressley*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served in accordance with the Texas Rules of Civil Procedure on April 20, 2015 on counsel of record as follows:

Charles 'Chuck' Herring Jr. 09534100
cherring@herring-irwin.com
Jess Irwin - 10425700
jess@herring-irwin.com
Lauren Ross – 24092001
laurenbross@herring-irwin.com
Herring & Irwin, L.L.P.
1411 West Avenue, Ste 100
Austin, TX  78701
Phone: 512-320-0665
Fax: (512) 519-7580

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
(512) 476-6000
(512) 476-6002- Facsimile
ATTORNEYS FOR CONTESTEE,
GREGORIO "GREG" CASAR

Andrew M. Williams
Assistant County Attorney
Travis County Attorney's Office
P.O. Box  1748
Austin, Texas 78767
Phone: (512) 854-9472
Fax:     (512) 854-4808
email:  andrew.williams@traviscountytx.gov


By: ___/s/ David Rogers_____

NO. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY<br>Contestant | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§<br>§ | TRAVIS COUNTY, TEXAS |
| GREGORIO "GREG" CASAR<br>Contestee | §<br>§<br>§ | 201ST JUDICIAL DISTRICT |

## CONTESTEE'S MOTION TO STRIKE PLEADINGS AND FOR SANCTIONS

### I.

1. Contestant Pressley has failed to comply with this Court's Order of April 13, 2015, which granted Contestee Casar's special exceptions to Pressley's Fourth Amended Original Contest ("Fourth Contest"). Pressley has filed a Fifth Amended Original Contest ("Fifth Contest") that fails to comply with the Court's Order in several respects. Therefore, Casar requests that the Court strike those allegations concerning which Pressley has failed to comply. Additionally, to the extent that Pressley filed those allegations without having evidentiary support for them, as required by § 10.001(2)-(3) of the Texas Civil Practice and Remedies Code, Casar requests that this Court impose reasonable sanctions under § 10.004.

### Special Exceptions Concerning Voting Locations

2. The Court sustained Casar's special exceptions to ¶¶ 13, 14, and 17-23 of Pressley's Fourth Contest, which addressed Pressley's allegations concerning the fact that Travis County had changed some voting locations for the runoff election for District 4. As the Court will recall, such changes are routine, the voters still had 136 locations at which to vote, and Pressley had failed to appear or object at the public meeting at which the City Council approved the runoff voting locations.

3.      The Court ruled on these points as follows:

> 1. Casar's Special Exception to ¶ 13 of the Contest is SUSTAINED. Contestant Pressley shall plead *facts showing illegal or otherwise improper changes* in voting locations, and shall *specifically identify the names, addresses, and precincts of the voters who were allegedly unable to vote* because of the changes.
>
> 2. Casar's Special Exception to ¶ 14 of the Contest is SUSTAINED. Contestant Pressley shall plead *facts showing illegal or otherwise improper changes* in voting locations, and shall *specifically identify the names, addresses, and precincts of the voters who were allegedly unable to vote* because of the changes.
>
> 3. Casar's Special Exception to ¶¶ 17 through 23 of the Contest is SUSTAINED. Contestant Pressley shall plead *the names, addresses, and precincts of the voters who were actually prevented from voting at the new polling locations* due to the consolidations.

(Emphasis added.) Pressley's Fifth Contest fails to comply with the Court's Order. Instead, Pressley claims to have attached a raw list of 1,108 voters who Pressley alleges often vote in District 4 but did not vote in the runoff. In fact, no such list is attached to the Fifth Contest. Thus, Pressley has failed to identify the names, addresses, and precinct numbers of the allegedly disenfranchised voters. Even if such a list existed, it would not show any name of a single voter who was "*actually prevented from voting*"—which is what this Court ordered—at the 136 voting locations that were available. Pressley's position on voter disenfranchisement is so extreme that she testified in her deposition that if a voter had to drive *20 seconds* to reach the new voting location, the resulting "inconvenience" constituted disenfranchisement.[1] This Court should strike ¶¶ 13, 14, and 17-23 of the Fifth Contest.

## Special Exception Concerning Voters Who Moved

4.      The Court sustained Casar's special exceptions to ¶ 24 of Pressley's Fourth Contest, concerning Pressley's allegations that certain voters who voted in the runoff election had moved out of their precinct. That allegation was legally flawed on its face because §

---

[1] Laura Pressley Deposition, 100:8-101:9 (attached as Exhibit A).

63.0011(b) of the Election Code allows a voter to vote in the former precinct if the voter still lives within the county. Thus, the Court ruled as follows:

> 4. Casar's Special Exception to ¶ 24 of the Contest is SUSTAINED. Contestant Pressley shall plead *which of the 66 voters had moved out of the county* before the runoff election, and shall *specifically identify the names, addresses, and precincts of the voters who allegedly had moved out of Travis County or out of the City of Austin before the runoff election.*

(Emphasis added.) Pressley claims that she attached a list of 64 voters "who had moved, no longer resided in District 4, or had some other residency issues, and may not have been eligible to vote in the District 4 Run Off Election." In fact, no such list is attached to the Fifth Contest. Even if such a list existed and was attached to the Fifth Contest, it would fail to identify the 66 voters who allegedly had moved out of the City or County. The Court should strike ¶ 24 of the Fifth Contest.

### Special Exception Concerning Voters Who Voted In The Runoff But Not The General Election

5. The Court sustained Casar's special exceptions to ¶ 25 of Pressley's Fourth Contest, concerning Pressley's allegations that certain voters voted in the runoff election but not the general election. Voters are entitled to do exactly that. Thus, the Court's ruling was as follows:

> 5. Casar's Special Exception to ¶ 25 of the Contest is SUSTAINED. Contestant Pressley shall plead *how the 156 votes who allegedly voted in the runoff election but not in the general election are illegal,* and shall *specifically identify the names, addresses, and precincts of the allegedly illegal voters.*

(Emphasis added.) Pressley's Fifth Contest completely fails to identify how the runoff votes were illegal or to identify the voters. She claims that she attached a list of 156 voters but no such list is attached to the Fifth Contest. The Court should strike ¶ 25 of the Fifth Contest.

## Special Exceptions Concerning Alleged Recount Irregularities

6.     The Court sustained Casar's special exceptions to ¶¶ 41 through 66 of Pressley's Fourth Contest concerning alleged irregularities in the recount process. This is an election contest, not a recount contest. Thus, the Court ruled as follows:

> 7.     Casar's Special Exceptions to ¶¶ 41 through 66 of the Contest are SUSTAINED. Contestant Pressley shall *plead to state specifically how each allegation concerning the recount shows that the runoff election was not the "true outcome" as opposed to showing that some error allegedly occurred during the recount.*

(Emphasis added.) Pressley's Fifth Contest fails to state specifically how any alleged recount error showed that the runoff election result was not the "true outcome." The Court should strike ¶¶ 41 through 66 of the Fifth Contest.

## Sanctions Request

7.     Pressley and her counsel had very specific, mandatory duties before they filed this lawsuit. Section 10.001 of the Texas Civil Practice and Remedies Code provides in relevant part:

§ 10.001. Signing Of Pleadings And Motions.

The signing of a pleading . . . constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, *formed after reasonable inquiry*:

> (1) the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> (2) *each claim, defense, or other legal contention in the pleading* or motion is *warranted by existing law or by a nonfrivolous argument* for the extension, modification, or reversal of existing law or the establishment of new law;
> (3) *each allegation or other factual contention in the pleading* or motion *has evidentiary support* or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

(Emphasis added.) As shown by Pressley's failure to comply with this Court's April 13 Order, as described above, Pressley and her counsel filed pleadings that in several respects were legally frivolous and factually unsupported. Section 10.004 provides for sanctions in exactly this situation:

> § 10.004. Violation; Sanction.
>
> (a) A court that determines that *a person has signed a pleading* or motion *in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both.*
> (b) The sanction must be limited to what is sufficient to deter repetition of the conduct or comparable conduct by others similarly situated.
> (c) A sanction may include any of the following:
> (1) a directive to the violator to perform, or refrain from performing, an act;
> (2) an order to pay a penalty into court; and
> (3) an order to pay to the other party the amount of the reasonable expenses incurred by the other party because of the filing of the pleading or motion, including reasonable attorney's fees.
> (d) The court may not award monetary sanctions against a represented party for a violation of Section 10.001(2).

Accordingly, Casar requests that the Court impose appropriate sanctions under Section 10.004 of the Texas Civil Practice and Remedies Code.

Casar requests that the Court strike Pressley's pleadings as described above, impose appropriate sanctions, and grant other appropriate relief.

Respectfully submitted,

HERRING & IRWIN, L.L.P.
1411 West Avenue, Suite 100
Austin, Texas 78701
(512) 320-0665
(512) 519-7580 – Facsimile


By: /s/ Charles Herring, Jr.
Charles Herring, Jr. – 09534100
cherring@herring-irwin.com
Lauren Ross – 24092001
laurenbross@gmail.com

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas   78731
(512) 476-6000
(512) 476-6002 – Facsimile

Jessica Palvino – 24048780
jpalvino@mcginnislaw.com
McGINNIS LOCHRIDGE & KILGORE
600 Congress Ave., Ste. 2100
Austin, Texas   78701
(512) 495-6079
(512) 505-6379 – Facsimile

ATTORNEYS FOR CONTESTEE,
GREGORIO "GREG" CASAR

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing Contestee's Motion to Strike Pleadings and for Sanctions has been delivered to counsel for Contestant by electronic service through the electronic filing manager, or if counsel is not registered with the electronic filing manager, by email, to Mr. Mark Cohen, 805 W. 10th, #100, Austin, Texas 78701 and Mr. David A. Rogers, Law Office of David Rogers, 1201 Spyglass Drive, Suite #100, Austin, Texas 78746, on this 23rd day of April, 2015.


      /s/ Charles Herring, Jr.
      Charles Herring, Jr.

CAUSE NO. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY, | ) | IN THE DISTRICT COURT |
| Contestant, | ) | |
| | ) | |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| GREGORIO "GREG" CASAR, | ) | |
| Contestee. | ) | 201ST JUDICIAL DISTRICT |

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF

LAURA PRESSLEY

April 16, 2015

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF LAURA PRESSLEY, produced as a witness at the instance of the Contestee, and duly sworn, was taken in the above-styled and numbered cause on the 16th of April, 2015, from 9:39 a.m. to 3:52 p.m., before Heidi Morrison, CSR, RPR, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Travis County Clerk's Office, Conference Room 222, 1000 Guadalupe, Austin, Texas 78701, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

EXHIBIT

A

485

reasoning is of why they would not look it up or why --
I can't speculate.

Q    (By Mr. Herring)  Well, a while ago, you said
that, though.  You said if it's inconvenient and because
of the inconvenience and the change, they don't vote.

A    Yeah, but there's a lot of -- sorry.  I'll let
you finish.

Q    Is that -- I'm just asking you, in -- if you
assume that a voter says -- has this mental process:
"I'm here at Highland Mall.  I see that this is closed.
I see I can go vote down here at 5501 Airport Boulevard,
take me three minutes, but I don't want to do it.
That's inconvenient."

As you use the term, is that voter
disenfranchised?

MR. COHEN:  Objection.  Form.

A    Yes.

Q    (By Mr. Herring)  Okay.  And suppose it was
one minute and the voter says, "One minute.  It's going
to take me one minute to drive there.  That's
inconvenient."  Is that voter disenfranchised, as you
use the term?

MR. COHEN:  Objection.  Form.

A    Yes.

Q    (By Mr. Herring)  Suppose it's 20 seconds and

11:44:11

11:44:20

11:44:35

11:44:52

11:45:01

11:45:09

the voter has the same thing. Would that voter be
disenfranchised, as you use the term?

MR. COHEN: Objection. Form.

A    If they -- if there's a reason that they don't
want to do it.

Q    (By Mr. Herring)  It's inconvenient. That's
the reason.

A    For whatever reason, they're disenfranchised.

Q    Okay.

MR. COHEN: What if they're walking,
Chuck?

THE WITNESS: What if they're in a
wheelchair --

MR. HERRING: They're fine.

THE WITNESS: -- and there's no
sidewalks. Okay?

MR. HERRING: Guys, come on.

THE WITNESS: What if they're walking,
there's no sidewalks?

MR. HERRING: Really.

MR. COHEN: We'll talk about this later.

MR. HERRING: You guys.

MR. COHEN: We'll talk about this later.

MR. HERRING: Yeah, we shall.

Q    (By Mr. Herring)  Are you aware that the City

11:45:11

11:45:21

11:45:34

11:45:38

11:45:41

11:45:47

**From:** Mark Cohen
**To:** Charles Herring; "Dan Mills"; Warren Vavra
**Cc:** Andrew Williams; firm@darogerslaw.com; Sherine Thomas; Pat Kelly; "Lauren Ross"; "Kurt Kuhn"; "Palvino, Jessica B."
**Subject:** RE: Pressley - Casar
**Date:** Friday, April 24, 2015 1:46:34 PM

I will review the discovery docs and your agreement to stipulate to the admissibility of the county's production. If I think I need any other testimony from the county to respond to your motion I will ask you to stipulate to it and if you feel that you cannot do that I will do my job as an attorney and get the evidence I think I need in admissible form and assert my right to do so before a summary judgment is set or considered. That is the best I can do to accommodate everyone's goal to expedite a final decision while still doing so based on all the available evidence

**Mark Cohen**
**805 W. 10th Street, Suite 100**
**Austin, Tx. 78701**
**512-474-4424**
**512-472-5444 (f)**
**Mark@cohenlegalservices.com**
www.CohenLegalServices.com

**Everyone needs a break for peace of mind- especially those involved with the legal system.**
**Rent our Villa with pool in Playa Del Carmen near the beach and town.**
**Need a vacation?** see http://villaalegreplaya.com and http://www.steinhardt.us/villaalegre/

CONFIDENTIALITY NOTICE
The information contained in this message may be privileged and confidential and protected from disclosure.If the reader of this message is not theintended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination,distribution or copying of thiscommunication is strictly prohibited. If you have received this communicationin error, please notify us immediately by replying to the message and deleting it from your computer.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the Treasury Department, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Charles Herring [mailto:cherring@herring-irwin.com]
**Sent:** Friday, April 24, 2015 1:40 PM
**To:** Mark Cohen; 'Dan Mills'; 'Warren. Vavra'
**Cc:** 'Andrew Williams'; firm@darogerslaw.com; 'Sherine Thomas'; 'Pat Kelly'; 'Lauren Ross'; 'Kurt Kuhn'; 'Palvino, Jessica B.'
**Subject:** RE: Pressley - Casar



EXHIBIT
4

4497

Whether you depose Ms. DeBeauvoir will be up to you, her, the County, and the Court. I was just pointing out that based on the only two reasons you have given thus far for deposing her, the deposition appears unnecessary.

**From:** Mark Cohen [mailto:mark@cohenlegalservices.com]
**Sent:** Friday, April 24, 2015 1:33 PM
**To:** Charles Herring; 'Dan Mills'; 'Warren. Vavra'
**Cc:** 'Andrew Williams'; firm@darogerslaw.com; 'Sherine Thomas'; 'Pat Kelly'; 'Lauren Ross'; 'Kurt Kuhn'; 'Palvino, Jessica B.'
**Subject:** RE: Pressley - Casar

Thank you for that stipulation I will prepare one for the response to the msj. That will shorten the deposition somewhat. However I have my reasons for wanting a deposition and it certainly is not to delay resolution of this matter past July 20. I am certain you would never let an opposing counsel tell you when you need to take a deposition either

**Mark Cohen**
**805 W. 10th Street, Suite 100**
**Austin, Tx. 78701**
**512-474-4424**
**512-472-5444 (f)**
Mark@cohenlegalservices.com
www.CohenLegalServices.com

**Everyone needs a break for peace of mind- especially those involved with the legal system.**
**Rent our Villa with pool in Playa Del Carmen near the beach and town.**
**Need a vacation?** see http://villaalegreplaya.com and http://www.steinhardt.us/villaalegre/

CONFIDENTIALITY NOTICE
The information contained in this message may be privileged and confidential and protected from disclosure.If the reader of this message is not theintended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination,distribution or copying of thiscommunication is strictly prohibited. If you have received this communicationin error, please notify us immediately by replying to the message and deleting it from your computer.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the Treasury Department, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Charles Herring [mailto:cherring@herring-irwin.com]
**Sent:** Friday, April 24, 2015 1:29 PM

**To:** Mark Cohen; 'Dan Mills'; 'Warren. Vavra'
**Cc:** 'Andrew Williams'; firm@darogerslaw.com; 'Sherine Thomas'; 'Pat Kelly'; 'Lauren Ross'; 'Kurt Kuhn'; 'Palvino, Jessica B.'
**Subject:** RE: Pressley - Casar

We agree to stipulate in advance to the authenticity of any document that Travis County produces. No deposition is necessary for that. Given that the Secretary of State, the County Clerk, the City Clerk, and the United States Election Advisory Commission all say exactly the same thing—that for electronic voting a Cast Vote Record is a ballot image—we can stipulate to that. Pressley filed for the recount on the last possible day, then filed suit the last possible day (1/30), and then failed to serve Casar until 2/10. The general election was November 4, six months before the early May hearing date. Six months after the election is the opposite of "speed" for an election contest. In many instances, trial of an election contest has to be set within 5 days after the filing of an answer. Election Code sec. 232.012(d). -- Chuck Herring

**From:** Mark Cohen [mailto:mark@cohenlegalservices.com]
**Sent:** Friday, April 24, 2015 1:02 PM
**To:** 'Dan Mills'; 'Warren. Vavra'; Charles Herring
**Cc:** 'Andrew Williams'; firm@darogerslaw.com; 'Sherine Thomas'; 'Pat Kelly'; 'Lauren Ross'; 'Kurt Kuhn'; 'Palvino, Jessica B.'
**Subject:** RE: Pressley - Casar

Dear Judge Mills:
We will need to take the deposition of Travis County clerk before we can be prepared to respond We have third party discovery from them but we will need admissible testimony to get them admitted . we also need admissible testimony from them that the cvr's are the only document they have to meet the image of ballot cast requirement. Sheri , the county attorney in charge is out until next week. As I told Mr. Herring I will be contacting Sherri and him for a mutually convenient date to take the depositions and then we have of course the printing of the deposition and the time for the deponent(s) to read and sign and I will need time to prepare a response to the Motion. The phantom need asserted to move this case so fast that it prejudices my client's chance to fairly present the case is strongly objected to and it just unnecessarily creates additional grounds for necessitating an appeal which will delay the final decision even more. The pendency of this case is having no more of an effect on Mr. Casar that every litigant waiting for the procedures of a trial to work their way and there is no evidence that the city is being adversely effected in any way. Frankly Mr. Herring's tactical efforts to prevent Ms. Presley from having a fair opportunity to provide you with all of the admissible evidence just affirms how important it is that I have the time to provide it to you. Given the trial is not until July 20 Ms. Pressley will object to any shortening of her time to respond and notice of hearing that is less than the 21 days required by the rules and ignores our right to conduct reasonable discovery before being required to respond to a Motion for Summary Judgment. Let's not sacrifice fairness for speed. I respectfully request that the Motion be set 21 days or more after I receive the deposition of the county clerks in form that is not subject to objection(it is signed or signature is waived or excused) necessary to have my evidence to meet the Summary Judgment allegations. As in most case some of the evidence if not most of it comes from other sources so it is not frivolous to take depositions to obtain it from the source that will satisfy the rules of evidence as to admissibility. My client is anxious to get the facts out and obtain a final

resolution as anyone since she is the one who is being deprived of an election with a true outcome. The city council and Mr. Casar are proceeding quite efficiently as if this case had never been filed

**Mark Cohen**
**805 W. 10th Street, Suite 100**
**Austin, Tx. 78701**
**512-474-4424**
**512-472-5444 (f)**
**Mark@cohenlegalservices.com**
www.CohenLegalServices.com

**Everyone needs a break for peace of mind- especially those involved with the legal system.**
**Rent our Villa with pool in Playa Del Carmen near the beach and town.**
**Need a vacation?** see http://villaalegreplaya.com and http://www.steinhardt.us/villaalegre/

CONFIDENTIALITY NOTICE
The information contained in this message may be privileged and confidential and protected from disclosure.If the reader of this message is not theintended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination,distribution or copying of thiscommunication is strictly prohibited. If you have received this communicationin error, please notify us immediately by replying to the message and deleting it from your computer.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the Treasury Department, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

No. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | 201st JUDICIAL DISTRICT |

---

**NOTICE OF DEPOSITION ON ORAL TESTIMONY OF A REPRESENTATIVE OF TRAVIS COUNTY CLERK'S OFFICE**

---

PLEASE TAKE NOTICE that, pursuant to the Texas Rules of Civil Procedure, Contestant Laurie Pressley, by and through her attorneys of record, give notice of deposition on oral testimony of a Representative of Travis County Clerk's Office with advanced knowledge in the areas of:

1. What kinds of data are stored and are capable of being stored in the voting system used by Travis County in 2014.
2. How and where data is stored in the voting system used by Travis County in 2014.
3. Security protocols in the voting system used by Travis County in 2014.
4. Details of the way the system was used by Travis County for that election.
5. Hart InterCivic documents and interpretation of those documents provided by Travis County including but not limited to Audit Logs, Manuals, and Contract for the various components of voting system used by Travis County in 2014 (Tally, Rally, eSlate, JBC, MBB, Ballot Now, SERVO, etc.).
6. Programming of Hart Voting System software.
7. Operation and technical details of Hart Voting System software and hardware.
8. What information exists along with operational and technical details regarding the eSlate Manual and its contents for the voting system used by Travis County in 2014.
9. What information exists regarding Judge's Booth controller (JBC) Manual and its contents for the voting system used by Travis County in 2014.
10. What information exists along with operational and technical details regarding Mobile Ballot Box Manual and Technical Specs for the voting system used by Travis County in 2014..
11. What information exists along with operational and technical details regarding



4488

Manuals for the correct versions of the Hart Voting System being used by Travis County. See Table 1.5.

12. What information exists along with operational and technical details regarding all Mobile Ballot Boxes that contain District 4 vote data from Early Voting and Election Day for the voting system used by Travis County in 2014.

13. What information exists along with operational and technical details regarding all Mobile Ballot Boxes that used by Travis County in 2014.

14. What information exists along with operational and technical details regarding all Mobile Ballot Boxes containing Ballot Now CVR's as identified in the Tally audit logs for the voting system used by Travis County in 2014.

15. What information exists along with operational and technical details regarding All Original District 4 CVR files stored on the eSlate, the JBC, MBB and Tally for the voting system used by Travis County in 2014.

16. What information exists along with operational and technical details regarding the identify of Travis County's Programmer and Contractors for Hart Voting System for the voting system used by Travis County in 2014.

17. What information exists along with operational and technical details regarding Contract between Hart and Travis County--Appendix B Contractor's RFP Response for the voting system used by Travis County in 2014.

18. What information exists along with operational and technical details regarding Mobile Ballot Box driver software and reader for the voting system used by Travis County in 2014.

19. What information exists along with operational and technical details regarding Cast Vote Records from MBB's from Ballot Now tabulation of Ballot by Mail for the voting system used by Travis County in 2014.

Deposition will take place on _____ at _____ , at the office of _____ , located at _____ , unless parties mutually agree in writing to hold the deposition on a different date or time and, or at a different location.

The deposition shall continue from _____ and will be recorded by stenographic means and video before an officer authorized to administer oaths. The deposition will be taken for the purposes of discovery, for the use at trial in this matter, and for any other purpose permitted under the Federal Rules of Civil Procedure.

Respectfully submitted,

Mark Cohen
805 W. 10th St., Suite 100
Austin, Texas 78701
David Rogers
512-474-4424
Mark@CohenLegalServices.com
Law Office of David Rogers
1201 Spyglass, Suite 100
Austin, TX 78746
(512) 923-1836
(512) 201-4082 (fax)
DARogers@aol.com

_/s/David Rogers_____
David Rogers
State Bar #24014089
Attorney for Contestant

4490

<u>**CERTIFICATE OF SERVICE**</u>

Pursuant to Federal Rules of Civil Procedure, a true and correct copy of the foregoing has been sent on this the 4th day of May, 2015 to counsel for the Travis County Clerk and all parties of record.

Patrick Kelly
Pat.Kelly@Co.Travis.Tx.US
Sherine Thomas
Sherine.Thomas@Co.Travis.Tx.US
Andrew Williams
Andrew.Williams@Co.Travis.Tx.US
David Escamilla, County Attorney
414 W. 11th St.
Granger Bldg., Suite #500
P.O. Box 1748
Austin, Texas 78767
Attorneys for Dana DeBeauvoir, Travis County Clerk
and Travis County Voter Registrar Bruce Elfant
5501 Airport Blvd, Austin, TX 78751


Charles 'Chuck' Herring Jr.
cherring@herring-irwin.com
Jess Irwin
Lauren Ross
LaurenBRoss@gmail.com
Herring & Irwin, L.L.P.
1411 West Avenue, Ste 100
Austin, TX  78701
*Attorney for Contestee Gregorio "Greg" Casar*


Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
*Attorney for Contestee Gregorio "Greg" Casar*


Jessica Palvino
jpalvino @mcginnislaw .com
MCGINNIS, LOCHRIDGE AND KILGORE LLP
600 Congress, Suite 2100
Austin, TX 78701

(512) 495-6079
(512) 505-6379- Facsimile
State Bar No. 24048780
*Attorney for Contestee Gregorio "Greg" Casar*


/s/ David Rogers
David Rogers

NO. D-1-GN-15-000374

| LAURA PRESSLEY | ) | IN THE DISTRICT COURT |
| Contestant | ) | |
| | ) | |
| | ) | |
| | ) | |
| VS. | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| | ) | |
| | ) | |
| GREGORIO "GREG" CASAR | ) | |
| Contestee | ) | 201ST JUDICIAL DISTRICT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

DANA DEBEAUVOIR

MAY 11, 2015

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF DANA DEBEAUVOIR, produced as a witness at the instance of the Contestee GREGORIO "GREG" CASAR, and duly sworn, was taken in the above-styled and numbered cause on May 11, 2015, from 9:44 a.m. to 12:24 p.m., before KATHERINE A. BUCHHORN, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of County Clerk's Courthouse Conference Room, Room 222, Heman Marion Sweatt Courthouse, 1000 Guadalupe, Austin, Texas 78701, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE CONTESTANT:

          MARK COHEN
          THE LAW OFFICES OF MARK COHEN & ROSE COHEN
          805 W. 10th Street
          Suite 100
          Austin, Texas  78701
          512.474.4424/512.472.5444 (fax)
          mark@cohenlegalservices.com


FOR THE DEPONENT, DANA DEBEAUVOIR:

          SHERINE E. THOMAS
          DIRECTOR LITIGATION DIVISION - TRAVIS COUNTY
          314 W. 11th Street
          Austin, Texas 78701
          512.854.9513/512.854.4808 (fax)
          sherine.thomas@traviscountytx.gov

                    - and -

          ANDREW M. WILLIAMS
          ASSISTANT COUNTY ATTORNEY - TRAVIS COUNTY
          314 W. 11th Street, Suite 500
          Austin, Texas 78701
          512.854.9513/512.854.9472 (fax)
          andrew.williams@traviscountytx.gov

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

FOR THE CONTESTEE, GREGORIO "GREG" CASAR:

      CHARLES HERRING, JR.
      HERRING & IRWIN, L.L.P.
      1411 West Avenue
      Suite 100
      Austin, Texas 78701
      512.320.0665/512.519.7580 (fax)
      cherring@herring-irwin.com

        - and -

      JESSICA PALVINO
      MCGINNIS LOCHRIDGE
      600 Congress Avenue, Suite 2100
      Austin, Texas 78701 78701
      512.495.6079/512.505.6379 (fax)
      jpalvino@mcginnislaw.com

ALSO PRESENT:

      Laura Pressley, Ph.D.
      Abbe Waldman

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

I N D E X

PAGE

Appearances. . . . . . . . . . . . . . . . . .          2

Exhibits . . . . . . . . . . . . . . . . .          5

Requested Information. . . . . . . . . . . .          7

Stipulations . . . . . . . . . . . . . . . .          8


DANA DEBEAUVOIR


Examination by Mr. Herring . . . . . . . . . .          9
Examination by Mr. Cohen . . . . . . . . . .         40
Further Examination by Mr. Herring . . . . .        128


Reporter's Certificate . . . . . . . . . . .        132


Changes and Signature. . . . . . . . . . . .        135

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | . . . . . . . . . . . . . . . . . . . . . . . .<br>Travis County Clerk Dana DeBeauvoir<br>Curriculum Vitae | 9 |
| 2 | . . . . . . . . . . . . . . . . . . . . .<br>*** NOT INTRODUCED *** | -- |
| 3 | . . . . . . . . . . . . . . . . . . . . . .<br>Election Advisory No. 2012-03 | 21 |
| 4 | . . . . . . . . . . . . . . . . . . . . .<br>Electronic Voting System Procedures | 22 |
| 5 | . . . . . . . . . . . . . . . . . . . . . .<br>Glossary of Key Election Terminology -<br>2007 | 23 |
| 6 | . . . . . . . . . . . . . . . . . . . . . .<br>eSlate Voting System - About the eSlate<br>Voting System | 51 |
| 7 | . . . . . . . . . . . . . . . . . . . .<br>By-Mail Ballot example | 44 |
| 8 | . . . . . . . . . . . . . . . . . . . .<br>By-Mail Ballot example | 45 |
| 9 | . . . . . . . . . . . . . . . . . . . . . .<br>*** MARKED - NOT INTRODUCED or PROVIDED<br>TO REPORTER *** | -- |
| 10 | . . . . . . . . . . . . . . . . . . . . . .<br>Votes by Precinct - JBCs Election Day<br>GR14, Precinct 133C | 42 |
| 11 | . . . . . . . . . . . . . . . . . . . . .<br>District 4 Runoff Cast Vote Record<br>Recount files Meta-Data - Date Modified | 119 |
| 12 | . . . . . . . . . . . . . . . . . . . . . .<br>Audit Log - Official, Travis County<br>December 16 2014 Joint Special Runoff<br>Election | 56 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 13 | . . . . . . . . . . . . . . . . . . . .<br>GR14 City of Austin Manual Recount of District 4 | 54 |
| 14 | . . . . . . . . . . . . . . . . . . . .<br>*** NOT MARKED *** | -- |
| 15 | . . . . . . . . . . . . . . . . . . . .<br>*** NOT MARKED *** | -- |
| 16 | . . . . . . . . . . . . . . . . . . . .<br>Precinct 133 Voters - December 16, 2014<br>Voting location:  Memorial United Methodist Church | 129 |
| 17 | . . . . . . . . . . . . . . . . . . . .<br>Precinct 142 Voters - December 16, 2014<br>Voting location: Travis County Airport Offices | 130 |
| 18 | . . . . . . . . . . . . . . . . . . . .<br>Precinct 209 Voters - December 16, 2014<br>Voting location: Grant AME Worship Center | 130 |
| 19 | . . . . . . . . . . . . . . . . . . . .<br>Precinct 258 Voters - December 16, 2014<br>Voting location: Walnut Creek Elementary | 130 |
| 20 | . . . . . . . . . . . . . . . . . . . .<br>Precinct 260 Voters - December 16, 2014<br>Voting location: Lanier High School | 130 |

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

```
          DOCUMENTS/INFORMATION REQUESTED
               (OR MAY BE REQUESTED)

NO.    DESCRIPTION                              PAGE

  1    . . . . . . . . . . . . . . . . . .      74
       Names of tally administrators

  2    . . . . . . . . . . . . . . . . . .      75
       Name of tally administrator making
       specific entry

  3    . . . . . . . . . . . . . . . . . .      87
       Names of people more familiar with
       Audit Log
```

1887

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

S T I P U L A T I O N S

The attorneys for all parties present stipulate and agree to the following items:

The deposition of DANA DEBEAUVOIR is taken pursuant to Notice;

That all objections will be made pursuant to the Texas Rules of Civil Procedure;

That the original transcript will be submitted for signature to the witness' attorney, SHERINE E. THOMAS, and that the witness or the witness' attorney will return the signed transcript to Sympson Reporting within 20 days of the date the transcript is provided to the witness' attorney.  If not returned, the witness may be deemed to have waived the right to make the changes, and an unsigned copy may be used as though signed.

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

                    PROCEEDINGS

          THE REPORTER:  Are there any special

stipulations today or just by the Rules?

          MR. COHEN:  Just regular stuff.

          (Witness sworn.)

                 DANA DEBEAUVOIR,

having been first duly sworn, testified as follows:

                    EXAMINATION

BY MR. HERRING:

     Q.   Would you state your name for the record?

     A.   My name is Dana DeBeauvoir.

     Q.   And Ms. DeBeauvoir, you are the county clerk of

Travis County, right?

     A.   Travis County Clerk.

          (DeBeauvoir Exhibit No. 1 marked)

     Q.   (BY MR. HERRING)  And let me hand you a copy of

what I have marked as Exhibit 1, which I believe is your

resume.

     A.   (Moved head up and down.)

     Q.   And is that what that is?

     A.   Yes, sir.

     Q.   And that's current?

     A.   Yes, it is.

     Q.   Okay.  And I just want to ask you -- it's a

lengthy resume.  I just want to ask you a few points

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

A. Pretty commonly, yes.

Q. Same process, generally?

A. Generally, yes.

Q. And is that true for election jurisdictions throughout Texas?

A. Yes, it is.

Q. And do they all follow that same, generally, standard process?

A. Yes, they do.

Q. Now, in Ms. Pressley's deposition, I asked her about a couple of locations. The Highland Mall location and then the Airport Boulevard location. And it turned out, it would -- according to Google Maps, it would take about three minutes to drive from the one location to the other.

MR. COHEN: Objection; form.

Q. (BY MR. HERRING) And Ms. Pressley said that that's voter disenfranchisement, to have to drive three minutes.

MR. COHEN: Objection; form.

Q. (BY MR. HERRING) In your -- in your opinion, is that -- is that disenfranchisement, to drive for three minutes?

MR. COHEN: Objection; form.

A. None of the places that we used for the -- for

Sympson Reporting ~ 512.374.0596

the runoff election, are inconvenient, nor represented any particular obstacle or barrier for voters. We believe everything was fair and equitable, in the distribution of those vote centers for the runoff election.

MS. THOMAS: Objection; form.

Q. (BY MR. HERRING) Since we've got some -- a series of objections, why don't we ask you a related question.

Do you have an opinion concerning whether the voting locations used in the runoff, were fair and reasonable?

A. Do I have an opinion? Yes, I have an opinion.

Q. And what's the opinion?

A. Yes. The opinion is --

MR. COHEN: Objection; form.

A. -- they were all very much reasonable, ADA-compliant, fully accessible, well-known, well-used, and fully advertised; so they were fair and equitable.

Q. (BY MR. HERRING) Did you receive any input from anyone, to the effect of, "Well, we ought to change some voter locations in District 4 to effect the outcome of the election"?

A. I received nothing. No input.

Q. And would you have -- if somebody came to you

votes than Ms. Pressley?

A.   Correct.

Q.   Thank you for your patience.

MR. HERRING:  I'll pass the witness. We'll play musical chairs here, and Mr. Cohen will ask some questions.

THE WITNESS:  Okay.

Do you want to take a break?

MS. THOMAS:  I was going to say, how long have we been going?

(Simultaneous speaking - unreportable)

MR. HERRING:  Let's take a little break.

MS. THOMAS:  Can we take a break, just because it's a good stopping point?

MR. HERRING:  Yeah.  That's great.

THE WITNESS:  Okay.  All right.

(Recess 10:23 a.m. - 10:38 a.m.)

(DeBeauvoir Exhibit Nos. 6 - 12 marked)

EXAMINATION

BY MR. COHEN:

Q.   Good morning, Ms. DeBeauvoir.

A.   Good morning, again.

Q.   We have known each other --

A.   Many years.

Q.   -- since you started -- the first time you ran

for election. I think --

A. Yeah.

Q. -- I was a big supporter of you then --

A. You are.

Q. -- and I have been ever since.

A. I know. And I'm a fan of yours.

Q. That's good. Okay. So I know that you -- what you want to do is make sure that you have the true results of every election that you're in charge of, correct?

A. That's correct.

Q. And that you want to be able to verify the results of the election if someone challenges that.

A. Correct.

Q. Okay. And so we are here because someone challenged them --

A. Uh-huh.

Q. -- and we just -- we're not sure that we had a system in place that really actually verified it. Okay?

A. I understand.

Q. All right. So I'm going to show you -- and you have said that, in your opinion, a cast vote record is the same as an image of a ballot, correct?

A. Yes --

Q. And is that --

A.    -- it is.

Q.    -- because what everybody else told you, or do you actually believe that?

A.    I actually believe that.

Q.    And you believe that's the best way to double-check the computer's compilation of the votes on election day?

A.    I believe it's the only way to know, yes.

Q.    The only way.  Okay.  So I'm going to show you what's marked as Exhibit 10.  It's a little bit out of order.

MR. COHEN:  Would you give Mr. Herring a copy of his --

MS. PRESSLEY:  Okay.  Is this it?

MR. COHEN:  Yeah.  It's the cast vote record.

MS. PRESSLEY:  Okay.

Q.    (BY MR. COHEN)  What is that, Exhibit 10?

A.    It looks like an election day report.

Q.    Is that a cast vote record?

A.    Yes, I believe it is.  This is --

Q.    So on election day -- let's go through this.  I know we all know this, but --

A.    Uh-huh.  Okay.

Q.    Okay.  So the voter comes in.  They sign in

MS. THOMAS: Yes. Yes. I'm sorry.

A. This is what a by-mail ballot would look like.

Q. (BY MR. COHEN) Okay. That's --

A. This is sort of like an optical scan ballot.

Q. Okay. And that says -- it says "Sample Ballot" on the side of it.

A. Okay. This is what a by-mail ballot looks like.

Q. Okay.

A. Our sample ballots don't look like this. I realize it says that on the side.

Q. Yeah.

A. This is what a by-mail ballot looks like. It looks like an optical scan ballot.

Q. Okay. And then I'll show you, marked Exhibit 8, and what is that? I thought that was what a --

A. Same thing.

Q. That's what a mail-in ballot looks like. You said that -- is that correct?

A. By mail, yes, uh-huh.

Q. Okay. All right. And then when a person goes to vote at the machine, No. 7 and No. 8 are -- it may be a little bit different, but that's what they look at, in deciding whether -- what -- who they want to vote for;

opportunity to change it.

Q. Okay. Right. And if you don't change it, that's who you vote for?

A. Correct.

Q. Okay. But when you make your decision, you're looking at Exhibit -- something like Exhibit 8 or 9, not something like Exhibit 10?

A. No.

MS. THOMAS: Objection, form.

A. No. This is your final chance. It'll look like this.

Q. (BY MR. COHEN) Okay.

A. It's a -- it looks like the summary screen.

Q. Exhibit No. 8 or 9 is what shows up in your face when you try to decide who you want to vote for, correct?

A. You voting. The process, yes.

Q. Yes. Okay.

A. Correct.

Q. And so you don't see No. 10 when you're deciding who to vote for. You see No. 10 to make sure that who you marked on Exhibit 8 is what you really want to do; is that correct?

MS. THOMAS: Objection --

A. No.

MS. THOMAS: -- form.

Hang -- just -- let me just get the objection in, and then you can answer.

Q. (BY MR. COHEN) You still have to answer the question. You said "No"?

A. Oh, excuse me. No. It's -- it's not. This is a part of the final decision process, and you still have the chance to change it, and it does look exactly like the summary screen.

Q. Okay. So when you see that, it's asking you if you want to change --

A. It is asking you --

Q. -- what you did on --

THE REPORTER: Wait. One at a time.

Q. (BY MR. COHEN) Hold on. It -- when you see Exhibit 10, it's asking you if you want to change what you marked on Exhibit 7 or 8?

A. Correct.

Q. Okay. And you're saying -- it's your opinion, I guess -- or the electronic system tells you that the ballot is -- the last chance, this No. 10, your last chance to change, is -- is what you considered to be the ballot -- the image of the ballot?

A. Correct.

Q. Okay. And then Exhibit 10 is somehow preserved

somewhere in the voting machine?

A.    Multiple places.

Q.    Okay.  Where is it --

A.    Multiple redundancy.

Q.    Where is it preserved?

MS. THOMAS:  Objection; form.

You can answer as --

A.    It is preserved twice on the eSlate and once in the JBC.  I think that's correct.  Or it may be the opposite.  It may be twice in the JBC and once in the eSlate.  And when -- I need to correct my answer.  It's twice in the JBC and once on the eSlate.

Q.    (BY MR. COHEN)  Okay.  What is the JBC?

A.    Judge's Booth Controller.  It's the device that stores the inventory of unvoted ballots, the inventory of voted ballots, and the access codes that qualify -- once a qualified voter is ready to vote, they give the voter, so they can start the process.

Q.    Okay.  So Exhibit -- versions of Exhibit 10, depending -- depending on that the voter verified what their choices were --

A.    Yeah.

Q.    -- are in the JBC in two places?

A.    Two places.

Q.    Where in -- where would we find them?

A.    It would be in -- in --

          MS. THOMAS:  Objection; form.

A.    -- in medium stored on the JBC.  And it's two different kinds of medium.  One of them looks kind of like a disk, and one of them looks like -- I think, something like a flash drive.

Q.    (BY MR. COHEN)  And what kind of program is that?

A.    I don't know.

          MS. THOMAS:  Objection; form.

Q.    (BY MR. COHEN)  You don't know?  Is it a Microsoft kind of function -- system or --

A.    No.

          MS. THOMAS:  Objection; form.

Q.    (BY MR. COHEN)  Okay.

A.    It was proprietary.

          MR. HERRING:  Mr. Cohen?

          MR. COHEN:  Yes.

          MR. HERRING:  I don't want to clutter up the record with objections.  Can I ride on her objections to form, or do you want me to --

          MR. COHEN:  That's fine.

          MR. HERRING:  -- lodge independent --

          MR. COHEN:  That's fine, because, really she's not representing a party and won't be able to make

objections at the trial --

MR. HERRING: Well, that's why I'm --

MR. COHEN: -- so I understand.

MR. HERRING: That's why I'm asking.

MR. COHEN: That's -- that's fine. If you want her to make objections for you, I will accept that.

MR. HERRING: Well, for her objections to form, I just want to be able to stand on those and have your rule 11 agreement that I can.

MR. COHEN: You can stand on those.

MR. HERRING: Okay.

Q. (BY MR. COHEN) Okay. Now, you have a website that talks about the E-voting system, correct?

A. Correct.

Q. Is this Exhibit No. 6 an accurate picture of the website page?

A. I believe so, yes.

Q. Okay. And do you see where I have marked --

MS. THOMAS: Objection; form.

Go ahead.

Q. (BY MR. COHEN) Do you see where I have marked on there -- that's probably why she's objecting; there's a mark on there that I made, that shows what I'm talking about. I don't want to go over the whole page. I just want to go over that line. And what does it say?

Q.   (BY MR. COHEN)   Well, it doesn't say "Official Ballot" on it, does it?

MS. THOMAS:  Objection; form.

You can answer.

A.   I don't think I ever really noticed.

Q.   (BY MR. COHEN)   There's a lot of other things that the statutes require to be on the ballot, that are not on Exhibit 10.  Isn't that true?

MS. THOMAS:  Objection; form.

A.   I don't know.

Q.   (BY MR. COHEN)   You don't know what the law requires to be on a ballot?

MS. THOMAS:  Objection; form.

Q.   (BY MR. COHEN)   It's okay if you don't.  I mean, most people don't, I'm sure.

MS. THOMAS:  Objection; form.

A.   I know that there are huge differences between what the law says for paper ballots and what the law says for electronic.  And I'd have to have the law in front of me, to make the distinction between the two.

Q.   (BY MR. COHEN)   Do you think there's a description in the law, of what needs to be on an electronic ballot?

MS. THOMAS:  Objection; form.

A.   I think it would take a thorough reading of the

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

code, to make those distinctions.  No, I don't think it's in one place.

Q.  (BY MR. COHEN)  Okay.  But there is a place where a ballot is defining what has to be on a ballot --

A.  Paper ballot.

Q.  -- somewhere?

A.  -- yes.

Q.  Yes.  Does it say "paper ballot"?

A.  Probably.

Q.  Okay.  But you could be wrong about that?

MS. THOMAS:  Objection; form.

A.  I don't think so.

Q.  (BY MR. COHEN)  Okay.  Is this a paper ballot, Number 7 --

A.  Yes.

Q.  -- and 8?

A.  Yes.

Q.  This is a paper ballot?

A.  That's what it look -- that's what a paper ballot looks like.  This is a representation of a paper ballot.  That's why it said it's by mail.

Q.  Okay.

(DeBeauvoir Exhibit No. 13 marked)

Q.  (BY MR. COHEN)  I'm showing you what's marked as Exhibit 13.

MR. COHEN: Do we have another copy of this for him?

MS. PRESSLEY: Sure do.

Q. (BY MR. COHEN) Do you know what that is?

A. Yes.

Q. What is that?

MS. PRESSLEY: What number is that?

MR. COHEN: 13.

MS. PRESSLEY: All right.

A. This document, Exhibit 13, looks like one of the tally sheets that we used for the recount.

Q. (BY MR. COHEN) Okay. And it's got your -- that little red thing over there --

A. Uh-huh.

Q. -- that's -- that's your "DD"?

A. Yes.

Q. Okay. So do you have any question about whether that's an accurate version of what you used for the recount?

A. I don't think so.

Q. You think it is?

A. I think it is.

Q. Okay.

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Okay. I'll show you what's

marked as Exhibit 12. If you want to look through that and see what...

A. All right.

Okay.

Q. Does that look, to you, like the audit log from the runoff election?

A. I believe so.

MS. THOMAS: Objection; form.

THE WITNESS: I'm sorry.

A. I believe so.

Q. (BY MR. COHEN) Okay. Now, Let me get back to one thing. Do you -- is there -- does the eSlate system have a tally capability?

A. Yes.

Q. Could the eSlate system make a copy of the voter's action on the actual ballot, that it looks at it when it makes a choice?

A. Not like --

MS. THOMAS: Objection; form.

THE WITNESS: I'm sorry.

MS. THOMAS: Go ahead.

A. Not like this.

Q. (BY MR. COHEN) Okay. It cannot make a copy of this?

A. No.

MS. THOMAS:  Objection; form.

Q.   (BY MR. COHEN)  Okay.  Can it make a copy of something that -- where the ballot is marked?

MS. THOMAS:  Objection; form.

A.   No.

Q.   (BY MR. COHEN)  Okay.  What version of the eSlate system are you using right now?

A.   I don't remember.  We'll have to look it up. It might say on here, someplace.  I don't remember.

Q.   You don't remember.  Okay.

And as you updated the -- with the new versions of the eSlate system, did you have some group of scientists and election experts verify that there was -- that the update was appropriate?

A.   Yes.  We go through a procedure, through the Secretary of State's office; and the main verification is called "hash code testing."

Q.   That goes -- you do that every time you incorporate an update into your system; is that correct?

A.   Every time.

Q.   Okay.  Let's take a look at the -- what does the Tally -- what does the Tally portion of the eSlate system do?  What is that function?

A.   Tally is a separate module that is only used for election night, to tally results from by-mail early

voting, in-person mail voting, and then election night. And it's -- it's just -- as I said, it's a separate module, it tallies the votes for election night, and then it's also used to communicate those results to the general public and to media, in a nutshell.

Q. So -- but it's not the official tally, correct?

A. It's not -- no.

Q. No.

A. It is for unofficial results on election night.

Q. Got you. Okay. Now, let me go back. I forgot to ask you a question about Exhibit 13.

This is -- you'd say this was a tally of the mail-in votes, correct? That it --

A. I'm sorry --

MS. THOMAS: Objection; form.

A. -- I can't tell. I would say this is not by-mail ballots. It's the wrong numbers. This is just a general tally.

Q. (BY MR. COHEN) Okay. Let me see. So you've got -- the totals -- not the cumulative total, but the totals at the bottom there --

A. Uh-huh.

Q. -- I believe -- and you have to correct me if I'm wrong -- or if you don't know, that's okay -- whether or not those 240 to 240 shows that the mail-in

ballots --

A.    I see what you're saying.

Q.    -- were equal?

A.    You are correct.

Q.    Okay.

A.    I'm sorry.

Q.    Thank you.  I just needed to clear that up.
That's what I thought it said.

A.    Yes.  Sorry.

Q.    Thank you.

So what security have you put in place to
prevent any kind of mistakes or -- intentional or
otherwise, in the tally of the voting?

A.    It's a lengthy list.

MS. THOMAS:  Objection; form.

Q.    (BY MR. COHEN)  Okay.  We're -- we're here to
hear it.

A.    Okay.  I need a little notepad.

MS. THOMAS:  This is for what purpose?

THE WITNESS:  Just for me to remember
which ones I'm telling him, for right now.

MS. THOMAS:  Okay.  This is going to be to
me.

MR. COHEN:  I won't look at it.  I won't
take it from her.  Okay.

A. Gosh.

Q. (BY MR. COHEN) Do you know what? Let's do this. Let me keep going, and we'll take a break and you can go back to your office and, you know, make -- have that answer to this question, once it gets --

A. Okay. It's also on our website. I mean, it's a rather lengthy list.

Q. Okay. What I want to ask you -- how they just work. That's --

A. Okay. Okay. I can --

Q. -- that's the problem.

A. -- do that, too.

Q. Okay. Okay. Do you feel comfortable sitting here and doing it, or would you --

A. I do. I think --

Q. -- rather take some time --

A. -- I can get everything --

Q. Okay.

A. -- if you'll just give me just a --

Q. Sure. No.

A. -- couple of minutes.

Q. Take as long -- I don't want you to be at a disadvantage, in answering the question. That's all.

A. If I forget something, we'll fill it in. That's okay. I really am --

Q.   (BY MR. COHEN)   I'll show you what's marked as Exhibit No. 11.   Tell me what that is.

A.   I'm not sure.   What is this?

Q.   Well, does it look like it could be the CVR -- the recount CVR file?

A.   I believe --

MS. THOMAS:   Objection; form.

If you don't know what that is, just tell him.

A.   I'm -- I'm sorry.   I -- it -- the format --

MR. COHEN:   Would you please stop coaching your witness?

MS. THOMAS:   Well --

MR. COHEN:   I'm going to call the -- you just told her, if she doesn't know what it is, what to answer.

MS. THOMAS:   Well, but she already --

MR. COHEN:   You can't do that.

MS. THOMAS:   -- said she --

MR. COHEN:   She is the one --

MS. THOMAS:   -- doesn't know what it is.

MR. COHEN:   -- testifying, not you. You -- you --

MS. THOMAS:   She already said she doesn't know what it is.

MR. COHEN:  Then let her testify to that. That's fine.  I don't want you saying anything.  It's against the Rules.

MR. HERRING:  Mr. Cohen, you need to lower your voice.

MS. THOMAS:  You need to --

MR. COHEN:  So please stop.  I'm almost done.  Just -- if you want to make 25 zillion ridiculous objections, you go right ahead; but don't tell her what -- don't make any comment, except "Objection, form."

MS. THOMAS:  Mr. Cohen --

MR. COHEN:  And that's all you get to do.

MS. THOMAS:  -- if you've got a problem, take it to the judge.

MR. COHEN:  Yeah.

MS. THOMAS:  But right now --

MR. COHEN:  Well, you're still doing it.

MS. THOMAS:  -- she already told you --

MR. COHEN:  You're still doing it.  You're still violating the Rule.

MS. THOMAS:  You're the one --

MR. COHEN:  Why don't you just stop?

MS. THOMAS:  If you have a problem, take it to the judge.

MR. COHEN:  I have a question for the --

MS. THOMAS:  Ask her the --

MR. COHEN:  -- for the witness.

MS. THOMAS:  -- question, then.

MR. COHEN:  I did.  I asked her a question, and now that you've talked so many times and told her all what to say --

MS. THOMAS:  I did not.

MR. COHEN:  -- we don't really know what the question was anymore --

MR. HERRING:  Mr. Cohen --

MR. COHEN:  -- so I'll ask it again.

MR. HERRING:  -- ask the question.  Move on.  Stop yelling.

Q.   (BY MR. COHEN)  Does that look, to you, like it could be the recount CVR file?

A.   Maybe.  Here is the -- Mark, here is what my problem is with it:  I don't recognize the format, at all.

Q.   Yeah.  Okay.  That's --

A.   The data might be something I'd recognize, but this is completely unfamiliar to me.

Q.   That's perfectly all right.  Thank you.

Okay.  Did your office have any recount activities on January 4th, 5th, or 6th?

MR. HERRING: That's 16.

MR. COHEN: Oh, that's 16?

MR. HERRING: Yeah.

Do the same with that one.

(DeBeauvoir Exhibit Nos. 17 marked)

Q. (BY MR. HERRING) And I'll show you 17 and ask you to identify what's the notice to and what's the new location?

A. It says Highland Mall is the previous location and that the Travis County main location is the new one.

Q. Okay.

(DeBeauvoir Exhibit Nos. 18 and 19 marked)

Q. (BY MR. HERRING) And all of these that I'm showing you, were they all posted at the old voting location?

A. At the old location, correct.

18.

Q. And what is 19?

A. 19 is the location posted at McBee Elementary School, indicating that it was the old location; and the new location is Walnut Creek Elementary.

(DeBeauvoir Exhibit No. 20 marked)

Q. (BY MR. HERRING) And let me show you what's been marked 20.

A. A notice posted, indicating that Austin

Brethren was the old location and that Lanier High School is the new location for the runoff election.

Q. And all of those were posted to assist voters?

A. Posted, correct.

Q. Were the new voting locations also available in multiple other forms, such as websites?

A. Correct. They're on our websites, they're in paper forms, they're on the County Clerk's website, the County website, the City website.

Q. Thank you.

MR. HERRING: Pass the witness.

MR. COHEN: No further questions at this time.

(Deposition concluded at 12:24 p.m.)

CAUSE NO. D-1-GN-15-000374

LAURA PRESSLEY                    )    IN THE DISTRICT COURT
Contestant                       )
                                 )
                                 )
                                 )
VS.                              )    TRAVIS COUNTY, TEXAS
                                 )
                                 )
                                 )
GREGORIO "GREG" CASAR            )
Contestee                        )    201ST JUDICIAL DISTRICT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORTER'S CERTIFICATION

ORAL DEPOSITION OF DANA DEBEAUVOIR

MAY 11, 2015

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I, KATHERINE A. BUCHHORN, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DANA DEBEAUVOIR, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on May 15, 2015, to the witness, DANA DEBEAUVOIR, c/o SHERINE E. THOMAS, for examination, signature, and return to SYMPSON REPORTING by June 4, 2015.

That the amount of time used by each party at the deposition is as follows:
    MR. CHARLES HERRING, JR. - 0 Hours, 57 Minutes
    MS. SHERINE E. THOMAS - 0 Hours, 0 Minutes
    MR. MARK COHEN - 1 Hour, 33 Minutes

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE CONTESTANT, LAURA PRESSLEY:
       MARK COHEN
       THE LAW OFFICES OF MARK COHEN & ROSE COHEN
       805 W. 10th Street, Suite 100
       Austin, Texas 78701
       512.474.4424/512.472.5444 (fax)
       mark@cohenlegalservices.com

FOR THE CONTESTEE, GREGORIO "GREG" CASAR:
       MR. CHARLES HERRING, JR.
       HERRING & IRWIN, L.L.P.
       1411 West Avenue
       Austin, Texas 78701
       512.320.0665/512.519.7580 (fax)
       cherring@herring-irwin.com

FOR THE DEPONENT, DANA DEBEAUVOIR:
       SHERINE E. THOMAS
       TRAVIS COUNTY
       314 W. 11th Street
       Austin, Texas 78701
       512.854.9513/512.854.4808 (fax)
       sherine.thomas@traviscountytx.gov


       I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

       Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

       Certified to by me this 14th day of May, 2015.




              /s/ Katherine A. Buchhorn
              KATHERINE A. BUCHHORN, Texas CSR 2788
              CSR Expiration:  12/31/15
              SYMPSON REPORTING
              Firm Registration No. 696
              7800 N. MoPac Expressway, Suite 120
              Austin, Texas 78759
              512-374-0596/512-697-8313 (fax)
              office@sympsonreporting.com

Page 134

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition of DANA DEBEAUVOIR was/was not returned to the deposition officer on or before _____, 2015. If returned after the stipulated date, the original deposition was returned on _____;

If returned, the attached "Changes and Corrections" page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to SHERINE E. THOMAS, 314 W. 11th Street, Granger Building, Suite 420, Austin, Texas 78701, Custodial Attorney;

That $_____ is the deposition officer's charges to CHARLES HERRING, JR., HERRING & IRWIN, L.L.P., 1411 West Avenue, Suite 100, Austin, Texas 78701, attorney for GREGORIO "GREG" CASAR, for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this _____ day of _____, 20____.

_____
KATHERINE A. BUCHHORN, Texas CSR 2788
CSR Expiration: 12/31/15
SYMPSON REPORTING
Firm Registration No. 696
7800 N. MoPac Expressway, Suite 120
Austin, Texas 78759
512-374-0596/512-697-8313 (fax)
office@sympsonreporting.com

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

CHANGES AND CORRECTIONS

WITNESS NAME:  DANA DEBEAUVOIR

DATE:  MAY 11, 2015

Reason Codes:  (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

PAGE/LINE     CHANGE                          REASON CODE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNATURE

I, DANA DEBEAUVOIR, have read the foregoing deposition and hereby affix my signature that the same is true and correct, except as noted on the previous page.

_____
DANA DEBEAUVOIR

THE STATE OF _____)

COUNTY OF _____)

Before me, _____, on this day personally appeared DANA DEBEAUVOIR, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 20____.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____
COMMISSION EXPIRES: _____

EXHIBIT C

The County Clerk has produced everything requested that fell within the scope of the Judge's Order on the County's objections to the first set of requests and Motion for Third Party Discovery Control Plan.

Andrew

**From:** Mark Cohen [mailto:mark@cohenlegalservices.com]
**Sent:** Monday, May 18, 2015 3:38 PM
**To:** Andrew Williams; 'darogers@aol.com'
**Cc:** cherring@herring-irwin.com; laurenbross@gmail.com; 'kurt@kuhnhobbs.com'; 'jpalvino@mcginnislaw.com'; Sherine Thomas; Pat Kelly; Amy Pollock; Amy Murray; Tiffaney Gould
**Subject:** RE: Pressley: Response re Privilege Log Request

Do I understand that other than what is listed in the log the county clerk has produced everything requested in the request for production it received from Pressley??

The County Clerk has produced all responsive documents that fell within the scope of discovery and has provided a log of all documents withheld as privileged. The Clerk stand on her objections as asserted in her response to your first request for production.

Andrew

No. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| | § | 201st JUDICIAL DISTRICT |

## CONTESTANTS' SIXTH AMENDED ORIGINAL CONTEST OF ELECTION, FOR THE OFFICE OF THE AUSTIN CITY COUNCIL, DISTRICT 4

### TO THE HONORABLE JUDGE OF SAID COURT

NOW COMES, Laura Pressley, Contestant, and files this Sixth Amended Original Petition for Election Contest for the Office the Austin City Council, District 4 (Petition) against Gregorio "Greg" Casar, Contestee.[1] In support of this election contest, Dr. Pressley will respectfully show as follows:

### I. DISCOVERY

1. The contestant intends that discovery be conducted under level three, a custom discovery plan for election contest devised with the approval of the court.

### II. SUMMARY

2. This contest is based on the facts that election irregularities, mistakes, manual, mechanical and electronic errors occurred with the election activities and tabulation of the votes that were cast using the electronic voting machines during Early Voting and on Election Day for the December

---

[1] This 6th Amended Petition is filed in response to the Discovery production of Travis County and has more specific allegations pleaded. Also, this Sixth Amended Petition is filed in Response to Contestee Gregorio "Greg" Casar's Answer and Special Exceptions to Contestant's Original Contest of Election, and the Court's order of April 13, 2015 regarding those Special Exceptions, and Casar's Motion to Strike the Fifth Amended Petition.

*Pressley 6th Amended Election Contest* *p.1*

16, 2014 Joint Special Runoff Election for the District 4 Austin City Council City of Austin election (referred to as the "Runoff") and January 6, 2015 District 4 Austin City Council Recount (referred to as the "Recount").

3.     There are numerous election irregularities in the administration and results tabulation of the Runoff election.  Specifically, the most material issues are related to:

a.  nine instances of corrupt Mobile Ballot Box errors during vote tabulation on election night at Central Counting,

b.  missing data log entries in the vote tabulation systems, the Tally Audit and Ballot Now audit logs,

c.  suspicious mathematical patterns observed in the Runoff Election results that show them to be erroneous and not credible,

d.  Travis County election officers instructing election officers to not print and retain crucial, mandated election records listing specific vote results for each candidate in a race (Zero Tapes, Tally/Results tapes),

e.  election equipment security seals that were improperly sealed, subsequently unsealed and replaced,

f.  not producing, counting and retaining statutorily required ballot images,

g.  obstructing Contestant's official poll watchers at polling locations and Central Counting after the polls closed.

4.     These violations materially affected the outcome of the election in that an inordinate number of election irregularities occurred and there was a lack of accountability of election officers with regard to no printing of Zero Tapes, no printing of Results Tapes, denying office poll watchers access to election activities, improperly sealed electronic devices, security breaches of

the Tally vote tabulation system, corrupt Mobile Ballot Box entries, and Tally Audit log deletions. Because of the erroneous reported election results, the egregious election irregularities, the missing election records, possible criminal and fraudulent violations, the outcome of the Runoff cannot be known.

5.     Specifically, these violations caused illegal votes to be counted and election officers failed to count legal votes correctly. In addition, the pervasive and numerous election irregularities make it impossible to conclude that the reported results are the true outcome of the election. Finally, because no ballots, or images of ballots were preserved by the Office of the Travis County Clerk, Dana DeBeauvoir, there are no ballots to count and no ballots to use to verify the electronic "cast vote records" in the Recount except for the paper Absentee/Mail-In ballots .

6.     Section 221.012 of the Texas Election Code provides in pertinent part:

Sec. 221.012. TRIBUNAL'S ACTION ON CONTEST.
(a)  If the tribunal hearing an election contest can ascertain the true outcome of the election, the tribunal shall declare the outcome.

(b)  The tribunal shall declare the election void if it cannot ascertain the true outcome of the election.

7.     "A contestant seeking to have an election declared void under this provision must allege and prove that the true results of the election are impossible to ascertain." *See City of La Grulla v. Rodriguez, 415 S.W.2d 701, 703* (Tex.Civ.App. San Antonio 1967, writ ref'd n. r. e.)." *Garcia v. Avila*, 597 S.W.2d 400, 403, 1980 Tex. App. LEXIS 3027, 6 (Tex. Civ. App. San Antonio 1980, writ dism'd w.o.j.)

8.     As will be presented below, many crucial election records for the 3,937 electronically cast ballots in the Runoff [2] are missing or corrupted[3] on the Travis County's Hart Voting System:  Ballot

---

[2]Exhibit A, Runoff Recount Results showing Ballot by Mail ballots of 480, and Cast Vote Records (electronically cast

images, vote tabulation Tally Audit logs[4], Zero Tapes[5], Tally/Results tapes[6,7], Mobile Ballot Box corruption[8,9], improperly sealed security seals for voting equipment[10], etc.

9.     The only legal ballots that have been retained, produced and recounted by Travis County, are the 480 votes cast on paper, Mail in Ballots (Exhibit 1). These ballots show an exact tie at 240 ballots cast as votes for Pressley and 240 ballots cast as votes for Casar (Exhibit 1).   Therefore, the outcome of the election is a tie and neither Pressley nor Casar may be declared the victor.

10.     Given the only retained ballots show an exact tie, along with the numerous mathematical anomalies observed with the Runoff election results, the statutory and mandated retention of important election records is needed to determine the true outcome of the election. In the absence of these crucial election records, the outcome cannot be known and this Honorable Court cannot ascertain the true outcome of the Runoff election between Pressley and Casar, and thus declare the Runoff election void and order a new election.

### III. PARTIES

11.     Contestant Laura Pressley is a resident of Austin City Council District 4, Travis County, Texas.  She was a candidate in the Austin City Council District 4 Runoff Election on December 16, 2014.

12.     Contestee Gregorio "Greg" Casar is a resident of Austin City Council District 4, Travis County, Texas.   He was a candidate in the Austin City Council District 4 Runoff Election on

---

ballots) of 3,937.

[3] Exhibit B, Tally Audit logs showing missing entries and multiple "Invalid/Corrupt MBB[Mobile Ballot Box]" errors.

[4] Exhibit B, Tally Audit logs,

[5] Exhibit C, Judges' Booth Controller (JBC) Judge's Envelope, p. xxx, Zero Tapes missing

[6] Exhibit C, Judges' Booth Controller (JBC), Judge's Envelope cover states, "DO NOT PRINT THE TALLY"

[7] Exhibit D, Travis County Clerk, Dana DeBeauvoir's Deposition regarding no Results tapes, p. 128, line 15.

[8] Exhibit B, Tally Audit Logs, Mobile Ballot Box corruption on pgs. 5, 22, 23, 26, 27, 29 and 42.

[9] Exhibit D, DeBeauvoir's deposition regarding MBB corruption errors, p. 98, lines 18-20, and p. 99, lines 4-9

[10] Exhibit E, Hart Voting System election equipment with improperly sealed security seals, election official signed affidavits.

December 16, 2014. The election results were canvassed on December 30, 2014 and Mr. Casar was declared the victor by 1,291 votes.[11] A "manual recount" of all early voting, election day, provisional, and mailed-in ballots was attempted on January 6, 2015.

13. The mail-in ballots were exactly tied between the candidates, at 240 each, for a total of 480 votes (Exhibit A). The attempted recount was a nullity and a full recount was made impossible in that the attempted recount violated state law and the manual recount of the 3,937 electronically cast ballots (Exhibit A) was incorrectly performed[12] using of the "cast vote records" in lieu of "images of ballots cast." Based on the counting of "cast vote records" and mail in ballots, as could be predicted, the invalid recount did not change the reported results of the election and the original declaration of Mr. Casar as the victor for the runoff election did not change.

14. Casar was sworn into office on January 6, 2014. He has been notified of the filing of this action by a delivery of a copy of this Petition in accordance with TEX. ELEC. CODE § 21.003(b).

## IV. JURISDICTION AND VENUE

15. Jurisdiction and venue in this case are proper and mandatory in Travis County because the office being sought is for a district entirely within the boundaries of Travis County under the Texas Elections Code, Section 232.006.

## V. FACTS

### Numerous Irregularities in Counting of Votes

16. Many election irregularities, errors, mistakes occurred with regard to the counting, tabulation, and reporting of votes for the District 4 Austin City Council Runoff Election and the

---

[11] Exhibit F, Official December 16, 2014 Runoff Cumulative Election Results.
[12] Though the County Clerk termed the action a "manual recount," because the event as it occurred did not satisfy statutory criteria, Pressley does not concede that what occurred was actually a statutory manual recount as defined by the Texas Election Code 128.001(a)2, 213.016, 214.049(e), 213.016.

Official Recount. Many of these unexplained gaps in security and defect vote counts at a very minimum made fraud possible and make ruling out fraud an impossibility.

Unnatural Mathematical Patterns Raises an Inference That the Reported Runoff Results are Erroneous—November General Election and December Runoff Results Are the Same

17.     The November 4, 2014 General Election for the District 4 Austin City Council City of Austin Election was comprised of 8 candidates and the December 2014 Runoff was comprised of 2 candidates (Pressley vs Casar).   A statistical analysis of the results of the election showed mathematical anomalies with the General Election and the Runoff.  See table below.

| Top 9 Precincts with > 200 Votes, 80% of Voters | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | November 4th | | | | Dec 16th | | | |
| Pct | LP | Casar | LP + GC | LP% | LP | Casar | Total | LP% |
| 156 | 188 | 517 | 705 | 27% | 197 | 449 | 646 | 30% |
| 222 | 275 | 354 | 629 | 44% | 233 | 312 | 545 | 43% |
| 135 | 128 | 498 | 626 | 20% | 106 | 416 | 522 | 20% |
| 139--HH | 251 | 259 | 510 | 49% | 198 | 229 | 427 | 46% |
| 217 | 176 | 259 | 435 | 40% | 151 | 219 | 370 | 41% |
| 149--Ave G | 80 | 306 | 386 | 21% | 76 | 279 | 355 | 21% |
| 140 | 240 | 181 | 421 | 57% | 187 | 169 | 356 | 53% |
| 164 | 82 | 157 | 239 | 34% | 62 | 122 | 184 | 34% |
| 133 | 69 | 223 | 292 | 24% | 65 | 173 | 238 | 27% |
| Election Overall Results | 1489 | 2754 | 4243 | 35.1% | 1275 | 2368 | 3643 | 35.0% |
| Average of Top 9 Pcts (unweighted) | | | | 35.1% | | | | 35.1% |

18.     Voters in the top nine (9) precincts in the City of Austin District 4 election comprise roughly 80% of the total voters in the Runoff (as documented by Exhibit G).[13]   The ratio of precinct level votes that the Contestant received compared to Contestee is the same ratio in the November General Election (8 candidates) as it was in the December Runoff Election (2 candidates), 35% vs 35% respectively.[14]

---

[13] Exhibit G, Comparison Results, p. 1.
[14] Exhibit G, Comparison Results, p. 1.

*Pressley 6th Amended Election Contest*                                                    *p.6*

19.     In addition, the average of the percentages the Contestant received in the unweighted precincts compared to Contestee, in the November General Election and the December Runoff, are also equal at 35% and 35%, respectively.  The fact that so many precincts showed exactly the same and unchanged results for the General Election and the Runoff is sufficient to raise an inference that the reported results are erroneous.

20.     The summary analysis (Exhibit G, p. 1) of the precinct level voting results for the General Election[15] and the precinct level results for the Runoff Election,[16] show very unusual and unique mathematical patterns and anomalies.  This analysis reveals the Runoff results are erroneous and are a result of counting and tabulation errors committed by Travis County and thus the outcome of the election cannot be determined.

21.     Reviewing Travis County Voter election results for the General and Runoff Elections, there was an overall attrition of over 4,000 voters from the General and Runoff elections.  The occurrence of duplicated relative results for Pressley and Casar for the General and Runoff Election shows the results are strictly isolated to the District 4 Pressley vs Casar race, are erroneous, and are indicative of errors committed by Travis County in the vote collection and/or tabulation and clearly raises an inference that the reported results are not accurate.

22.     For voters in just the top 9 precincts, there was an attrition of at least 600 voters (who voted for either Pressley or Casar) between the General and the Runoff Elections[24.]  The unique occurrence that the results remain unchanged between Pressley's City Council General and Runoff is not correct.

23.     From 2003 – 2014, a total of eleven races have resulted in a City of Austin City Council

---

[15]Exhibit H, Official 2014 General Election Results by precinct, self-authenticating public record, website for the Travis County Clerks' Election Results:  http://www.traviscountyclerk.org/eclerk/Content.do?code=E.1
[16] Exhibit I, Official Runoff Election Results cumulative, and by precinct, self-authenticating public record, website for the Travis County Clerks' Election Results:  http://www.traviscountyclerk.org/eclerk/Content.do?code=E.1

Runoff.[17]  The graph below shows the ranges and standard deviations of the four, weighted and unweighted precinct results, values for those 11 races (similarly calculated as the Pressley race).

24.     Furthermore, compared to the Pressley vs Casar race, no race in 11 years shows such a tight distribution with a standard deviation of 0.06%.  Ten races have greater than 10x the standard deviation (0.67% or higher) and three races show greater than 100x the standard  deviation (7.05% or higher) .



No other Council race in the history of electronic voting in the City of Austin for Council races from 2003 – 2014 has shown such a tight distribution between a General and a Runoff Elections and this fact strengthens the inference that the results are erroneous.  These vote tabulation mistakes by Travis County are likely related to violations of, but not limited to

   a.  mishandling and tabulation of the electronic ballots cast on the Hart InterCivic hardware and software,

---

[17] Self-authenticating Travis County Website of precinct level results for Austin City Council races for the General and the Runoff elections for 2003, 2005, 2008, and 2011 http://www.traviscountyclerk.org/eclerk/Content.do?code=E.1.

b. not adhering to the specific laws and procedures as defined by the Texas Constitution[18], Texas Election Code[19], Texas Secretary of State[20], US Federal Elections Commission[21,22], and

25. Hart InterCivic operation and training manuals.[23] Errors committed by Travis County caused these 3,937 electronically cast votes[24] to be counted and tabulated incorrectly. Thus, election officers failed to count legal votes correctly.

26. Because so many high volume District 4 precincts showed exactly the same percentage results for Pressley and Casar, it is possible mistakes were made with the saving, loading and/or counting the votes on the memory cards (Mobile Ballot Boxes). In addition, errors, mistakes, or possible fraudulent activity may have occurred with the hardware or software used for counting and tabulating voting results (Mobile Ballot Boxes, Tally, Rally, BOSS, JBC, eSlates, etc.) used for the Runoff.

A. Early Voting—More Ballots than Voters

27. Anomalies occurred with counting and reporting of the Early Voting results. The December 30, 2014 canvassed results for Early Voting were inconsistent with the December 1-10, 2014 Travis County Early Voting voter reports received from Travis County.

28. During Early Voting from December 1 – December 10, Travis County published 24 hour reports that reported 2,651 total voters voted in Early Voting in District 4. Reviewing the voter

---

[18] Texas Constitution, Article 6, Section 4

[19] Texas Election Codes 52.062, 52.063, 52.064, 52.070, 124.063

[20] Exhibit J, Texas Secretary of State 2014 Electronic Voting Procedures: (http://www.sos.state.tx.us/elections/laws/electronic-voting-system-procedures.shtml), and the 2012-03 Advisory (http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml)

[21] Exhibit K, 1990 Federal Election Commission Performance and Testing Standard for Punchcard, Marksense, and Direct Recording Electronic Voting Systems.

[22] Exhibit L, 2002 Federal Election Commission Voting System's Standards, Volume 1, Performance Standards.

[23] Exhibit M, Hart Voting System Support Procedures Training Manual, self-authenticating Idaho Secretary of State Website: http://www.sos.idaho.gov/elect/clerk/Hart/ac6300-006_62D_SupportProcedures_%23390-cp.pdf

[24] Exhibit A

ID's, 437 entries existed for those submitting Ballot by Mail (BBM).

29.     There were at least 28 duplicate entries for BBM.[25]  At least 28 Ballot by Mail, mail-in ballots, appear to have been counted and/or referenced twice or three times.  See Exhibit N for duplicate Ballot by Mail Entries.

30.     Once duplicate BBM's were removed from the voter rolls, 2,622 unique voter names remained that voted in Early Voting according to the Early Voting lists from Travis County that were distributed prior to Election Day, December 16, 2014.

31.     Based on Travis County's Canvassed and Recount results for those that voted for Greg Casar, or Laura Pressley or Under Voted, the total number of ballots cast for Early Voting is 2,701.  The unknown extra 80 ballots are distributed among 15 of the 18 precincts of the District 4 Race  (One precinct, with one eligible voter, showed no votes.).[26]  See table below.

32.     The pervasiveness of the Early Voting discrepancies in 15 precincts are evidence of systemic errors occurring in the counting.  Thus the Early Voting tabulation accuracy cannot be relied on to determine the outcome of the election.

33.     The issue of the mismatch between the number of individuals who voted and the number of ballots cast, is indicative of several known and documented scenarios of errors and security breaches that can occur with the Hart Electronic Voting Systems[27].

---

[25]Exhibit N, Duplicate Ballot by Mail entries reported in Travis County's 24hr Early Voting Rolls
[26] Exhibit O, Early Voting Discrepancies, more ballots than voters.
[27] Exhibit P, California Secretary of State Source Code Review of the Hart Expert and Exhibit S, affidavit declaration by Dr. Jefferey Jacobson, Ph.D. regarding theInterCivic Voting System:
http://pubs.cs.rice.edu/sites/pubs.cs.rice.edu/files/Source%20Code%20Review%20of%20the%20Hart%20InterCivic%20Voting%20System.pdf

| | Early Voting Discrepancies | | |
|---|---|---|---|
| Pct | Total Ballots Cast per Canvass and Recount | Voters Names per Early Voting Rolls from County | Ballot Discrepancy (Over votes) |
| 156 | 431 | 422 | 9 |
| 222 | 319 | 307 | 12 |
| 135 | 271 | 264 | 7 |
| 139-- | 270 | 265 | 5 |
| 140 | 233 | 228 | 5 |
| 217 | 216 | 205 | 11 |
| 149-- | 195 | 191 | 4 |
| 133-- | 149 | 145 | 4 |
| 164-- | 116 | 113 | 3 |
| 260-- | 108 | 103 | 5 |
| 142-- | 86 | 83 | 3 |
| 209-- | 81 | 77 | 4 |
| 223-- | 68 | 66 | 2 |
| 258-- | 59 | 55 | 4 |
| 268-- | 59 | 57 | 2 |
| 211-- | 24 | 25 | -1 |
| 224-- | 16 | 16 | 0 |

34. These tabulation irregularities also show the reported Runoff results for the Pressley/Casar race are in question and are erroneous.

35. According to expert, Dr. Jefferey Jacobson, Ph.D. [28],

> The patterns Dr. Pressley found in the vote data are suspicious enough to warrant further analysis and testing, especially in light of the numerous election irregularities and given the security weaknesses in the Hart InterCivic voting system.

36. The previously noted, highly unlikely mathematical patterns associated with the 3,643 votes cast in the top 9 precincts, along with the Early Voting discrepancies, strongly suggests that the electronically cast and counted votes in the Runoff cannot be relied in determining the true outcome of the election because there are no true ballot images to verify the voters' intent. Contestant alleges the counting errors—in tabulating the top 9 precincts (3,643 votes) and the counting errors in tabulating the Early Votes (2,701 votes)—committed by Travis County caused

---

[28] Exhibit S, Expert affidavit and declaration by Dr. Jeffrey Jacobson, Ph.D.

these votes to be counted incorrectly and prevents knowing or ascertaining the true outcome of the election.

**B. Election Irregularities, Mistakes and Possibility of Fraud Makes Results Invalid**

37.     Travis County election officers committed numerous mistakes and election law violations related to all of the 3,937 electronically cast votes in the District 4 Runoff that materially affected the outcome of the election.   For these specific electronically cast votes, Travis County failed to adhere to critical election rules, counting procedures, and security protocols as outlined in the Texas Constitution, the Texas Election Code, the Texas Secretary of States Procedure/Advisories, and the Federal Election Commission's Voting System's Standards, and the Hart Voting System requirements.   Violations that materially affected the outcome of the election are outlined in chronological order as they occurred on Election Day and during the Recount in the following respects:

1. Not printing Zero Tape Reports

38.     The Texas Secretary of State[29] and Hart InterCivic Manuals[30] require the printing of Zero Tape Reports during Early Voting and on Election Day at each precinct/polling location. Zero Tape Reports are defined by the Texas Secretary of State as "A Zero Tape is the tape that is printed when the voting machine is first set up at the polls.  It is called a Zero Tape since all contests or propositions should have zero votes next to each name or question."  Exhibit J, p. 13 and 35.

39.     According to the Texas Secretary of State's Election Advisory No. 2012-03(6)(g)(vi), for

"Opening the Polls:
      vi.  1. At a minimum print one zero tape from each applicable device, as follows:  The

---

[29] Exhibit J, Texas Secretary of State 2012-03 and June 2014 Electronic Voting Procedures Advisories.
[30] Exhibit M, Hart Training Manual

presiding judge, an election clerk, and not more than two watchers, if one or more watchers are present, *shall* sign the zero tape. 2. Maintain zero tapes in a secure location to be returned with election materials (i.e. Ballot Box #4 or other secure means designated by the general custodian of election records)." *(emphasis added)*

40.     According to Hart's Voting System Support Procedures Training Manual Exhibit J, p. 108, "The "Zero Tape" report displays the contests and options [candidates] available on the ballot(s) for this polling place. It is *proof* that the JBC has no votes cast on it the first day of Early Voting and/or the start of Election Day." *emphasis added.*

41.     Travis County received a waiver from the Secretary of State granting permission to not print Zero Tapes for the November 4th General Election because of the extensive number of races and candidates for the General Election.  The Secretary of State did not provide a waiver granting permission to not print Zero Tapes for the December 16, 2014 Runoff and Special Election which had a very small number of races and candidates (Austin Mayor, Council Members, AISD and ACC Trustees).

42.     Michael Winn, Travis County Elections Division Director, in a phone call, relayed to Contestant on December 15, 2014, they were instructing election judges to not print Zero Tapes at the beginning of Early Voting and to not print Zero Tapes on Election Day for the Runoff. Review of Discovery documents provided by Travis County, no Zero Tapes (showing the number of votes present on the Hart Voting equipment for each candidate when the polls open) were printed during Early Voting and no Zero Tapes were printed on Election Day of the Runoff.  This is evidenced by the JBC Report Envelope produced by Travis County, Exhibit C. [31]

43.     Travis County disregarded the printing Zero Tape Reports and the Hart InterCivic operational procedures and the retention of crucial election records mandated by the Texas

---

[31] Exhibit C, JBC Envelope contents produced by Travis County showing the District 4 polling locations election materials— no Zero Tapes were printed or signed by election judges at those locations.

Secretary of State. As a result, as the Hart Training Manual (Exhibit M) states, there is no "*proof* that the JBC has no votes cast on it the first day of Early Voting and/or the start of Election Day" *(emphasis added)* at the Countywide Polling locations the Runoff.

44. A critical election security protocol for retaining key election records was ignored. This undermines the claimed DRE results, (3,937) electronically cast ballots, for the District 4 race because there is no "*proof* that the JBC has no votes cast on it the first day of Early Voting and/or the start of Election Day." The Travis County officers violations affected the outcome of the election because votes may have remained on the voting equipment (Mobile Ballot Boxes (MBB's), eSlates and JBC) and as a result the court cannot ascertain the true outcome of the election.

### 2. Not printing Results/Tally Tape Reports

45. The Texas Secretary of State also mandates the printing of Results/Tally Tape Reports on Election Day at each precinct/polling location.[32] Tally/Results Tape Reports are defined by the Texas Secretary of State as "A Results Tape is the tape that is printed when the polls close. It is called a Results tape since all contests and propositions are listed and have the resulting votes next to each name or question." Exhibit J, p. 12 and 35.

46. According to the Texas Secretary of State's Election Advisory No. 2012-03(6)(k)(iii) Exhibit J, for

"Closing the Polls:"
> iii. After the polls have been closed on Election Day, the precinct election officials *shall* print out, at a minimum, two copies of the results tape from each applicable device and secure the voting device against further use. (Warning do not print the results tape during Early Voting; this includes the last day of Early Voting). 1. The presiding election judge, an election clerk, and not more than two watchers, if one or more watchers are present, *shall* sign the results tape(s). 2. The copies of the results tape(s) shall be distributed as

---

[32]Exhibit J, Texas Secretary of State 2012-03 and June 2014 Electronic Voting Procedures Advisories.

follows: a. Envelope #3 this is delivered to the presiding election judge; and b. Ballot Box #4 (or other secure means designated) that is delivered to the general custodian of election records, along with other election media and materials." *Emphasis added.*

47.     Similarly as noted above, Travis County received a waiver from the Secretary of State granting permission to not print Results/Tally Tape Reports for the November 4th General Election because of the extensive number of races and candidates for the General Election.[33]  The Secretary of State did not provide a waiver granting permission to not print Results Tapes for the December 16, 2014 Runoff and Special Election which had a very small number of races and candidates (Austin Mayor, Council Members, AISD and ACC Trustees).

48.     Michael Winn, Travis County Director of Elections also relayed to Contestant on December 15, 2014, that election officers were instructed to not print Tally/Results Tapes at the close of the polls on Election Day.  A review of Discovery documents provided by Travis County, shows no Results Tapes were printed or signed by election officers on Election Day of the Runoff.[34]

49.     Travis County produced actual envelopes the election officers used to store official election records.[35]  On the front of each of the election judges' JBC Report Envelopes (where polling location election records are stored and returned), were the instructions, "DO NOT PRINT THE TALLY." [36]

50.     In addition, in Travis County Clerk, Dana DeBeauvoir's deposition (Exhibit D, p. 128, 13-15), she confirms election judges were instructed to not print the Tally/Results tapes that the Texas

---

[33] Exhibit T, Texas Secretary of State Waiver for General Election, Nov. 4th 2015.
[34] Exhibit C, JBC Envelope contents produced by Travis County showing the District 4 polling locations election materials— no Results/Tally Tapes were printed or signed by election judges at those locations.
[35] Exhibit C, JBC Envelope contents produced by Travis County showing the District 4 polling locations election materials— no Results/Tally Tapes were printed or signed by election judges at those locations.
[36] Exhibit C, JBC Report Envelope contents produced by Travis County showing the District 4 polling locations election materials— no Results/Tally Tapes were printed or signed by election judges at those locations.  On the cover of the JBC Report Envelope, instructions to election officers clearly state, "DO NOT PRINT THE TALLY."

Secretary of State requires.

51.    Without Results/Tally Tape Reports, there is no proof of the vote totals each candidate received during the election, prior to the election materials (eSlates, JBC's and MBB's) being transferred to Central Counting for electronic tabulation.

52.    The Results/Tally Tapes are an essential backup election record of the vote and they help ensure the electronically cast 3,937 votes results are consistent with subsequent Central Counting computer tabulation results.  A critical election security protocol for retaining key election records was ignored by Travis County and thus invalidates the results for the (3,937) electronically cast ballots for the District 4 race because there is no *proof* that the JBC had no votes cast on it erroneously for the Runoff or that there were computer corruption issues at Central Counting that skewed the true will of the voters in the Runoff.

53.    The lack of retention of the Results/Tally tape further highlight the fact the Runoff results are erroneous, cannot be trusted due to corruption errors, and cannot be validated with retained election records, and so many security protocols were violated.  These irregularities have caused the  true outcome, of the 3,937 electronically cast votes in the Runoff, to not be known.


    4.Contestant's Official Poll Watchers Were Denied Access on Election Night— Four Counts
       of Criminal Violations Committed by Travis County Election Officer

54.    Two of Contestant's Official Poll Watchers were denied access to and were prevented from signing Results/Tally Tapes.  Rae Nadler-Olenick and Paul Williams were official poll watchers for the Pressley Campaign and they were enied access to Results/Tally Tapes on December 16, 2014 at polling location Randalls at Braker/Research Hwy 183 and Gus Garcia Recreation Center, respectively.

55. Both Mrs. Nadler-Olenick and Mr. Williams were present and observed that official Poll/Tally tapes were not printed when the polls were closed at their respective polling locations. They were both present and observed that Results/Tally tapes were not printed before the election materials and equipment was removed from their respective polling locations. They were both prevented from signing the official Results/Tally tapes because the election officials at Randalls were instructed to not print the Results/Tally tapes[37] and they, inturn, did not print them.[38] See affidavit of official poll watcher, Paul Williams, Exhibit U.[39]

56. The Travis County officers violations materially affected the outcome of the election because there is no way to verify the voting equipment and vote results (MBB, eSlate, and JBC) were s not corrupted or modified after leaving the polling location. We know for a fact from multiple Travis County election officer affidavits that many security seals on the election equipment were improperly sealed, seals were removed, and resealed because of security issues.[40] Two additional Pressley Official Poll Watchers were denied access to view election activities at the Dobie Middle School election substation and the Travis County Central Counting facility on Election Day after the polls closed.

57. Sergio Martinez and Claire Martinez were also Official Campaign Poll Watchers for Contestant. Sergio and Claire Martinez were initially denied access to Dobie Middle School, Substation on December 16, 2014 and were not able to monitor and track the first set of election materials being transferred from the countywide polling location at Gus Garcia Recreation Center

---

[37] Exhibit C, JBC Report Envelope contents produced by Travis County showing the District 4 polling locations election materials— no Results/Tally Tapes were printed or signed by election judges at those locations. On the cover of the JBC Report Envelope, instructions to election officers clearly state, "DO NOT PRINT THE TALLY."
[38] Exhibit C, JBC Envelope contents produced by Travis County showing the District 4 polling locations election materials— no Results/Tally Tapes were printed or signed by election judges at those locations.
[39] Exhibit U, Affidavit of Official Poll Watcher, Paul Williams.
[40] Exhibit E, Affidavits from Runoff election officers documenting security seals are improperly sealed, removed and resealed.

to the Dobie Substation. This was one of the strongest Pressley precincts and voting locations in District 4 and they intended to track the MBB chain of custody and transfer procedures.

58. Election materials entered and left the Dobie Substation and Mr. and Mrs. Martinez were not able to monitor the chain of custody and transfer status of election materials (MBB's, etc.) from the various polling locations. This affected the outcome of the Runoff election in that errors in tabulating votes and maintaining security protocols occurred at Central Counting.

59. Also, Sergio and Claire Martinez were subsequently denied access in monitoring the transfer of election materials (including but not limited to Mobile Ballot Boxes, sealed JBC and eSlate computers, official envelopes with materials, and the like) and were prevented from monitoring the tabulation activities occurring at Central Counting on Election night on December 16, 2014.

60. On Election night, Contestant made numerous personal phone calls to the Travis County Director of Elections, Michael Winn, informing him of that Mr. and Mrs. Martinez were repeatedly being denied direct access to election and tabulation activities at Central Counting and Mr. Winn did not correct the situation after multiple conversations.

61. Obstructing an official poll watcher is a Class A misdemeanor in the Texas Election Code 33.061:

> Sec. 33.061. UNLAWFULLY OBSTRUCTING WATCHER. (a) A person commits an offense if the person serves in an official capacity at a location at which the presence of watchers is authorized and knowingly prevents a watcher from observing an activity the watcher is entitled to observe. (b) An offense under this section is a Class A misdemeanor. Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.

62. Multiple "activities the watcher is entitled to observe" were violate by Travis County election officers as it relates to Pressley's official watchers:

    a. Pressley poll watchers Paul Williams and Rae Nadler-Olenick were prevented from

observing the printing and signing of Result tapes at the respective polling locations they were serving on Election Day, and

    b.   Pressley poll watchers Sergio and Claire Martinez were prevented from accessing and observing election materials transfer at Dobie Middle School and election material transfer/election tabulation activities at Central Counting, respectively, on Election Day.

63.    Multiple election irregularities occurred at Central Counting on Election Day and Pressley's poll watchers were denied access to monitor and report the issues. These election irregularities are the most concerning and egregious out of all the irregularities which occurred during the Runoff election. These are very serious Class A misdemeanors, criminal violations, of the Texas Election Code 33.061 and Contestant has documented violations of four separate counts.

64.    These violations materially affected the outcome of the election in that an inordinate number of election irregularities occurred and there was a lack of accountability of election officers with regard to no printing of Zero Tapes, no printing of Results Tapes, denying office poll watchers access to election activities, improperly sealed electronic devices, security breaches of the Tally vote tabulation system, corrupt Mobile Ballot Box entries, and Tally Audit log deletions. The intent of the poll watchers is to ensure accountability, transparency, and secure practices are adhered to. Because of the erroneous reported election results, the egregious election irregularities, and the missing election records, the outcome of the Runoff cannot be known.

5.Audit Logs at Central Counting Show Missing Logs, Security Issues and Corrupt Files Loaded

65.    Hart Voting System Audit Logs show multiple problems

a.  Tally Audit log and Ballot Now entries missing (Exhibit B, V,[41] W[42])

b.  Security issues (Exhibit B, E)

c.  MBB processing errors during vote tabulations at Central Counting on Election Day, December 16,2014, and (Exhibit B)

d.  questionable entries into the Tally and security systems after Contestant filed her Election Contest, etc. (Exhibit B).

66.  Numerous software/hardware errors occurred when Travis County electronically transferred and tabulated the electronic Cast Vote Records. There are nine "Invalid/Corrupt MBB" errors recorded in the Tally Audit logs during Election Day tabulations of votes. These are errors associated with tabulating the electronic votes from the Mobile Ballot Boxes (Exhibit B pages 5, 22, 23, 26, 27, 29 and 42). According to the Travis County Clerk, Dana DeBeauvoir, the Tally Audit logs are legally required and she describes the information the logs contain:

> "In general, they're going to track every single step, everything that's happening at the counting station on election night.··So every time something's turned on, every time something's turned off, every time an entry happens." (Exhibit D, DeBeauvoir's Deposition, p. 72 ,19-23)

67.  The audit logs in the Tally (Exhibit B) and Ballot Now subsystems (Exhibit V and W) show long periods of apparent inactivity between an administrator's last recorded action and a session logout. They range from two hours to days long (see summary table, below).

---

[41] Exhibit V, Security audit logs for BN PC5system
[42] Exhibit V, Security audit logs for BN PC3  system

| Date of LogOut | Travis County audit logs | Time System Was Open | Time Frame System Was Open and Vulnerable |
|---|---|---|---|
| 12/1/2014 | Ballot Now (BNPC3) | 10 days | Early Voting |
| 12/2/2014 | Ballot Now (BNPC5) | 7 days | Early Voting |
| 12/10/2014 | Ballot Now (BNPC3) | 9 days | Early Voting |
| 12/11/2014 | Ballot Now (BNPC3) | 1 day | Early Voting |
| 12/12/2014 | Ballot Now (BNPC3) | 1day | Early Voting |
| 12/15/2014 | Ballot Now (BNPC3) | 3 days | Early Voting |
| 12/16/2014 | Tally | 2 hrs, 44 min | Election Day Tabulations |
| 12/16/2014 | Ballot Now (BNPC3) | 1 day | Election Day Tabulations |
| 12/18/2014 | Ballot Now (BNPC5) | 8 days | Election Day Tabulations |
| 1/6/2015 | Tally | 4 hours | Recount |

68.     During these extended logon times, anyone with physical access to the computer could use the administrator account to arbitrarily change vote information in the database then directly edit the log files to hide the fact (Exhibit S, Dr. Jacobson's affidavit).  This would require no more skill than reading the Tally manual and using legal administrator commands. There are unusually long periods of apparent inactivity during a crucially important logged-in Tally administration session during Election Day when vote tabulations were underway from 12:30pm thru 3:24pm (Exhibit B).

69.     When not in use, the Tally system should be logged off to protect the security of the vote tabulation database.  Having the system open is a critical security breach.  The Tally system vote tabulation database was left open and security was compromised or there are activity files missing. Either way, the integrity of the electronic vote tabulation cannot be trusted.   Thus, the outcome cannot be known to be true.   Every vote counted electronically cast and counted (3,937) cannot be known and exceed the margin of victory.  The Court cannot determine the will of the votes and a new election is required.

70.     When asked about other extended time periods where the Tally administrator was logged on and no activity was documented for roughly 7 days (Exhibit B)  DeBeauvoir (Exhibit D,

deposition) stated, "I don't know what this means...I don't believe that's true...I doubt it's true...I doubt it's true...[the log is wrong?] yeah...I don't think that's true...I don't know..." (Exhibit M, Dana's Deposition p. 114, line 16 thru p. 117, p. 3).

71.　In effect, the Travis County Clerk under oath when asked about the Tally Audit logs and the issues, she stated, "I don't think that's [Audit logs] true."　Because the voting tabulation system was left open and security was compromised or there are log files missing, the integrity of the vote tabulation cannot be trusted.　Thus, the outcome of the electronically tabulated votes cannot be known to be true.

72.　Tally Audit Logs show multiple error codes being registered during the loading of MBB's during vote tabulations at Central Counting[43].　With no Results/Tally Tape Reports from the polling locations (Exhibit C), there is no data to validate the results of the tabulation of the electronically cast ballots and, thus, the results for the (3,937) electronically cast ballots for the District 4 race and the outcome cannot be known.

73.　In this election, the Tally Audit log produced by Travis County shows no less than nine (9) instances of a corrupted Mobile Ballot Box being introduced into the Travis County election Tally system (Exhibit B).　These documented, admitted nine (9) separate instances of corrupted data being introduced into the election count system make it impossible to determine the true outcome of the election.[44]

74.　This is an extraordinary level of corrupt mobile ballot boxes (MBBs), showing something was wrong with the system that tallied the votes, according to the Travis County Clerk.　From her deposition (Exhibit D, page 98, lines 18-20; page 99 lines 4 -9):

---

[43] Exhibit B, Tally Audit Logs

[44] *See* Exhibit S, Declaration of expert witness Jeffrey Jacobson, Ph.D; *See also* Attachment B thereto, Audit Log produced by Travis County; *See also* Exhibit D, Deposition of Dana DeBeauvoir, p. 87, 94, 96, 97, and 98, and Tally Audit Log, Exhibit 12 to Exhibit M (authenticated at page 55-56.)

Q. [I]t's a little unusual to have so many invalid MBBs in an election tally, isn't it?
A. · ·I've never heard of so many –

A. I suspect there's something wrong with the reader, not the MBBs.
Q. (BY MR. COHEN) Okay. So you think -- your suspicion is that there was something wrong with the reader that night?
A. Correct.

75.     There were more invalid/corrupt ballot boxes in a single election than Dana DeBeauvoir had ever heard of. DeBeauvoir is a person of extraordinary experience and knowledge in elections. She has been Travis County Clerk for 28 years, overseeing elections in all that time, including every election since 2002 using the Hart eSlate system. And she has NEVER HEARD OF as many invalid MBBs in an election tally as there were in this election. The Travis County Clerk herself conceded that something was very wrong with the system tallying the votes -- that there was a degree of error in that election beyond anything she had ever heard of happening before.

76.     And, according to her deposition testimony (Exhibit D), she has no idea why. From her deposition, page 95, lines 6-10:

Q. · ·I haven't seen anywhere in this audit log what -- where it tells you what it did when it found a corrupt MBB. · ·Do you -- is that...
A. · ·Yeah. · ·There would be other documentation that will tell you what happened. · ·I can't tell you.

77.     From her deposition, page 96, lines 22-25:

·Q. · ·(BY MR. COHEN) · ·Again, on page 23, if you go down by 8:42, there's another "Invalid/Corrupt MBB," and we still don't know what happened to that MBB.
 A. · ·Same thing.

78.     From her deposition, page 97, lines 1-8:

Q. · ·Okay. · ·And then there's another one a little further down, again. · ·And then there -- it says "MBB already read by Tally." · ·Do you see that? · ·There's three of those in a row.
A. · ·Uh-huh. · ·Uh-huh.
Q. · ·Do you have any idea what that -- what happened as a result of that?

A.· ·I'm sorry.··I don't.

According to expert, Dr. Jefferey Jacobson, Ph.D.(Exhibit S p. 1-2), "Properly created MBB(s) may have contained legitimate votes, but some event made it/them unreadable or corrupted... Alternatively, a third party may 'Introduce corrupt MBBs into the legitimate flow of MBBs from the precincts back to Election Central' (California report, page 48, paragraph 1).[45] This could damage the credibility of the vote counting process."

79.     Corrupt MBBs, whether deliberately tampered with or accidentally introduced into the system, will either result in a failure to count actual votes, or in the counting of invalid votes, or in other corruption of the system.

80.      In any event, nine (9) separate introductions of corrupted mobile ballot boxes into a system designed to tally votes is sufficient to undermine the reliability of the purported outcome.

81.     The numerous irregularities (mathematical anomalies, failure to keep ballot images, failure to print and keep Tally/Results tapes, numerous Invalid/Corrupt Mobile Ballot Box errors, Mobile Ballot Box reader malfunction, deleted Tally Audit log data, and security breaches of the Tally system, shutting down polling locations) all render impossible a determination of the true outcome of the 3,937 electronically cast votes in the Runoff election.

6.Travis County Conducted Critical Recount Activities from January 4, 2015 through January 6, 2015 at 10:59am, before the Official Recount on January 6, 2015 at 11:00am.

82.     The discussion of the problems and illegalities arising in the "recount" are relevant to the

---

[45] Exhibit A, Attachment 5, **California Report:**  Inguva, S., Rescorla, E., Shacham, H., & Wallach, D. S. (2007). Source code review of the Hart InterCivic voting system. *University of California, Berkeley under contract to the California Secretary of State.* https://www.sos.ca.gov/voting-systems/oversight/ttbr/Hart-source-public.pdf  **California2007.pdf, Attachment 5 to Jacobson Declaration.** This report is an official California government record, obtained through an official California government website, and is admissible as an exception to the hearsay rule under Texas Rule of Evidence 803(8) (c) (new number 803 (8)(A)(iii), effective April 1, 2015.), and TRE 902 (5).

election contest because the issues that appeared for the first time in the recount pointed to errors in the conduct of the election. Specifically, the inability of Travis County to produce "images of ballots cast" at the recount, in violation Texas Election Code § 213.016 led to the discovery that the machines, as configured by Travis County for the December run-off election, violated Texas Election Code § 128.001(a)(2). The discovery that Travis County, in operating the December run-off election, did not "provide for the **use** of a computerized voting system with . . . (2) a main computer to coordinate ballot presentation, vote selection, **ballot image storage**, and result tabulation" is conclusive evidence of illegality in the election.

83. One of the items the tribunal in an election contest is charges with determining is if "the outcome of the contested election, as shown by the final canvass, is not the true outcome because: … an election officer or other person officially involved in the administration of the election:… engaged in other fraud or illegal conduct or made a mistake." TEX. ELEC. CODE § 221.003.

84. Failing to print the legally required "images of ballots cast" for the election recount is a violation of Texas Election Code § 213.016 by itself. But it also led proximately to the discovery of additional illegality.

85. Moreover, the discovery of those two illegalities undermine both the possibility of an accurate count or an accurate recount, as "images of ballots cast" are a prerequisite to a recount, and the counting of actual ballots is the nature of a count.

86. The errors and illegalities at the "recount" also led to the discovery in the audit logs of multiple corrupt mobile ballot boxes and other errors in the conduct of the election, some of which were testified to by the County Clerk.

87. Unofficial recount activities were completed on January 4 – 6. This was prior to the official Recount Start Notice (January 6, 2015 at 11:0am) and as a result, Pressley and her official

watchers were not aware of and not allowed to monitor the unofficial recount activities that occurred prior.

88.     On January 4 – January 5, 2015, prior to the start of the Official Recount on January 6, 2015, Travis County Clerk and the Election Division officers conducted unofficial recount activities in which they:

   a.   gained access to the sealed and archived voting records for the District 4 Austin City Council Runoff Election on December 16, 2014, (Exhibit B)

   b.   Electronically extracted the District 4 voting records in the form of Cast Vote Records, (Exhibit B),

   c.   copied and compiled the official District 4, Cast Vote Records into a single pdf report, (Exhibit X)[46]

   d.   printed roughly 4,000 Cast Vote Records for the District 4 race,

   e.   convened members of the Recount Committee whose roles were to recount votes (Exhibit Y)[47]

   f.   conducted unofficial Recount activities that lasted 4-6 hours[48].

89.     A Travis County employee, a member of the recount committee, who was present at the Official Recount on January 6th, relayed to one Pressley's recount watchers, on January 6, 2015, "They started all this on Sunday [January 4, 2015]."

90.     Direct evidence of unofficial recount activities are shown in the Audit logs of Travis County's Hart Tally and SERVO systems (Exhibit B).  These various audit logs document access, extraction, compilation, and printing of reports of the official District 4 Cast Vote Records and

---

[46] Exhibit X, Early Vote CVR in one file, used to print CVR, produced by Travis County
[47] Exhibit Y, Recount Invoice from Travis County
[48] Exhibit Y, Recount Invoice from Travis County

data on January 4th (2:18pm), January 5th (2:18pm), and January 6th (8:24am)—all prior to the start time of the Official Recount on January 6, 2015 at 11:00am.

91.     Contestant and her Official Watchers attended the Official Recount which started at 11:00 am and individuals tasked with counting votes were dismissed around 4:30pm (roughly after 5.5 hours).  Additional evidence for unofficial recount activities are shown in the invoice (Exhibit Y) of the Recount charges which was provided to Contestant by Travis County after the Official Recount.  The invoice documents Recount Committee members such as individuals who were temporary employees and who counted votes.  In many cases, individuals counting votes were documented as working over 9 hours performing vote recounting activities.

92.     This Travis County Recount invoice documents Recount Committee members counting votes, spent roughly twice the hours (Exhibit Y) required to complete the Official Recount and Contestant's Official Watchers were not allowed to monitor those prior recount activities.

93.     In addition, at the Official Recount, Contestant requested to view the source and properties of the CVR files, such as dates of the CVR files and origination, and was denied by the Recount Committee Member, the Travis County Director of Elections, Michael Winn.

94.     Obstructing an Official Watcher is a criminal offense and materially affected the outcome of the Recount.  Contestant and her Official Poll Watchers were denied access and were not allowed to monitor the critical recount activities such as vote retrieval and counting (Exhibit Y).

95.     Most importantly, Contestant and her official Recount Watchers were not allowed to monitor the integrity of where the Cast Vote Records were retrieved (Exhibit B), the source where the retrieval occurred, or the copying of the Cast Vote Record files to an aggregated pdf file.  The Recount pdf file obtained from Travis County during Production, is an electronic file and was created on January 6 approximately at 10:00 am was used to print, and was used to count votes in

the Recount.

96.     Denying Contestant her rightful access to monitor Recount activities and determine that illegal votes (in the form of duplicate copies of CVR's) were printed and counted, materially affected the outcome of the Recount. Counting copies of 3,937 CVR's do not meet the statutory requirements for counting legal votes. The only legal votes produced at the Recount were the Mail in Ballots which were counted and tabulated to result in an exact tie of 240 votes for Pressley and 240 votes for Casar (Exhibit A).

7. Illegal Votes Counted—Statutory Ballots, Ballot Images and Images of Ballots Cast Were not Retained, Produced or Counted at Official Recount

97.     On Tuesday, January 6, 2015, at 11:00 a.m. when the recount was to begin, the Travis County Clerk and the Recount Committee relayed to Contestant and her official recount watcher, Karen Renick that images of ballots cast on the Hart Electronic Voting System (eSlate) were not available, would not be printed, and would not be recounted.[49]

98.     At that meeting, Dr. Pressley expressly stated, in her "Petition Requesting a Recount," and "Amended Petition Requesting a Recount" that "[w]e are requesting a manual recount of the results using the actual, stored, ballot images." (See Appendix 11.) Pressley also expressly requested "a manual (by-hand) count." "[T]he election code expressly provides for the 'printing of images of ballots cast using direct recording electronic voting machines for the purpose of a manual recount.' *See id*. § 213.016." *Andrade v. NAACP of Austin*, 287 S.W.3d 240, 258 (Tex. App. Austin 2009), *rev'd on other grounds* by *Andrade v. NAACP of Austin*, 345 S.W.3d 1 (Tex. 2011).

99.     Travis County's failure to print and count 3,937 images of ballots cast, for the District 4

---

[49] Exhibit Z, Affidavit of Karen Renick.

Austin City Council Election on December 16, 2014 on the Hart eSlate Electronic Voting System, violates this provision of the election code and materially affected the outcome of the election because 3,937 illegal cast votes were counted.

100.    Printing the CVR data files was in essence reprinting the previous electronically counted results obtained on Election night.  A CVR is a printing of a data file to a template.  A template that does not meet the statutory requirements for a "ballot" or an image of a "ballot" and as such it is not a meaningful check on the original count.[50]

101.    The recount failed to *only* count legal votes because "images of ballots cast" were not

---

[50] Secretary of State is somewhat unclear on this issue.  Travis County's production of a "cast vote record" is a subset of the information on an Official Ballot.  Therefore, an "image of ballots cast," if a true image, is an exact replica of a ballot cast. The 2014 Electronic Voting System Procedures bulletin, posted online at http://www.sos.state.tx.us/elections/laws/electronic-voting-system-procedures.shtml, the SOS appears to not clearly differentiate cast vote records from ballot images. *See, e.g.*, Section 8:

**Section 8 – Requested Recounts (if necessary)**

**Requested Recount on DRE Voting Systems (Pursuant to TEC § 214.071):**

1. The candidate requesting a recount may request that the recount be done electronically or manually.
2. For an electronic recount, the persons specifically permitted by law to be present at the recount are also authorized to be present as the election media are reloaded into the central accumulator system.
3. For a manual recount of a DRE election, the Recount Coordinator shall organize the printing of cast vote records (ballot images) for the affected race or issue.
a.      The Recount Coordinator shall notify the parties in the recount of the date, place, and time the printing of cast vote records (ballot images) will take place.
b.      The full recount committee is not required to be present at the printing of cast vote records (ballot images) and the Recount Chair shall determine how many members should be present. The persons specifically permitted by law to be present at the recount are entitled to be present as the cast vote records (ballot images) are printed and to have the same number of representatives as allowed for the recount.
c.      If the manual recount does not take place immediately after the printing of the cast vote records (ballot images), the printed cast vote records (ballot images) shall be locked and secured until the recount takes place.
d.      A manual count of the printed cast vote records (ballot images) shall be conducted in the same manner as a recount of hand-counted paper ballots.

After the recount is complete, the printed cast vote records (ballot images) shall be secured and preserved for the appropriate preservation period for maintaining election records.

provided and counted. Using the 3,937 CVR's instead of ballot image violates Texas Election Code 214.049 (e): "If electronic voting system ballots are to be recounted manually, the original ballot, rather than the duplicate of the original ballot, shall be counted." Ballots are defined in Texas Election Code Chapter 52, Subchapter C.[51]

<u>Cast Vote Records are not legal Ballots, Ballot Images or Images of Ballots Cast</u>

102.     The most material fact in this lawsuit and is at a minimum hotly contested. Contestee relies on *post-hoc* letters and instructions from agencies with a bureaucratic bias to argue that a cast vote record satisfies the statutory and constitutional requirements that an image of a ballot cast be kept to verify the computers tabulation of what the actual ballot the voter sees when the selecting a candidate. Contestant relies on the factual difference between the ballot used and the cast vote record, expert testimony relying on reports and government statements and the statutes and laws of the State of Texas to contend that a cast vote record does not comply with the law's requirement to maintain images of the ballots cast. The resolution of this issue is very material to the decision in this case because if a cast vote record is not a ballot or an image of a ballot there were no votes in the election that can be counted other than the Absentee/Mail in Ballots.

**1. Definitions of "Ballot Image"**

---

[51] For the purposes of this suit, the most salient portions of that subchapter are Sec. 52.003 and Sec. 52.070.
Sec. 52.003. PLACING CANDIDATE'S NAME ON BALLOT. (a) Except as otherwise provided by law, the authority responsible for having the official ballot prepared shall have placed on the ballot *the name of each candidate*:…
Sec. 52.070. VOTING SQUARE AND INSTRUCTION FOR CANDIDATES. (a) A square for voting shall be printed to the left of *each candidate's name* on a ballot.
(b) Immediately below "OFFICIAL BALLOT," the following instruction shall be printed: "Vote for the candidate of your choice in each race by placing an 'X' in the square beside the candidate's name."
…
(e) A square shall be printed to the left of each line provided for write-in voting under Section 52.066(c), but failure to place a mark in the square does not affect the counting of a write-in vote. (*emphasis* added.)

103. The Texas Secretary of State defines "Ballot image" without reference to a notion of "Cast Vote Records."[52] Per the Secretary of State's Glossary of Election Terminonolgy (Exhibit AA, p. 2): "Ballot Image: The ballot as it appears on a direct recording electronic (DRE) voting system. A ballot image is self-evidently therefore not a Cast Vote Record.

104. The phrase "Cast Vote Record" does not appear in the Exhibit O, Texas Secretary of State's Glossary of Election Terminology. *Id.*

105. The Federal government also defines "Ballot image" without reference to the notion of "Cast Vote Record." In 1990, the Federal Election Commission's Performance and Testing Standard for Punchcard, Marksense, and Direct Recording Electronic Voting Systems (DRE)[53] (Exhibit K, p. 48, paragraph 1) reported:

> To attain a measure of integrity over the process, DRE systems must also maintain images of each ballot that is cast, such that records of individual ballots are maintained by a subsystem independent and distinct from the main vote detection, diagnostic, processing and reporting path.

106. Therefore, a Cast Vote Record (CVR) is not an image of "each ballot that is cast."

107. To the extent the 1990 FEC report discusses what would later be known by others as "Cast Vote Records," the FEC distinguishes these data files from ballot images, saying there should be two pathways for vote records in DRE's: a) images of ballots cast capability, and b) vote detection, processing and reporting path for vote data. The CVR is a reporting path/subsystem for reporting voete results to the Tally system and a ballot image is an image file that is independent from a data reporting path (*See* Exhibit K). Therefore a Cast Vote Record is not an image file of a ballot.

108. In 2002, The Federal Elections Commission's 2002 Voting System's Standards, Volume 1,

---

[52] *See* Attached Exhibit AA, Texas Secretary of State's Glossary of Election Terminology, http://www.sos.state.tx.us/elections/laws/glossary.shtml.
[53] *See* Exhibit K the Federal Election Commission's 1990 Performance and Testing Standard for Punchcard, Marksense, and Direct Recording Electronic Voting Systems.

Performance Standards[54] (Exhibit L) reinforced and upheld these 1990 requirements for DRE's to maintain two pathways independent from each other so that vote data is stored and ballot images are preserved (p. 31-Section 2.2.4.2, p. 60–Section 3.2.1b(2), and page 135—Section 9.5.1.2.a). Therefore, a Cast Vote Record is not an image of a ballot.

109. In addition, Contestee never proves that the Cast Vote Record electronic file or paper copy produced by Travis County is an image file, is a replica of anything a voter sees when they are voting, or that it meets the legal standards of an Official ballot. The Cast Vote Record that Travis County has produced is not produced from an official ballot, is not produced from an image of an official ballot, or produced from anything a voter saw or experienced when casting their electronic vote. Therefore, a Cast Vote Record is not a ballot image.

110. Perhaps most decisively, the Hart Intercivic manuals themselves concede that a CVR is not a ballot image. Hart's own Ballot Now Operations Manual documentation[55] provided to Travis County states that the eScan subsystem scans each paper ballot to create an exact digital image of the ballot cast. The eScan creates and stores a ballot image (a bitmap, .bmp file) and then reads the data to make a Cast Vote Record (Ballot Now manual, Exhibit AB, page 24 and 259-260). In this way, the Travis County's Hart manual clearly refers to the CVR (a data structure used to transfer data for tabulation in Tally) and the ballot image (bitmap, .bmp file) as two technically different things. Therfore, a Cast Vote Record is not an image of a ballot.

### 1. A Cast Vote Record is not the same as a Ballot Image

111. Paragraph 22-29, above, decisively establish that the Texas Secretary of State, the Federal Election Commission and Hart InterCivic all define "ballot image" and "Cast Vote Record" as

---

[54] *See* Exhibit L Elections Commission's 2002 Voting System's Standards, Volume 1, Performance Standards.
[55] Exhibit AB, Ballot Now Manual produced by Travis County.

distinctly different.[56] This, at a minimum, creates a fact issue as to whether a Cast Vote Record is an image of ballot cast that is required by law to preserved and counted in recount and contest.

112. Additionally, the following Texas statutes show that the Legislature intended the word "ballot image" to have a specific meaning that is different from the meaning asserted for "Cast Vote Record."

113. The Texas Election Code, Sec. 128.001(a)(2), requires that "The secretary of state shall prescribe procedures to allow for the use of a computerized voting system. The procedures **must** provide for the **use** of a computerized voting system with . . . (2) a main computer to coordinate ballot presentation, vote selection, **ballot image storage**, and result tabulation." The language of the statute is mandatory.[57]

114. Thus, the statute requires any Travis County electronic voting system have all of those four components: a main computer to coordinate a) ballot presentation, b) vote selection, c) **ballot image storage**, and 4) result tabulation.

115. Importantly, this section of the Code was enacted in 1997, before the word "Cast Vote Record" appears in any Federal Election Commission and Texas Secretary of State records, and before such a term could have acquired any "technical or particular meaning." The words must therefore be construed as required under the Code Construction Act "Sec. 311.011. COMMON

---

[56] Exhibit AC, additionally, Casar misrepresents the definitions of Cast Vote Record and ballot image in the 2007 Election Assistance Commission Spanish-English Glossary of Key Election Terminology by omitting relevant pages in Exhibit AC. Those relevant pages are attached, however in Exhibit 6 to Exhibit 24 of the Amended MSJ, and provide the false notion that the EAC defines "ballot image" and "Cast Vote Record" as synonymous. The relevant pages are found in Exhibit AC, p. 15, 16,and 19.

[57] Texas Government Code (Code Construction Act) governs the use of the word.

   Sec. 311.016. "MAY," "SHALL," "MUST," ETC. The following constructions apply unless the context in which the word or phrase appears necessarily requires a different construction or unless a different construction is expressly provided by statute:
       (1) "May" creates discretionary authority or grants permission or a power.
       (2) "Shall" imposes a duty.
       (3) "Must" creates or recognizes a condition precedent.

AND TECHNICAL USAGE OF WORDS. (a) Words and phrases shall be read in context and construed according to the rules of grammar and **common usage**." (emphasis added.)

*See* Acts 1997, 75th Leg., ch. 1349, Sec. 50, eff. Sept. 1, 1997.

116.    While Contestee mocks Pressley's use of the common usage of the word "image" as a "picture," that is plainly the meaning contemplated by the Legislature in enacting the statute in 1997. A "Cast Vote Record" is nothing more than "result tabulation" referenced by the 1990 Federal Election Commission and contemplated by the 1997 statute.[58]

117.    This interpretation is subsequently supported by the 2002 Federal Election Commission report (Exhibit L) and the Texas Secretary of State Glossary of Election Terms (Exhibit AA, http://www.sos.state.tx.us/elections/laws/glossary.shtml, last visited March 15, 2015, 11:36 a.m.) defines as follows: "Ballot Image: The ballot as it appears on a direct recording electronic (DRE) voting system." No definition of "Cast Vote Record" appears in the Secretary of State's Glossary of Election Terms.

118.    A genuine issue of material fact exists as to the central issue in this case: whether all four components were provided in the conduct of the Runoff election in order to determine the victor in the runoff. Plaintiffs assert the "Cast Vote Record" used in the Travis County Runoff election is not an "image of a ballot cast." A side-by-side comparison of a Hart "ballot image" and "cast vote record" shows that the two are not the same.

119.    The Cast Vote Record shown below (Exhibit AD) is authenticated in Exhibit D, Deposition of Dana DeBeauvoir, Exhibit 10, p. 42 lines 18-21.

---

[58] Alternatively, a CVR could also be described using the language of the FEC report, as a vote data storage pathway – essentially synonymous with "results tabulation."

"Ballot Image" from Hart InterCivic Ballot Now Manual
Produced by Travis County

"Cast Vote Record"
Produced by Travis County

120.

121.    The "ballot image" shown above from the Hart Intercivic Ballot Now Manual is from Exhibit AB.

122.    Further, a comparison of an example of an "image of ballot cast" (from the Hart Manual) and a Travis County Runoff Absentee/Mail-in-Ballot (Exhibit AE) shows that the two are as nearly identical to each other.  They are clearly very different from the  Travis County Runoff Cast Vote Record.

"Ballot Image" from Hart InterCivic Ballot Now Manual
Produced by Travis County

Actual Ballot by Mail
Produced by Travis County

123. The Absentee/Mail-in Ballot results are attached as Exhibit A, and are authenticated in the Deposition of Dana DeBeauvoir (Exhibit D), p. 44-46 p 58, line 10 – p 59, line 9.

124. The Absentee/Mail-in Ballot is attached as Exhibit AE, and is authenticated in the Deposition of Dana DeBeauvoir (Exhibit D), p. 45, lines 13-21.

125. The Cast Vote Record is attached as Exhibit AD, and is authenticated in the Deposition of Dana DeBeauvoir (Exhibit D), p. 42, lines 20-21.

**A CVR is not a "Ballot Image" as a matter of information technology**

126. A CVR is not a Ballot "Image" as a matter of information technology and computer science. As reported by expert, Dr. Jeffrey Jacobson, Ph.D., in Exhibit S, p. 2, "[According to] the

California Report[59], a Cast Vote Record is typically not more than 100 bytes of digital information.

Image files are far larger than a Cast Vote Record. Image files contain digital information that is not

present in a Cast Vote Record. A CVR is nothing more than a simple data record."

**CVR is not a "Ballot Image" as a matter of law.**

127. A ballot image, as a matter of plain language, requires a "Ballot" and an "image."

128. A Cast Vote Record is not an electronic system Ballot as defined under Tex. Elec. Code §

124.063:

> Sec. 124.063. INSTRUCTIONS REQUIRED ON BALLOT. (a) An electronic
> system ballot on which a voter indicates a vote by making a mark on the ballot must
> contain the following instruction if candidates are to be voted on: "Vote for the
> candidate of your choice in each race by making a mark in the space provided
> adjacent to the name of that candidate." If a proposition appears on the ballot, the
> ballot must contain the following instruction: "Make a mark in the space provided
> beside the statement indicating the way you desire to vote."

129. The Cast Vote Record, Exhibit S, does not include the mandated instructions.

130. A CVR is not a Ballot as defined under Exhibit A, Attachment 7, the Federal Election

Commission Performance and Test Standards, 1990, which was the most current federal guidelines

in 1997, when the first Texas statute using the term, Texas Election Code § 128.001(a), was enacted.

131. A Cast Vote Record is not a Ballot as defined under Tex. Elec. Code Chapter 52.

132. A Cast Vote Record is not a Ballot as defined under Tex. Constitution, Art. 6, Sec. 4.

133. The tribunal cannot ascertain the true outcome because the only actual ballots – the

Absentee/Mail-in Ballots – are exactly tied,[60] and no other ballots were legally cast, or recorded and

---

[59] Exhibit P, **California Report:** Inguva, S., Rescorla, E., Shacham, H., & Wallach, D. S. (2007). Source code review of the Hart InterCivic voting system. *University of California, Berkeley under contract to the California Secretary of State.* https://www.sos.ca.gov/voting-systems/oversight/ttbr/Hart-source-public.pdf **California2007.pdf, Attachment 5 to Jacobson Declaration.** This report is an official California government record, obtained through an official California government website, and is admissible as an exception to the hearsay rule under Texas Rule of Evidence 803(8) (c) (new number 803 (8)(A)(iii), effective April 1, 2015.), and TRE 902 (5).
[60] *See* Attached Exhibit A, (authenticated by Deposition of Dana DeBeauvoir, Exhibit D, p. 58, Line 10 - p. 59, Line 9, and attached Exhibit 13.)

counted.

134. Travis County admits that its system can only produce the easily-falsifiable Cast Vote Records, not the more secure images of ballot cast required under the Texas Election Code (128.001a(2), 213.016).

135. During the recount, for the first time, it became apparent that Travis County had this illegal defect in its procedures when Travis County only produced Cast Vote Records, and the election recount supervisor stated that Travis County was incapable of printing images of ballots cast.[61]

136. Because no ballot images were ever preserved, it is impossible for Travis County to produce and count the ballots, as required under the Tex. Constitution, Art. 6, Sec. 4, and Texas Election Code (213.016, 214.049(e)).

137. Because no ballot images were ever preserved, it is impossible for Travis County to conduct a lawful recount the ballots, as required under the Texas Election Code (213.016, 214.049(e))

138. The ballot images must be preserved under the Texas Election Code. Failure to preserve ballot images means that essential election records are missing. Such missing records make it impossible for the tribunal to determine the outcome. In the event of such missing records,[62] an order to void the result and order a new election is appropriate. *Garcia v. Avila*, 597 S.W.2d 400, 405 (Tex. Civ. App.-San Antonio 1980, writ dism'd).

139. Additionally, the evidence produced by Travis County shows that mistakes were made that make it impossible for the tribunal to know the true outcome of the election.

<u>**Arguments and Authorities**</u>

---

[61] Attached Exhibit Z, Affidavit of Karen Renick, p.2

[62] DeBeauvoir confirmed that the election Tally system audit log is also missing data during Early Voting (Exhibit D, Deposition of Dana DeBeauvoir, p.76, line 7-15). In addition, DeBeauvoir confirmed that Travis County is also missing the Results/Tally Tapes required by the Secretary of State. The SOS requires Results/Tally Tapes be printed when closing the polls. When DeBeavoir was asked if the Runoff poll judges were told to not print Results/Tally tapes directly after the closing of the polls, her response was "correct." (Exhibit M, Deposition of Dana DeBeauvoir, p. 128, line 15).

140. "The tribunal shall declare the election void if it cannot ascertain the true outcome of the election." TEX. ELEC. CODE § 221.012. The tribunal cannot ascertain the true outcome, because of evidence of mistakes and illegalities in the conduct of the election.[63]

141. The largest and simplest illegality is plain. Travis County did not comply with the Texas Election Code requirement that, if it is to use a computerized voting system, it must use a system with ballot image storage.[64]

## A CVR is not a "Ballot Image."

142. **As a matter of computer science, a CVR is not an "image" at all.** Image files contain information not present in a CVR. The California report (Exhibit P, page 60, paragraph two) clearly states that the CVR is a data structure. A data structure is a table or list of information, in this case, a listing of the votes from one ballot. By contrast, an image file is a computer file which describes an image as a grid of pixels, with color and other information for each pixel stored individually. A data structure is not an image file, so the Cast Vote Record file is too small to be a ballot image file.[65]

143. Image files are far larger than a Cast Vote Record.. "A CVR is not ever more than 100 bytes long (p 58, paragraph nine), which is more than enough room to hold a list of votes, at one byte per vote. But no image file format could do more than a dozen or so letters in 100 bytes; it certainly could not hold an entire ballot image."[66] A CVR is nothing more than a simple data record. "Hart's own documentation provided to Travis County states that the eScan subsystem scans each paper ballot to create an exact digital image of the ballot cast. The eScan then reads the ballot image to

---

[63] Sec. 221.003. SCOPE OF INQUIRY. (a) The tribunal hearing an election contest shall attempt to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because:
(1) illegal votes were counted; or
(2) an election officer or other person officially involved in the administration of the election:
(A) prevented eligible voters from voting;
(B) failed to count legal votes; or
(C) engaged in other fraud or illegal conduct or made a mistake.
[64] Texas Election Code §128.001
[65] *See* Declaration of expert witness Jeffrey Jacobson, Ph.D. Exhibit S, p. 2-3.
[66] *See* Declaration of expert witness Jeffrey Jacobson, Ph.D. Exhibit S, p. 2

make a CVR (Ballot Now manual, page 24, paragraph 5). In this way, the manuals clearly refer to the CVR and the ballot image as two different things."[67] A CVR is not an image file.

**144. Under Texas Statutes and constitution, a CVR is not a "ballot image" or "image of ballot cast."**

145. A ballot image, as a matter of plain language, requires a "Ballot" and an "image."

146. A ballot is defined through requirements set forth in the Texas Constitution and the Texas Election Code. It must possess:

    a. a unique serial/ticket number (Texas Constitution, Article 6, Section 4 and Texas Election Code 52.062)

    b. the election name (Texas Election Code 52.063), of Joint Special Runoff Election, Travis County

    c. the election date (Texas Election Code 52.063), of December 16, 2014,

    d. the designation of Official Ballot (Texas Election Code 52.064)

    e. a voting square to the left of each candidate's name (Texas Election Code 52.070), and

    f. voting instructions (Texas Election Code 52.070, and 124.062)

147. The Texas Code Construction Act[68] governs the interpretation of words in statutes. "Sec. 311.011. COMMON AND TECHNICAL USAGE OF WORDS. (a) Words and phrases shall be read in context and construed according to the rules of grammar and ***common usage***." (emphasis added.)

---

[67] *See* Exhibit S, Declaration of expert witness Jeffrey Jacobson, Ph.D. *See also* Hart Ballot Now manual, attached as Exhibit AB, p. 24, 149, 259, 260
[68] Texas Government Code, Chapter 311.

148.    The word "image" is defined at http://www.merriam-webster.com/dictionary/ as: Image *noun*
im·age \'i-mij\
: a picture that is produced by a camera, artist, mirror, etc.
: a mental picture : the thought of how something looks or might look
: the idea that people have about someone or something
Full Definition of IMAGE
**1:**  a reproduction or imitation of the form of a person or thing; *especially* :  an imitation in solid form :  statue
**2 a :**  the optical counterpart of an object produced by an optical device (as a lens or mirror) or an electronic device
**b :**  a visual representation of something: as (1) :  a likeness of an object produced on a photographic material (2) :  a picture produced on an electronic display (as a television or computer screen)
**3 a :**  exact likeness :  semblance <God created man in his own *image* — Genesis 1:27(Revised Standard Version)>
**b :**  a person strikingly like another person <she is the *image* of her mother>
**4 a :**  a tangible or visible representation :  incarnation <the *image* of filial devotion>
**b** *archaic* :  an illusory form :  apparition
**5 a** (1) :  a mental picture or impression of something <had a negative body *image* of herself> (2) :  a mental conception held in common by members of a group and symbolic of a basic attitude and orientation <a disorderly courtroom can seriously tarnish a community's *image* of justice — Herbert Brownell>

**b :**  idea, concept
**6:**  a vivid or graphic representation or description
**7:**  figure of speech
**8:**  a popular conception (as of a person, institution, or nation) projected especially through the mass media <promoting a corporate *image* of brotherly love and concern — R. C. Buck>
**9 :**  a set of values given by a mathematical function (as a homomorphism) that corresponds to a particular subset of the domain

149.    Thus, an "image" of a ballot cast, as "construed according to the rules of grammar and *common usage*," would require a "picture" or "reproduction" or "optical counterpart" or "visual representation" or "exact likeness" or "image" file, in something similar to a photograph, a bitmap, Jpeg, pdf, tif, etc. or similar computer format.

150.    The Texas Election Code, Sec. 128.001(a)(2), requires that "The secretary of state shall prescribe procedures to allow for the use of a computerized voting system.  The procedures **must** provide for the **use** of a computerized voting system with . . . (2) a main computer to coordinate ballot presentation, vote selection, **ballot image storage**, and result tabulation."

151. A "Cast Vote Record" is nothing more than data storage file used for results tabulation. The Texas Government Code, Sec. 311.016(2) and (3) states:

> "MAY," "SHALL," "MUST," ETC.  The following constructions apply unless the context in which the word or phrase appears necessarily requires a different construction or unless a different construction is expressly provided by statute:
> (2)  "Shall" imposes a duty.
> (3)  "Must" creates or recognizes a condition precedent.

152. Since Section 128.0001 of the Election Code states that the "secretary of state shall prescribe procedures [which] **must** provide for the **use** of a computerized voting system with . . . (2) a main computer to coordinate … **ballot image storage**," the ballot image storage is a condition precedent to the legal use of any computerized voting system.

153. Travis County has failed to comply with this condition precedent to the legal conduct of an election.  While this would theoretically affect other races decided in December of 2014, the statute of limitations has passed for all election contests save this one.

154. The Hart Electronic Voting system can, according to its manuals, store ballot images and cast vote records.[69]  The sky will not fall if this Court orders Travis County to conduct this election in conformance with Texas Election Code, using capabilities that are already part of the Hart Intercivic Ballot Now system (Exhibit A, Attachment 6).  Contests of all other elections that have been held are barred by limitations.  According to the Hart Manual it is a simple fix to have the system preserve images of the ballots the voters use in deciding which candidate to vote for and that conforms to the legal definition of a ballot.

155. Further, the Texas Government Code, Sec. 311.021, states in pertinent part:

> Sec. 311.021.  INTENTION IN ENACTMENT OF STATUTES.  In enacting a statute, it is presumed that:
>
> (1) compliance with the constitutions of this state and the United States is intended;

---

[69] Exhibit AB, Hart Ballot Now Operations Manual p. 24, 149, 259, 260

(2) the entire statute is intended to be effective;
(3) a just and reasonable result is intended;
(4) a result feasible of execution is intended; and
(5) public interest is favored over any private interest.

156.    Because the "ballot image storage" is listed separately as a requirement in two different parts of the statute, it is a just and reasonable to construe the entire statute as operating under that feasible requirement that an actual "ballot image," instead of a mere tally of the "Cast Vote Records," be retained in the system in order to promote the public interest in transparent elections in which a human being can look at an image of a ballot and count by hand accordingly in a Recount, in a manner closely analogous to the way that ballots have been counted in America for centuries.

157.    The private interest of saving money by using a system on the cheap that does not fulfill the public purpose of transparent elections is disfavored.  The purpose of the Election Code is to provide an accurate and transparent method of electing representatives to government offices in a way that is both efficient and conducive to public faith in the process.[70]

158.    In *Alvarez v. Espinoza*, the court observed that "[t]he election code seeks to prevent error, fraud, <u>mistake,</u> and corruption, *and to give effect to the will of the voters*."  844 S.W.2d 238, 242 (Tex. App.—San Antonio 1992, writ dism'd w.o.j.) (*emphasis* added).  The court continued:

> The public must have confidence that the election process is fair for all candidates….Those who have studied history and have observed the fragility of democratic institutions in our own time realize that one of our country's most precious possessions is the commitment of our public officials to the rule of law—fair and evenhanded application of rules known in advance—*and the widespread acceptance of election results.*

Id. at 249 (*emphasis* added).

---

[70] "The purpose of the election code is to ensure that the true will of the voters is 'fairly expressed' and that the evidence of that expression is 'properly preserved.' *Prado* [*v. Johnson*, 625 S.W.2d 368 (Tex. Civ. App.--San Antonio 1981, writ dism'd w.o.j.))], 625 S.W.2d at 369-70." *Gonzalez v. Villarreal*, 251 S.W.3d 763, 778 (Tex. App.-Corpus Christi 2013).  The failures and mistakes illustrated in this Contest show that the will of voters was thwarted, and the evidence of that expression was **not** properly preserved.

159.	The United States Supreme Court has observed that:

> [v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised. The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

*Purcell v. Gonzalez*, 549 U.S. 1, 7 (2006) (per curiam) (internal citations and quotations omitted).

160.	By throwing out illegitimate votes of nonresidents, and enforcing the strict procedures for storage of ballot images, use of only non-corrupt mobile ballot boxes and non-defective mobile ballot box readers which protect against fraud and exploitation of voters, *see Guerrero v. State*, 820 S.W.2d 378, 383 (Tex. App.—Corpus Christi 1991, pet. ref'd), this court will protect the franchise of all those District 4 voters who voted legitimately.  The court should not hesitate, therefore, in ordering a clean election.

161.	Because "ballot image storage" was not used by Travis County, as the statute requires, the ballot images from the runoff election are missing election records and there are no ballots that can be counted other than the Absentee/Mail in Ballots which resulted in a tie. Therefore the only true outcome that can be ascertained is a tie which requires a new election.

> "Election records" also include ballot boxes (containing voted ballots), tally sheets, absentee ballots, applications for absentee ballots in person and by mail, signature rosters for election day voting, and poll lists. *Garcia v. Avila*, 597 S.W.2d 400, 405 (Tex. Civ. App.-San Antonio 1980, writ dism'd). These items, and items like them, also constitute "precinct election records," as defined and used in chapter 66 of the code. In addition, section 273.003 lists election returns, voted ballots, and the signature roster as specific types of election records. TEX. ELEC. CODE ANN. § 273.003 (Vernon 1986). Based on the uses of the term "election records" and the examples listed within the code, we conclude "election records" are those which memorialize the actual election and the actual conduct of the election.

*Dallas Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 228-229, 2000 Tex. App. LEXIS 5773, 13-14 (Tex. App. Dallas 2000)

162.	"Ballot images" are "'election records' ... which memorialize the actual election and the

actual conduct of the election."

163.    Travis County has no ballot images.

164.    Missing election records are, alone, sufficient grounds for this court to void the election. *Garcia v. Avila*, 597 S.W.2d 400, 403 (Tex. App.—San Antonio 1980) ("[B]ecause of the missing records it was impossible to ascertain the true results of the election. On that basis, the election was declared void and a special election was ordered.)

165.    Similarly, in this case, because the election records are missing, this honorable Court must void the election and order a runoff election between the Contestant and Contestee on voting machines that "use ballot image storage" as required by Texas Election Code 128.001 (a). Contestee's amended motion for summary judgment must be denied.

**The unserious "argument" that erroneous agency interpretation can retroactively affect statutory history.**

166.    Contestee alleges, in what can only be described as a preposterous parody of statutory construction, that an *ex post facto* application of agency construction of language that flies in the face of plain meaning rule and which undermines the relevant federal standards and produces a result that is both absurd and at odds with the statutory intent is to control.

167.    It is uncontested that the relevant Texas statutes were enacted in 1997[71] and 2003.[72] Those statutes require "ballot image storage." and "images of ballots cast."

168.    In his motion for traditional summary judgment, Contestee attempts to create ambiguity in the reading of the statutes by asserting that various administrative agencies, years after the enactment of the statutes at issue, have redefined the words of the statutes in ways that are inconsistent with plain language and inconsistent with the meaning of the statutes as understood at

---

[71] Texas Election Code, Sec. 128.001(a)(2)
[72] Texas Election Code, Sec. 213.016

the time of their enactment.

169.    This is, to put it generously, a badly mistaken view of statutory construction.

170.    Administrative redefinition of statutes is not allowed.

171.    Under Texas case law, as set forth in *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water, 336 S.W.3d 619, 625 (Tex. 2011)*, the Texas Supreme Court reaffirmed it's 20-year-old rule that limited the deference due to administrative determinations to those that are " 'reasonable and do[] not contradict the plain language of the statute.' *First Am. Title Ins. Co., 258 S.W.3d at 632* (quoting *Tarrant Appraisal Dist. v. Moore, 845 S.W.2d 820, 823 (Tex. 1993))*."

172.    The *Safe Future* Court added that "this deference is tempered by several considerations:"

> It is true that courts give some deference to an agency regulation containing a reasonable interpretation of an ambiguous statute. But there are several qualifiers in that statement. First, it applies to formal opinions adopted after formal proceedings, not isolated comments during a hearing or opinions [in a court brief]. Second, the language at issue must be ambiguous; an agency's opinion cannot change plain language. Third, the agency's construction must be reasonable; alternative *unreasonable* constructions do not make a policy ambiguous.

173.    The plain language of the statutes require an "image" of a "ballot." A "Cast Vote Record," as a mere data record is neither "image" nor "ballot."

174.    In *Texas Dep't of Protective and Regulatory Services v. Mega Child Care,* 145 S.W.3d 170, 177 (Tex. 2004), the Texas Supreme Court, in overruling a 25-year-long pattern of erroneous interpretation of administrative law, made it clear that Texas embraces an unusually strong version of the plain meaning rule.

> If the statutory text is unambiguous, a court must adopt the interpretation supported by the statute's plain language unless that interpretation would lead to absurd results. *See Tune v. Tex. Dep't of Pub. Safety*, 23 S.W.3d 358, 363 (Tex.2000) ("We must enforce the plain meaning of an unambiguous statute."); *Republic Bank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex.1985) ("Unless a statute is ambiguous, we must follow the clear language of the statute."); *Brazos River Auth. v. City of Graham*, 163 Tex. 167, 354 S.W.2d 99, 109 n. 3 (1962) ("[O]perating as we are under a strict theoretical division of governmental powers, it would take a bit of

doing on the part of the judiciary to say, **in** the absence of ambiguous and uncertain statement or patent and manifest absurdity, that the Legislature intended something different from the clear import of the words chosen by it...."); *Gilmore v. Waples*, 108 Tex. 167, 188 S.W. 1037, 1039 (1916) (The literal meaning of a statute may be disregarded "only where it is perfectly plain that the literal sense works an absurdity or manifest injustice.").

*See also AIC Mgmt. v. Crews*, 246 S.W.3d 640 (Willet, J., concurring) (internal citations omitted) (citing to *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 652 n.4 (Tex. 2006) and 542 U.S. 241, 267, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004) (Scalia, J., concurring in the judgment).

175.    The language of 128.001(a)(2) and 213.016 is unambiguous. The application of the plain language does not lead to absurd results. The plain language does not work an absurdity or manifest injustice. Therefore, the Court must enforce the plain language requiring the storage and printing of images of ballots cast.

176.    Contestee argues that the plain meaning rule does not apply, because subsequent statements by administrative agencies contradict the plain meaning. In support of this notion, Contestee cites Texas Government Code 311.011 (b): "Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

177.    First of all, it is obvious that there is no unanimous or consistent re-definition of a "ballot image" as a "Cast Vote Record" at the federal level, or even within the Texas Secretary of State's Office, or within the manuals of Hart InterCivic governing this very voting system. *See supra*, paragraphs 22-29.

178.    Moreover, every suggestion of such a re-definition put forth by Contestee is dated AFTER the statutes were enacted in 1997 and 2003.[73] It is impossible that documents published AFTER the statutes were enacted were considered by the legislature, and intended to have effect in defining

---

[73] The Texas Secretary of State references cited are in 2012, 2014 and 2015. A single Election Assistance Commission reference, which is mischaracterized as described *supra*, is dated 2007. There is no evidence that the "Words and phrases [] ha[d] acquired a technical or particular meaning" prior to statutory enactment.

statutes written years before they were published.[74] The suggestion, once clearly explained, is obviously ludicrous.

179.    If that were not enough reason to disregard the notion put forward by Contestee, the *Safe Future* deference "applies [only] to formal opinions adopted after formal proceedings, not isolated comments during a hearing or opinions [in a court brief]." (second bracket set in original.)

180.    Contestee has put forward no evidence of any "formal opinions adopted after formal proceedings," and has explicitly attempted to rely on a 2008 "isolated comments during a hearing or opinions [in a court brief]." These random droppings are due no deference by this court..

181.    Contestee also rests its notion that the SOS may willy-nilly redefine the words in statutes on Section 52.075 of the Election Code. That section allows the SOS to "prescribe the form and content of a ballot for a... electronic voting system .. to conform to the formatting requirements of the system." The limiting language in the provision does not allow the SoS to redefine the statute. The limiting language allows the SoS to change the form and content merely to the extent required to conform with formatting requirements of a computer system. This is unsurprising, necessary, and nowhere near as broad a grant of power as Contestee imagines. This allows the SoS to choose, for instance, among various image file formats. But it does not allow the SoS to ignore the requirement  of Texas Election Code, Sec. 128.001(a)(2) for "a main computer to coordinate ballot presentation, vote selection, **ballot image storage**, and result tabulation." *How* the SoS mandates compliance with the 128.001(a)(2) elements is discretionary under 52.075. *If* they mandate compliance with the 128.001(a)(2) elements is *not* made discretionary by 52.075. Further, the more specific provisions of Election Code Chapter 124, SubChapter C Electronic Voting System Ballot, trump 52.075. (*e.g.*,

---

[74] Tex. Const., Art. 1, Sec. 16. states that "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." There is no reason to believe that retroactive administrative rulings are in some way exempt from this rule.

the electronic system ballot must be a different color than the sample ballot, §124.062; specific instructions are required, §124.062.)

182. A ballot is defined through requirements set forth in the Texas Constitution and the Texas Election Code. It must possess:

    a. a unique serial/ticket number (Texas Constitution, Article 6, Section 4 and Texas Election Code 52.062)

    b. the election name (Texas Election Code 52.063), of Joint Special Runoff Election, Travis County

    c. the election date (Texas Election Code 52.063), of December 16, 2014,

    d. the designation of Official Ballot (Texas Election Code 52.064)

    e. a voting square to the left of each candidate's name (Texas Election Code 52.070), and

    f. voting instructions (Texas Election Code 52.070)

183. The cast vote records do not fulfill these requirements.

184. Consequently, the Court must reject any "cast vote records" counted, produced and tallied on election night and the recount because they do not meet the statutory standards of an Official Ballot and cannot be verified as representing the voter's intent in the District 4 Runoff race. This is especially true when the election tally is pervasively tainted s described above.

185. In addition, the Texas Election Code is very clear that "ballots," "images of ballots cast," and "ballot images" are to be counted and used to verify voters' intent when the election results are challenged. It is well known, that an actual digital, electronic image file in the form of various types such as a bitmap, pdf, jpg, png, etc. is a different type of file compared to a CVR dataset file. The legislature's specific language of "ballot image" provides a secondary method for verifying

ballot counts. Simply printing out the same CVR data to a predefined CVR template, and counting those CVR's which is what was already electronically counted, is not a verification method.

8.Re-canvass Should have Occurred with Mail in Ballots

186. The District 4 Austin City Council Election made material errors and should have been re-canvassed using the results of the recount of the Mail in Ballots (240 for Pressley and 240 for Casar) and the election should have been declared a tie between Contestant Pressley and Contestee Casar.

187. Travis County failed to follow statutorily required recount procedures and recounted the 3,937 votes which were illegal on two counts. Primarily, the 3,937 votes were not counted from "images of ballots cast." Secondarily, the 3,937 votes were not original Cast Vote Records—they were copies of Cast Vote Records that were aggregated into a pdf file that was generated in January 2015. Travis County made material errors because the 3,937 votes cast on the eSlate are illegal on both counts and the final canvassed result, which was derived from these illegal votes, is not the true outcome of the election; the true outcome is a tie.

III. CAUSE OF ACTION

188. Contestant incorporates paragraphs 1 through 76 of this Petition herein

189. The runoff election for City Council of the City of Austin, Precinct 4 must be voided pursuant to Section 221.012 of the Texas Election Code and a new election held as described below because the true outcome cannot be ascertained or, in the alternative the only ballots cast in the election meeting legal requirements of a ballot resulted in a tie.

190. The result of these multiple irregularities, mistakes and possibility of fraud is that the result cannot be ascertained. The Court may request voters to disclose how they voted. Or, the

Court may declare the election void without attempting to determine how voters voted (Texas Election Code 221.009) and call for a new election. Dr. Pressley requests that such an election be timely set, and conducted in compliance with the Texas Constitution and the Texas Election Code.

191. In Texas Constitution, Article 6, Section 4, "In all elections by the people, the vote shall be by ballot..." The Texas Election Code 52.001, also stipulates, "the vote in an election is by official ballot..." Ballots are defined in Texas Election Code Chapter 52, Subchapter C.[75]

192. In addition, the Texas Election Code (xxx) is very clear that "ballots," "images of ballots cast," and "ballot images" are to be counted and used to verify voters' intent when the election results are challenged. It is well known, that an actual digital, electronic image file in the form of various types such as a bitmap, pdf, jpg, png, etc. is a different type of file compared to a CVR dataset file. The legislature's specific language of "ballot image" provides a secondary method for verifying ballot counts. Simply printing out the same CVR data to a predefined CVR template, and counting those CVR's which is what was already electronically counted, is not a verification method.

193. Several election safeguards and procedures defined by the Legislature and the Secretary of State that are intended to prevent human errors were mistakenly not followed by Travis County. The mistakes and failure to adhere to the Secretary of State's procedures led to and caused errors, and illegal votes to be counted, legal votes to be not counted, and the election outcome cannot be

---

[75] For the purposes of this suit, the most salient portions of that subchapter are Sec. 52.003 and Sec. 52.070.
Sec. 52.003. PLACING CANDIDATE'S NAME ON BALLOT. (a) Except as otherwise provided by law, the authority responsible for having the official ballot prepared shall have placed on the ballot *the name of each candidate*:...
Sec. 52.070. VOTING SQUARE AND INSTRUCTION FOR CANDIDATES. (a) A square for voting shall be printed to the left of *each candidate's name* on a ballot.
(b) Immediately below "OFFICIAL BALLOT," the following instruction shall be printed: "Vote for the candidate of your choice in each race by placing an 'X' in the square beside the candidate's name."
...
(e) A square shall be printed to the left of each line provided for write-in voting under Section 52.066(c), but failure to place a mark in the square does not affect the counting of a write-in vote.
(*emphasis* added.)

known.

194.    The sum total of all voting irregularities identified herein <u>exceeds</u> the number of votes by which the election was decided.

195.    If no "images of ballots cast" can be retrieved, printed and counted, the true outcome of the election cannot be ascertained.  The Court may order each of the more than 4,000 voters who voted in person to testify as to how they voted, pursuant to Texas Election Code Sec. 221.010. "SECONDARY EVIDENCE FOR UNAVAILABLE BALLOTS.    If an examination of ballots is needed in an election contest and the ballots are lost, destroyed, or otherwise beyond the reach of the tribunal, the voters who cast the ballots may testify as to how they voted."

196.    In the alternative, if Travis County cannot produce "images of ballots cast" to be printed and counted, then Travis County cannot unequivocally determine the outcome of the election, and the election is void.  If the court does not count cast vote records because they are not images of anything defined by law as a ballot then it can ascertain the election to be a tie by counting the Absentee/mail-In ballots either way as a matter of law, the Court must therefore order a new election.  TEX. ELEC. CODE § 232.041.[76]

**VI. PETITION TIMELY FILED**

197.    This Election Contest is brought in accordance with the provisions of TEX. ELEC. CODE §232.008, which requires the Original Petition to be filed with the District Court not later than the 30th day after the date the official result of the contested election is determined.

_____

[76] Sec. 232.041. NEW ELECTION ORDERED IF CONTESTED ELECTION VOID.  In an election contest in which the contested election is declared void, the court shall include in its judgment an order directing the appropriate authority to order a new election.

198. On Tuesday, December 30th, the Mayor and City Council of Austin conducted an official canvass and certification of the Runoff results for all races on the December 16, 2014 ballot, including District 4. However a recount was conducted on January 6, 2015 and those results did not change. The deadline for submission of a petition in an election contest is January 29, 2015. The original petition was filed on or before that date and was timely filed.

## VII. CONDITIONS PRECEDENT

199. All conditions precedents to Pressley's relief requested herein have been performed or have occurred.

### Prayer

200. Therefore, based on the foregoing, the Contestant requests the Runoff election be declared void, a new Runoff be held at which images of the ballots the voter marks on an image that contains the legally required elements of an official ballot be preserved using procedures compliant with the Texas Election Code for use in the event of a contest, the Court award reimbursement for the cost of her election contest, recount fees, and that the Court grant all other and further relief, in law and in equity, to which she may be entitled.

Respectfully submitted,

David Rogers
LAW OFFICE OF DAVID ROGERS

By: ___/s/ David Rogers_____
David A. Rogers
Texas Bar No. 24014089
1201 Spyglass Drive, Suite #100
Austin, Texas 78746
512-923-1836 — Telephone
512-201-4082 — Facsimile

Email: Firm@DARogersLaw.com

Mark Cohen
805 W. 10th Street, Suite 100
Austin, Tx. 78701
512-474-4424
512-472-5444 (f)
Mark@cohenlegalservices.com
www.CohenLegalServices.com
*Attorney for Contestant Dr. Laura Pressley*

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served in accordance with the Texas Rules of Civil Procedure on May 19, 2015 on counsel of record as follows:

Charles 'Chuck' Herring Jr. 09534100
cherring@herring-irwin.com
Jess Irwin - 10425700
jess@herring-irwin.com
Lauren Ross – 24092001
laurenbross@herring-irwin.com
Herring & Irwin, L.L.P.
1411 West Avenue, Ste 100
Austin, TX  78701
Phone: 512-320-0665
Fax: (512) 519-7580

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
Phone: (512) 476-6000
Fax: (512) 476-6002
ATTORNEYS FOR CONTESTEE,
GREGORIO "GREG" CASAR

Jessica Belinda Palvino
MCGINNIS, LOCHRIDGE & KILGORE LLP
600 Congress Avenue
Suite 2100
Austin, TX  78723
Phone: 512-495-6000
Fax: 512 495-6093
jpalvino@mcginnislaw.com

David A. Escamilla
Travis County Attorney
Sherine E. Thomas
Andrew M. Williams
Patrick M. Kelly
Assistant County Attorneys
Travis County Attorney's Office
P.O. Box  1748
Austin, Texas 78767

Phone: (512) 854-9472
Fax:     (512) 854-4808
email:  Sherine.Thomas@traviscountytx.gov,
        Pat.Kelly@traviscountytx.gov,
        andrew.williams@traviscountytx.gov

By:      _/s/ David Rogers_____

5/20/2015 10:57:19 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-15-000374

CAUSE NO. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY, | § | IN THE DISTRICT COURT |
| Contestant, | § | |
| | § | |
| V. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| GREGORIO "GREG" CASAR, | § | |
| Contestee. | § | 201st JUDICIAL DISTRICT |

## CONTESTANT'S MOTION TO COMPEL

TO THE HONORABLE JUDGE MILLS

COMES NOW, Laura Pressley, Contestant herein, and seeks an order compelling the Travis County Clerk ("Clerk") to produce documents and in support thereof would show the following:

## I.. INTRODUCTION

1. Contestant moves this honorable Court to compel the Clerk of Travis County, Texas to provide documents responsive to her requests for production. While there is some overlap, basically, the Travis County Clerk has either failed to provide such responsive documents, made erroneous objections, or asserted privileges which do not comply with Texas Rule of Civil Procedure 193.

2. Procedurally, Travis County has not provided evidence to support the privileges they assert as required by TRCP 193.4. Rule 193.4(a) requires that "The party making the objection or claim of privilege must present any evidence necessary to support the objection or privilege." The privilege log provides no such evidence of the basis for the privileges asserted. Mere assertions are not enough to preclude Travis County from providing the documents requested.

*Pressley v. Casar Motion to Compel*          *p.1*

4501

3.   Further, there are documents missing from the production requested that Travis County has asserted neither objection nor privilege.  The responses are either unclear or incomplete.  Since there are no timely objections or assertions of privilege as to the unclear or incomplete responses, the Travis County Clerk must provide the requested documents.

4.   Based on the pleadings, dispositive motions, and expert[1] impressions on file with this Court, the documents sought by this motion to compel discovery responses are essential to Contestant's case for a new election.  Contestant's response to Contestee's motions for summary judgment demonstrates potential corruption of the election process.  Contestant's expert describes the necessity and materiality of the documents requested.  The documents sought delve into the details of Travis County's process of conducting the December 2014 Runoff Election for City Council District 4 using electronirc voting machines and the proof that not only that the process itself was full of irregularities that materially affected the outcome, but that the process used by Travis County does not produce an "image of a ballot cast" as required by the Texas Election Code.

5.   Contestant moves the Court issue an order to compel Travis County to produce the documents for which it claimed privilege as well as documents that are missing or clarification of the response.

6.   Finally, should Travis County fail to comply with the Court's order, Contestant requests that the Court award attorney's fees and costs associated with this motion

---

[1] Exhibit F, Expert's Mental Impressions and Exhibit G, Expert's Declaration in Lieu of Affidavit.

*Pressley v. Casar Motion to Compel*                                              *p.2*

## II. STANDARD TO COMPEL IN ELELCTION CONTEST

7.  Texas Rule of Civil Procedure 193.1 states that "When responding to written discovery, a party must make a complete response, based on all information reasonably available to the responding party or its attorney at the time the response is made." See *In re Allied Chem. Corp.,* 227 S.W.3d *652,* 657 n.20 (Tex. 2007)("a party must make a complete response, based on all information reasonably available to the responding party or its attorney at the time the response is made.")  Providing incomplete responses violates the Texas rules for discovery.

8.  To the extent privilege is asserted based on an agreement with one of the parties, the agreement itself cannot form the basis of a privilege when portions of the information therein are discoverable.  *Fleming v. Ahumada*, 193 S.W.3d 704, 716 (Tex.App. – Corpus Christi 2006) (citing *Scott v. McIlhany, 798 S.W.2d 556, 559-60, 34 Tex. Sup. Ct. J. 64 (Tex. 1990)* (discussing inability of litigants to use private agreements to block discovery of information and testimony sought by third parties); *In re Cont'l Ins., 994 S.W.2d 423, 426 (Tex. App.-Waco 1999, orig. proceeding)* mand. granted   *In re Union Pac. Res. Co., 22 S.W.3d 338, 43 Tex. Sup. Ct. J. 145 (Tex. 1999)* (discussing limitations on contractual provisions to require litigant to "raise frivolous objections or grounds for refusing to produce discoverable information"). See also *In re DCP Midstream, L.P.*, 2014 Tex. App. LEXIS 11092 (Tex.App. – Corpus Christi 2014) (" the fact that a settlement agreement contains a confidentiality provision does not render the agreement or its contents undiscoverable as a matter of law . . . Accordingly, the confidentiality provisions of the agreement do not insulate the settlement agreement from discovery if the discovery is otherwise warranted.")

9.  Refusal to provide these documents and access to the election software and hardware used could deprive Contestant of evidence at trial relating to the actual malfunction of the electronic voting system actually used.

## III. FACTS

10. On March 19, 2015, Contestant served her First Requests for Production to Travis County, Texas County Clerk Dana DeBeauvoir, and she responded.  *See* attached Exhibit A for the initial Request for Production, Exhibit B for Court's Order, Exhibit C for Privledge Log, Exhibit D for Email responses regarding repeated requests for Production The Travis County Clerk failed to provide documents in response to the following specific requests that were originally granted by Court (Exhibit E).

11. On April 13, 2015, the Court held that the Clerk was not required to produce access to proprietary information or inspection of direct electronic voting machines, eSlate voting system, Judge's booth controllers, software or hardware used in conjunction with eState system directly to Pressley.  In attempted compliance with the order, the Clerk withheld that information from production and the equipment from inspection.

12.  The Clerk provided the privilege log attached hereto as Exhibit C listing what it did not produce and why.

13.  Of course, the documents and items the Court allowed the Clerk to withhold from direct unprotected production and inspection are not privileged except to the extent they constitute trade secrets.   The Texas Supreme Court in *In re Bass, 113 S.W.3d 735* (Tex. 2003) set forth the standard by which information may be considered a trade secret entitled to privilege:

*Pressley v. Casar Motion to Compel*                                                                              *p.4*

We have held that a ***trade secret*** is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it . . . To determine whether a ***trade secret*** exists, this Court applies the Restatement of Torts' six- factor test:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others . . .

14. There is no privilege for evidence termed "proprietary." Indeed, everything is proprietary to somebody. The Court in *In re Continental General Tire*, 979 SW2d 609, 615 (Tex. 1998) held:

> Trade secrets and confidential information are not necessarily "***privileged***" matters within the meaning of Rule 186a. If the information is material and necessary to the litigation and unavailable from any other source, a witness may be required to make disclosure.

15. Some of the withheld information is not trade secrets and should be produced and their inspection does not violate a protectable trade secret. *Midstream*, *id*. (the confidentiality provisions of the agreement do not insulate the settlement agreement from discovery if the discovery is otherwise warranted.)

16. To the extent such information and items for inspection may constitute trade secrets, they still contain information relevant to the issues in this case. The proper procedure is for such items to be tendered to the Court *in camera* for its determination if they are indeed trade secrets and with respect to trade secrets if they contain relevant information. If they contain relevant information, they should still be ordered disclosed subject to a protective order designed to protect their secrecy consistent with their need for use in this proceeding. *See In re: Dupont de*

*Pressley v. Casar Motion to Compel*                                                             *p.5*

*Nemours & Co.,* 136 S.W.2d 218 (Tex 2004). *In re: Continental General Tire, Inc.,* 979 S.W.2d 609, 613 (Tex 1998). See also *In re: Bass,* 113 S.W.3d 735, 743 (Tex 2003). See § 134A.006, Civil Practices and Remedies Code. *Jampole v. Touchy,* 673 S.W.2d 869 (Tex 1984), *Garcia v. Peeples,* 734 S.W.2d 343 (%Tex 1987). "Trade Secrets and confidential information are not necessarily "privileged" matters within the meaning of Rule 186a. If the information is material and necessary to the litigation and unavailable from any other source, a witness may be required to make disclosure." *In re: Continental General Tire, Inc.* at 615. ("Trade secrets and confidential information are not necessarily **"*privileged*"** matters within the meaning of Rule 186a. If the information is material and necessary to the litigation and unavailable from any other source, a witness may be required to make disclosure.")

### IV. Contestant and Her  Expert Needs Withheld Evidence

17.  In addition to the documents Travis County seeks to claim as privileged, other documents in Travis County's possession, custody, or control responsive to discovery for which no privilege is asserted are either missing or are not complete.

18. Refusal to let experts examine manuals, eSlate machines and MMB's to determine if they were functioning properly and other material identified in the expert's declaration severely prejudices Pressley's ability to present reliable expert testimony. Especially in light of all the defective Mobile Ballot Boxes (MBB's) which contain actual vote data, identified in the log and other irregularities identified in Pressley's response to the motions for summary judgment and the lack of images of what the voters used to make their decisions on who to vote for these items are vital not only for the expert but also for court to decide if the outcome of the election..

*Pressley v. Casar Motion to Compel*                                                              *p.6*

Also, many questions remain with regard to the preservation and printing of various crucial election records, those involved in the entry of vote data, etc. Also, the question of whether the system used was capable of preserving and printing images of the pages on which the voters chose who to vote for among the various choices is essential to whether the cast vote record satisfies the statutory requirement to maintain an image of the ballot for use in a recount as a check on the CVR produced by the computer. Therefore the Court should order the withheld documents listed on Exhibit A produced to it *in camera* and upon such inspection by the court order disclosure of all of the items on Exhibit A that are not trade secrets and for those that are but have information material to proving that the election system and procedures were unreliable, illegal and otherwise defective, order disclosure of those documents pursuant to a protective order limiting their disclosure to use in this litigation .

Respectfully Submitted,

__/s/ David Rogers_____
David Rogers
LAW OFFICE OF DAVID ROGERS
Texas Bar No. 24014089
1201 Spyglass Drive, Suite #100
Austin, Texas 78746
512-923-1836 — Telephone
512-201-4082 — Facsimile
Email: Firm@DARogersLaw.com


Mark Cohen
SBN: 04508400
805 West 10th Street, Suite 100
Austin, Texas 78701

(512) 474-4424  Phone
(512) 472-5444  Facsimile
Mark@cohenlegalservices.com
www.CohenLegalServices.com

*Attorneys for Contestant Dr. Laura Pressley*

4508

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served in accordance with the Texas Rules of Civil Procedure on May 20, 2015 on counsel of record as follows:

Charles 'Chuck' Herring Jr. 09534100
cherring@herring-irwin.com
Jess Irwin - 10425700
jess@herring-irwin.com
Lauren Ross – 24092001
laurenbross@herring-irwin.com
Herring & Irwin, L.L.P.
1411 West Avenue, Ste 100
Austin, TX  78701
Phone: 512-320-0665
Fax: (512) 519-7580

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
Phone: (512) 476-6000
Fax: (512) 476-6002
ATTORNEYS FOR CONTESTEE,
GREGORIO "GREG" CASAR

Jessica Belinda Palvino
McGINNIS, LOCHRIDGE & KILGORE LLP
600 Congress Avenue
Suite 2100
Austin, TX  78723
Phone: 512-495-6000
Fax: 512 495-6093
jpalvino@mcginnislaw.com

David A. Escamilla
Travis County Attorney
Sherine E. Thomas
Andrew M. Williams
Patrick M. Kelly

*Pressley v. Casar Motion to Compel*                                                      *p.9*

4509

Assistant County Attorneys
Travis County Attorney's Office
P.O. Box  1748
Austin, Texas 78767
Phone: (512) 854-9472
Fax:    (512) 854-4808
email:  Sherine.Thomas@traviscountytx.gov,
        Pat.Kelly@traviscountytx.gov,
        andrew.williams@traviscountytx.gov

By:      _/s/ David Rogers_____

4510

NO. D-I-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | 201ST JUDICIAL DISTRICT |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | 201ST JUDICIAL DISTRICT |

CONTESTANT'S RESPONSE TO CONTESTEE'S
MOTION TO STRIKE PLEADINGS AND FOR SANCTIONS

COMES NOW LAURA PRESSLEY, Contestant, and files this Response To Contestee's

Motion To Strike Pleadings And For Sanctions, showing as follows:

INTRODUCTION

1.  Contestee's motion to strike and for sanctions must be denied. First, Contestee asks the Court to strike Contestant's pleading based on lack of attachment of the lists referenced in the pleading. Contestant made a good faith effort to amend her contest; the attachments were not, it turns out, accepted by the Court's electronic filing system, leaving the attachments off the filing. Counsel and Contestant were not aware that the electronic filing system had rejected the attachment to the 5th Amended Contest.

2.  Second, a simple phone call or email from opposing counsel would have resulted in Contestant's counsel emailing the attachments to them. As Contestant will show below, she has done so. Constestee's counsel currently has in their possession the attachments Contestee asserts were lacking, the basis of his motion to strike and sanctions. Because Contestee has these documents in his possession, his claims that Contestant's assertions are groundless, are themselves groundless.

*Pressley Response To Casar's Motion To Strike Pleadings And For Sanctions*       *p.1*

3. Third, through discovery, Contestant has learned from Travis County's Audit Log for the 2014 Runoff election that there were nine (9) mobile ballot boxes (MBB) from the Runoff election were that were reported as corrupted. In addition to the fact the Contestee has the documents they claimed they lacked, the evidence that nine MBB's were corrupted belies Contestee's groundless claim. Finally, the issues raised in Contestee's motion to strike are addressed, and therefore mooted, by Contestant's 6th Amended Petition. Contestee's motion must be denied on the grounds set forth.

<u>Error by Court Electronic Filing System in attaching the lists referenced in the pleading</u>

4. Contestee complains that attachments referenced in the amended contest were missing from the filing. Contestant made a good faith effort to cure the defects of her previous contest based on the Court's order on special exception. Contestant attached the exhibits reference in Contestee's Motion to Strike to the filing of her 5th Amended Contest. The Court's electronic filing system did not accept the attachments as part of the system. See Exhibit A, Declaration of David Rogers with Attachment 1, E-FILETEXAS.GOV Email notice of Submission Failure 4962344 included herein by reference as if fully set forth.

5. Neither Contestant nor her counsel were aware of the failure of the system to accept the exhibit attachments until Contestee's counsel filed this motion. Had counsel conferred with Contestant's counsel regarding the missing exhibits, Contestant's counsel would have immediately provided same. Contestant, through counsel, emailed the rejected attachments to counsel for Contestee. *See* Exhibit B, Declaration of Charlotte Secord with Attachment 2, Email of 5th Amended Contest attachments to Contestee's counsel included herein by reference as if fully set forth.

6.     The Court cannot strike the pleadings of a party that makes a good faith effort to cure defects in their pleading. *Humphreys v. Meadows*, 938 S.W.2d 750, 753 (Tex.App. – Ft. Worth 1996, writ denied). Instead, Contestee must file new special exceptions, the Court must sustain them, and Contestant must be given another opportunity to amend before the Court may strike her pleadings. *Baca v. Sanchez*, 172 S.W.3d93, 95-96 (Tex.App. – El Paso 2005, no pet).

No Basis of Groundlessness

7.     The court in *Dike v. Peltier Chevrolet, Inc.* 343 S.W. 3d 179 (Tex.App. – Texarkana 2011) held:

> [T]o award sanctions under Chapter 10, it must be shown that: (1) the pleading or motion was brought for an improper purpose; (2) there were no grounds for the legal arguments advanced; or (3) the factual allegations or denials lacked evidentiary support. Chapter 10 specifies that one of the aims for imposition of sanctions for the filing of frivolous or groundless pleadings is to "deter repetition of the conduct or comparable conduct by others similarly situated."). (Citations omitted)

8.     More importantly, the court in *Peltier* expounded on the standard for the award of attorney's fees for sanctions:

> In determining whether sanctions are appropriate, the trial court must examine the facts available to the litigant and the circumstances existing when the litigant filed the pleading Courts should presume parties and their counsel file all papers in good faith, and the party seeking sanctions must overcome that presumption. The party seeking sanctions has the burden of showing its right to relief. (Citations omitted.)

See also *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 361 (Tex. 2014) ("Generally, courts presume pleadings and other papers are filed in good faith The party seeking sanctions bears the burden of overcoming this presumption of good faith."); *Zeifman v. Michels*, 2013 Tex. App. LEXIS 10523 (Tex.App. – Austin 2013).

9.    Even in a case such as this, where the sanction is sought pursuant to CPRC 10.01 *et. seq.*, the burden is on the party seeking sanctions to prove that the pleading is groundless, i.e., *that the fact alleged could not be proved factually or there is no legal basis.*  In *Peltier*, 343 S.W. 3d 179, 184, the court held:

> Under Section 10.001, the signer of a pleading certifies that each claim and allegation is based on the signatory's best knowledge, information, and belief, formed after reasonable inquiry. Each allegation and factual contention in a pleading must have, or be likely to have, evidentiary support after a reasonable investigation. (Citation omitted)

*See also Low v. Henry, 221 S.W.3d 609, 614 (Tex. 2007).*

10.    In this case, the sole basis for Contestee's motion is that Contestant allegedly failed to attach the documents referred to in the 5th Amended Contest.  As shown above, not only was the lack of attachments simply an electronic clerical error, Contestant has provided Contestee's counsel with the documents supporting Contestant's claims in her 5th Amended Contest (with a copy to the Court) rejected by the Court's e-filing system.

11.    Counsel for Contestee could have swiftly and easily remedied the confusion by a phone call or email to counsel for Contestant for the attachments referenced in Contestant's 5th Amended Contest.  Instead, Contestee's counsel has chosen to exercise the resources of this Court to basically accomplish the same result.

Groundlessness Belied by Corrupted Mobile Ballot Boxes

12.    On May 11, 2015, counsel for Contestant deposed the Travis County, Texas County Clerk, Dana DeBeauvoir regarding, among other things, the electronic voting system used in the 2014

Travis County Runoff election. Among the exhibits about which she was deposed was the Official Audit Log for the December 16, 2014 Joint Special Runoff Election. *See* attached Exhibit C.

13. Therein, Contestant discovered entries for MBB's identified as corrupted. Below is a chart that references the page numbers on which the corrupted MBB's are listed:

| Page | Date | Time | Description |
|------|------|------|-------------|
| 5 | 12/16/14 | 12:30:00 pm | Invalid/Corrupt MBB |
| 22 | 12/16/14 | 8:34:45 pm | Invalid/Corrupt MBB |
| 23 | 12/16/14 | 8:42:16 | Invalid/Corrupt MBB |
| 23 | 12/16/14 | 8:42:43 | Invalid/Corrupt MBB |
| 26 | 12/16/14 | 8:53:36 | Invalid/Corrupt MBB |
| 27 | 12/16/14 | 8:57:04 | Invalid/Corrupt MBB |
| 27 | 12/16/14 | 8:57:04 | Invalid/Corrupt MBB |
| 29 | 12/16/14 | 9:09:34 | Invalid/Corrupt MBB |
| 42 | 12/16/14 | 10:12:44 | Invalid/Corrupt MBB |

14. These nine entries on Travis County's 2014 Runoff election audit log clearly indicate that the mobile ballot boxes were either invalid or corrupted. The corrupt MBBs contained Runoff election votes which may or may not have been properly included in the Runoff election count and recount. Regardless, Contestants allegation and factual contention that corruption of votes in the corrupted Travis County electronic voting system in her contest has, or is likely to have, evidentiary support after a reasonable investigation. *Peltier, id.; Nath, id.* Because there is no basis for a groundless pleading claim, Contestee's motion to strike and sanctions must be denied.

<u>Contestee's motion to strike addressed and mooted by Contestant's 6th Amended Petition</u>

15.    The offending references to specific voters has been removed by the Contestant's filing of her 6th Amended Contest.  Because the challenged portions of Contestant's prior pleadings no longer exist in the live Contest, Contestee's motion to strike is moot.  As the court in *Houston Chronicle Publ'g Co. v. Thomas*, 196 S.W.3d 396, 399 (Tex.App. Houston [1[st] Dist.] 2006) explained:

> The mootness doctrine limits courts to deciding cases in which an actual controversy exists." A controversy "must exist between the parties at *every* stage of the legal proceedings . . . *(Emphasis added)*

Citing *F.D.I.C. v. Nueces County*, 886 S.W.2d 766, 767, 38 Tex. Sup. Ct. J. 29 (Tex. 1994) (citing *Camarena v. Tex. Employment Comm'n*, 754 S.W.2d 149, 151, 31 Tex. Sup. Ct. J. 563 (Tex. 1988)).

16.    Further, there is no pretrial order in this case.  As such, Contestant is authorized to amend her petition at any time more than 7 days prior to trial without leave of court as long as the amendment does not operate as a surprise to the opposing party.  Texas Rule of Civil Procedure 63; *Sosa v. Central Power & Light*, 909 S.W.2d 893, 895 (Tex. 1995).  Since the trial is not scheduled until July 20, 2015, Contestant may amend her pleading anytime prior to July 13, 2015.  Contestee has not asserted surprise from Contestant's amended pleading.  Contestant has filed a Sixth Amended Contest based on the partial discovery provided by the Travis County Clerk.  Contestee's motion to strike is moot and should, therefore, be denied.

<u>Sanctions</u>

17.    Based on the foregoing, there is no factual or legal basis for awarding sanctions.

*Pressley Response To Casar's Motion To Strike Pleadings And For Sanctions*               *p.6*

PRAYER

WHEREFORE PREMISES CONSIDERED Contestant prays this honorable Court deny Contestee's Motion to Strike and Sanctions and grant such other and further relief, in law or in equity, which the Court may find Contestant justly entitled.

Respectfully submitted,

David Rogers
LAW OFFICE OF DAVID ROGERS


By:     */s/ David Rogers*
David A. Rogers
Texas Bar No. 24014089
1201 Spyglass Drive, Suite #100
Austin, Texas 78746
512-923-1836 — Telephone
512-201-4082 — Facsimile
Email: Firm@DARogersLaw.com

Mark Cohen
805 W. 10th Street, Suite 100
Austin, Tx. 78701
512-474-4424
512-472-5444 (f)
Mark@cohenlegalservices.com
www.CohenLegalServices.com
*Attorney for Contestant Dr. Laura Pressley*


**Attachments:**

Exhibit A, Declaration of David Rogers with Attachment 1, E-FILETEXAS.GOV Email notice of Submission Failure 4962344

Exhibit B, Declaration of Charlotte Secord with Attachment 2, Email of 5th Amended Contest attachments to Contestee's counsel

Exhibit C – Deposition, Travis County, Texas County Clerk, Dana DeBeauvoir Exhibit 12, Official Audit Log for the December 16, 2014 Joint Special Runoff Election.

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served in accordance with the Texas Rules of Civil Procedure on May 25, 2015 on counsel of record as follows:


Charles 'Chuck' Herring Jr. 09534100
cherring@herring-irwin.com
Jess Irwin - 10425700
jess@herring-irwin.com
Lauren Ross – 24092001
laurenbross@herring-irwin.com
Herring & Irwin, L.L.P.
1411 West Avenue, Ste 100
Austin, TX  78701
Phone: 512-320-0665
Fax: (512) 519-7580

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
Phone: (512) 476-6000
Fax: (512) 476-6002
ATTORNEYS FOR CONTESTEE,
GREGORIO "GREG" CASAR

Jessica Belinda Palvino
MCGINNIS, LOCHRIDGE & KILGORE LLP
600 Congress Avenue
Suite 2100
Austin, TX  78723
Phone: 512-495-6000
Fax: 512 495-6093
jpalvino@mcginnislaw.com

David A. Escamilla
Travis County Attorney
Sherine E. Thomas
Andrew M. Williams
Patrick M. Kelly
Assistant County Attorneys
Travis County Attorney's Office
P.O. Box  1748
Austin, Texas 78767

No. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| | § | 201st JUDICIAL DISTRICT |

## CONTESTANTS' FIFTH AMENDED ORIGINAL CONTEST OF ELECTION, MOTION TO MODIFY DISCOVERY DEADLINES, AND REQUESTS FOR DISCLOSURE FOR THE OFFICE OF THE AUSTIN CITY COUNCIL, DISTRICT 4

## TO THE HONORABLE JUDGE OF SAID COURT

NOW COMES, Laura Pressley, Contestant, and files this Fifth Amended Original Petition for Election Contest for the Office the Austin City Council, District 4 (Petition) against Gregorio "Greg" Casar, Contestee.[1] This Amended Pleading is in response to the court's order sustaining special exceptions to which the Contestant disagrees. It is filed assuming the Court's Order providing the April 20, 2015 Deadline to replead assumed Contestant would have reviewed documents ordered to be produced by the Travis County Clerk's Office. This has not happened yet so some of the information the Court assumed in its order Contestant would have available in time to completely meet the order on special exception is still not available at this time. Contestant anticipates filing another amended pleading with more specific allegations as soon as it has had sufficient time to do so. The election was held on December 16, 2014 and canvassed

---

1 This Fifth Amended Petition is filed in Response to Contestee Gregorio "Greg" Casar's Answer and Special Exceptions to Contestant's Original Contest of Election, and the Court's order of April 13, 2015 regarding those Special Exceptions.

on December 30, 2014. In support of this election contest, Dr. Pressley will respectfully show as follows:

## I. DISCOVERY

1.    The contestant intends that discovery be conducted under level three, a custom discovery plan for election contest devised with the approval of the court.

## II. REQUEST FOR DISCLOSURE

2.    Pursuant to Texas Rule of Civil Procedure 194, and the motion set forth below, the plaintiff requests that the defendants, within thirty days of the service of the Original Petition, disclose the information and material described in Rule 194.2.

## III. SUMMARY

3.    This contest is based on the facts that illegal votes were counted, election officers prevented eligible voters from voting, election officers failed to count legal votes, and election officers made mistakes that resulted in an election outcome which is not the true outcome. Thus, deprivation of voting rights of voters in several high population polling locations which were improperly closed, irregularity in votes counted or not counted, and a failure to comply with the Texas Election Code requirement for storing, retrieval and printing of "images of ballots cast" in electronic voting machines occurred and negatively affected the outcome for Pressley. Particularly, the improper closure, consolidation and moving of the voting locations alone appears to have reduced the vote considerably more than the margin reported in the canvass of the election.[2]

4.    Additionally, Travis County uses electronic voting machines from Hart Intercivic to conduct

_____

[2] This is sufficient to "materially affect[] the election results." *Gonzalez v. Villarreal*, 251 S.W.3d 763,773,777-78 (Tex. App.-Corpus Christi 2008, pet. dism'd w.o.j.) (quoting *Tiller v. Martinez*, 974 S.W.2d 769, 772 (Tex. App.—San Antonio 1998, pet. dism'd w.o.j.) (emphasis added); *accord Reese v. Duncan*, 80 S.W.3d 650, 655-56 (Tex. App.-Dallas 2002, pet. denied).

elections within the county.[3] Pressley requests that the court compel Travis County election officers to print the "images of ballots cast" as required under the Texas Election Code.[4] (TEX. ELEC. CODE §213.016). Without these statutorily-required "images of ballots cast" it is impossible for the Court to determine the actual election outcome, as the only actual ballots – the mail-in ballots – are exactly and perfectly tied between the two candidates. The Travis County Clerk has asserted that the system Travis County uses cannot print "images of ballots cast." Images of ballots cast" is not the same as "cast vote records." The Court, consequently, must reject any "cast vote records" produced and tallied by such machines. The result of these multiple irregularities is that the result cannot be known, and the Court must order a new election. Dr. Pressley requests that such an election be timely set, and conducted in compliance with the Texas Election Code and the Secretary of State's regulations governing elections.

5.      "The purpose of the election code is to ensure that the true will of the voters is 'fairly expressed' and that the evidence of that expression is 'properly preserved.' *Prado* [*v. Johnson*, 625 S.W.2d 368

---

[3] Voters in different parts of the state utilize a number of different voting systems, all of which must first be certified by the Secretary of State. Tex. Elec. Code § 122.001, .031. ... Once a system is certified, local political subdivisions may adopt it for use in elections. *Id*. § 123.001. ...
The eSlate, a paperless DRE manufactured by Hart Intercivic, is one of a handful of DREs the Secretary has certified. *See Voting Systems*, Texas Secretary of State, http://www.sos.state.tx.us/elections/laws/votingsystems.shtml. Voters arriving at the polls in counties using the eSlate are given a unique access code. The voter enters the code into the eSlate, which then displays the ballot. Voters turn a dial to highlight their ballot choice and then press "enter" to make a selection. After a voter completes his selections, the eSlate displays a ballot summary page. If the voter's choices are correctly displayed, the voter presses the "cast ballot" button, and the vote is purportedly recorded. *See Voter Instructions*, Travis County, http://www.co.travis.tx.us/county_clerk/election/eSlate/pdfs/English_Flyer_050923.pdf. Travis County purchased the eSlate system in 2001 and has used it since 2003.
*Andrade v. NAACP of Austin*, 345 S.W.3d 1, 4, 5-6 (Tex. 2011) (footnotes omitted.)
[4] *See* attached Appendix 10, September 30, 2014 letter from Texas Secretary of State. In this letter, Keith Ingram, Director of Elections for the Texas Secretary of State's office, specifically states "in the [Hart Voting System], ballot images remain on the voting machines themselves for recounts, contests, and other post-election reviews until archived by the county for the following election." p.2, second to last paragraph, last sentence.

(Tex. Civ. App.--San Antonio 1981, writ dism'd w.o.j.))], 625 S.W.2d at 369-70." *Gonzalez v. Villarreal*, 251 S.W.3d 763, 778 (Tex. App.-Corpus Christi 2013). The failures and mistakes illustrated in this Contest show that the will of voters was thwarted, the evidence of that expression was **not** properly preserved and thus, the true outcome cannot be determined.[5]

6.      While some actual ballots were preserved – the mail-in ballots, in which the candidates are perfectly tied – the vast majority of ballots and the evidence of the voters' intent were not preserved. According to the Travis County Clerk, there are no "images of ballots cast" that the court can review. Therefore, if "images of ballots cast" cannot be produced, we request the court to order a new election.

## IV. PARTIES

7.      Contestant Laura Pressley is a resident of Austin City Council District 4, Travis County, Texas. She was a candidate in the Austin City Council District 4 Run Off Election on December 16, 2014.

8.      Contestee Gregorio "Greg" Casar is a resident of Austin City Council District 4, Travis County, Texas. He was a candidate in the Austin City Council District 4 Run Off Election on December 16, 2014. Casar has been served and has answered in this cause.

9.      The election results were canvassed on December 30, 2014 and Mr. Casar was declared the victor.

10.     A "manual recount" of all early voting, election day, provisional, and mailed-in ballots was attempted on January 6, 2015.[6] The mail-in ballots were exactly tied between the candidates, at 240

---

[5] The requirement to preserve "images of ballots cast" in the statute is fundamental to preserving the evidence of the will of the voters. By failing to preserve that evidence, the County has destroyed evidence of the expression of the will of the voters and forced the court to call a new election.

[6] Though the County Clerk termed the action a "manual recount," because the event as it occurred

each, for a total of 480 votes.[7]  The attempted recount was a nullity and a real recount was made impossible in that the attempted recount violated state law and was incorrectly performed using of the "cast vote records" in lieu of "images of ballots cast" combined with the actual mail in ballots.  Based on the counting of "cast vote records" and mail in ballots, as could be predicted, the invalid recount did not change the reported results of the election and the original declaration of  Mr. Casar as the victor for the run off election did not change.  Casar was sworn into office on January 6, 2014.   He has been notified of the filing of this action by a delivery of a copy of this Petition in accordance with TEX. ELEC. CODE § 21.003(b).

## V. JURISDICTION AND VENUE

11.     Jurisdiction and venue in this case are  proper and mandatory in Travis County because the office being sought is for a district entirely within the boundaries of Travis County under the Texas Elections Code, Section 232.006.

## VI. FACTS

### Travis County Election Officials Prevented Eligible Voters from Voting

12.     City of Austin District 4,  comprised of 18  voting  precincts,  is located  entirely  in  Travis County. Early Voting and Election Day was December 1-12, and 16, 2014, respectively.  **Voters seeking to vote at high-volume locations were improperly denied the right to cast their vote.** Disenfranchisement of District 4 voters occurred as a result of the closing of the highest volume District 4 voting locations in the Run Off during Early Voting and Election Day, December 16,

---

did not satisfy statutory criteria, Pressley does not concede that what occurred was actually a statutory manual recount as defined by the Texas Election Code.

[7] These were the only actual ballots counted during the "manual recount."  The mail-in ballots were more than 10% of the total ballots cast in the election.  The allegation of the county is that, despite the perfect tie in mail-in ballots, Casar beat Pressley by a 2-to-1 margin in the remaining ballots. This is a variation in election results that is highly improbable and unrecorded to Contestant's knowledge.

2014.

13. The Highland Mall voting location at 6601 Airport Blvd was open during the General Election for Early Voting and Election Day on October 20-31, and November 4, 2014, respectively and saw some of the highest volume of voters in District 4. This location was the designated voting location for Precinct 142 and was an important and convenient voting location for Precinct 156 and others nearby. It was closed for the December Run Off election for Early Voting and Election Day. It was moved to the far less convenient Travis County Tax Office at 5501 Airport Blvd (*See* Appendix 1). The Pressley campaign received multiple reports of voters being upset and confused because the voting location had been moved.

14. Specifically, reports were received by Contestant on Election Day, December 16th, from voters while Contestant was phone banking. District 4 voter, Thomas Crawford showed up at Cooke Elementary to vote, and reported no signs were posted to indicate where the polling location had been moved. Similar reports were received by Brad Parsons, a campaign volunteer, who was phone banking on Election Day. Campaign supporter, Matthew Palmer reported that Highland Mall was closed and it was a problem for voters. Based on information and belief, Contestant asserts that said confusion was a result of failure to post, or premature removal of, a notice at Cooke Elementary, Precinct 222, of the relocation of the polling place.

15. Upon reviewing voter rolls for Pct 156 and 142, published by Travis County, Appendix 2 shows names, addresses and precincts of **365 voters** of Pcts 156 and 142 that we allege were disenfranchised. These **365 voters** were identified based on their voting histories which include but are not limited to voting in General Elections, City of Austin Council Elections, and Primary Elections. The extensive voting histories of these **365 voters** show they are the most consistent voters in Precincts 142 and 156 and surprisingly did not vote in the City Council Run off election

*Pressley v. Casar Fifth Amended OP Contest* *p.6*

in 2014. In addition, the Pressley campaign verified additional voters, multiple times, as very strong Pressley supporters (by block walking/phone banking/yard signs posted), who were waiting to vote on Election Day. These voters total **73**. Therefore, Contestant alleges a total of **438 voters** in Precincts 142 and 156 were disenfranchised.

16. To enhance the accuracy of this list, additional information (detailed voter information of precincts, ballot styles, voting histories, and voting locations for those voting in the General and Run off elections), has been requested through discovery from Travis County. Upon receipt and review of discovery responses from Travis County, Contestant may identify additional voters and improve the accuracy of this list. Also, for trial, Contestant is in the process of collecting affidavits regarding disenfranchisement specifics from these voters.

17. The second highest voting precinct and polling location in District 4 for the November General Election was Precinct 222 at Cooke Elementary located at 1511 Cripple Creek. That Precinct is comprised of more than 25% senior voters who are 60 years and older. It was closed during Election Day for the December Run Off (*See* Appendix 1). It was combined with the fourth lowest voter turnout location in District 4, Precinct 268, Grant AME Worship Center at 1701 Kramer Lane.

18. The Pressley campaign received reports from Rob Hale, a resident and voter in Pct 222. As usual, he and other Pct 222 voters showed up to Cooke Elementary for the December Run Off on Election Day and were confused as to why Cooke Elementary was closed for voting for Pct 222. He helped senior voters look up an alternative location in which to vote on Kramer Lane. When he arrived at the Kramer location, he waited for the senior voters and they did not arrive. In addition, he had a relative that showed up at Cooke Elementary to vote, and the relative reported no signs were posted to indicate where the polling location had been moved.

19. Upon reviewing Pct 222 voter rolls published by Travis County, Appendix 3 shows names, addresses and precincts of **248 voters** that we allege were disenfranchised. These **248 voters** have voting histories which include but are not limited to voting in General Elections, City of Austin Council Elections, and Primary Elections. The extensive voting histories of these **248 voters** show they are the most consistent voters in Precinct 222 and they surprisingly did not vote in the City Council Run off election in 2014. In addition, the Pressley campaign verified additional voters, multiple times, as very strong Pressley supporters (by block walking/phone banking/yard signs posted), which were waiting to vote on Election Day. These voters total **71**. Therefore, Contestant alleges a total of **319 voters** in Precinct 222 alone were disenfranchised.

20. To enhance the accuracy of this list, additional information (such as detailed voter information such as precincts, ballot styles, voting histories, and voting locations for those voting in the General and Run off elections), has been requested through Discovery from Travis County. Upon receipt and review of Discovery responses from Travis County, Contestant may identify additional voters and improve the accuracy of this list. Also, for trial, Contestant is in the process of collecting affidavits regarding disenfranchisement specifics from these voters.

21. Another voting location open during the General Election but closed for the District 4 Run off was Precinct 133, which was open for the General Election at Blanton Elementary located at 5408 Westminster. It was combined with the non-District 4 Precinct 130, at Memorial UMC.

22. The Pressley campaign received reports from Pct 133, Election Judge, Arthur Turner, a resident and voter in Pct 133. During Election Day, voters from Pct 133, showed up at Blanton Elementary to vote in the Run Off and were confused and upset as to why Blanton Elementary was closed for voting for Pct 133. Mr. Turner had multiple calls from upset voters who did not know where to vote.

23. Upon reviewing Pct 133 voter rolls published by Travis County, Appendix 4 shows names, addresses and precincts of **116 voters** Contestant alleges were disenfranchised. These **116 voters** have voting histories which include but are not limited to voting in General Elections, City of Austin Council Elections, and Primary Elections. The extensive voting histories of these **116 voters** show they are the most consistent voters in Precinct 133 and they surprisingly did not vote in the City Council Run off election in 2014.

24. To enhance the accuracy of this list, additional information (such as detailed voter information such as precincts, ballot styles, voting histories, and voting locations for those voting in the General and Run off elections), has been requested through discovery from Travis County. Upon receipt and review of discovery responses from Travis County, Contestant may identify additional voters and improve the accuracy of this list. Also, for trial, Contestant is in the process of collecting affidavits regarding disenfranchisement specifics from these voters.

25. Three additional polling locations were closed for the Run off election for District 4 (Pcts 209, 258, and 260). Upon reviewing the voter rolls for these precincts published by Travis County, Appendix 5 shows names, addresses and precincts of **235 voters** that we allege were disenfranchised. These **235 voters** have voting histories which include but are not limited to voting in General Elections, City of Austin Council Elections, and Primary Elections. The extensive voting histories of these **235 voters** show they are the most consistent voters in Precincts 209, 258, and 260 and they surprisingly did not vote in the City Council Run off election in 2014.

26. The total number of closed/moved/combined precincts in District 4 for the Run off comes to a total of 7 Precincts out of 17 voting precincts in District 4. Therefore, 41% of District 4's polling locations were closed, combined or moved for the December Austin City Council Run off. Appendix 6. This caused a much lower than expected turnout for Election Day for District 4.

27. To summarize, typically Election Day and Early Voting turn out is very similar. Early Voting for the District 4 Run Off race saw approximately 2,646 voters and on Election Day only 1,771 turned out. Due closing/ moving/ combining of 41% of District 4 Polling locations, voters were confused and disenfranchised and Election Day voters were about 875 short.

28. The County's actions of closing multiple, key, high volume polling locations had a disproportionate effect on minorities, working people, and elderly voters of District 4—one of the Hispanic-opportunity districts in the City of Austin. Four of Pressley's strongest voting locations/boxes that showed over 50% for Pressley (222, 156, 133, 258), as evidenced by the only remaining ballots, Mail in Ballot results, were moved or closed for the Run Off election (*See* Appendix 6).

29. As a result of these aggressive and improper closures, voters registered at those locations were improperly denied the right to cast their vote. The closure of these pro-Pressley precincts was unfair and undermined the true outcome of the election. **A conservative count of disenfranchised voters resulting from the improper closure/moving/combining of precincts 133, 142, 156, 209, 222, 258, and 260 is 1,108. This value is consistent with the low voter turnout on Election Day as compared to Early Voting.** Upon evaluation of discovery responses from Travis County, a more accurate number may be provided. Also, for trial, Contestant is in the process of obtaining testimony regarding disenfranchisement specifics from these voters.

**Travis County Election Officials Allowed Ineligible Voters to Cast Votes (Illegal Votes)**

30. A thorough review the 4,414 Early Voting and Election Day voter names and addresses with returned mail, and the National Change of Address database (NCOA), and voter registration

records available online, 64 of the voters had moved, no longer resided in District 4, or had some other residency issues, and may not have been eligible to vote in the District 4 Run Off Election. Therefore, **at least 64 ineligible voters cast votes in this election due to residency issues**. A more detailed review of the voter registrar information provided by Travis County is needed with regard to Provisional Ballots, statements of residence, etc. Upon evaluation of Discovery responses from Travis County, a more accurate number may be provided. A list of the 64 voter's Voter ID's and precincts are found in Appendix 7.

31.    With regard to additional categories for illegal votes, it is unlikely that voters that are not interested in voting in a General Election will be interested in voting in a Run Off election. After reviewing Travis County voter rolls (https://tax-office.traviscountytx.gov/voter-data), for the General Election and the Run Off, **156 voters** voted in the Run Off that did not vote in the General Election. Many are Ballot by Mails and a large number voted at specific locations. These are potentially illegal votes and we ask the court to allow Contestant time to review and evaluate various Discovery responses from Travis County voting records including, but not limited to, Ballot by Mail, voter registration cards, polling location sign in sheets, and residency records, etc. to validate the votes were cast legally. A List of these voters are found in Appendix 8.

### More Ballots Than Voters During Early Voting (Illegal Votes)

32.    On Tuesday, December 30, 2014, the Mayor of Austin and the Austin City Council conducted an initial official canvass and certification for the Election Day results for all races on the ballot, including City of Austin District 4. The canvassed and certified totals for District 4 were Laura Pressley 1,563, Gregorio "Greg" Casar 2,854 for a total of 4,417 votes cast.

33.    The canvassed results were inconsistent with the Early Voting voter reports. Travis County reported that 2,651 total voters voted in Early Voting in District 4. Reviewing the voter ID's, 437

entries existed for those submitting Ballot by Mail (BBM). There were at least 28 duplicate entries for BBM. **At least 28 mail-in votes appear to have been counted twice or three times**. *See* Appendix 6, Duplicate Ballot by Mail Entries.

34.    Once duplicate BBM's were removed, 2,622 voter names remained that voted in Early Voting according to the Early Voting lists from Travis County that were distributed prior to Election Day, December 16, 2014. Based on Travis County's Canvassed and Recount results for those that voted for Greg Casar, or Laura Pressley or Under Voted, the total number of ballots cast for Early Voting is 2,701. Therefore, **there are 80 more ballots than voters for Early Voting**. These 80 extra ballots are distributed among 15 of the 18 precincts of the District 4 Race.[8]  (One precinct, with one eligible voter, showed no votes.) *See* Appendix 7, Early Voting Discrepancies.

**Statistical Improbabilities**

35.    An analysis of the voting results show a pattern of mathematical anomalies which is highly unlikely to occur naturally. (*See* Appendix 8, pages 1-3.) For the nine (9) precincts in District 4 with more than 200 voters,[9] the highest volume of voters, the ratio of votes that the Contestant received compared to Contestee is the same ratio in the November General Election (with a total of 8 candidates) as it was in the December Run Off Election (with 2 candidates), 35.1% vs 35.0% respectively. In addition, the average of the percentages of the unweighted precincts that the Contestant received compared to Contestee, in the November General Election and the December Run Off, are also equal at 35.1% and 35.1%, respectively. No other Council race in the history of electronic voting in the City (2003 – current) has shown such a tight non-variation between a

---

[8] In the original petition, this number was identified as 79. One precinct, 211, had a single vote undervote. *See* Appendix 7, Early Voting Discrepancies." Additionally, there are an unknown number of ballot by mail overvotes, invalid voter registrations, ineligible voters and election day overvotes.

[9] These precincts account for more than 80% of the vote in the District.

general election and a run off. Since 2003, of the total eleven Council races that went into a run off, seven races have greater than 10x variation and 3 show greater than 100x variation. *See* attached Appendix 8, Comparison of Election Returns.

36.     The fact that so many precincts showed exactly the same and unchanged results for the General Election and the Run Off is indicative of mistakes made by Travis County election officers. These mistakes are likely related to and are due to, but not limited to, the handling of voter hardware, software, etc.

37.     From Travis County Voter Rolls, though over 4,000 voters were different between the General and Run Off elections, the unique and unlikely occurrence that the results remain unchanged and which has not occurred in the last 11 years in Travis County for any other Run Off candidate or election is highly improbable. The occurrence is surprising, is strictly isolated to District 4, and is indicative of human error. Because so many high volume District 4 precincts showed exactly the same percentage results for Pressley and Casar, it is possible that some memory cards or counting software used in the General Election were mistakenly reused in error for the Run Off.

38.     Contestee Casar alleges the factual and statistically improbable election results for the General Election and the Run Off "are unsurprising." This is indicative of emotional wishful thinking rather than a clear-eyed analytical assessment of evidence and data. Additionally, Casar offers vague and irrelevant references and personal attacks from a politically biased news source, the far-left Austin Chronicle. The Chronicle endorsed and directly campaigned for Contestee Casar. Additionally, the Chronicle has little to no scientific expertise on staff that is qualified to offer expert testimony on complex topics of mathematics, chemistry, physics and engineering, which they attempt to report and critique.

39.     Conversely, Contestee Dr. Laura Pressley holds a Ph.D. in Physical Chemistry from the

University of Texas at Austin and holds a minor in mathematics and has worked in the semiconductor and technology industry as a process engineer and senior manager in Austin for over 26 years. She has led defect and yield enhancement engineering teams in Austin, Asia, and Europe and is an expert in mathematical and statistical data analysis. She has successfully led projects that have reduced corporate waste on the order of multimillion dollars, quarter after quarter. *See* Politifact article that that discusses Dr. Pressley's chemistry and engineering related statements made during the campaign: http://tinyurl.com/lmey73z. Her community involvement has included being the Chair Elect of the SafePlace, on the Executive Committee of the Austin Neighborhoods Council, President of her neighborhood association and a team leader of the Restore Rundberg Revitalization Team. Her main campaign messages were related to reducing waste and debt at City Hall and implementing a City of Austin Homestead Exemption. Attached is a 2014 campaign mailer that compares Dr. Pressley's experience and City Council policy goals with Contestant Casar (Appendix 9.)

**Procedures Were Violated and Illegal Votes Appear to Have Been Counted**

40. Several election safeguards and procedures defined by the Legislature and the Secretary of State that are intended to prevent human errors were mistakenly not followed by Travis County. The mistakes and failure to adhere to the Secretary of State's procedures led to and caused illegal votes to be counted.

41. With regard to the counting of illegal votes, during Early and Election Day Voting, many election irregularities occurred and mistakes were made by Travis County election officers. According to Travis County Election Division director Michael Winn, no Zero Tapes[10] were printed for machines to verify that directly prior to the first votes being cast, no votes were pre-registered on

---

[10] A "zero tape" is run on the Judge's Booth Controller ("JBC") to ensure no votes reside in the system. When voters arrive they are given a JBC-generated PIN number that they enter on the eSlate. They then vote and the votes are stored on the eSlate, Mobile Ballot Boxes (MBB), and JBC.

the machines.[11]  This failure is in violation of Texas Secretary of State requirements.  The Travis County officers violations affected the outcome of the election because votes may have remained on the voting equipment from prior activities.  *See* Texas Secretary of State Advisory 2012-03, 6(g)(vi), 6(k)(iii)  http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

42.     Given so many high volume District 4 precincts showed exactly the same percentage results for Pressley and Casar, it is possible that some memory cards or counting software used in the General Election were mistakenly reused in error for the Run Off.  (*See* Appendix 8.)

43.     In addition, with regard to illegal votes being counted, on Election Day, no results tapes were printed at the countywide locations when closing the polls.  The SOS procedures require the printing of closing results tapes, also.  This failure is in violation of Texas Secretary of State requirements.  The Travis County officers violations affected the outcome of the election because votes may have remained on the voting equipment from prior activities.  *See* Texas Secretary of State Advisory 2012-03, 6(g)(vi), 6(k)(iii)  http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).  On Election Day, Pressley campaign official poll watchers were denied access to results tapes for signing purposes at two polling locations, Gus Garcia and Randall's at Research Blvd.  Official poll watchers that were denied access are the following:

a)  Rae Nadler-Olenick was denied access to Results/Tally Tapes on December 16, 2014 at polling location Randalls at Braker and Research.  Results Tapes were not printed as required by Secretary of State procedures (http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml).  This affected the

---

[11] Travis County received a waiver of the state requirement for such tapes for the general election *only* in a letter dated September 30, 2014, based on the burden of the extremely long statewide ballot.  *See* attached Appendix 10, September 30, 2014 letter from Texas Secretary of State. The run-off election ballot includes only City Council and Mayoral candidates.  The run-off was restricted to two candidates in the races requiring a run-off, unlike the first round, in which as many as twelve candidates participated in some races.

outcome of the Run off election in that errors in counting, ballots cast, and voters signing in, and maintaining security protocols may have occurred.

b) Paul Williams was denied access to Results/Tally Tapes on December 16, 2014 when the polls closed at Gus Garcia polling location. Results Tapes were not printed as required by Secretary of State procedures (http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml). This affected the outcome of the Run off election in that errors in counting, ballots cast, and voters signing in, and maintaining security protocols may have occurred.

c) Sergio and Claire Martinez were denied access to Dobie Middle School, SubStation on December 16, 2014 and were not able to monitor for election materials coming from Gus Garcia. This affected the outcome of the Run off election in that errors in counting, maintaining security protocols may have occurred.

44. This violates Secretary of State regulations requiring that poll watchers be allowed to sign such tapes. "The presiding election judge, an election clerk, and not more than two watchers, if one or more watchers are present, shall sign the results tape(s)." The Travis County officers violations affected the outcome of the election because votes may have remained on the voting equipment from prior activities or excess votes may have been added before or after the close of the polls and the lack of "images of ballots cast" makes the results impossible to verify. Texas Secretary of State Advisory 2012-03, 6(k)(i) http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

45. On Election Day, Pressley campaign official poll watchers not allowed access at the polling substation at Dobie Middle School, where the most important ballots (for the Graham, Gus Garcia, and Virginia Brown precincts) were placed in transit to central counting. Those boxes were the largest and strongest Pressley boxes, as evidenced by the ballot by mail recount results. (*See* Appendix 3.) This failure is in violation of Texas Secretary of State requirements. The Travis County officers' violations affected the outcome of the election because votes may have remained on the voting equipment from prior activities. *See* Texas Secretary of State Advisory 2012-03, 6(g)(vi), 6(k)(iii) http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

46.     On Election Day, poll watchers were improperly denied access to Central Counting activities with Mobile Ballot Boxes ("MBB"), Tally activities, and the like.[12]   This failure is in violation of Texas Secretary of State requirements.   The Travis County officers violations affected the outcome of the election because votes may have remained on the voting equipment from prior activities or been added improperly later.   *See* Texas Secretary of State Advisory 2012-03, 6(g)(vi), 6(k)(iii) http://www.sos.state.tx.us/elections/laws/advisory2012-03.shtml (last visited 1-29-2014).

---

[12] Hart's eSlate System

Hart's electronic (DRE) voting system is known as eSlate. The eSlate system is comprised of several distinct components.

The Ballot Origination Software System ("BOSS") is used by election officials to define and create individualized electronic ballots. Data is entered once into BOSS and then flows through all components of the eSlate system.

The Mobile Ballot Box ("MBB") is a reusable, portable flash memory card. It is used to store and transfer election information. When inserted into the Judge's Booth Controller, the MBB supplies election information and ballot styles, it stores an electronic representation of how votes were cast. Once voting has concluded the MBB is removed and its contents are tallied by the Tally software.

The Judge's Booth Controller ("JBC") is the "brain" that manages the system, enabling poll workers to know which voting booths are in use at any time. The JBC issues access codes for the voters' use. It can control up to 12 daisy-chained eSlate units.

eSlate refers to the system generally and to the device that voters use to cast ballots, unless using paper ballots, in which case Ballot Now is used. The eSlate may be equipped with a disabled access unit ("DAU") for use by disabled voters. The eSlate units are physically connected to the JBC, which stores cast-vote records.

Tally is a software application that reads, stores, and tabulates the cast-vote records from the MBB (the portable flash card that transferred the cast-vote records from the JBC). Tally tabulates all early voting, absentee, and election day results, and produces various reports.

Rally is a software application that is capable of reading, storing, and transferring cast-vote data from polling places or collection centers with respect to early returns.

The System for Election Records and Verification Operations ("SERVO") software is an election records archiving and asset management system. SERVO is designed to recover data from equipment in the case of a lost or damaged MBB. SERVO also is designed for various recount purposes.

Ballot Now is a digital-scan paper ballot system that manages the printing, scanning, and resolution of mailed-in paper ballots. It also records the electronic cast vote records to an MBB to be read and tabulated with Tally.

## Illegal Votes Counted

47.    Because of the previously noted, highly improbable statistical anomalies[13], the duplicate Ballot by Mail entries, and the fact that there are more ballots than number of voters for Early Voting (overvotes), Contestant requested a manual recount of the District 4 Election with the goal of reconciling the discrepancies.

48.    Contestant claims the recount evidence and findings are critically material to this case and the allegations are legally relevant to this election contest.

49.    The recount failed to *only* count legal votes because "images of ballots cast" were not provided and counted.   Printing the "cast vote record" or "CVR" data files was in essence reprinting the previous electronically counted results obtained on Election night.   A CVR prints data from a data file to a template; it does not count the "images of ballots cast" – it merely reprints the tally on separate sheets of paper.   It was not recounting the source data of the "images of ballots cast," and as such it is not a meaningful check on the original count.[14]   Using the CVR

---

[13] *See* Appendix 8.

[14] The Secretary of State is somewhat unclear on this issue.  While "images of ballots cast" could be considered as a subset of the category "cast vote records," the CVRs in this case are not, in fact, images.  In logical terms, the expression would be that just because all A are B does not mean all B are A.  (All dogs are animals, but not all animals are dogs.)  In its 2014 Electronic Voting System Procedures bulletin, posted online at http://www.sos.state.tx.us/elections/laws/electronic-voting-system-procedures.shtml, the SOS appears to not clearly differentiate cast vote records from ballot images.  *See, e.g.*, Section 8:
**Section 8 – Requested Recounts (if necessary)**
**Requested Recount on DRE Voting Systems (Pursuant to TEC § 214.071):**
1. The candidate requesting a recount may request that the recount be done electronically or manually.
2. For an electronic recount, the persons specifically permitted by law to be present at the recount are also authorized to be present as the election media are reloaded into the central accumulator system.
3. For a manual recount of a DRE election, the Recount Coordinator shall organize the printing of cast vote records (ballot images) for the affected race or issue.

instead of ballot image also appears to violate Texas Election Code 214.049 (e): "If electronic voting system ballots are to be recounted manually, the original ballot, rather than the duplicate of the original ballot, shall be counted." Ballots are defined in Texas Election Code Chapter 52, Subchapter C.[15]

50. On Sunday January 4, 2015, prior to the Recount, Pursuant to TEX. ELEC. CODE § 213.016, "PRINTING IMAGES OF BALLOTS CAST USING DIRECT RECORDING ELECTRONIC VOTING MACHINES," Dr. Pressley communicated over the phone with the the Travis County Clerk. Pressley informed the Clerk that she desired to be present during the printing of images of ballots cast. "Each candidate is entitled to be present and to have representatives present in the

a. The Recount Coordinator shall notify the parties in the recount of the date, place, and time the printing of cast vote records (ballot images) will take place.
b. The full recount committee is not required to be present at the printing of cast vote records (ballot images) and the Recount Chair shall determine how many members should be present. The persons specifically permitted by law to be present at the recount are entitled to be present as the cast vote records (ballot images) are printed and to have the same number of representatives as allowed for the recount.
c. If the manual recount does not take place immediately after the printing of the cast vote records (ballot images), the printed cast vote records (ballot images) shall be locked and secured until the recount takes place.
d. A manual count of the printed cast vote records (ballot images) shall be conducted in the same manner as a recount of hand-counted paper ballots.
After the recount is complete, the printed cast vote records (ballot images) shall be secured and preserved for the appropriate preservation period for maintaining election records.
[15] For the purposes of this suit, the most salient portions of that subchapter are Sec. 52.003 and Sec. 52.070.
Sec. 52.003. PLACING CANDIDATE'S NAME ON BALLOT. (a) Except as otherwise provided by law, the authority responsible for having the official ballot prepared shall have placed on the ballot *the name of each candidate*:…
Sec. 52.070. VOTING SQUARE AND INSTRUCTION FOR CANDIDATES. (a) A square for voting shall be printed to the left of *each candidate's name* on a ballot.
(b) Immediately below "OFFICIAL BALLOT," the following instruction shall be printed: "Vote for the candidate of your choice in each race by placing an 'X' in the square beside the candidate's name."
…
(e) A square shall be printed to the left of each line provided for write-in voting under Section 52.066(c), but failure to place a mark in the square does not affect the counting of a write-in vote. (*emphasis* added.)

same number as prescribed by Section 213.013(b) for a recount during the printing of the images." The next day, January 5, 2015, Pressley sent an email to the Travis County Clerk and copied to the Texas Secretary of State's Office, to the same effect.

51.    In addition, on January 5, 2015, Dr. Pressley communicated over the phone with the Director of Travis County Elections Division.  Pressley informed the Director that she desired to be present during the printing of images of ballots cast.   An email was sent to The Travis County Clerk and copied to the Texas Secretary of State's Office, to the same effect.

52.    On  6, 2015, a "manual recount," which did not use "images of ballots cast" for the "direct recording electronic voting machines," was conducted and additional irregularities ensued with regard to and during the recount.

**No "Images of Ballots Cast" for Recount—Illegal Votes Counted**

53.    On Tuesday, January 6, 2015, at 11:00 a.m. (*See* Appendix 12) when the recount was to begin, the Travis County Clerk and the Recount Committee relayed to Contestant and her official recount watcher, Karen Renick, that images of ballots cast were not available, would not be printed, and would not be used for the recount.[16]  Dr. Pressley expressly stated, in her "Petition Requesting a Recount," and "Amended Petition Requesting a Recount" that "[w]e are requesting a manual recount of the results using the actual, stored, ballot images."   (See Appendix 11.) Pressley also expressly requested "a manual (by-hand) count."   "[T]he election code expressly provides for the 'printing of images of ballots cast using direct recording electronic voting machines for the purpose of a recount.' *See id.* § 213.016." *Andrade v. NAACP of Austin*, 287 S.W.3d 240, 258 (Tex. App. Austin 2009), *rev'd on other grounds* by *Andrade v. NAACP of Austin*, 345 S.W.3d 1 (Tex. 2011).  Failure to print images of ballots violates this provision of the

---

[16] *See* attached Appendix 13, Affidavit of Karen Renick, with Exhibits 1 & 2.

election code.

## Printing errors

54. Prior to the start of the Recount, Travis County selected the data files to print and pre-printed an aggregated data file of Cast Vote Records ("CVRs"). The pre-printed CVRs contained a fractional subset of the data that a District 4 ballot contains. Upon starting the recount on January 6, 2014 around 11:00am, Contestant relayed to the Travis County Clerk and the Recount Committee, that not providing printed images of ballots cast was a violation of TEX. ELEC. CODE § 213.016.

55. Cast Vote Records are not "images of ballots cast." Ballots are defined in Texas Election Code Chapter 52, Subchapter C.[17]

56. At the same meeting, Dr. Pressley stated that the pre-printing of recount records and starting the recount process was also a violation of 213.016 and 213.009(c), respectively. A member of the recount committee responded to one of the recount watchers: "They started all this on Sunday [January 4, 2015]."

57. Pressley warned the County Clerk that the irregularities, of not printing the images of

---

[17] For the purposes of this suit, the most salient portions of that subchapter are Sec. 52.003 and Sec. 52.070.
Sec. 52.003. PLACING CANDIDATE'S NAME ON BALLOT. (a) Except as otherwise provided by law, the authority responsible for having the official ballot prepared shall have placed on the ballot *the name of each candidate*:...
Sec. 52.070. VOTING SQUARE AND INSTRUCTION FOR CANDIDATES. (a) A square for voting shall be printed to the left of *each candidate's name* on a ballot.
(b) Immediately below "OFFICIAL BALLOT," the following instruction shall be printed: "Vote for the candidate of your choice in each race by placing an 'X' in the square beside the candidate's name."
...
(e) A square shall be printed to the left of each line provided for write-in voting under Section 52.066(c), but failure to place a mark in the square does not affect the counting of a write-in vote. (*emphasis* added.)

ballots cast, were in violation of the approved amended Petition for Recount and the Texas Election Code and was grounds for an Incident Report. Printing the CVR data files was in essence reprinting the previous electronically counted results obtained on Election night. A CVR is a printing of a data file to a template – it does not "count" the images of ballots – it merely reprints the tally on separate sheets of paper. It was not recounting the source data of the "images of ballots cast," and as such it is not a meaningful check on the original count.[18] Using the CVR instead of ballot image also appears to violate Texas Election Code 214.049 (e): "If electronic voting system ballots are to be recounted manually, **the original ballot**, rather than the duplicate

---

[18] Secretary of State is somewhat unclear on this issue. While "images of ballots cast" could be considered as a subset of the category "cast vote records," the CVRs in this case are not, in fact, images. In logical terms, the expression would be that just because all A are B does not mean all B are A. (All dogs are animals, but not all animals are dogs.) In its 2014 Electronic Voting System Procedures bulletin, posted online at http://www.sos.state.tx.us/elections/laws/electronic-voting-system-procedures.shtml, the SOS appears to not clearly differentiate cast vote records from ballot images. *See, e.g.*, Section 8:
**Section 8 – Requested Recounts (if necessary)**
**Requested Recount on DRE Voting Systems (Pursuant to TEC § 214.071):**
4. The candidate requesting a recount may request that the recount be done electronically or manually.
5. For an electronic recount, the persons specifically permitted by law to be present at the recount are also authorized to be present as the election media are reloaded into the central accumulator system.
6. For a manual recount of a DRE election, the Recount Coordinator shall organize the printing of cast vote records (ballot images) for the affected race or issue.
a.      The Recount Coordinator shall notify the parties in the recount of the date, place, and time the printing of cast vote records (ballot images) will take place.
b.      The full recount committee is not required to be present at the printing of cast vote records (ballot images) and the Recount Chair shall determine how many members should be present. The persons specifically permitted by law to be present at the recount are entitled to be present as the cast vote records (ballot images) are printed and to have the same number of representatives as allowed for the recount.
c.      If the manual recount does not take place immediately after the printing of the cast vote records (ballot images), the printed cast vote records (ballot images) shall be locked and secured until the recount takes place.
d.      A manual count of the printed cast vote records (ballot images) shall be conducted in the same manner as a recount of hand-counted paper ballots.
After the recount is complete, the printed cast vote records (ballot images) shall be secured and preserved for the appropriate preservation period for maintaining election records.

---

*Pressley v. Casar Fifth Amended OP Contest*                                                        *p.22*

of the original ballot, shall be counted." **(Emphasis added.)**

58.     Contestant requested to conditionally proceed with the Recount and re-print the available CVR data files.

59.     Pursuant to TEX. ELEC. CODE § 213.007, the machines, materials, programs, and records may be available to the Recount Committee.   Pursuant to TEX. ELEC. CODE § 213.013(h), each person entitled to be present at a recount is entitled to observe recount activities.  Contestant was not allowed to view the full recount process and how the recount data was selected from the electronic voting machines.  The CVR data files were identified, isolated and pre-selected prior to the beginning of the Recount. Contestant requested to view the source and properties of the CVR files, such as dates of the CVR files and origination, and was denied by the Recount Committee Member, the Travis County Director of Elections, Michael Winn.

### Recount Precinct Returns—Illegal Votes Counted

60.     Pursuant to TEX. ELEC. CODE § 214.002, counting procedures for a recount shall be certified in the same manner as the original count.  Pursuant to TEX. ELEC. CODE § 65.014(b)(1), the procedures for preparing the original precinct returns must state the total number of voters who voted at the polling location as indicated by the poll list.  Poll lists were not apparently reviewed by the Recount Committee during the recount.  Dr. Pressley requested the poll lists to be reviewed and the number voters per precinct be reconciled with those documented on the polling location combination sign-in forms.  Pressley requested those numbers be reconciled with the recount results, because of Early Voting voter lists discrepancies identified in the Recount Petition.  The request was denied by the Travis County Clerk, the Chair of the Recount Committee, and the Director of Travis County Elections.  The request was also specifically made prior to the recount in the Amended Petition for Recount (*See* Attached Appendix 11, Amended Petition for Recount.)

61.    Pursuant to TEX. ELEC. CODE § 213.012, the committee chair prepared a report of the vote count.  The Travis County Clerk and the Director of the Elections Division repeatedly informed Dr. Pressley that "it was not the scope of the Recount" to reconcile the ballots with the number of voters.  The chair wrote, "The numbers of voters matched the number of ballots cast," and signed the report (*See* Attached Appendix 14, "Recount Affidavit of Jay Brim").  During the Recount, the numbers of voters on voter lists were not publicly reconciled with the ballots recounted by the chair.   Dr. Pressley commented to the chair, "Matching the numbers was not supposedly done today," and no explanation was provided by the chair.

62.    On January 5, 2015, the Mayor of Austin and City Clerk approved Contestant's amended petition requesting a manual recount of actual stored "images of ballots cast."[19]  Contestant's amended petition included a request to reconcile the ballots cast with the number of voters documented on the sign in sheets and combination forms for District 4 for the countywide polling locations and Precincts to ensure accurate reporting of results.  The <u>number of voters recorded</u> and the <u>number of votes recorded</u> <u>did not match</u>.

### Ballot by Mail Ballots Are The Only Legal Ballots That Are Properly Preserved

63.    This is why printing the "images of the ballots cast" is critical.  The ballot in the General Election was very different (8 candidates) from the ballot in the Run Off (2 candidates).  If some memory cards or counting software were reused by mistake, then the "images of the ballots cast" will instantly and unmistakably distinguish the true votes from the illegal votes.  This is the intent of the

---

[19] Texas Election Code §213.016.
Sec. 213.016. PRINTING IMAGES OF BALLOTS CAST USING DIRECT RECORDING ELECTRONIC VOTING MACHINES.  During any printing of images of ballots cast using direct recording electronic voting machines for the purpose of a recount, the full recount committee is not required to be present.  The recount committee chair shall determine how many committee members must be present during the printing of the images.  Each candidate is entitled to be present and to have representatives present in the same number as prescribed by Section 213.013(b) for a recount during the printing of the images.

"images of ballots cast" language of the law. Which ballots were counted is the question that can be answered only by review of the "images of ballots cast."

64.     The mandatory nature of this requirement becomes clear in context.

> [W]e believe that violations of certain recording provisions by election clerks can certainly undermine the purpose of the election code and obscure the true will of the qualified voters.

*Gonzalez v. Villareal*, 251 S.W.3d at 778

65.     Failure to retain "image of ballots cast," "ballots" and or "ballot originals" is precisely such a violation, because there is no clear and unequivocal record of the voter's intent, absent such an image.

66.     Given the facts and the election mistakes made by Travis County election officers, all of the **4,023 votes** that show to be cast in person, are in question and must be verified. Therefore, we ask the Court to compel Travis County to print and tally the "images of ballots cast" for the District 4 Run Off so the court may ascertain whether the outcome as shown by the canvass is not the true outcome because illegal votes were counted. The list of the **4,023 voters** and their Voter ID's are provided in Appendix 15.

67.     The recount included the Ballot by Mail ballots, and those specific results for Pressley and Casar were determined.[20] Ballot by Mail Votes were cast in seventeen of the eighteen precincts of District 4.[21] Pressley received 240 votes and Casar received 240 votes of the 480 total votes cast for either candidate for the Ballot by Mail ballots. Pressley received *exactly* 50% of the votes.

68.     The Ballot by Mail result is very different from the 33.3 and 33.8% Pressley is reported to have received for early voting and election day voting from the "cast vote records" – a variation from mail-in votes and non-mail-in votes of almost 20% (*See* attached Appendix 3, "Recount

---

[20] *See* attached Appendix 3, "Recount Results."
[21] One precinct, with a population of a single voter, showed no votes.

Results").

69.    The only actual "ballots" that were preserved and counted during the recount show Pressley and Casar split the vote exactly in half.  Moreover, 10 of the 18 precincts showed 50% or more of the vote for Pressley. The Ballot by Mail ballots that were cast for either candidate (total of 480 votes) were over 10% of the total ballots cast for the Run Off election.

70.        The 480 Ballot by Mail ballots are the only " ballots," as that term is defined in the Election Code, which were available and counted during the recount.    Therefore, the election should have been re-canvassed only with the 480 Ballot by Mail "ballots" and not the results including the 4,023 illegally recounted "cast vote records."

71.    This is an additional reason for the court to compel the Travis County Clerk to comply with TEX. ELEC. CODE § 213.016[22]  and 214.049 (e)[23] to print and count the statutorily required "images of ballots cast" and ascertain whether the previous outcome of the election is not the true outcome.

72.    On January 6, 2015, the recount was conducted and completed.   After the recount, the totals were unchanged as compared to the original canvassed results.   The totals were Laura Pressley 1,563, Gregorio "Greg" Casar 2,854 for a total of 4,417 votes cast.

73.    Reconciliation of voter signatures on rolls at polling locations and total ballots cast has not been completed.   An election contest is the only available remedy to explore the discrepancy between the number of ballots counted and the number of voter names and signatures in the precincts.

74.    The sum total of all voting irregularities identified herein <u>exceeds</u> the number of votes by

---

[22] "PRINTING IMAGES OF BALLOTS CAST USING DIRECT RECORDING ELECTRONIC VOTING MACHINES"
[23]"If electronic voting system ballots are to be recounted manually, the original ballot, rather than the duplicate of the original ballot, shall be counted."

which the election was decided.

75.     If no "images of ballots cast" can be retrieved, printed and counted, Travis County cannot unequivocally determine the outcome of the election. The Court may order each of the more than 4,000 voters who voted in person to testify as to how they voted, pursuant to Texas Election Code Sec. 221.010. "SECONDARY EVIDENCE FOR UNAVAILABLE BALLOTS. If an examination of ballots is needed in an election contest and the ballots are lost, destroyed, or otherwise beyond the reach of the tribunal, the voters who cast the ballots may testify as to how they voted."

76.     In the alternative, if Travis County cannot produce "images of ballots cast" to be printed and counted, then Travis County cannot unequivocally determine the outcome of the election, and the election is void. As a matter of law, the Court must therefore order a new election. TEX. ELEC. CODE § 232.041.[24]

## VII. PETITION TIMELY FILED

77.     This Election Contest is brought in accordance with the provisions of TEX. ELEC. CODE §232.008, which requires the Original Petition to be filed with the District Court not later than the 30th day after the date the official result of the contested election is determined.

78.     On Tuesday, December 30th, the Mayor and City Council of Austin conducted an official canvass and certification of the Run Off results for all races on the December 16, 2014 ballot, including District 4. However a recount was conducted on January 6, 2015 and those results did not change. The deadline for submission of a petition in an election contest is January 29, 2015. The original petition was filed on or before that date and was timely filed.

_____

[24] Sec. 232.041. NEW ELECTION ORDERED IF CONTESTED ELECTION VOID. In an election contest in which the contested election is declared void, the court shall include in its judgment an order directing the appropriate authority to order a new election.

*Pressley v. Casar Fifth Amended OP Contest*                                          *p.27*

79.     All conditions precedent have been performed or have occurred.

## IX. VIOLATIONS OF LAW

*Texas Election Code Violation*

Lack of Notice of Relocation of Polling Place

82.     The facts asserted above are included herein by reference.  Contestant claims that voters were disenfranchised due to the failure of Travis County to provide and/or maintain an adequate notice at the general election polling place (Highland Mall and other voting locations identified herein) detailing the relocation of the polling place to the Travis County offices for the runoff election in December 2014.  Such failure to provide notice of relocation of the polling place for the runoff election is a violation of Texas Election Code § 43.062. Section 43.062 states:

> Sec. 43.062.  NOTICE AT PREVIOUS POLLING PLACE.  If the location of the polling place for an election precinct is different from the location used for the precinct in the preceding election ordered by the same authority, the authority responsible for giving notice of the election shall, if possible, post notice at the entrance to the previous polling place stating that the location has changed and providing the location of the new polling place.

> Added by Acts 2001, 77th Leg., ch. 802, Sec. 1, eff. Sept. 1, 2001.

Contestant seeks an order requiring a vacation of the runoff election and an order requiring a properly noticed runoff election be held forthwith.

Failure to Provide "Images of Ballots Cast"

83.     Contestant asserts that the December 2014 runoff fails to comply with the statutory requirements of the Texas Election Code Chapters 128 and 213.  Section 128.001 states:

> Sec. 128.001.  COMPUTERIZED VOTING SYSTEM STANDARDS.

(a) The secretary of state shall prescribe procedures to allow for the use of a computerized voting system. The procedures must provide for the use of a computerized voting system with:

(1) multiple voting terminals for the input of vote selections on the ballot presented by a main computer; and

(2) a main computer to coordinate ballot presentation, vote selection, *ballot image storage*, and result tabulation.

84.    Section 213.016 states:

Sec. 213.016. PRINTING IMAGES OF BALLOTS CAST USING DIRECT RECORDING ELECTRONIC VOTING MACHINES.

During any printing of *images of ballots cast* using direct recording electronic voting machines for the purpose of a recount, the full recount committee is not required to be present. The recount committee chair shall determine how many committee members must be present during the printing of the images. Each candidate is entitled to be present and to have representatives present *during the printing of the images* in the same number as Section 213.013(b) prescribes for watchers for a recount.

Added by Acts 2003, 78th Leg., ch. 583, Sec. 2, eff. Sept. 1, 2003.
Amended by:
        Acts 2009, 81st Leg., R.S., Ch. 1235 (S.B. 1970), Sec. 22, eff. September 1, 2009.

85.    As asserted above, the Travis County Clerk cannot provide "images of ballots cast" for purposes of a recount in the December runoff election as required by the Texas Election Code. Because the Travis County Clerk cannot produce "images of ballots cast", the ballots cast on the electronic voting machines cannot be verified. Contestant seeks an order from this case vacating the December 2014 runoff election. Since the only verifiable votes in the December runoff are the ballots by mail, said votes resulting in a tie in the runoff, Contestant seeks an order from this Court directing that another runoff election be conducted and that the Travis County Clerk provide "images of ballots cast" in such a runoff election for purposes of allowing all affected parties to verify the results of said runoff in compliance with the above-referenced provisions of

the Texas Election Code.

*Violation of Section 2 of the Federal Voting Rights Act*

86.     Contestant asserts that failure to provide notice at the general election polling place of the relocation of the polling place for the runoff has a disproportionate impact on minority voters in violation of Section 2 of the Voting Rights Act. 42 U.S.C. §§ 1973b(f), 1973l(c)(3)) (now 52 USC 10303) bars voting discrimination against certain language minorities--specifically, persons of American Indian, Asian American, Native Alaskan, and Spanish heritage.   Members of the protected class of Spanish heritage in Precincts 142 and 156 (Appendix 1) were disenfranchised by the confusion created by the lack of notice of the change in polling place for the December 2014 runoff election.   Contestant seeks an injunction from this Court pursuant to 42 U.S.C. §1983 vacating the runoff election and requiring a new runoff election forthwith.

## IX. MOTION TO MODIFY STANDARD DISCOVERY PROCEDURES

87.     Pursuant to Texas Rule of Civil Procedure 191.1, Contestants request that the Court sign an order shortening the time allowed for Contestee to comply with the discovery requests set forth below to no more than fifteen days.

88.     Pursuant to Texas Rule of Civil Procedure 191.1, Contestants request that the Court sign an order shortening the time allowed for Contestee and third-party witnesses, voters, the City of Austin and Travis County, to comply with the discovery requests set forth below in paragraph to no more than ten days, and that the period of notice required for Deposition on Written Questions be reduced to ten days.

89.     Contestants further requests that the Court sign an order requiring that Contestee's

response to the request for disclosure, and all other responses and answers in this case be hand-delivered, faxed or emailed.

90.     The foregoing modifications to standard discovery procedures are necessary because of the accelerated procedures that apply to this election contest. The foregoing reasons constitute good cause for the requested relief.

## X. RESPONSE TO SPECIAL EXCEPTIONS

### Introduction

91.     Dr. Pressley has found indisputable election irregularities and mistakes that were made in conducting the District 4 election held on December 16, 2014 that show the outcome as shown by the final canvass is not accurate and she is bringing this election contest. Because illegal votes were counted, eligible voters were prevented from voting, legal votes were not counted, and Travis County election officers made errors and mistakes, Dr. Pressley is asking, pursuant to Section 221.003 (a), for the "court to ascertain whether the outcome of the District 4 Run Off election, as shown by the canvass, is not the true outcome." If a contestant is prevented by the county clerk from proving the actual number of legal votes by the clerk's act of not preserving or requiring or counting images of the ballots actually cast there is no way to conclude the clerk reported the true outcome . Without the images of the actual ballots there is not a true outcome and the run-off election must be repeated preserving the images of the ballots cast as provided and required by state law.

92.     Contestee alleges Dr. Pressley is attacking the entire state-wide electronic-voting system. In fact, the contest is limited solely to the discrete errors made by the Travis County Clerk's office in this single election. All counties are capable of complying with the law and preserving images of the actual ballots cast by a voter. Travis county just elected to ignore that law and the sound public

*Pressley v. Casar Fifth Amended OP Contest*                                    *p.31*

1568

policy behind it. It cannot certify a true outcome by reason of its own misconduct in this election that is at issue in this case.

93.     Weaknesses in the Travis County Election systems are well known and have been extensively identified. Several years ago, Travis County Clerk Dana DeBeauvoir herself convened a Travis County Clerk Election Study Group to evaluate Travis County's current voting system and       make       recommendations       for       future       systems. (http://www.traviscountyclerk.org/eclerk/content/images/presentations_articles/pdf_tc_elections_E SG_Report_2009.pdf)   Clerk DeBeauvoir had determined that a study group was needed to address public concerns about electronic voting and to ensure ample time to plan for an upgrade or replacement of the existing system and "its most significant recommendation is that Travis County move away from an all-electronic voting system to one that offers electronically-counted paper ballots."   Clerk DeBeauvoir is on record stating the need to redesign and replace Travis County's voting                                                                                                         systems: (http://www.traviscountyclerk.org/eclerk/content/images/presentations_articles/pdf_tc_elections_2 013.07.26_star.pdf  and  https://www.supportthevoter.gov/files/2013/09/Dana-Debeauvoir-STAR-Voting-System-Diagram.pdf and "Three years ago, DeBeauvoir decided that something had to change. "I said, 'Okay, I'm fed up. I'm going to design my own system.'" Part of her frustration stemmed from complaints lodged against the county that she felt blamed officials for things beyond    their    control."(    https://www.texastribune.org/2014/07/09/travis-county-forges-new-territory-voting-machines/):

94.     Given the specific voting irregularities outlined herein, Dr. Laura Pressley fully supports the Clerk's search for a more accountable and election system.   One critical component that the Travis County system is lacking is that Texas Election Code allows for a manual recount using

"images of ballots cast." When Pressley requested a manual recount using "images of ballots cast" for the District 4 Run Off election, Travis County is on record stating they cannot comply. Interestingly, in January 2015, Pressley was informed both by DeBeauvoir and former Travis County Judge Bill Aleshire that no other candidate in Travis County's history had requested a manual recount of "images of ballots cast." A review of reported cases shows no indication that any candidate in the state has requested such a statutorily-allowed recount. This contest, therefore, to the extent it decides issues regarding this mandate and this language, is a case of first impression.[25]

---

[25] The court will, of course, be guided by the Texas Supreme Court's view of statutory language, which is not as fluid as that of federal courts or other state courts.

> **If** the statutory text is **unambiguous**, a court **must** adopt the interpretation supported by the statute's **plain language** unless that interpretation would lead to absurd results. *See Tune v. Tex. Dep't of Pub. Safety*, 23 S.W.3d 358, 363 (Tex.2000) ("We must enforce the **plain meaning** of an unambiguous statute."); *RepublicBank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex.1985) ("Unless a statute is ambiguous, we must follow the **clear language** of the statute."); *Brazos River Auth. v. City of Graham*, 163 Tex. 167, 354 S.W.2d 99, 109 n. 3 (1962) ("[O]perating as we are under a strict theoretical division of governmental powers, it would take a bit of doing on the part of the judiciary to say, **in the absence of ambiguous and uncertain statement or patent and manifest absurdity**, that **the Legislature intended something different from the clear import of the words** chosen by it...."); *Gilmore v. Waples*, 108 Tex. 167, 188 S.W. 1037, 1039 (1916) (The literal meaning of a statute may be disregarded "only where it is **perfectly plain** that the **literal sense** works an **absurdity or manifest injustice**.").

*Texas Dep't of Protective and Regulatory Services v. Mega Child Care*, 145 S.W.3d 170, 177 (Tex. 2004). (emphasis added.)

*See also AIC Mgmt. v. Crews*, 246 S.W.3d 640 (Willet, J., concurring) (internal citations omitted) (citing to *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 652 n.4 (Tex. 2006) and 542 U.S. 241, 267, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004) (Scalia, J., concurring in the judgment).

> This Court recognizes that legislative intent is best embodied in legislative language. We recently cautioned that "over-reliance on secondary materials should be avoided, particularly where a statute's language is clear. If the text is unambiguous, we must take the Legislature at its word and not rummage around in legislative minutiae."

95.    With regard to the fact that Travis Count's use of one version of the Hart InterCivic eSlate system may violate the Texas Election Code requirements for storing, retrieving, and printing of "images of ballots cast," we respectfully assert any regulatory redefinition equating "images of ballots cast" with "cast vote records" exceeds the statutory grant of authority.[26] Given that the term "ballot" is defined in the Texas Election Code and "images of ballots cast" is referenced with regard to recounts and "cast vote records" are not, the Texas Election Code trumps the Secretary of State's administrative definitions.

96.    Addressing the various pieces of evidence that became available and the irregularities that occurred during the recount is important in the analysis and evaluation of this election contest. The recount evidence is critically material to this case and the allegations are legally relevant to this election contest. Moreover, it is in the recount failures that Travis County's failure to use equipment up to statutory standards becomes clear.

97.    The legal question raised by an election contest is whether the outcome of the contested District 4 election is not, or cannot be conclusively determined to be, the true outcome. Specifically, Dr. Pressley has found that illegal votes were counted, Travis County Elections Division prevented eligible voters from voting, failed to count legal votes, and engaged in other irregularities that materially affected the election results. Moreover, because of the failure of Travis County to maintain "images of ballots cast", the outcome cannot be determined to be the

---

Faced with clear statutory language, "the judge's inquiry is at an end." It may be a widespread practice to mine the minutiae of legislative records to discern what lawmakers had in mind, but as we have held, relying on these materials is verboten where the statutory text is, as here, absolutely clear.

[26] We cannot construe the rule in a manner that is **inconsistent** with the **statute**. *See, e.g., Centerpoint Energy, Inc. v. Public Util. Comm'n*, 143 S.W.3d 81, 85 (Tex. 2004) (observing that rule is invalid if it violates statutory provision); *Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 657-58 (Tex. 2004)
*Tex. Mut. Ins. Co. v. Vista Cmty. Med. Ctr.*, LLP, 275 S.W.3d 538, 557, 2008 Tex. App. LEXIS 8602, 45 (Tex. App. Austin 2008) (emphasis added.)

true outcome.

## Case Law Presented by Contestee is largely irrelevant

### *Andrade v. NAACP*, 345 S.W. 3d 1 (Tex. 2011)

98.     Contestee Casar's ORIGINAL ANSWER AND SPECIAL EXCEPTIONS TO CONTESTANT'S ORIGINAL CONTEST OF ELECTION references the *Andrade v. NAACP* case, seeks to apply it to the instant case, and states that "the Secretary of State's certification of eSlate for use by Travis County did not violate equal protection rights of voters using electronic voting system."

99.      Contestee Casar misinterprets Contestant Dr. Pressley's claims in this case.  She does not assert a claim of violation of equal protection as it relates to electronic voting systems.  Rather, Contestant Dr. Pressley asserts that illegal votes were counted, election officers prevented eligible voters from voting, election officers failed to count legal votes, and election officers made mistakes that resulted in an election outcome which is not the true outcome and did not preserve images of ballots to be used as acheck on the computer results which prevented a determination that the election and the  recount was a true outcome.  Thus, the *Andrade* case is irrelevant.

100.     Contestee Dr. Pressley's election contest claims were not asserted in *Andrade v. NAACP* and Dr. Pressley has been directly harmed by Travis County's conduct during the District 4 election and she has been directly harmed by the County's inability to ascertain the true outcome because "ballots," "original ballots" and/or "images of ballots cast" cannot be counted.

### *Tex. Democratic Party v. Williams*, 285 Fed. Appx. 194, 195 (5th Cir. 2008)

101.     In CONTESTEE'S  ORIGINAL ANSWER AND SPECIAL EXCEPTIONS TO CONTESTANT'S ORIGINAL CONTEST OF ELECTION he references *Tex. Democratic Party v. Williams,* and applies it to our case with regard to "the eSlate did not violate voters' rights under

the First and Fourteenth Amendments to the United States Constitution."

102.    Contestee Casar misinterprets Contestant Dr. Pressley's claims in this case.  She does not assert claims of violations of the First and Fourteenth Amendments to the United States Constitution as it relates to electronic voting systems.    Rather, Contestant Dr. Pressley asserts, illegal votes were counted, election officers prevented eligible voters from voting, election officers failed to count legal votes, and election officers made mistakes that resulted in an election outcome which is not the true outcome and they did not preserve the images of ballots which is a possible function of the eSlate program.

103.    Additionally, as a matter of law, Dr. Pressley claims that "cast vote records" do not meet the statutory requirements of "ballots," "original ballots" and/or "images of ballots cast."  Therefore, if "images of ballots cast" were not preserved, **and thus** cannot be retrieved, printed and counted, then Travis County cannot unequivocally determine the outcome of the election.

## Conclusion

104.     Therefore, based on the foregoing, the Contestant requests the run-off election be declared void, a new run-off be held at which images of the ballots actually cast be preserved using procedures compliant with the Texas Election Code for use in the event of a contest, the Court award reimbursement for the cost of her election contest, recount fees, and that the Court grant all other and further relief, in law and in equity, to which she may be entitled.

<div align="right">

Respectfully submitted,

David Rogers
LAW OFFICE OF DAVID ROGERS

</div>

By:     ___/s/ David Rogers_____
David A. Rogers
Texas Bar No. 24014089
1201 Spyglass Drive, Suite #100
Austin, Texas 78746
512-923-1836 — Telephone
512-201-4082 — Facsimile
Email: Firm@DARogersLaw.com

Mark Cohen
805 W. 10th Street, Suite 100
Austin, Tx. 78701
512-474-4424
512-472-5444 (f)
Mark@cohenlegalservices.com
www.CohenLegalServices.com
*Attorney for Contestant Dr. Laura Pressley*

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served in accordance with the Texas Rules of Civil Procedure on April 20, 2015 on counsel of record as follows:


Charles 'Chuck' Herring Jr. 09534100
cherring@herring-irwin.com
Jess Irwin - 10425700
jess@herring-irwin.com
Lauren Ross – 24092001
laurenbross@herring-irwin.com
Herring & Irwin, L.L.P.
1411 West Avenue, Ste 100
Austin, TX  78701
Phone: 512-320-0665
Fax: (512) 519-7580

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
(512) 476-6000
(512) 476-6002- Facsimile
ATTORNEYS FOR CONTESTEE,
GREGORIO "GREG" CASAR

Andrew M. Williams
Assistant County Attorney
Travis County Attorney's Office
P.O. Box  1748
Austin, Texas 78767
Phone: (512) 854-9472
Fax:    (512) 854-4808
email:  andrew.williams@traviscountytx.gov


By:    ___/s/ David Rogers_____

CAUSE NO. D-1-GN-15-000374

| LAURA PRESSLEY, | § | IN THE DISTRICT COURT |
| Contestant, | § | |
| | § | |
| V. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| GREGORIO "GREG" CASAR, | § | |
| Contestee. | § | 201st JUDICIAL DISTRICT |

**CONTESTANT'S RESPONSE TO**
**THIRD PARTY MOTION FOR PROTECTIVE ORDER**

TO THE HONORABLE JUDGE MILLS

COMES NOW, Laura Pressley, Contestant responding to Third Party's Motion for Protective Order.

## I.    BACKGROUND

1.  Contestant requests this honorable Court to compel the Clerk of Travis County, Texas to provide documents responsive to her Second Request for Production of Documents to Travis County Clerk, Dana DeBeauvoir submitted on May 14, 2015.   Also, Contestant request this honorable Court to compel the Clerk of Travis County, Texas to respond appropriately to deposition requests that have been made by Contestant. The Clerk has recently filed a Motion for Protective Order claiming Contestant is conducting discovery which is outside the Court's Order on Third Party Discovery Plan.  This is not an accurate representation.  The Travis County Clerk has made erroneous objections, or asserted privileges which do not comply with Texas Rule of Civil Procedure 193. Contestant's Second Request for Production of Documents submitted to the

*Pressley v. Casar, Contestant's Response to Third Party Protective Order*
*p.1*

Travis County Clerk is relevant to the subject matter of her pending action and are directly related to new information disclosed in the Clerk's discovery response and Contestant would be unfairly prejudiced without such additional discovery.

## II. ARGUMENT AND AUTHORITIES

2. The Travis County Clerk continues to make overly broad statements and objections to Contestant's production requests. The Clerk has not provided a good faith factual and legal basis for the objections. Instead the Clerk's objections are broad, non-specific, and do not identify which of the 29 individual requests are problematic and why.

3. According to Texas Rule of Civil Procedure 192.3, it is not a ground for objection that the information sought will be inadmissible at trial if the information appears to be reasonably calculated to lead to discovery of admissible evidence. All of Contestant's requests will be admissible and/or is expected to lead to admissible information.

4. Contrary to the Clerk's assertion, Contestant is not seeking discovery that is contrary to the Court's rulings. Contestant's Second Request for Production of Documents, submitted to the Travis County Clerk, is relevant to the subject matter of her pending action and are directly related to new information disclosed in the Clerk's discovery response and deposition. Furthermore, Contestant would be unfairly prejudiced without such additional discovery.

5. If the Clerk believes a request violates the Court's ruling, the Clerk should be specific as to which requests from Contestant's Second Request for Production of Documents are in violation of the Third Party Discovery Control Plan. At this time, the Clerk has only make broad generalities and no specific details of her allegations have been presented.

*Pressley v. Casar, Contestant's Response to Third Party Protective Order*
*p.2*

6. If the Court desires, Contestant is more than amendable to providing details for the various production request to explain the importance of each item and describe how the requests will either be admissible evidence at trial or lead to admissible evidence. However, this has been made clear in the response to summary judgment and the motion to compel already on file.

7. In addition, in light of the recent discovery responses and the Clerk's deposition, new pleadings have been filed in Contestant's 6th Amended Petition[1]. Contestant's Second Request for Production of Documents[2] reflect, and are directly related to, new information disclosed in Clerk's recent discovery response and Contestant would be unfairly prejudiced without such additional discovery.

8. In fact, this Court stated to Contestant's Council, Mr. Rogers, "If you can provide the Court with some evidence as to some -- one of these mistakes that you can identify, I'll have them search for those particular issues. . . ." (Transcript from Special Hearing, April 6, 2015, pp. 124-5). See below for examples of such mistakes that warrant further discovery requests.

9. The Clerk's discovery responses and her subsequent deposition have validated that numerous mistakes were made during the tabulation of votes on the night of the Runoff election.[3,4] Many vote corruption mistakes (Exhibit C, pages 5, 22, 23, 26, 27, 29 and 42), as evidenced in the Hart Voting System security audit logs errors, "Invalid/Corrupt MBB [Mobile Ballot Box—where

---

[1] Exhibit A, Contestant's 6th Amended Petition.
[2] Exhibit B, 2nd Request for Production for Travis County Clerk, Dana DeBeauvoir
[3] Exhibit C, Tally system security audit logs
[4] Exhibit D, Deposition of Travis County Clerk, Dana DeBeauvoir

*Pressley v. Casar, Contestant's Response to Third Party Protective Order*
*p.3*

votes are stored].” Regarding these errors, the Clerk said, , “I've never heard of so many.”[5] (Exhibit D, Page 98 lines 16-25)

10. Contestant has made additional production requests based on the reasonable calculation that the new information related to corrupt memory cards, corrupt hardware, preventive maintenance of hardware, corrective action logs, those with access to corrupt memory cards, manuals, specifications, backup hardware, software, parallel testing, etc. will be admissible at trial or will lead to admissible information at trial so the Court can determine if the true outcome of the election can be known

11. In addition, discovery documents specifically state ballot images in the form of an image file (.bmp) and cast vote records are stored on the Hart Voting System[6] (Exhibit E, page 24 and 259-260) and thus Contestant has made specific requests related to ballot images stored on the equipment.

12. The Clerk further misrepresents the facts in this case with respect to the manual recount. The manual recount was conducted in violation of the Texas Election Code, in that ballot images were not used to recount votes, A cast vote record is not an image of ballots cast because it is not a ballot, or an image.

13. Also, in the Motion for Protective Order, the Clerk misrepresents that documents have been provided to Contestant that “verify the outcome of the election”:

---

[5] Exhibit D, Dana Deposition, MBB references.
[6] Exhibit E, Hart Voting System Ballot Now Operations Manual

*Pressley v. Casar, Contestant's Response to Third Party Protective Order*
*p.4*

a. Polling place sign in sheets—These do not verify the votes cast by voters, do not meet requirements in the Texas Election Code as statutory ballot images, and therefore, do not verify the election outcome.

b. Audit logs— These do not verify the votes cast by voters, do not meet requirements in the Texas Election Code as statutory ballot images, and therefore, do not verify the election outcome. In addition, the audit logs have been found to have missing entries and thus are not credible.

c. Serial numbers of equipment— These do not verify the votes cast by voters, do not meet requirements in the Texas Election Code as statutory ballot images, and therefore, do not verify the election outcome.

d. List of Early Votes names— These do not verify the votes cast by voters, do not meet requirements in the Texas Election Code as statutory ballot images, and therefore, do not verify the election outcome. In addition, compared to Early Voting lists provided in December to Contestant, it appears many voters names have been removed and thus is not a credible list.

e. Canvass Reports— These do not verify the votes cast by voters, do not meet requirements in the Texas Election Code as statutory ballot images, and therefore, do not verify the election outcome.. These lists are produced from the same system that was subject to the "Invalid/Corrupt MBB" errors and thus are unreliable.

f.  Zero Tapes—These do not verify the votes cast by voters, do not meet requirements in the Texas Election Code as statutory ballot images, and therefore, do not verify the election outcome.  In addition, discovery documents provided by Travis County show no "Zero Tapes" that meet the Texas Secretary of State's definition were printed and retained for the Runoff and thus were not provided to Contestant.

14.  To be clear, documents have not been provided to Contestant that meet Texas Election Code to verify the voters' intent in the District 4 Runoff election and thus do not verify the outcome of the election.

15. Furthermore, the Clerk misrepresents the intent of the Court's Discovery Control Plan Order[7] paragraph 8 whose subject matter specifically refers to communication documents and Contestant's Second Request for Production do not ask for any communication related documents:

a.  "…emails, memos, correspondence, or text messages regarding communications regarding the election without specificity as to the email and basis…"

b.  "…communications (including reports, emails, memo, correspondence, text messages, IM's, video conferencing or power points) regarding the election…"

---

[7] Exhibit F, Court's Discovery Plan Order

*Pressley v. Casar, Contestant's Response to Third Party Protective Order*
*p.6*

4611

16. It is unreasonable for the Clerk to claim immunity from further discovery requests since the election records of the Runoff are statutorily held by the Travis County Clerk's office. Additional discovery requests are needed to ascertain if the true outcome can be determined.

17. Also, for the Clerk to continue to make statements that Contestant's case is a "frivolous contest" is highly disingenuous and inappropriate given the numerous election irregularities and possible criminal violations that have caused statutorily required election records to be missing and/or deleted. Because of the missing election records, the true outcome of the Runoff cannot be known and Contestant will continue to make requests for documents and depositions that will be admissible in trial or lead to admissible information for trial.

18. It is not been proven by the Travis County's Clerk's office that the Hart Voting System does not have the capability to produce "images of ballots cast" per the Texas Election Code. Based on Hart Manuals, and Hart patents, the equipment has the capability to store and use ballot image files in the form of a bitmap (.bmp). Contestant asserts that Travis County may not understand how their equipment stores or retrieves ballot images:

    a. Firstly, the Ballot Now manual[8] provided to Contestant clearly documents the system saves "ballot images" in the form of a bitmap (.bmp format) file and in addition, it stores cast vote records (data structure format) to transfer data to Tally system. In the Clerk's deposition, she stated, the Ballot Now does not store ballot images. This is clearly a misinformed statement.

---

[8] Exhibit E, Hart's Ballot Now Operations Manual (page 24 and 259-260)

*Pressley v. Casar, Contestant's Response to Third Party Protective Order*
*p.7*

b.  Secondly, in Contestant's First Request for Production, all Cast Vote Records were requested and we know they have not been produced.  It has been repeatedly stated by the Clerk's counsel, Mr. Williams, that they have produced all cast vote records.  This is clearly a misinformed statement given the Ballot Now manual[9] clearly states Cast Vote Records are stored and used to transfer Absentee/Mail in Ballot voter data, and

c.  Thirdly, in Contestant's First Request for Production, all Ballot Images were requested and we know they have not been produced.  It has been repeatedly stated by the Clerk's counsel, Mr. Williams, that they cannot produce any ballot images.  This is a misinformed statement given Travis County's Ballot Now Operations manual clearly states ballot images in the form of a bitmap file (.bmp) are stored and can be retrieved.[10]

Thus, given these three examples of Travis County not being aware of the full capabilities of the Hart system as they relate to cast vote records and ballot images, Contestant seeks information to prove or disprove ballot images remain on the eSlate, JBC, and the Mobile Ballot Boxes (MBB's) for the Runoff.

19. Contestant understands and is sensitive to proprietary concerns given she holds four U.S. patents herself and because of her extensive background in the technology industry here in Austin.  With that in mind, Contestant is amenable to gaining access to documents under a

---

[9]  Exhibit E, Hart's Ballot Now Operations Manual (page 24 and 259-260)
[10] Exhibit E, Hart's Ballot Now Operations Manual (page 24 and 259-260)

*Pressley v. Casar, Contestant's Response to Third Party Protective Order*
*p.8*

protective order or *in camera* inspection. The intent of the discovery requests are to determine if the true outcome of the election can be known.

20. Oral deposition of those Travis County employees and/or contractors that have information regarding security database error codes or security protocols that occurred during the Runoff given the security breaches, missing audit log entries, corrupt error codes, duplicate vote entries, that occurred with the tabulation of votes is critical and is reasonably calculated to lead to admissible information. In addition, in her deposition, the Travis County Clerk agreed to provide names of such individuals.[11]

21. The needs and circumstances of this election contest warrant the above referenced Second Request for Production and deposition of Travis County employee(s) that have knowledge of the details of the Runoff election as it relates to the error codes and entries documented in the audit logs.

Respectfully submitted,

David Rogers
LAW OFFICE OF DAVID ROGERS

By:     */s/ David Rogers*
David A. Rogers
Texas Bar No. 24014089
1201 Spyglass Drive, Suite #100
Austin, Texas 78746
512-923-1836 — Telephone
512-201-4082 — Facsimile
Email: Firm@DARogersLaw.com

---

[11] Exhibit D, Deposition of Travis County Clerk, Dana DeBeauvoir, p. 7 lines 1-9, p. 74 lines 13 – 24 and p. 87 lines 1 - 10

*Pressley v. Casar, Contestant's Response to Third Party Protective Order*
*p.9*

Mark Cohen
805 W. 10th Street, Suite 100
Austin, Tx. 78701
512-474-4424
512-472-5444 (f)
Mark@cohenlegalservices.com
www.CohenLegalServices.com
*Attorney for Contestant Dr. Laura Pressley*

22.

**This is to** certify that a true and correct copy of the foregoing has been served in accordance with the Texas Rules of Civil Procedure on May 25, 2015 on counsel of record as follows:

Charles 'Chuck' Herring Jr. 09534100
cherring@herring-irwin.com
Jess Irwin - 10425700
jess@herring-irwin.com
Lauren Ross – 24092001
laurenbross@herring-irwin.com
Herring & Irwin, L.L.P.
1411 West Avenue, Ste 100
Austin, TX  78701
Phone: 512-320-0665
Fax: (512) 519-7580

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
Phone: (512) 476-6000
Fax: (512) 476-6002
ATTORNEYS FOR CONTESTEE,
GREGORIO "GREG" CASAR

Jessica Belinda Palvino
MCGINNIS, LOCHRIDGE & KILGORE LLP
600 Congress Avenue
Suite 2100
Austin, TX  78723
Phone: 512-495-6000
Fax: 512 495-6093
jpalvino@mcginnislaw.com

David A. Escamilla

*Pressley v. Casar, Contestant's Response to Third Party Protective Order*
*p.11*

4616

Travis County Attorney
Sherine E. Thomas
Andrew M. Williams
Patrick M. Kelly
Assistant County Attorneys
Travis County Attorney's Office
P.O. Box  1748
Austin, Texas 78767
Phone: (512) 854-9472
Fax:    (512) 854-4808
email:  Sherine.Thomas@traviscountytx.gov,
        Pat.Kelly@traviscountytx.gov,
        andrew.williams@traviscountytx.gov

By:     _/s/ David Rogers_____

4617

NO. D-I-GN-15-000374

| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | 201ST JUDICIAL DISTRICT |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | 201ST JUDICIAL DISTRICT |
| | § | |
| | § | |

## NOTICE OF WITHDRAWAL AS CO-COUNSEL

TO THE HONORABLE JUDGE OF SAID COURT:

1.      Comes now David Rogers, attorney of record for Contestant Laura Pressley, and notices this court that he has withdrawn as co-counsel.

2.      Contestant notified attorney David Rogers in writing on June 3, 2015 that his services have been terminated.

3.      As such, attorney Rogers cannot appear before this court or correspond with this court or with any party to this suit in any capacity that purports to represent Contestant's interests.

4.      At the time of filing of this Notice, attorney Mark Cohen continues to represent Contestant Laura Pressley as lead counsel.

5.      Attorney Rogers would respectfully request this court direct all filings, correspondence and other communications to lead counsel Mark Cohen at his address and phone number on file with the court.

13

RESPECTFULLY SUBMITTED,

LAW OFFICE OF DAVID ROGERS

By:    _/s/ David Rogers_____
David A. Rogers
Texas Bar No. 24014089
1201 Spyglass Drive, Suite #100
Austin, Texas 78746
512-923-1836 — Telephone
512-201-4082 — Facsimile
Email: Firm@DARogersLaw.com

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Notice has been served in accordance with the Texas Rules of Civil Procedure on June 5, 2015 on counsel of record as follows:

Charles 'Chuck' Herring Jr. 09534100
cherring@herring-irwin.com
Jess Irwin - 10425700
jess@herring-irwin.com
Lauren Ross – 24092001
laurenbross@herring-irwin.com
Herring & Irwin, L.L.P.
1411 West Avenue, Ste 100
Austin, TX  78701
Phone: 512-320-0665
Fax: (512) 519-7580

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
Phone: (512) 476-6000
Fax: (512) 476-6002
ATTORNEYS FOR CONTESTEE,
GREGORIO "GREG" CASAR

Jessica Belinda Palvino
MCGINNIS, LOCHRIDGE & KILGORE LLP
600 Congress Avenue

Suite 2100
Austin, TX 78723
Phone: 512-495-6000
Fax: 512 495-6093
jpalvino@mcginnislaw.com

David A. Escamilla
Travis County Attorney
Sherine E. Thomas
Andrew M. Williams
Patrick M. Kelly
Assistant County Attorneys
Travis County Attorney's Office
P.O. Box 1748
Austin, Texas 78767
Phone: (512) 854-9472
Fax:    (512) 854-4808
email: Sherine.Thomas@traviscountytx.gov,
       Pat.Kelly@traviscountytx.gov,
       andrew.williams@traviscountytx.gov

By:      */s/ David Rogers*_____

No. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY,<br>Contestant, | §<br>§<br>§ | IN THE DISTRICT COURT |
| V. | §<br>§ | OF TRAVIS COUNTY, TEXAS |
| GREGORIO "GREG" CASAR,<br>Contestee. | §<br>§<br>§ | 201st JUDICIAL DISTRICT |

## NOTICE OF ACCELERATED APPEAL

TO THE HONORABLE COURT:

NOW COMES, Laura Pressley, Contestant herein and give notice of her intent to appeal the trial court's judgment rendered on May 26, 2015 by accelerated appeal. This accelerated appeal is taken to the Third Court of Appeals, in Austin, Texas. This appeal does not pertain to a parental termination or child protection case as defined in Appellate 28.4.

Respectfully Submitted,

Mark Cohen
SBN: 04508400
805 W. 10th Street, Suite 100
Austin, Texas 78701
(512) 474-4424     Phone
(512) 472-5444     Facsimile
mark@cohenlegalservices.com

**ATTORNEY FOR CONTESTANT**

5224

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served by efile and/or facsimile to the following persons on this 15th day of June, 2015.

Charles 'Chuck' Herring Jr.
Jess Irwin
Lauren Ross
Herring & Irwin, L.L.P.
1411 West Avenue, Suite 100
Austin, TX 78701
(512) 320-0665     Telephone
(512) 519-7580     Facsimile
cherring@herring-irwin.com
jess@herring-irwin.com
laurenbross@herring-irwin.com

Jessica Palvino
McGinnis, Lochridge and Kilgore, LLP
600 Congress, Suite 2100
Austin, Texas 78701
(512) 495-6079     Telephone
(512) 505-6379     Facsimile
jpalvino@mcginnislaw.com

Kurt Kuhn
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
(512) 476-6000     Telephone
(512) 476-6002     Facsimile
kurt@kuhnhobbs.com

_____
Mark Cohen



# COURT OF APPEALS

**THIRD DISTRICT OF TEXAS**
P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

Filed In The District Court
of Travis County, Texas
on ___June 16, 2015___
at ___6:03___ P. M.
Velva L. Price, District Clerk

JEFFREY D. KYLE, CLERK

JEFF L. ROSE, CHIEF JUSTICE
DAVID PURYEAR, JUSTICE
BOB PEMBERTON, JUSTICE
MELISSA GOODWIN, JUSTICE
SCOTT K. FIELD, JUSTICE
CINDY OLSON BOURLAND, JUSTICE

June 16, 2015

Mr. Charles Herring, Jr.
Herring & Irwin LLP
1411 West Avenue Suite 100
Austin, TX 78701
* DELIVERED VIA E-MAIL *

Mr. Mark A. Cohen
Law Office of Mark A. Cohen
805 West 10th Street Suite 100
Austin, TX 78701
* DELIVERED VIA E-MAIL *

RE:  Court of Appeals Number:  03-15-00368-CV
     Trial Court Case Number:  D-1-GN-15-00037 4

Style:  Laura Pressley
        v. Gregorio "Greg" Casar

Dear Counsel:

The Court has been advised that appellant has given notice of appeal. The cause in this Court will bear the number and style shown above. If appellant has not already done so, he must make a written request to the clerk and the court reporter and make arrangements for payment of the record within ten days of the receipt of this notice. *See* Tex. R. App. P. 34.6(b)(1).

Very truly yours,

JEFFREY D. KYLE, CLERK

BY: *Courtland Crocker*

Courtland Crocker, Deputy Clerk

cc:  Ms. Mary Lou Taylor

The Honorable Velva L. Price



004077088

5226

NO. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | 201st JUDICIAL DISTRICT |

**CONTESTEE GREG CASAR'S**
**REPLY TO DAVID ROGERS' RESPONSE TO**
**CONTESTEE'S MOTION FOR SANCTIONS**

TO THE HONORABLE JUDGE DAN MILLS:

Gregorio "Greg" Casar ("Casar") files this reply to David Rogers' Response to Contestee's Motion for Sanctions and would show as follows:

I.     Rogers Misstates the Standard for Chapter 10 Sanctions

Contestee Casar seeks relief under Chapter 10 of the Texas Civil Practice and Remedies Code. He does not seek sanctions under Texas Rule of Civil Procedure 13, and Rogers' Response confuses the two standards. Contestee's burden is not, as Rogers asserts, to prove that the Contestant's pleadings were "groundless," or brought for an "improper purpose." *See* Reply at ¶¶ 5-7. This is the standard under Texas Rule of Civil Procedure 13. A different test applies under Chapter 10 of the Civil Practices and Remedies Code, the authority under which Contestee seeks sanctions.

Under § 10.001, the signer of a pleading or motion certifies that "**each claim, each allegation, and *each* denial is based on the signatory's best knowledge, information, and belief, formed after reasonable inquiry.**" *Low v. Henry,* 221 S.W.3d 609, 614 (Tex. 2007)(emphasis in original) (upholding sanctions under CPRC Chapter 10 against an attorney who plead that two doctors provided or prescribed a certain drug to the plaintiff, in spite of

1

2020

information to the contrary in the plaintiff's medical records which the attorney possessed); *see also* Tex. Civ. Prac. & Rem. Code 10.001(2)-(3) (referring to "each claim" and "each allegation"). Casar is not required to show bad faith or malicious intent by Rogers. He must only show that Rogers certified he made a reasonable inquiry into all of the allegations when he did not and that he certified that all the allegations in the petition had evidentiary support when some allegations did not. *Low,* 221 S.W.3d at 617. A reasonable inquiry is that amount of examination that is reasonable under the circumstances of the case. *Softech Int'l, Inc. v. Diversys Learning, Inc.*, No. 03-07-00687-CV, 2009 WL 638203, at *5 (Tex. App. Mar. 13, 2009) (citing *Robson v. Gilbreath,* 267 S.W.3d 401, 406 (Tex.App.-Austin 2008, pet. denied)). The trial court must examine the facts and circumstances as they existed <u>when the pleadings were filed</u>, and determine what information the plaintiffs did <u>and could</u> discover before filing suit. *Softech Int'l,* 2009 WL 638203 at *5 (citing *Armstrong v. Collin Co. Bail Bond Bd.,* 233 S.W.3d 57, 63 (Tex.App.-Dallas 2007, no pet.)).

The relevant portions of Section 10.001 state that:

> "The signing of a pleading or motion as required by the Texas Rules of Civil Procedure constitutes **a certificate** by the signatory that to the signatory's best knowledge, information, and belief, **formed after reasonable inquiry**:
>
> . . . (2) **each claim**, defense, **or other legal contention** in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) **each allegation or other factual contention** in the pleading or motion **has evidentiary support** or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . ."

2

Thus, § 10.001(2) addresses legal contentions, and § 10.001(3) addresses factual allegations. Section 10.001(2) applies only to counsel, Mr. Rogers, and § 10.001(3) applies to both Ms. Pressley and Mr. Rogers.

II.     <u>Rogers Failed to Make a Reasonable Inquiry into the Claims and Legal Contentions Asserted under 10.001(2)</u>

Rogers repeatedly, throughout six separate Contests, made the legal contention that a "ballot image" differs from a "cast vote record." *See* Original Contest at ¶¶ 32-38; Second Amended Contest at ¶¶ 31-37; Third Amended Contest at ¶¶ 43-53; Fourth Amended Contest at ¶¶ 43-53; Fifth Amended Contest at ¶¶ 49-59; Sixth Amended Contest at ¶¶ 3, 13, 82, 84, 97-138. In his reply, he attempts to justify these contentions by claiming that he reasonably relied on several sources. *See* Rogers' Response at ¶10. As an initial matter, Rogers did not cite most these supposed legal sources until the Sixth Amended Contest and therefore could not have relied on them for the first five Contests he filed. Furthermore, a close examination of these sources reveals that Rogers failed to make a reasonably inquiry into his claim that a Ballot Image differs from a Cast Vote Record.

Simply put, Rogers' inquiry was not reasonable. He ignored an abundance of controlling and persuasive legal authority from the Texas Secretary of State, Election Assistance Commission, and Travis County, which define ballot image and cast vote record as synonymous. *See, e.g., Contestee's Motion for Summary Judgment at* Ex. 15, U.S. Election Assistance Commission Glossary of Key Election Terminology (2007) at 10; Ex. 16, Memo from Keith Ingram, *Electronic Voting System Procedures*, (April 1, 2014). He also ignored the letters that the Secretary of State's Election Administrator sent to Ms. Pressley, before suit was filed, expressly stating that the Travis County Clerk had printed ballot images. *See* Contestee's

3

2022

Amended Motion for Summary Judgment, Ex. 6, Letter from Texas Secretary of State Director of Elections Keith Ingram to Pressley (Jan. 20, 2015); Ex. 7, Letter from Texas Secretary of State Director of Elections Keith Ingram to Pressley (Jan. 27, 2015).

Instead, he pieced together unrelated and outdated excerpts from the Election Code, the Texas Constitution, and various other sources. *See* Rogers' Response at ¶10. The chart below analyzes the evidence upon which Rogers claims he relies, and the reasons why his reliance on these authorities is unreasonable.

| Source | Reliance is Unreasonable Because... |
|---|---|
| Tex. Elec. Code § 124.063; Texas Election Code § 128.001(a) Texas Election Code Chapter 52; Texas Constitution Article 6, Sec. 4 | These authorities do not state that a cast vote record differs from a ballot image. Moreover, Rogers' citation to these sections is selective and he ignores other, clearly applicable authority to the contrary. For example, Texas Election Code § 52.075 gives the Secretary of State authority to prescribe the form and content of ballots for electronic voting machine. Similarly, § 129.002 of the Election Code gives the Secretary of State the authority to implement Direct Recording Electronic voting systems, like the Hart Intercivic System, that utilize Cast Vote Records. |
| 1990 Federal Election Commission Performance and Test Standards | Rogers did not cite these supposed legal sources until the Sixth Contest. The 1990 report is outdated and was superseded by a 2002 report from the FEC. Rogers failed to consider the more recent definition from the FEC, which does define a ballot image in a way that includes a CVR. *See* Contestant's Response to Summary Judgment at Ex. A-8, pages 2-21. The 2002 standards define ballot image as "an electronic record of all votes cast by the voter." *Id.* Furthermore, the Election Assistance Commission, not the Federal Election Commission, is the appropriate governing agency. The FEC enforces campaign finance laws. The EAC provides guidance on election administration. The Election Assistance Commission has unequivocally defined "ballot |

4

| | image" as synonymous with "CVR." |
|---|---|
| Source Code review of the Hart Intercivic voting system | Rogers did not cite this supposed legal source until the Sixth Contest.<br><br>The California Source Code review does not distinguish a ballot image from a cast vote record or provide any direct support for Roger's contentions. Even if did, however, an analysis conducted more than seven years ago by a foreign Secretary of State is not controlling and would have minimal persuasive effect, especially if it directly contradicted the Texas Secretary of State's definition. Travis County has used the eSlate system since 2002 without incident. |
| Jacobson's Expert Declaration | Jacobson had not made his declaration or been designated as an expert at the time the most of Rogers' legal contentions were made, therefore Rogers' could not have reasonably relied on his opinions. *Softech Int'l*, 2009 WL 638203 at *5 (citing *Armstrong v. Collin Co. Bail Bond Bd.*, 233 S.W.3d 57, 63 (Tex.App.-Dallas 2007, no pet.)) (holding that the trial court must examine the facts and circumstances as they existed <u>when the pleadings were filed</u>). In any event, he had zero qualifications in election technology and was not a legally competent or qualified source. |

A review of the totality of legal authorities available to Rogers reveals that he did not conduct a reasonable inquiry before making his legal contention that a ballot image differs from a Cast Vote Record. TEX. CIV. PRAC. & REM. CODE 10.001. This contention was not warranted by existing law nor was there a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. TEX. CIV. PRAC. & REM. CODE 10.001(2). His failure to conduct such an inquiry is sanctionable. TEX. CIV. PRAC. & REM. CODE 10.001, 10.004.

5

III.    Rogers Failed to Make a Reasonable Inquiry into the Factual Allegations and Contentions Under § 10.001(3)

Rogers also failed to make a reasonable inquiry concerning the factual allegations. The Texas Supreme Court held that the pleading party must meet the pleading-certification requirements separately for each allegation: "[e]ach allegation and factual contention in a pleading or motion must have, or be likely to have, evidentiary support after a reasonable investigation." *Low*, 221 S.W.3d at 612.

In the present case, the Court granted Mr. Casar's no-evidence summary judgment motion. Thus, the Court has already held that Ms. Pressley failed to present evidence raising a genuine issue of material fact. This ruling shows that Ms. Pressley failed to meet the § 10.001(3) evidentiary-support requirement.

Even apart from the summary judgment, however, the evidence for Ms. Pressley's relevant allegations is non-existent. Many of Ms. Pressley's allegations are nothing more than unsupported suspicions. Suspicions are not evidence. *Softech Int'l, Inc. v. Diversys Learning, Inc.*, No. 03-07-00687-CV, 2009 WL 638203, at *4 (Tex. App. Mar. 13, 2009) (citing *Continental Coffee Prod. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex. 1996); *Litton Indus. Prod., Inc. v. Gammage,* 668 S.W.2d 319, 324 (Tex. 1984)) (holding that "when circumstances surrounding an action are consistent with more than one inference and nothing shows that one inference is more probable than the other, the circumstances constitute mere suspicion, and not legally cognizable evidence.") In *Softech*, for example, the Austin Court of Appeals upheld an award of sanctions against an attorney who failed to perform a reasonable factual inquiry before filing suit. *Id.* In so holding, the Court chastised the Plaintiff, stating that:

6

2025

"[Plaintiff] confuses mere suspicion with circumstantial evidence. The circumstances .... could be sufficient to arouse suspicion, but do not rise to the level of circumstantial evidence. The civil practice and remedies code requires that potential plaintiffs conduct a "reasonable inquiry" to determine if there is any evidence to support their suspicions before filing suit ... [Plaintiff] skipped this crucial step."

*Id.* at *5.

Like the Plaintiff in *Softech*, Ms. Pressley and her legal team failed to conduct a reasonable inquiry to determine if there was any evidence supporting their suspicions before filing suit. The chart below lays out some of the factual allegations asserted by Ms. Pressley and Mr. Rogers, and the evidence showing that a reasonable inquiry was not made into the accuracy of these facts before pleading them.

| Pressley Allegation | Facts Establishing No Reasonable Inquiry |
|---|---|
| Widespread and "illegal" voter disenfranchisement occurred as a result of a consolidation in voting locations, resulting in a "conservative count" of 1,108 disenfranchised voters. Original Contest at ¶ 13; Second Amended Contest at¶¶ 13;  Third Amended Contest at ¶ 12-23; Fourth Amended Contest at ¶ 12-23; Fifth Amended Contest at ¶ 12-29. | In her deposition, Ms. Pressley admitted that she could not identify a single voter who was prevented from voting based on the change in voting location. *See* Contestee's Amended Motion for Summary Judgment at Ex. 8, Pressley Deposition pp. 114-15.<br><br>She also claimed that if a voter had to drive only *20 seconds* to a new voting location, that 20-second drive would constitute voter disenfranchisement. *See* Contestee's Amended Motion for Summary Judgment at Ex. 8, Pressley Deposition pp. 100-101. That is nonsense, and Pressley has no legal support for that odd notion.<br><br>Pressley or her counsel apparently realized that they had no factual support for this assertion, and dropped it from their Sixth Amended Contest. |
| Travis County election officers "instructed election officials" to not print zero tapes or results tapes on election day. Original Contest at ¶ 14; Second Amended Contest at¶¶ 11, 14;  Third Amended Contest at ¶ 35; Fourth Amended Contest at ¶ 35; Fifth Amended Contest at ¶ 41; Sixth Amended | This is a false and misleading assertion. As Ms. DeBeauvoir explained in her deposition, results tapes were printed on election day. But, on election day, results tapes are called by a different name – "access codes" – not results tapes. *See* Contestee's Amended Motion for Summary Judgment at Ex. 25, DeBeauvoir's deposition p. 126-27. |

7

| | |
|---|---|
| Contest at ¶¶3, 8, 42, 43, and 64. | By falsely claiming that the County did not print "results tapes" on election day, Pressley was attempting to mislead this Court into believing that the County somehow failed to comply with the Election Code.<br><br>Similarly, Ms. Pressley's claim that no zero tapes were printed is false and misleading. Ms. Pressley testified that didn't know if zero tapes were printed, where they were printed, or when. *See* Pressley Deposition, p. 134. Thus, she had zero factual support for her statement when she made those allegations in the Contests. Furthermore, Ms.DeBeauvoir explained in her deposition that zero tapes were printed before the election, as required by the Secretary of State. *See* Contestee's Amended Motion for Summary Judgment at Ex. 25, DeBeauvoir's deposition p. 125-26. In fact, Ms. Pressley and her legal team attached a Zero Tape to her Sixth Contest. *See* Exhibit C to Pressley's Sixth Contest. |
| Travis County Director of Elections Michael Winn committed a criminal violation by not allowing Pressley and her poll watchers to view the source, properties, and copying of the CVR files. *See* Sixth Contest, ¶¶ 93 and 94 | Ms. Pressley claims that Mr. Winn violated on Texas Election Code Section 33.061[1] by not allowing her and her poll watchers to view the source and properties of the CVR files during the recount. *See* Sixth Contest, ¶¶ 93 and 94. Under Election Code § 213.016, Ms. Pressley and her poll watchers were allowed to be present for the printing of the CVRs. However, nothing in the Election Code authorizes Ms. Pressley or her poll watchers to view the source and properties of the CVR files, such as dates of the CVR files and origination. The factual statement that Mr. Winn committed a criminal violation is false and unsupported. |

---

[1] Texas Election Code Sec. 33.061, UNLAWFULLY OBSTRUCTING WATCHER, provides that "(a) A person commits an offense if the person serves in an official capacity at a location at which the presence of watchers is authorized and knowingly prevents a watcher from observing an activity the watcher is entitled to observe. (b) An offense under this section is a Class A misdemeanor."

8

## CONCLUSION

Contestee Casar respectfully requests that this Court grant his motion for sanctions, award him the remedies provided by Texas Civil Practices and Remedies Code Chapter 10, and any additional relief to which he is entitled.

Respectfully submitted,

MCGINNIS, LOCHRIDGE AND KILGORE LLP
600 Congress, Suite 2100
Austin, TX 78701
(512) 495-6079
(512) 505-6379 - Facsimile

Jessica Palvino - 24048780
jpalvino@mcginnislaw.com

Charles Herring, Jr.
State Bar No. 09534100
cherring@herring-irwin.com
Lauren Ross
State Bar No. 24092001
laurenbross@gmail.com
HERRING & IRWIN, L.L.P.
1411 West Avenue, Suite 100
Austin, Texas 78701
(512) 320-0665
(512) 519-7580 FAX

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas 78731
(512) 476-6000
(512) 476-6002 – Facsimile

ATTORNEYS FOR CONTESTEE
GREGORIO "GREG" CASAR

9

2028

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document has been delivered to Mr. David A. Rogers, Law Office of David Rogers, 1201 Spyglass Drive, Suite #100, Austin, Texas 78746 and to Mr. Mark Cohen, 805 W. 10th Street, Suite 100, Austin, Tx. 78701 by electronic service through the electronic filing manager, or if counsel is not registered with the electronic filing manager, by email, on this 17th day of June, 2015.

<u>                                  </u>

2029

CAUSE NO. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | 201st JUDICIAL DISTRICT |

## PROPOSED ORDER ON THIRD PARTY DISCOVERY CONTROL PLAN

On April 6, 2015, Contestant, Contestee and the Travis County Clerk and Voter Registrar came before the Court. After considering Motion for Protective Order and Motion for Third Party Discovery Control Plan, the Court finds that the Travis County Clerk and Voter Registrar's Motion is meritorious in part. It is therefore ORDERED that Travis County Clerk and Voter Registrar's Objections to Contestant's discovery requests are SUSTAINED in part and Motion for a Third Party Control Plan is GRANTED in part as follows:

It is ORDERED that responses to discovery shall be produced in the following manner:

1. Travis County Clerk and Travis County Voter Registrar shall respond to requests for production by April 20, 2015, as limited by this Court's ruling on scope below.

2. To the extent that voter information is available on a publicly accessible website, Travis County shall provide to Contestant the appropriate specific website address. To the extent that information is not publicly available, Travis County shall produce for inspection and copying voter registration data. This is subject to Contestant's disclosure of voters as addressed in paragraph 11.

3. To the extent that Travis County contends that data requested is proprietary or they are contractually prohibited from turning over that data, the County is ordered to turn over the contracts providing the basis for such objections for inspection and copying. Travis County shall not be required to produce access to proprietary information or inspection of direct recording electronic voting machines, eSlates, judge's booth controllers, software or hardware used in conjunction with the eSlate system.

4. The County shall produce as soon as practicable the Cast Vote Records for the December runoff for District 4 for inspection and copying.

5. The County shall produce all records showing which machines were used in the November and December elections, including voting machines, Mobile Ballot Boxes, Judge's Booth Controllers, Direct Record Electronic machines, Ballot Now machines or any other machines used to count votes or ballots in the November election and December runoff, including but not limited to those reports produced for the Texas Secretary of State's office pursuant to reporting requirements and requests.

6. To the extent the County makes copies, it shall assess the copy costs at the rate of $ .50 per page.



Case # D-1-GN-15-000374

003978729



EXHIBIT

2

ENTERED

4493

7. The County shall produce all documents required within 15 days of the hearing on discovery, with the following exceptions: results of Logic and Accuracy Testing shall be produced as soon as practicable and the previously produced cast vote records shall be made available immediately on request.

8. Travis County shall not be required to produce emails, memos, correspondence, or text messages regarding communication regarding the election without specificity as to the email and basis for that request. Travis County, to the extent known, shall provide emails, memos, correspondence or text messages regarding the December 16, 2014 runoff election as it relates to any known issues relating to any type of failure or operating issues as to the electronic voting machines. Travis County shall not be required to produce documents or communications (including reports, emails, memos, correspondence, text messages, IM's, video conferencing or power points) regarding the election or eSlate system, its components and the related personnel, access, location, security, programing, training, maintenance, operation, capacity or warranties.

9. The County shall produce all incident logs and other reports that show problems it is aware of with regard to the November election and runoff.

10. The scope of Discovery shall be limited to the Austin City Council District 4 December 2014 runoff and subsequent recount, except as otherwise ordered.

11. However, responses to those requests which seek individual voter information or documentation regarding poll watchers shall be due no sooner than 10 days after the Contestant identifies the individuals, either in a separate document or in her amended pleading to be filed in response to the Court's order on Contestee's special exceptions; To the extent possible, Travis County should provide information on request regarding individual voters alleged to have voted illegally as soon as practicable due to the expedited nature of this matter.

12. The Travis County Clerk shall make the Cast Vote Records or "CVRs" for each vote cast in the December Runoff available to the parties for inspection no later than April 16, 2015. The parties and the Travis County Clerk are ordered to establish a mutually agreeable time for the inspection of records which is to take place at 5501 Airport Blvd, Austin, TX 78751.

13. The Travis County Clerk and/or Travis County Voter Registrar may object to any remaining requests and provide statutory cites or other law as the basis for those objections.

14. IT IS SO ORDERED.

Signed this 13th Day of April,

Judge Dan Mills

is that correct?

A. Similar.

Q. Yes. Okay. It certainly isn't Exhibit 10 that they see.

A. That's not correct. That's what I keep trying to tell you.

Q. Okay. They do see Exhibit 10 when they vote?

A. Uh-huh. Uh-huh. What will happen is, is that after you've voted, the last screen that you will see is what's called a "summary screen." And this information is contained on the summary screen, so it looks almost exactly like this.

Q. So it --

A. This part is going to be missing; but what you'll see on the summary, is this.

Q. Okay. So if I -- when I go in and I decide who to vote for and I mark who I vote for, then the computer says, "This is who you vote for. Are you sure you want to vote for them?" Is --

A. Yes.

Q. -- that correct?

A. Yes.

Q. Okay.

A. Do you want -- this -- it will say, "Here are your selections," and it will give you a last

EXHIBIT
3

4495

iDepos Prepared for sherine.thomas@traviscountytx.gov

opportunity to change it.

Q. Okay. Right. And if you don't change it, that's who you vote for?

A. Correct.

Q. Okay. But when you make your decision, you're looking at Exhibit -- something like Exhibit 8 or 9, not something like Exhibit 10?

A. No.

MS. THOMAS: Objection, form.

A. No. This is your final chance. It'll look like this.

Q. (BY MR. COHEN) Okay.

A. It's a -- it looks like the summary screen.

Q. Exhibit No. 8 or 9 is what shows up in your face when you try to decide who you want to vote for, correct?

A. You voting. The process, yes.

Q. Yes. Okay.

A. Correct.

Q. And so you don't see No. 10 when you're deciding who to vote for. You see No. 10 to make sure that who you marked on Exhibit 8 is what you really want to do; is that correct?

MS. THOMAS: Objection --

A. No.

| | |
|---|---|
| **From:** | Mark Cohen |
| **To:** | Charles Herring; "Dan Mills"; Warren Vavra |
| **Cc:** | Andrew Williams; firm@darogerslaw.com; Sherine Thomas; Pat Kelly; "Lauren Ross"; "Kurt Kuhn"; "Palvino, Jessica B." |
| **Subject:** | RE: Pressley - Casar |
| **Date:** | Friday, April 24, 2015 1:46:34 PM |

I will review the discovery docs and your agreement to stipulate to the admissibility of the county's production. If I think I need any other testimony from the county to respond to your motion I will ask you to stipulate to it and if you feel that you cannot do that I will do my job as an attorney and get the evidence I think I need in admissible form and assert my right to do so before a summary judgment is set or considered. That is the best I can do to accommodate everyone's goal to expedite a final decision while still doing so based on all the available evidence

**Mark Cohen**
**805 W. 10th Street, Suite 100**
**Austin, Tx. 78701**
**512-474-4424**
**512-472-5444 (f)**
**Mark@cohenlegalservices.com**
www.CohenLegalServices.com

**Everyone needs a break for peace of mind- especially those involved with the legal system.**
**Rent our Villa with pool in Playa Del Carmen near the beach and town.**
**Need a vacation?** see http://villaalegreplaya.com and http://www.steinhardt.us/villaalegre/

CONFIDENTIALITY NOTICE
The information contained in this message may be privileged and confidential and protected from disclosure.If the reader of this message is not theintended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination,distribution or copying of thiscommunication is strictly prohibited. If you have received this communicationin error, please notify us immediately by replying to the message and deleting it from your computer.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the Treasury Department, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Charles Herring [mailto:cherring@herring-irwin.com]
**Sent:** Friday, April 24, 2015 1:40 PM
**To:** Mark Cohen; 'Dan Mills'; 'Warren. Vavra'
**Cc:** 'Andrew Williams'; firm@darogerslaw.com; 'Sherine Thomas'; 'Pat Kelly'; 'Lauren Ross'; 'Kurt Kuhn'; 'Palvino, Jessica B.'
**Subject:** RE: Pressley - Casar



EXHIBIT
4

4497

Whether you depose Ms. DeBeauvoir will be up to you, her, the County, and the Court. I was just pointing out that based on the only two reasons you have given thus far for deposing her, the deposition appears unnecessary.

**From:** Mark Cohen [mailto:mark@cohenlegalservices.com]
**Sent:** Friday, April 24, 2015 1:33 PM
**To:** Charles Herring; 'Dan Mills'; 'Warren. Vavra'
**Cc:** 'Andrew Williams'; firm@darogerslaw.com; 'Sherine Thomas'; 'Pat Kelly'; 'Lauren Ross'; 'Kurt Kuhn'; 'Palvino, Jessica B.'
**Subject:** RE: Pressley - Casar


Thank you for that stipulation I will prepare one for the response to the msj. That will shorten the deposition somewhat. However I have my reasons for wanting a deposition and it certainly is not to delay resolution of this matter past July 20. I am certain you would never let an opposing counsel tell you when you need to take a deposition either

**Mark Cohen**
**805 W. 10th Street, Suite 100**
**Austin, Tx. 78701**
**512-474-4424**
**512-472-5444 (f)**
**Mark@cohenlegalservices.com**
www.CohenLegalServices.com

**Everyone needs a break for peace of mind- especially those involved with the legal system.**
**Rent our Villa with pool in Playa Del Carmen near the beach and town.**
**Need a vacation?** see http://villaalegreplaya.com and http://www.steinhardt.us/villaalegre/

CONFIDENTIALITY NOTICE
The information contained in this message may be privileged and confidential and protected from disclosure.If the reader of this message is not theintended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination,distribution or copying of thiscommunication is strictly prohibited. If you have received this communicationin error, please notify us immediately by replying to the message and deleting it from your computer.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the Treasury Department, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Charles Herring [mailto:cherring@herring-irwin.com]
**Sent:** Friday, April 24, 2015 1:29 PM

**To:** Mark Cohen; 'Dan Mills'; 'Warren. Vavra'
**Cc:** 'Andrew Williams'; firm@darogerslaw.com; 'Sherine Thomas'; 'Pat Kelly'; 'Lauren Ross'; 'Kurt Kuhn'; 'Palvino, Jessica B.'
**Subject:** RE: Pressley - Casar

We agree to stipulate in advance to the authenticity of any document that Travis County produces. No deposition is necessary for that. Given that the Secretary of State, the County Clerk, the City Clerk, and the United States Election Advisory Commission all say exactly the same thing—that for electronic voting a Cast Vote Record is a ballot image—we can stipulate to that. Pressley filed for the recount on the last possible day, then filed suit the last possible day (1/30), and then failed to serve Casar until 2/10. The general election was November 4, six months before the early May hearing date. Six months after the election is the opposite of "speed" for an election contest. In many instances, trial of an election contest has to be set within 5 days after the filing of an answer. Election Code sec. 232.012(d). -- Chuck Herring

**From:** Mark Cohen [mailto:mark@cohenlegalservices.com]
**Sent:** Friday, April 24, 2015 1:02 PM
**To:** 'Dan Mills'; 'Warren. Vavra'; Charles Herring
**Cc:** 'Andrew Williams'; firm@darogerslaw.com; 'Sherine Thomas'; 'Pat Kelly'; 'Lauren Ross'; 'Kurt Kuhn'; 'Palvino, Jessica B.'
**Subject:** RE: Pressley - Casar

Dear Judge Mills:
We will need to take the deposition of Travis County clerk before we can be prepared to respond We have third party discovery from them but we will need admissible testimony to get them admitted . we also need admissible testimony from them that the cvr's are the only document they have to meet the image of ballot cast requirement. Sheri , the county attorney in charge is out until next week. As I told Mr. Herring I will be contacting Sherri and him for a mutually convenient date to take the depositions and then we have of course the printing of the deposition and the time for the deponent(s) to read and sign and I will need time to prepare a response to the Motion. The phantom need asserted to move this case so fast that it prejudices my client's chance to fairly present the case is strongly objected to and it just unnecessarily creates additional grounds for necessitating an appeal which will delay the final decision even more. The pendency of this case is having no more of an effect on Mr. Casar that every litigant waiting for the procedures of a trial to work their way and there is no evidence that the city is being adversely effected in any way. Frankly Mr. Herring's tactical efforts to prevent Ms. Presley from having a fair opportunity to provide you with all of the admissible evidence just affirms how important it is that I have the time to provide it to you. Given the trial is not until July 20 Ms. Pressley will object to any shortening of her time to respond and notice of hearing that is less than the 21 days required by the rules and ignores our right to conduct reasonable discovery before being required to respond to a Motion for Summary Judgment. Let's not sacrifice fairness for speed. I respectfully request that the Motion be set 21 days or more after I receive the deposition of the county clerks in form that is not subject to objection(it is signed or signature is waived or excused) necessary to have my evidence to meet the Summary Judgment allegations. As in most case some of the evidence if not most of it comes from other sources so it is not frivolous to take depositions to obtain it from the source that will satisfy the rules of evidence as to admissibility. My client is anxious to get the facts out and obtain a final

resolution as anyone since she is the one who is being deprived of an election with a true outcome. The city council and Mr. Casar are proceeding quite efficiently as if this case had never been filed

**Mark Cohen**
**805 W. 10th Street, Suite 100**
**Austin, Tx. 78701**
**512-474-4424**
**512-472-5444 (f)**
**Mark@cohenlegalservices.com**
www.CohenLegalServices.com

**Everyone needs a break for peace of mind- especially those involved with the legal system.**
**Rent our Villa with pool in Playa Del Carmen near the beach and town.**
**Need a vacation?** see http://villaalegreplaya.com and http://www.steinhardt.us/villaalegre/

CONFIDENTIALITY NOTICE
The information contained in this message may be privileged and confidential and protected from disclosure.If the reader of this message is not theintended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination,distribution or copying of thiscommunication is strictly prohibited. If you have received this communicationin error, please notify us immediately by replying to the message and deleting it from your computer.

TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the Treasury Department, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

EXHIBIT
25

Blumberg No. 5208

---

Page 1

NO. D-1-GN-15-000374

LAURA PRESSLEY ) IN THE DISTRICT COURT
Contestant )
)
)
VS. ) TRAVIS COUNTY, TEXAS
)
)
GREGORIO "GREG" CASAR )
Contestee ) 201ST JUDICIAL DISTRICT

**********************************************

ORAL DEPOSITION OF

DANA DEBEAUVOIR

MAY 11, 2015

**********************************************

ORAL DEPOSITION OF DANA DEBEAUVOIR, produced as a witness at the instance of the Contestee GREGORIO "GREG" CASAR, and duly sworn, was taken in the above-styled and numbered cause on May 11, 2015, from 9:44 a.m. to 12:24 p.m., before KATHERINE A. BUCHHORN, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of County Clerk's Courthouse Conference Room, Room 222, Heman Marion Sweatt Courthouse, 1000 Guadalupe, Austin, Texas 78701, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

---

Page 2

APPEARANCES

FOR THE CONTESTANT:

MARK COHEN
THE LAW OFFICES OF MARK COHEN & ROSE COHEN
805 W. 10th Street
Suite 100
Austin, Texas 78701
512.474.4424/512.472.5444 (fax)
mark@cohenlegalservices.com

FOR THE DEPONENT, DANA DEBEAUVOIR:

SHERINE E. THOMAS
DIRECTOR LITIGATION DIVISION - TRAVIS COUNTY
314 W. 11th Street
Austin, Texas 78701
512.854.9513/512.854.4808 (fax)
sherine.thomas@traviscountytx.gov

- and -

ANDREW M. WILLIAMS
ASSISTANT COUNTY ATTORNEY - TRAVIS COUNTY
314 W. 11th Street, Suite 500
Austin, Texas 78701
512.854.9513/512.854.9472 (fax)
andrew.williams@traviscountytx.gov

---

Page 3

FOR THE CONTESTEE, GREGORIO "GREG" CASAR:

CHARLES HERRING, JR.
HERRING & IRWIN, L.L.P.
1411 West Avenue
Suite 100
Austin, Texas 78701
512.320.0665/512.519.7580 (fax)
cherring@herring-irwin.com
- and -

JESSICA PALVINO
MCGINNIS LOCHRIDGE
600 Congress Avenue, Suite 2100
Austin, Texas 78701 78701
512.495.6079/512.505.6379 (fax)
jpalvino@mcginnislaw.com

ALSO PRESENT:

Laura Pressley, Ph.D.
Abbe Waldman

---

Page 4

INDEX

PAGE

Appearances. . . . . . . . . . . . . . . . 2
Exhibits . . . . . . . . . . . . . . . . . 5
Requested Information. . . . . . . . . . . 7
Stipulations . . . . . . . . . . . . . . . 8

DANA DEBEAUVOIR

Examination by Mr. Herring . . . . . . . . 9
Examination by Mr. Cohen . . . . . . . . . 40
Further Examination by Mr. Herring . . . . . 128

Reporter's Certificate . . . . . . . . . . 132

Changes and Signature. . . . . . . . . . . 135

---

4543

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 5

EXHIBITS
NO. DESCRIPTION                PAGE
1 ..................... 9
  Travis County Clerk Dana DeBeauvoir
  Curriculum Vitae
2 ..................... --
  *** NOT INTRODUCED ***

3 ..................... 21
  Election Advisory No. 2012-03
4 ..................... 22
  Electronic Voting System Procedures

5 ..................... 23
  Glossary of Key Election Terminology -
  2007

6 ..................... 51
  eSlate Voting System - About the eSlate
  Voting System

7 ..................... 44
  By-Mail Ballot example
8 ..................... 45
  By-Mail Ballot example

9 ..................... --
  *** MARKED - NOT INTRODUCED or PROVIDED
  TO REPORTER ***

10 ..................... 42
  Votes by Precinct - JBCs Election Day
  GR14, Precinct 133C

11 ..................... 119
  District 4 Runoff Cast Vote Record
  Recount files Meta-Data - Date Modified

12 ..................... 56
  Audit Log - Official, Travis County
  December 16 2014 Joint Special Runoff
  Election

Page 6

EXHIBITS
NO. DESCRIPTION                PAGE
13 ..................... 54
  GR14 City of Austin Manual Recount of
  District 4
14 ..................... --
  *** NOT MARKED ***

15 ..................... --
  *** NOT MARKED ***
16 ..................... 129
  Precinct 133 Voters - December 16, 2014
  Voting location: Memorial United
  Methodist Church

17 ..................... 130
  Precinct 142 Voters - December 16, 2014
  Voting location: Travis County Airport
  Offices
18 ..................... 130
  Precinct 209 Voters - December 16, 2014
  Voting location: Grant AME Worship
  Center

19 ..................... 130
  Precinct 258 Voters - December 16, 2014
  Voting location: Walnut Creek Elementary

20 ..................... 130
  Precinct 260 Voters - December 16, 2014
  Voting location: Lanier High School

Page 7

DOCUMENTS/INFORMATION REQUESTED
(OR MAY BE REQUESTED)

NO. DESCRIPTION                PAGE

1 ..................... 74
  Names of tally administrators
2 ..................... 75
  Name of tally administrator making
  specific entry
3 ..................... 87
  Names of people more familiar with
  Audit Log

Page 8

STIPULATIONS

The attorneys for all parties present stipulate and agree to the following items:

The deposition of DANA DEBEAUVOIR is taken pursuant to Notice;

That all objections will be made pursuant to the Texas Rules of Civil Procedure;

That the original transcript will be submitted for signature to the witness' attorney, SHERINE E. THOMAS, and that the witness or the witness' attorney will return the signed transcript to Sympson Reporting within 20 days of the date the transcript is provided to the witness' attorney. If not returned, the witness may be deemed to have waived the right to make the changes, and an unsigned copy may be used as though signed.

4544

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 9

PROCEEDINGS

THE REPORTER: Are there any special stipulations today or just by the Rules?

MR. COHEN: Just regular stuff.

(Witness sworn.)

DANA DEBEAUVOIR, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HERRING:

Q. Would you state your name for the record?

A. **My name is Dana DeBeauvoir.**

Q. And Ms. DeBeauvoir, you are the county clerk of Travis County, right?

A. **Travis County Clerk.**

(DeBeauvoir Exhibit No. 1 marked)

Q. (BY MR. HERRING) And let me hand you a copy of what I have marked as Exhibit 1, which I believe is your resume.

A. **(Moved head up and down.)**

Q. And is that what that is?

A. **Yes, sir.**

Q. And that's current?

A. **Yes, it is.**

Q. Okay. And I just want to ask you -- it's a lengthy resume. I just want to ask you a few points

Page 10

from it. Your educational background, just very briefly, college and your master's.

A. **Right. I have a college degree from the University of Texas at Arlington. It's a dual in sociology/social work; and I have a master's degree from the LBJ School of Public Affairs, 1981.**

Q. And you've been a county clerk since when?

A. **I was elected in '86 and took office January 1, 1987.**

Q. Right. And do you have any idea how many elections you have presided over since then?

A. **We keep meaning to add it up, but a couple of hundred, at least.**

Q. And I assume it would be -- I mean, you would have city, county, state, federal, school district, bond issues, referendum. Referenda, sometimes. Have I left anything out?

A. **Primaries.**

Q. And primaries. And runoffs.

A. **Runoffs; special, uh-huh.**

Q. So I mean, if you -- and if you added up all the candidates --

A. **Oh.**

Q. -- on the ballots, for all those years, it would be thousands.

Page 11

A. **It would be thousands. It would be thousands of candidates.**

Q. You have great experience in elections.

A. **Yeah.**

Q. All right. And you've also won, I see from your resume, awards from various bodies, local and national, for your work in elections.

A. **Yes.**

Q. Is that a fair statement?

A. **Yeah.**

Q. And I need you to answer out loud --

A. **Yes.**

Q. -- so we can make sure we have it.

Let me just see. One of them was the National Association of County Recorders, Election Officials and Clerks.

A. **Yeah.**

Q. And I can't pronounce the acronym, so I'll just leave it at that. And you won, in 2009, Public Official of the Year.

A. **I did win that incredible award.**

Q. All right. And then also, the same year, the National Association of Election Officials awarded you the 2009 Minute Man Award for developing effective security practices that were effective, inexpensive, and

Page 12

easy for election officials to adopt; is that correct?

A. **Yes, I did.**

Q. And then in 2005, you were the national recipient of the Election Center's Best Practices Award for your work in risk analysis to implement security measures for electronic voting systems; is that right?

A. **Yes, I did.**

Q. Let's see. You also serve as -- on the board, the Standards Board, it looks like, of the United States Election Assistance Commission.

A. **I am a current member, yes. Recently appointed.**

Q. And how long have you been on that?

A. **I was with the original group; so since two-thousand -- late 2003.**

Q. Okay. And that came into existence because of the --

A. **The beginnings of --**

Q. -- the Help America Vote --

A. **-- the Help America Vote Act.**

Q. -- which was enacted 2002; is that right?

A. **It was written in 2002, it started in 2003, and the act was fully implemented as of January 1, 2006.**

Q. And you have also been an international election observer and monitor in a series of elections

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 13

around the world, the most famous, I suppose, being the South African election that ended Apartheid in 1994, was it?

A. April of 1994.

Q. And you have done similar functions in Bosnia and Kosovo?

A. Bangladesh. Yes, I've done several assignments.

Q. Okay. You've also -- am I correct, you -- I guess you still do -- you serve as chair of the Elections Legislative Committee for the County and District Clerk's Association?

A. Yes, I do.

Q. And that's been true since 1995?

A. Yes. Twenty years.

Q. Wow. All right. And then you've also been a member of the Election Center's Postal Task Force for By-Mail Voting, since 2005.

A. Right. I'm -- I'm no longer current on that, but I just left that one.

Q. Okay. And you made a variety of presentations on developing security procedures for a DRE environment and that sort of thing, across Texas and elsewhere, right?

A. Yes. We've -- we've -- it's sort of become our

Page 14

pet project, over the years, to teach people about how to improve security with DRE systems.

Q. Very good. Since you've been in office, what types of voting systems have you worked with?

A. I've done paper ballot elections. I inherited a punch card voting system from the County, when I was first elected. I operated that for three years. Then we had -- I purchased an Optical Scan Central Count system. We operated that until approximately 2000. And then in 2000, we brought in Hart eSlate.

Q. And you brought in the Hart eSlate system after the Secretary of State had certified that?

A. Yes.

Q. And explain, briefly, the certification process; in other words, what the Secretary of State does, relative to the certification -- by the way, the Secretary of State is the chief election officer, under the Election Code for the Texas; is that correct?

A. It is.

MR. COHEN: Objection; form.

A. That is correct.

MR. HERRING: Sorry?

MR. COHEN: Form objection.

Q. (BY MR. HERRING) Let me -- let me ask that again, then. Who is --

Page 15

A. Okay.

Q. -- the chief election officer in the State of Texas, under the Election Code?

A. The Secretary of State provides guidance and instructions on all election law and procedure, and they are the ones we turn to for any instructions; so they are the chief officer for elections for the state.

Q. And that would be true not just for you, as the chief election administrator for Travis County, but for election administrators across the state of Texas?

A. All county clerks, election administrators, and anybody else who conducts elections.

Q. And going back to the certification process, in general, what does the Secretary of State do to certify election systems?

A. They're first going to follow the federal standards that are established by the Standards Board of the EAC.

Q. That's -- the EAC is Elections --

A. Elections Assistance Commission.

THE REPORTER: One at a time, please.

THE WITNESS: Sorry.

A. Elections Assistance Commission.

Q. We just have the to be careful not to talk over each other.

Page 16

A. Right.

Q. You will know my questions before I finish them, but -- okay. It's the way we always have it happen in depositions, so don't worry about it, but...

So the EAC is the -- that's the commission -- can I help you?

A. I'm looking for a tissue.

Q. Oh.

(Discussion off the record)

A. All right. So what does the Secretary of State do, in terms of certified election equipment?

Q. (BY MR. HERRING) Yes.

A. All right. First of all, they're going to follow all the federal standards, so they're going to look at what the system has been through, in terms of all the federal qualifications, testing, all of that. And then they are going to put the system through an additional layer of state testing, which involves calling in a set of experts; and they have a cadre of folks that they pull from. Those folks will then look at the software coding, and then they'll put it through a series of tests for the system itself, and then they will put the vendor that's selling it through a series of question and answer.

And after that piece is finished, then the

4546

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 17

panel of -- it's usually two computer science-type or software engineer-type folks, and then a third person who is knowledgeable about Texas election law. It's -- it's a panel. And it could be more than that, but it's a -- it's a minimum of three people. And then they will go over all their notes and they will give the system a rating and they will decide if it needs to have anything upgraded, repaired, fixed, added, anything like that. And then depending on their final answer, the Secretary reviews their final report, accepts or rejects their recommendation, and then lets the company know whether they're certified in Texas.

Q. And so that would be true, say, for the eSlate system, from the beginning -- from the beginning, in each version of the eSlate system?

A. Yes. There -- there have been some recognitions that upgrades, over the years, don't necessarily have to start at zero and repeat the whole process; but, yes, you -- you have to step through everything, for every new system.

Q. So if we looked at the eSlate system, there would be some of the earlier versions that may not be certified now; but the current versions all would have been through this, or the predecessors would have been --

Page 18

A. That's correct.

Q. -- through this?

Okay. Who made the choice, in Travis County, to go to the eSlate system? Who -- who made the decision?

A. Ultimately, it was Travis County Commissioners Court. A group of approximately 45 Travis County citizens from all walks of life, under my direction, studied that issue for at least two years. Worked very hard, and they arrived at the conclusion, after doing research beforehand, deciding what we needed. And then they compared that needs assessment to what was available in the market; reviewed the available systems; judged that this -- that the Hart eSlate was the best of the available systems, and then made that recommendation to the Commissioners Court, along with me. And Commissioners Court accepted that recommendation and decided to purchase it.

Q. And that was roughly 2000, 2001, that time frame?

A. Roughly. It might have even been late '99.

Q. All right. And then that's what we've used, eSlate, since then?

A. Since then.

Q. So this system has been through, as you've

Page 19

said, many, many elections?

A. Many elections.

Q. And are you comfortable and confident in its security, based on that experience?

A. The way we run it, yes.

Q. And its efficiency?

A. Yes.

Q. Overall, for that time period, has it been a good system?

A. Yes. Yes.

Q. Do you know how many other jurisdictions use the eSlate, in Texas?

A. A bunch.

Q. I think I read, over 100 counties?

A. That would be right.

MR. COHEN: Objection; form.

Q. (BY MR. HERRING) Does that sound right?

A. A bunch of counties.

Q. Maybe --

A. One hundred sounds reasonable.

Q. You're aware that one of the issues that Ms. Pressley has raised in this election contest is, she has questioned whether the CVR, the cast vote record, is a ballot image, for purposes of the Election Code and the regulations that the Secretary of State has issued.

Page 20

Are you aware that she has raised that -- that issue?

A. I'm aware of that, yes.

Q. And as far as you are concerned, based on your understanding from the Secretary of State, is the CVR, the cast vote record, a ballot image or not, for electronic voting systems?

A. It's the same thing. Yes, it is the image.

Q. It is a ballot image?

A. It's a ballot image.

Q. And have you -- before Ms. Pressley came up with her different interpretation, had you ever heard anyone say it was not a ballot image?

A. No. No.

Q. So is that an interpretation that is consistent, in your experience, in your dealings, with the Secretary of State?

MR. COHEN: Objection; form.

Q. (BY MR. HERRING) Is it or is it not consistent with what the Secretary of State has instructed your office that a CVR is a ballot image?

A. It's consistent with the Secretary of State, the CVR and ballot image are the same thing.

Q. And is that true or is that not true of the United States Election Assistance Commission?

A. Their terms are also the same. It's consistent

4547

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 21

with the Election Assistance Commission, that ballot image and CVR are the same thing.

Q. Do you have any question in your mind, but that ballot image equals CVR, in electronic voting systems?

A. No, I do not have any question.

Q. And has the Secretary of State, indeed, handed out, distributed, various advisories, over the years, that say the same thing?

A. Many advisories.

(DeBeauvoir Exhibit No. 3 marked)

Q. Let me show you what has been marked as Exhibit 3 and ask you if that is, indeed, the type of election advisory you received from the Texas Secretary of State?

A. It is the copy of the advisory I received, yes, it is.

Q. And this one is -- is -- I guess they come out -- they're numbered; is that right?

A. That's correct, they are. Yes. Advisory.

Q. This is one is numbered Election Advisory No. 2012-03.

A. Uh-huh.

Q. 2012-03.

A. Correct.

Q. And I'll ask you to turn to, oh, about four pages from the back of that document. And it's a

Page 22

glossary that begins with "Audit Logs." Do you see that?

A. Yeah.

Q. And you see the second term that's defined in that -- in that glossary, is the term "Ballot Image"?

A. Yes.

Q. Would you read the definition of that?

A. "Ballot Image. Electronically produced record of all votes cast by a single voter."

Q. And then the next definition or defined term or phrase is "Cast Vote Record." Would you read that definition?

A. "Cast Vote Record. Permanent record of all votes produced by a single voter whether in electronic or paper copy form. Used for counting votes. Also referred to as ballot image when used to refer to electronic ballots."

Q. And is this definition in this advisory, this 2012 advisory, consistent with what you've known and what you've been informed by the Secretary of State since you started using the eSlate system?

A. Yes, it is.

(DeBeauvoir Exhibit No. 4 marked)

Q. (BY MR. HERRING) Let me show you what's been marked as Exhibit 4 and ask you if that's another

Page 23

document issued to the county election officers and other political subdivision officials, by Keith Ingram, Director of Elections?

A. Yes, it is.

Q. And what's the date on that?

A. April 1st, 2014.

Q. And let me ask you to turn to numbered page 12. They're numbered in the lower right-hand corners. And does that have the same definitions we just went through in the election advisory, for "ballot image" and "cast vote record"?

A. "Ballot image" and "cast vote record" are the same.

(DeBeauvoir Exhibit No. 5 marked)

Q. (BY MR. HERRING) Let me show you what's been marked as Exhibit 5 and ask you if that is a document from the U.S. Election Assistance Commission, again, a Glossary of Key Election Terminology?

A. Yes, it is.

Q. And does that also have a definition of "cast vote record"?

A. Yes, it does.

Q. And that's on page 10 of this exhibit; is that right?

A. Yes, it is.

Page 24

Q. And what is the definition of "cast vote record"?

A. "Cast vote record. Permanent record of all votes produced by a single voter whether in electronic, paper, or other form. Also referred to as ballot image when used to refer to electronic ballots."

Q. And is that consistent with the definitions that you've had all along, since you've had the eSlate system, from Secretary of State?

A. Yes, it is.

Q. Is that a standard meaning of the term, that particular term, across the United States?

A. It is the standard meaning of the term.

Q. And, indeed, that's issued by the -- well, let me ask.

You mentioned you are on the Board of Standards for the commission. Is that a term that you and your board have worked with, through the years, that --

A. Yes, it is.

Q. -- that definition?

A. Since we developed the first standards, yes.

Q. Ms. Pressley has asked the Court, in one or more of her pleadings, to have an election with paper ballots. How long has it been since we had a completely

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 25

paper ballot election in Travis County?

A. I don't remember exactly, but I'm thinking sometime in the '80s. A very small election, and it would have been -- I'm not sure, but I think it would have been side by side with some larger election, a little add-on piece.

Q. So in the larger election, the general process would have been --

A. Regular procedure: punch card or optical scan.

Q. In those days?

A. Yeah. And then it would have been some buddied extra that needing something, that was perhaps added on late. Could have been a MUD.

Q. Suppose that the Court said, "Well, you're going to have to have a complete paper ballot system." What would that require your office, you, Travis County, the other jurisdictions, to do?

A. Well, it would be huge. We are completely -- we have no infrastructure any longer to do a paper ballot election. We don't have even ballot boxes anymore. So we would have to start over from scratch for everything we would need.

Travis County is no longer the 200,000 registered voters from back in the 80's that it once was. We are now over 600,000 registered voters. And we

Page 26

typically now use vote centers. So trying to conduct a paper ballot election in our new world of convenience voting calls for levels of security for those paper ballots, for inventory control, and for the balancing that you're required to do every day. And to maintain those stocks, I'm -- the levels of security needed for all those key steps are mind-boggling.

Q. So it would be expensive to convert?

A. Very expensive, to keep the paper levels high enough and, mostly, the security levels there to protect that paper inventory.

Q. Would you need a new training system for everyone?

A. Absolutely. All-new training systems. All new training manuals; all new packets, what we call the "kits," that go out into the individual vote centers; preparation materials to conduct the election.

Q. Ballot boxes?

A. Yeah, ballot -- certainly, ballot boxes, yeah. Multiple ballot boxes.

Q. What are some of the security issues with paper ballots that you don't have with an electronic voting system?

A. The -- it's like handling dollar bills. And the serial number that's on each dollar bill has to be

Page 27

maintained on a list such that as you hand out a dollar bill to a voter, the serial number for that dollar bill gets crossed off the list as having been used. All right?

That serial number is never connected to the voter or the voter's name. All right? But the serial number gets crossed off, and it has to go through -- this process has to go through a system whereby we account for the fact that we've used one ballot, so we've -- we've used it, ont of the inventory, and we have to manage to retrieve, from the central inventory, a replacement ballot for that, because the next voter needs to have that ballot available; bring it back out to the vote center; resupply it into the inventory and account for its serial number, both including into the inventory at the location, and its subtraction from the inventory at whatever central county is.

And the closer you get to election day, there would be a reduction of any kind of central inventory so that -- such that, on election day, everything would be decentralized out into the vote centers, and you would have very little central inventory left. It would all be distributed.

Q. So you have a security issue with just the

Page 28

number of paper ballots that have to be distributed --

A. Yes.

Q. -- I assume. And do you have a logistics issue with how many ballots are printed for the election and how many go to different voting locations?

A. Yes, we do have a logistics issue. We have a policy in Travis County, and have for many, many, many years, that we don't under-order our ballots, based on projections of turnout. Many counties do that to save money. We don't do that here. We order 100 percent of ballots. That actually translates into ordering a little more than 100 percent so that you can make sure that your inventory at one location accounts for the fact that somebody from that particular area might go vote someplace else; and so you have a suitable inventory at all of your locations, for wherever that voter might turn up.

Q. And I seem to recall, from the paper ballot days, you also had issues of high turnout in -- unanticipated high turnout --

A. Correct.

Q. -- in one precinct and not in another and having to then transfer paper ballots, with the security --

A. Correct.

4549

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 29

Q. -- transfer, as well.

A. **Right. And for security, we use law enforcement. That's constables and sheriffs. So a third party that is accountable to the public.**

Q. And I recall from -- from those days, that we used to have a problem of potential voter fraud with -- because so many people have to handle the ballots -- with the very simple over-voting technique --

A. Uh-huh.

Q. -- which is, "I don't want Candidate A to win, so I'll -- his name has been filled in. I'll put -- I'll fill in Candidate B's name." And then you've got an over-vote and an invalid vote. Isn't that what used to be --

A. **Paper ballots have their problems, that they are susceptible to handling errors.**

Q. The way our electronic voting system works in Travis County, is it safer and more secure against voter fraud or election fraud, than a paper ballot system?

A. **In my opinion, the way we run it here, it is far superior to paper ballots. It's far -- far more accurate and secure.**

Q. Are you able to estimate the potential cost -- if, say, in this case, Ms. Pressley says, "Well, let's have another election for District 4, and let's have

Page 30

only paper ballots," do you have any kind of way to give me a rough estimate of what the cost would be?

A. **I'm -- I don't think I do, right this minute, no. It's -- it's -- it would be -- it would be a completely different world that we would have to start from zero to build.**

Q. And would it say time to even develop such a system?

A. **Yes, it would.**

Q. Are we talking a week or are we talking months?

A. **Oh, months. We would have to go through purchasing requirements, in order to put out bids to buy everything that we would need. We would have to redo all of the election management software project -- products that we have. I -- I -- and at this point, I can't even think through the list of things that we would have to redo.**

Q. Now, there has been some discussion of upgrading or changing from eSlate, which we've had for, I guess, 13, 14 years, whatever the number is, to a new system. And that's, I assume, an ongoing evaluation that all election administrators make. Have you looked at that possibility, down the line?

A. **Yes, we have.**

Q. And have you seen any -- any cost estimates or

Page 31

bids or financial numbers, for replacing the Hart eSlate system, completely, with a different system?

A. **Yes. Yes.**

Q. And what's the ballpark range of what that would cost?

A. **We have an estimate that if we were to -- making some assumptions, if we were to replace the existing system we have with something similar, say, another Hart system that had some similar qualities, the cost of that system would be approximately 14 million.**

Q. $14 million?

A. **$14 million.**

Q. Okay. Another argument that Ms. Pressley has raised, as to why she thinks the election outcome was not valid, is the changes between the general election and the runoff election day, of some voter locations.

A. **Yeah.**

Q. Are you familiar with her making that argument?

A. **I am.**

Q. And to begin with, let me go back to the point you mentioned previously; and that is, we use voting centers in Travis County, correct?

A. **Correct.**

Q. And I think in Ms. Pressley's deposition, we had a question as to whether, for the runoff election

Page 32

for city council, for District 4, there were either 135 or 136 voting centers; but approximately 135 or 136 voting centers were available to anyone who wanted to vote in those runoff elections, correct?

A. **Correct.**

Q. And so if I were a resident of District 4 and I wanted to take off my lunch hour -- I work downtown and want to take off my lunch hour and go to a voting center, I can go anyplace in the county and vote at one of those centers, correct?

A. **Any place --**

MR. COHEN: Objection form.

A. **-- that's convenient for you, you can vote.**

Q. (BY MR. HERRING) Suppose I were a voter in District 4 and I was wanting to take off and vote when I was downtown working, at lunch. Where could I vote?

A. **There are a lot of places to vote. I would need to have a list in front of me; but, typically, we've got City Hall. There are some places around the university. There are lots of schools around, that have locations. I mean, there are multiple places.**

Q. In fact, if I wanted to drive, I could vote at any one of the 136 --

A. **You know --**

Q. -- locations. True?

4550

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 33

A. -- that's correct.

MR. COHEN: Objection; form.

Q. (BY MR. HERRING) Could I vote at any one of the 136 locations, if I wanted to take off and drive at lunch?

A. You absolutely could vote anywhere you wanted.

Q. Okay. And if I were taking a child to school and the school was outside of District 4, could I vote in a voting center near a school?

A. You can stop -- drop the child off, stop, go in and vote. Absolutely.

Q. All right. So in no sense was any resident of District 4 limited to voting at the locations within District 4?

MR. COHEN: Objection; form.

A. No one was limited to a single voting place, under a vote center scenario.

Q. (BY MR. HERRING) Now, explain -- explain why -- strike that.

Is it -- is it common practice, between a general election, whether it's a primary election and a runoff or some other runoff -- of course, it's the first time we've had the runoff for city council this way --

A. Right.

Q. -- but is it common practice, between the first

Page 34

election day and the runoff election day, to change locations for voters, to consolidate or to modify?

A. It is common practice to reduce the footprint of the election, for a runoff election.

Q. Why?

A. It's to save money. Typically, the turnout is so much lower for runoff elections, that most elections, most jurisdictions, cut back, for the runoff.

Q. And going back to our listing elections earlier, for this -- in this instance, the November 4th election, of course, had that entire ballot --

A. Yeah.

Q. -- correct?

A. Correct.

Q. So city, county, state, federal. We had a ballot, constitutional --

A. Constitutional amendment, uh-huh.

Q. -- amendment. School district?

A. Uh-huh.

Q. And then the runoff election, as I recall, had only two categories. It would have had city council, mayor, and then it would have had the school district runoff, as I --

A. Uh-huh. Uh-huh.

Q. -- recall, correct?

Page 35

A. Uh-huh. That's correct.

Q. So you had a vast reduction in the number of candidates on the ballot?

MS. THOMAS: Objection; form.

Q. (BY MR. HERRING) Is that right?

A. We had very much fewer candidates on the ballot. It was a much, much shorter ballot.

Q. And how does -- how did you go about deciding which locations to make that -- that more cost-efficient footprint, which locations to consolidate or -- or close?

A. Right. This was the first time we ever did it, because this was the first time we ever had to deal with this election. So we used a variety of sources to advise us how to do this.

Certainly, we consulted with the City. They were our main source to advise us which way to go. We did look at turnout patterns. We talked to people in the community. We made our best judgment.

Q. So you received input from as many sources as you could?

A. As possible.

Q. And if Ms. Pressley had wanted to come to you and say, "No, I don't think that you should close a particular voting location," would you have listened to

Page 36

her?

A. Absolutely.

Q. Did she do that?

A. No.

Q. And it's also true, isn't it, that the city council has a role in approving the election locations for the runoff? Is that right?

A. Yes, they do.

Q. And did they have a public notice and posting and hearing, to allow citizen input on where the voting locations would be?

A. Yes. In addition to the opinions we recruited and asked for, the City has a public process to ask for opinion.

Q. Okay. And Ms. Pressley has testified that she did not, and her campaign did not, appear before the city council to protest or question or challenge or make suggestion or provide any input whatsoever to the council, concerning the voting locations for the runoff. Is that your understanding?

A. I'm not aware of any additional input.

Q. Okay. Do you also consolidate voting locations, change voting locations, say, in a party primary, between the primary election day and the runoff day?

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 37

A. Pretty commonly, yes.

Q. Same process, generally?

A. Generally, yes.

Q. And is that true for election jurisdictions throughout Texas?

A. Yes, it is.

Q. And do they all follow that same, generally, standard process?

A. Yes, they do.

Q. Now, in Ms. Pressley's deposition, I asked her about a couple of locations. The Highland Mall location and then the Airport Boulevard location. And it turned out, it would -- according to Google Maps, it would take about three minutes to drive from the one location to the other.

MR. COHEN: Objection; form.

Q. (BY MR. HERRING) And Ms. Pressley said that that's voter disenfranchisement, to have to drive three minutes.

MR. COHEN: Objection; form.

Q. (BY MR. HERRING) In your -- in your opinion, is that -- is that disenfranchisement, to drive for three minutes?

MR. COHEN: Objection; form.

A. None of the places that we used for the -- for

Page 38

the runoff election, are inconvenient, nor represented any particular obstacle or barrier for voters. We believe everything was fair and equitable, in the distribution of those vote centers for the runoff election.

MS. THOMAS: Objection; form.

Q. (BY MR. HERRING) Since we've got some -- a series of objections, why don't we ask you a related question.

Do you have an opinion concerning whether the voting locations used in the runoff, were fair and reasonable?

A. Do I have an opinion? Yes, I have an opinion.

Q. And what's the opinion?

A. Yes. The opinion is --

MR. COHEN: Objection; form.

A. -- they were all very much reasonable, ADA-compliant, fully accessible, well-known, well-used, and fully advertised; so they were fair and equitable.

Q. (BY MR. HERRING) Did you receive any input from anyone, to the effect of, "Well, we ought to change some voter locations in District 4 to effect the outcome of the election"?

A. I received nothing. No input.

Q. And would you have -- if somebody came to you

Page 39

and said, you know, "I really want this candidate to win" -- in any of these elections -- "and so we ought to change voting locations," what would you have done?

A. I would have been insulted and told them that that is a completely inappropriate role for the county clerk to play.

Q. Based on -- strike that.

You've had quite a few interactions with Ms. Pressley, concerning the election, correct?

A. I have.

Q. She filed a series of complaints against you and your office, with the Secretary of State, correct?

A. Correct.

Q. The Secretary of State rejected those complaints; is that correct?

A. The Secretary did.

Q. Do you have -- after you have been through this whole process, viewed her complaints, do you have any question in your mind, but that the election results certified for the runoff was the true outcome of the election? Do you have any doubt about that?

A. No question at all. We are very clear of the outcome. It's been manually recounted. There's no question.

Q. And Mr. Casar received 1200 and any one more

Page 40

votes than Ms. Pressley?

A. Correct.

Q. Thank you for your patience.

MR. HERRING: I'll pass the witness. We'll play musical chairs here, and Mr. Cohen will ask some questions.

THE WITNESS: Okay.

Do you want to take a break?

MS. THOMAS: I was going to say, how long have we been going?

(Simultaneous speaking - unreportable)

MR. HERRING: Let's take a little break.

MS. THOMAS: Can we take a break, just because it's a good stopping point?

MR. HERRING: Yeah. That's great.

THE WITNESS: Okay. All right.

(Recess 10:23 a.m. - 10:38 a.m.)

(DeBeauvoir Exhibit Nos. 6 - 12 marked)

EXAMINATION

BY MR. COHEN:

Q. Good morning, Ms. DeBeauvoir.

A. Good morning, again.

Q. We have known each other --

A. Many years.

Q. -- since you started -- the first time you ran

4552

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 41

for election. I think --

A. Yeah.

Q. -- I was a big supporter of you then --

A. You are.

Q. -- and I have been ever since.

A. I know. And I'm a fan of yours.

Q. That's good. Okay. So I know that you -- what you want to do is make sure that you have the true results of every election that you're in charge of, correct?

A. That's correct.

Q. And that you want to be able to verify the results of the election if someone challenges that.

A. Correct.

Q. Okay. And so we are here because someone challenged them --

A. Uh-huh.

Q. -- and we just -- we're not sure that we had a system in place that really actually verified it. Okay?

A. I understand.

Q. All right. So I'm going to show you -- and you have said that, in your opinion, a cast vote record is the same as an image of a ballot, correct?

A. Yes --

Q. And is that --

Page 42

A. -- it is.

Q. -- because what everybody else told you, or do you actually believe that?

A. I actually believe that.

Q. And you believe that's the best way to double-check the computer's compilation of the votes on election day?

A. I believe it's the only way to know, yes.

Q. The only way. Okay. So I'm going to show you what's marked as Exhibit 10. It's a little bit out of order.

MR. COHEN: Would you give Mr. Herring a copy of his --

MS. PRESSLEY: Okay. Is this it?

MR. COHEN: Yeah. It's the cast vote record.

MS. PRESSLEY: Okay.

Q. (BY MR. COHEN) What is that, Exhibit 10?

A. It looks like an election day report.

Q. Is that a cast vote record?

A. Yes, I believe it is. This is --

Q. So on election day -- let's go through this. 1 know we all know this, but --

A. Uh-huh. Okay.

Q. Okay. So the voter comes in. They sign in

Page 43

twice, right? They show their ID, and if they have a proper -- well, if they don't have a voter's registration certificate, they show some ID and sign next to that, correct?

A. Correct.

Q. And then they go to the next person -- at least I do in my poll, because I don't have a voter ID card when I vote; and then I sign for a number, right, that I'm going to feed into the machine?

A. More or less correct. That's okay.

Q. Yeah. And when I do that, what does the machine show me, in order for me to decide who I'm going to vote for? It doesn't show me that, correct? It doesn't show me Exhibit 10?

A. Okay. Let --

Q. Is that correct?

A. Your question is confusing to me.

Q. Okay. Let me help -- then tell me what --

A. Okay.

Q. -- so I can get you to understand.

A. All right. You -- you were talking about the sign-in process, so --

Q. Yeah.

A. -- you only sign once --

Q. Yeah. Okay.

Page 44

A. -- and then you go over to the station that issues you your access code.

Q. Yeah.

A. It's a four-digit code. Okay. The access code is what you're going to take over to the voting booth --

Q. Right.

A. -- enter the access code, and the entire ballot is going to come up for you.

Q. Right.

A. Okay? So I'm just walk -- walking through. Okay. So the ballot -- you're going to work through the ballot, marking the ballot. At the end of your ballot, there is --

Q. Let me stop you there, because I want to go through the process --

A. Okay.

Q. -- a little bit slower than that. So I'm looking at a ballot. I'm not looking at that, at Exhibit 10, am I?

A. No.

Q. Okay. Am I looking more like -- especially in this election, like Exhibit 7 -- tell me what Exhibit 7 is.

MR. HERRING: Can I have a copy of Exhibit 7?

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 45

MS. THOMAS: Yes. Yes. I'm sorry.

A. This is what a by-mail ballot would look like.

Q. (BY MR. COHEN) Okay. That's --

A. This is sort of like an optical scan ballot.

Q. Okay. And that says -- it says "Sample Ballot" on the side of it.

A. Okay. This is what a by-mail ballot looks like.

Q. Okay.

A. Our sample ballots don't look like this. I realize it says that on the side.

Q. Yeah.

A. This is what a by-mail ballot looks like. It looks like an optical scan ballot.

Q. Okay. And then I'll show you, marked Exhibit 8, and what is that? I thought that was what a --

A. Same thing.

Q. That's what a mail-in ballot looks like. You said that -- is that correct?

A. By mail, yes, uh-huh.

Q. Okay. All right. And then when a person goes to vote at the machine, No. 7 and No. 8 are -- it may be a little bit different, but that's what they look at, in deciding whether -- what -- who they want to vote for;

Page 46

is that correct?

A. Similar.

Q. Yes. Okay. It certainly isn't Exhibit 10 that they see.

A. That's not correct. That's what I keep trying to tell you.

Q. Okay. They do see Exhibit 10 when they vote?

A. Uh-huh. Uh-huh. What will happen is, is that after you've voted, the last screen that you will see is what's called a "summary screen." And this information is contained on the summary screen, so it looks almost exactly like this.

Q. So it --

A. This part is going to be missing; but what you'll see on the summary, is this.

Q. Okay. So if I -- when I go in and I decide who to vote for and I mark who I vote for, then the computer says, "This is who you vote for. Are you sure you want to vote for them?" Is --

A. Yes.

Q. -- that correct?

A. Yes.

Q. Okay.

A. Do you want -- this -- it will say, "Here are your selections," and it will give you a last

Page 47

opportunity to change it.

Q. Okay. Right. And if you don't change it, that's who you vote for?

A. Correct.

Q. Okay. But when you make your decision, you're looking at Exhibit -- something like Exhibit 8 or 9, not something like Exhibit 10?

A. No.

MS. THOMAS: Objection, form.

A. No. This is your final chance. It'll look like this.

Q. (BY MR. COHEN) Okay.

A. It's a -- it looks like the summary screen.

Q. Exhibit No. 8 or 9 is what shows up in your face when you try to decide who you want to vote for, correct?

A. You voting. The process, yes.

Q. Yes. Okay.

A. Correct.

Q. And so you don't see No. 10 when you're deciding who to vote for. You see No. 10 to make sure that who you marked on Exhibit 8 is what you really want to do; is that correct?

MS. THOMAS: Objection --

A. No.

Page 48

MS. THOMAS: -- form.

Hang -- just -- let me just get the objection in, and then you can answer.

Q. (BY MR. COHEN) You still have to answer the question. You said "No"?

A. Oh, excuse me. No. It's -- it's not. This is a part of the final decision process, and you still have the chance to change it, and it does look exactly like the summary screen.

Q. Okay. So when you see that, it's asking you if you want to change --

A. It is asking you --

Q. -- what you did on --

THE REPORTER: Wait. One at a time.

Q. (BY MR. COHEN) Hold on. It -- when you see Exhibit 10, it's asking you if you want to change what you marked on Exhibit 7 or 8?

A. Correct.

Q. Okay. And you're saying -- it's your opinion, I guess -- or the electronic system tells you that the ballot is -- the last chance, this No. 10, your last chance to change, is -- is what you considered to be the ballot -- the image of the ballot?

A. Correct.

Q. Okay. And then Exhibit 10 is somehow preserved

4554

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 49

somewhere in the voting machine?

A. Multiple places.

Q. Okay. Where is it --

A. Multiple redundancy.

Q. Where is it preserved?

MS. THOMAS: Objection; form.

You can answer as --

A. It is preserved twice on the eSlate and once in the JBC. I think that's correct. Or it may be the opposite. It may be twice in the JBC and once in the eSlate. And when -- I need to correct my answer. It's twice in the JBC and once on the eSlate.

Q. (BY MR. COHEN) Okay. What is the JBC?

A. Judge's Booth Controller. It's the device that stores the inventory of unvoted ballots, the inventory of voted ballots, and the access codes that qualify -- once a qualified voter is ready to vote, they give the voter, so they can start the process.

Q. Okay. So Exhibit -- versions of Exhibit 10, depending -- depending on that the voter verified what their choices were --

A. Yeah.

Q. -- are in the JBC in two places?

A. Two places.

Q. Where in -- where would we find them?

Page 50

A. It would be in -- in --

MS. THOMAS: Objection; form.

A. -- in medium stored on the JBC. And it's two different kinds of medium. One of them looks kind of like a disk, and one of them looks like -- I think, something like a flash drive.

Q. (BY MR. COHEN) And what kind of program is that?

A. I don't know.

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) You don't know? Is it a Microsoft kind of function -- system or --

A. No.

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Okay.

A. It was proprietary.

MR. HERRING: Mr. Cohen?

MR. COHEN: Yes.

MR. HERRING: I don't want to clutter up the record with objections. Can I ride on her objections to form, or do you want me to --

MR. COHEN: That's fine.

MR. HERRING: -- lodge independent --

MR. COHEN: That's fine, because, really she's not representing a party and won't be able to make

Page 51

objections at the trial --

MR. HERRING: Well, that's why I'm --

MR. COHEN: -- so I understand.

MR. HERRING: That's why I'm asking.

MR. COHEN: That's -- that's fine. If you want her to make objections for you, I will accept that.

MR. HERRING: Well, for her objections to form, I just want to be able to stand on those and have your rule 11 agreement that I can.

MR. COHEN: You can stand on those.

MR. HERRING: Okay.

Q. (BY MR. COHEN) Okay. Now, you have a website that talks about the E-voting system, correct?

A. Correct.

Q. Is this Exhibit No. 6 an accurate picture of the website page?

A. I believe so, yes.

Q. Okay. And do you see where I have marked --

MS. THOMAS: Objection; form.

Go ahead.

Q. (BY MR. COHEN) Do you see where I have marked on there -- that's probably why she's objecting; there's a mark on there that I made, that shows what I'm talking about. I don't want to go over the whole page. I just want to go over that line. And what does it say?

Page 52

A. It says -- you want the fourth item. "Captures an image of each ballot cast so that electronic or manual counts can be" -- "recounts can be conducted."

Q. And you think No. 10 is what you're talking about there, correct? Exhibit No. 10? Is that what you're talking about?

A. This is the paper version of it, yes. They're referring to the electronic image of it. This is the paper part of it.

Q. This is -- this is --

A. This is the --

Q. -- a copy of the --

A. -- yeah.

Q. -- electronic image?

A. They're saying an electronic image, yeah.

Q. But this is a copy of the electronic image --

A. That's correct.

Q. -- is that what you're saying?

A. That's correct.

Q. So do you think -- really think people thought that this is what their ballot would look like, what you were talking about?

MS. THOMAS: Objection; form.

A. Yes. Why not? Yes. It says their -- that's the -- office and who they picked.

4555

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 53

Q. (BY MR. COHEN) Well, it doesn't say "Official Ballot" on it, does it?

MS. THOMAS: Objection; form.

You can answer.

A. I don't think I ever really noticed.

Q. (BY MR. COHEN) There's a lot of other things that the statutes require to be on the ballot, that are not on Exhibit 10. Isn't that true?

MS. THOMAS: Objection; form.

A. I don't know.

Q. (BY MR. COHEN) You don't know what the law requires to be on a ballot?

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) It's okay if you don't. I mean, most people don't, I'm sure.

MS. THOMAS: Objection; form.

A. I know that there are huge differences between what the law says for paper ballots and what the law says for electronic. And I'd have to have the law in front of me, to make the distinction between the two.

Q. (BY MR. COHEN) Do you think there's a description in the law, of what needs to be on an electronic ballot?

MS. THOMAS: Objection; form.

A. I think it would take a thorough reading of the

Page 54

code, to make those distinctions. No, I don't think it's in one place.

Q. (BY MR. COHEN) Okay. But there is a place where a ballot is defining what has to be on a ballot --

A. Paper ballot.

Q. -- somewhere?

A. -- yes.

Q. Yes. Does it say "paper ballot"?

A. Probably.

Q. Okay. But you could be wrong about that?

MS. THOMAS: Objection; form.

A. I don't think so.

Q. (BY MR. COHEN) Okay. Is this a paper ballot, Number 7 --

A. Yes.

Q. -- and 8?

A. Yes.

Q. This is a paper ballot?

A. That's what it look -- that's what a paper ballot looks like. This is a representation of a paper ballot. That's why it said it's by mail.

Q. Okay.

(DeBeauvoir Exhibit No. 13 marked)

Q. (BY MR. COHEN) I'm showing you what's marked as Exhibit 13.

Page 55

MR. COHEN: Do we have another copy of this for him?

MS. PRESSLEY: Sure do.

Q. (BY MR. COHEN) Do you know what that is?

A. Yes.

Q. What is that?

MS. PRESSLEY: What number is that?

MR. COHEN: 13.

MS. PRESSLEY: All right.

A. This document, Exhibit 13, looks like one of the tally sheets that we used for the recount.

Q. (BY MR. COHEN) Okay. And it's got your -- that little red thing over there --

A. Uh-huh.

Q. -- that's -- that's your "DD"?

A. Yes.

Q. Okay. So do you have any question about whether that's an accurate version of what you used for the recount?

A. I don't think so.

Q. You think it is?

A. I think it is.

Q. Okay.

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Okay. I'll show you what's

Page 56

marked as Exhibit 12. If you want to look through that and see what...

A. All right.

Okay.

Q. Does that look, to you, like the audit log from the runoff election?

A. I believe so.

MS. THOMAS: Objection; form.

THE WITNESS: I'm sorry.

A. I believe so.

Q. (BY MR. COHEN) Okay. Now, Let me get back to one thing. Do you -- is there -- does the eSlate system have a tally capability?

A. Yes.

Q. Could the eSlate system make a copy of the voter's action on the actual ballot, that it looks at it when it makes a choice?

A. Not like --

MS. THOMAS: Objection; form.

THE WITNESS: I'm sorry.

MS. THOMAS: Go ahead.

A. Not like this.

Q. (BY MR. COHEN) Okay. It cannot make a copy of this?

A. No.

4556

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 57

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Okay. Can it make a copy of something that -- where the ballot is marked?

MS. THOMAS: Objection; form.

A. No.

Q. (BY MR. COHEN) Okay. What version of the eSlate system are you using right now?

A. I don't remember. We'll have to look it up. It might say on here, someplace. I don't remember.

Q. You don't remember. Okay.

And as you updated the -- with the new versions of the eSlate system, did you have some group of scientists and election experts verify that there was -- that the update was appropriate?

A. Yes. We go through a procedure, through the Secretary of State's office; and the main verification is called "hash code testing."

Q. That goes -- you do that every time you incorporate an update into your system; is that correct?

A. Every time.

Q. Okay. Let's take a look at the -- what does the Tally -- what does the Tally portion of the eSlate system do? What is that function?

A. Tally is a separate module that is only used for election night, to tally results from by-mail early

Page 58

voting, in-person mail voting, and then election night. And it's -- it's just -- as I said, it's a separate module, it tallies the votes for election night, and then it's also used to communicate those results to the general public and to media, in a nutshell.

Q. So -- but it's not the official tally, correct?

A. It's not -- no.

Q. No.

A. It is for unofficial results on election night.

Q. Got you. Okay. Now, let me go back. I forgot to ask you a question about Exhibit 13.

This is -- you'd say this was a tally of the mail-in votes, correct? That it --

A. I'm sorry --

MS. THOMAS: Objection; form.

A. -- I can't tell. I would say this is not by-mail ballots. It's the wrong numbers. This is just a general tally.

Q. (BY MR. COHEN) Okay. Let me see. So you've got -- the totals -- not the cumulative total, but the totals at the bottom there --

A. Uh-huh.

Q. -- I believe -- and you have to correct me if I'm wrong -- or if you don't know, that's okay -- whether or not those 240 to 240 shows that the mail-in

Page 59

ballots --

A. I see what you're saying.

Q. -- were equal?

A. You are correct.

Q. Okay.

A. I'm sorry.

Q. Thank you. I just needed to clear that up. That's what I thought it said.

A. Yes. Sorry.

Q. Thank you.

So what security have you put in place to prevent any kind of mistakes or -- intentional or otherwise, in the tally of the voting?

A. It's a lengthy list.

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Okay. We're -- we're here to hear it.

A. Okay. I need a little notepad.

MS. THOMAS: This is for what purpose?

THE WITNESS: Just for me to remember which ones I'm telling him, for right now.

MS. THOMAS: Okay. This is going to be to me.

MR. COHEN: I won't look at it. I won't take it from her. Okay.

Page 60

A. Gosh.

Q. (BY MR. COHEN) Do you know what? Let's do this. Let me keep going, and we'll take a break and you can go back to your office and, you know, make -- have that answer to this question, once it gets --

A. Okay. It's also on our website. I mean, it's a rather lengthy list.

Q. Okay. What I want to ask you -- how they just work. That's --

A. Okay. Okay. I can --

Q. -- that's the problem.

A. -- do that, too.

Q. Okay. Okay. Do you feel comfortable sitting here and doing it, or would you --

A. I do. I think --

Q. -- rather take some time --

A. -- I can get everything --

Q. Okay.

A. -- if you'll just give me just a --

Q. Sure. No.

A. -- couple of minutes.

Q. Take as long -- I don't want you to be at a disadvantage, in answering the question. That's all.

A. If I forget something, we'll fill it in. That's okay. I really am --

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 61

Q. I don't know, myself.

A. -- here to help. I'm --

Q. I don't know.

A. --- here to help.

Q. I don't know the answer. That's why I'm asking.

A. Okay. Lets see.

Oh, I keep thinking of others. Okay. Let's start with these. These are the basic ones.

Q. Okay.

A. All right. All right. The -- let's see. Where should I start?

Let's -- all right. This is for Tally, so we're going to -- we're going to talk about election night. There are procedures that -- that we use all around the election, that come to the fore, election night. Okay?

One of the -- one of the basic things we use is numbered seals so that you -- it's a way to prove up chain of custody. All right? So seals is a piece of chain of custody. We're going to come back to chain of custody, but numbered seals are important because they can tell -- it tells you, has anything happened prior to the last stage of when this thing was either opened or looked at. All right? So we use a lot of seals.

Page 62

And we always have multiple people verifying the seal number of who put it on the last time, and then there's -- on -- on the list of those seal numbers and who changed them. It's an envelope, so we keep the seal numbers all together.

Law enforcement, Ds and Rs in the counting station. And it's a -- it's a group effort to watch over those seal numbers. And that includes both at the polling place, when everything is sealed up; at the receiving substation, when the verifications are made -- and I'm going to get to that next -- and then at the counting station, when everything is brought in by law enforcement.

Q. Can I stop you right there for a second? When you say --

A. Sure.

Q. -- everything is brought in by law enforcement --

A. Enforcement.

Q. -- what are you talking about?

A. All right.

Q. What is brought in?

A. The -- the paperwork. And you're going to mostly think about that as the sign-up sheets and any paperwork -- affidavits, any paperwork describing what

Page 63

went on in a polling work -- polling place that day; the actual ballot box, which looks like a card.

Q. Is that the --

A. I'm trying --

Q. -- MBB?

A. I mean, it's basically all the paperwork, the sign-up sheets, and the ballot box, are going to be brought in, by law enforcement, from the substation. At the substation, what happens is, is that the election judge from the polling place makes an official surrender of the entire JBC through a process where they have to step through to make sure everything is there; that it checks out before they leave so that, if we have questions, we've got them right there, to answer. Then it's sealed back up again, given to law enforcement, and they take it downtown.

Q. Okay. So there's a ballot box, did you say, just now?

A. Correct. The -- the --

Q. What does --

A. -- the judges bring in the ballot box and the --

Q. What does that look like?

A. -- and the medium is --

Q. What -- is that called the "MBB"?

Page 64

A. The JBC. It's JBC.

Q. Okay.

A. It's about this big and about this high (indicating). It's a gray box.

Q. Okay. I'm sorry. I didn't mean that. I mean, what's in it?

A. It's the ballot box, and it was what I had talked to you earlier about --

Q. Okay.

A. -- about it contains the inventory of unvoted ballots, the inventory of the voted ballots, and the mechanism for issuing a access code for the voter to gain access to the ballot. So that's --

Q. When you say --

A. -- what a JBC --

Q. -- "ballot," you're talking about --

A. Electronic ballot.

Q. -- Exhibit 10?

A. I think the electronic --

Q. So in -- in this ballot box is --

A. This -- this is only -- okay. No, I'm not talking about Exhibit 10.

Q. Okay. What is -- what's wrong with Exhibit 10?

A. Okay. Exhibit 10, this is a copy of either the summary page or the CVR, which is -- if you're talking

4558

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 65

about the summary page, that's one screen of what the voter is going to see at the tail end of their voting.

If you're talking about the CVR, it looks like this, but the voter isn't going to see a CVR. Okay?

Q. Okay.

A. All right.

Q. The voter never sees a CVR.

A. No. Only if it's --

Q. And -- and --

A. -- printed out, after the fact, for recount purposes. The voter is going to see this, which is the summary screen; and it looks like a CVR.

Q. Would you tell me what the difference between the summary screen and the CVR is?

MS. THOMAS: Objection; form.

A. The summary screen is a method by which a voter can make a final decision. It tells them what they've selected so far and this is, sort of, a last chance, "Are you sure you got everything correct?" before they hit the final cast ballot button.

Okay. A CVR is the electronic capture of those choices. It's the image of the ballot.

Q. (BY MR. COHEN) Okay. So the -- let me get this right, because I'm having trouble with this. I'm

Page 66

not an election law expert, I must confess.

The CVR is a computer's rendition of what Exhibit 10 says, for each voter; is that correct?

MS. THOMAS: Objection; form.

A. We have a definition of CVR. I mean, it -- it -- it's not -- it's not special. It's -- the CVR is -- it looks -- it is this. It's the electronic record of the votes and action -- or the votes and choices made by a voter, and it looks like this.

Q. (BY MR. COHEN) And the only difference, you're saying, is, the voter doesn't see it in this form?

A. They do see it in that form.

Q. So what is the difference between a CVR and Exhibit 10?

MS. THOMAS: Objection; form.

A. A summary screen is the method by -- is the last screen that a voter is going to see when they're voting, that gives them a last chance to make any corrections in those. So it's still an active voting screen. All right.

Q. (BY MR. COHEN) So you're saying the difference is, this -- that the -- this is what the voters see --

A. Voting, yes.

Q. -- while they're voting --

A. Right.

Page 67

Q. -- and a CVR is a copy -- is a computerized --

A. -- is a final version.

THE REPORTER: One at a time, please.

A. -- of that.

THE WITNESS: Okay. I'm sorry.

THE REPORTER: I can only get one at a time.

THE WITNESS: Sorry.

Q. (BY MR. COHEN) Say that -- I'm sorry. I don't want to put words in your mouth, because I don't know.

A. This is -- this is -- if you're talking about a summary screen, this is an active voting screen that is -- that a voter sees. Okay?

It -- as a CVR, this is -- it looks just like the summary screen, but it's an actual image of what the voter finally selected.

Q. It's not a copy of what the voter says -- saw when he pressed that this -- "I'm okay with what I already" --

A. Uh-huh.

Q. -- selected, right?

A. Uh-huh.

Q. It's not a --

A. It is.

MS. THOMAS: Objection; form.

Page 68

Q. (BY MR. COHEN) Okay.

A. It is a copy of it.

Q. The CVR is an actual copy of what the -- the screen that voter sees --

A. Well --

Q. -- when it decides not to make any changes; is that correct?

MS. THOMAS: Objection; form.

A. I don't think I can draw that direct a parallel, no, because it's after they've -- no.

Q. (BY MR. COHEN) Okay. Well, let's try this a different way.

A. You're -- you're asking me an engineering question.

Q. Yeah. Okay. Well, if you can't answer it, that's fine. You just tell me that. I don't know whether it's an engine -- I don't how much you know.

Okay. So what I'm trying to figure out is -- I got to the point where I'm always at, where the computer has asked me if I -- what my selections are, my -- what I really want to do, and I push a button and say yes.

A. Right.

Q. Okay. How does that turn into something that you count when you're counting the votes?

4559

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 69

MS. THOMAS: Objection; form.

A. It's an electronic capture of what you last saw on your screen.

Q. (BY MR. COHEN) It's a picture of it? An image of it?

A. An image of it, yes.

Q. Okay. And the computer makes that image?

A. That's correct.

Q. Okay. And -- okay. And then that image goes where?

A. It's stored --

MS. THOMAS: Objection; form.

THE WITNESS: Sorry.

A. Stored in several places, but at least three places.

Q. (BY MR. COHEN) Okay. And that's what you told me. Two of them in the...

A. Right.

Q. And then where -- what do you do with those images of Exhibit 10?

MS. THOMAS: Objection; form.

A. They are saved and backed up, and they're kept -- if it's a federal election, they are kept for 22 months. All of the electronic and physical documentation is kept for 22 months.

Page 70

The actual equipment, once we've gone through all of the auditing and the canvass and everything is final, then it's all zeroed out, sent back to the warehouse and prepared for the next elections.

Q. (BY MR. COHEN) And do you do some kind of computerized verification that you have zeroed out the equipment so there's no more votes that remain inside it?

A. Yes, we do.

Q. Okay. We didn't see that for this election, in your records. I don't know whether it was --

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) -- an oversight -- I -- I don't know if it was an oversight --

MS. THOMAS: It doesn't --

Q. (BY MR. COHEN) -- but do you have that for this election?

MR. COHEN: Can you wait until I finish the question, please? Okay.

Q. (BY MR. COHEN) Do you -- do you have it as an over -- any of that -- zero tapes? Is that what they call them, "zero tapes"?

A. Yeah.

Q. Okay. They don't have -- do you have zero tapes for this election, for the runoff?

Page 71

MS. THOMAS: Objection; form.

A. They were made available and were sitting right there at discovery, and we have no idea why y'all didn't look at them.

Q. (BY MR. COHEN) Okay. It's -- I wasn't here, so that's a good answer.

A. They were right there.

Q. All right. And so there are zero tapes --

A. Yes.

Q. -- for these machines?

And were there zero tapes done for these machines in the next prior election they were used in?

A. I'm sorry. Would you say that again?

Q. Okay. As I understand it, what we want to do is, we want to make sure, when we use the machines, there's no other votes --

A. Correct.

Q. -- in them. And when we're finished using the machines, there's no votes left in there.

A. Correct.

Q. Okay. So what I want to know is, do you have some zero tapes for these very -- these same machines, the last time they were used, before the runoff election?

A. I would think so, yes. I think so.

Page 72

Q. And do you have zero tapes -- do you do the zero taping again, before you use the machines for the next election?

A. Yes.

Q. So it's before and after?

A. Correct.

Q. And are you saying that the before ones were also made available --

A. Correct.

Q. -- at discovery? Okay. I didn't see them, so that why I was curious.

All right. Let's go back to Exhibit No. 12. What does the error code -- well, first of all, what is the log used for, Exhibit 12 used for? What's the purpose of it?

A. Oh, let's see. Well, these logs are used for several purposes.

Q. Okay.

A. In general, they're going to track every single step, everything that's happening at the counting station on election night. So every time something's turned on, every time something's turned off, every time an entry happens.

Q. In the central counting place --

A. It is.

4560

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 73

Q. -- like --

A. It is. It's required by law. So if you want to know, oh, well, somebody did this, or what time was this precinct run, or how long did it take this precinct to get from here to here, this is an incredibly helpful log. There's any numbers of things, any number of questions, that this type of log will answer. And it's used for all kinds of questions, you know, either in the course of counting the ballots on election night or, especially, afterwards. It's a -- it's a useful audit log for a lot of reasons.

Q. Okay. So would the audit log -- for instance, when you stop using it for a little while, will it show the time that you stopped using it?

A. Uh-huh, uh-huh, uh-huh.

Q. And then when you start using it again, it will show you, okay, we're on it again?

A. Yes, it will.

Q. Okay.

A. Everything.

Q. All right. And there's a bunch of error codes, I noticed, in -- in this. And --

A. Okay.

Q. -- well, let's look at the --

MS. THOMAS: Objection; form.

Page 74

Q. (BY MR. COHEN) -- first page.

MS. THOMAS: Wait for a question.

MR. COHEN: I haven't asked the question yet.

MS. THOMAS: I know. I said, "Wait for a question," before she starts --

MR. COHEN: Oh. Okay.

MS. THOMAS: -- to answer.

Q. (BY MR. COHEN) Okay. So on the first page, you'll see -- well, first of all, who is the tally administer that took care of this log?

MS. THOMAS: Objection; form.

A. We never have just one person, because there's -- it's chain of custody and because we -- you know, we -- we observe what we call "clean counting." So it'll be Julian and then at least two other people. I would have to go back and look, to see who was on the list.

Q. (BY MR. COHEN) Okay. Would you mind -- you're going to get a copy of this deposition. Would you mind filling their --

A. I can --

Q. -- names in, please?

A. -- do that.

Q. All right. And then because it just says -- in

Page 75

the left-hand corner -- column, after the number, where it's -- where it numbers the entries, it says "User."

A. Yeah.

Q. And it just says "tally" and then "admin." "Admi." It doesn't identify which tally administer is making the entry.

A. Okay.

Q. So is there some way to figure out who it was?

A. Uh-huh.

Q. How would we do that?

A. We'll be happy to tell you. In fact, I -- we may already have said that.

Q. No. I --

A. I don't remember.

Q. If you have, please tell me you have; and if not --

A. Sure.

Q. -- then let me know. Okay. Now -- so if you look -- let's see where -- how do I get -- direct you here?

MS. PRESSLEY: Date and time exhibit.

Q. (BY MR. COHEN) Okay. So look on the first page, and you see 12/05/14. They're all -- I guess the time is going to be the easiest way. 10:03:18 a.m. It says "Cross File Setting." Do you see that?

Page 76

A. Yes.

Q. Okay. Where is the logout? It says "login." I don't see where anybody logged out, from the beginning.

MS. THOMAS: Objection; form.

A. Yeah.

Q. (BY MR. COHEN) Do you know if that's -- why -- why there isn't something that says -- I mean, I would expect it to say "logged out, 10:13" and --

A. Right. Right.

Q. -- "logged in at 10:20," or something like that; but I don't see where it was ever logged out.

A. Right.

Q. So how did -- when -- when was it logged in?

A. Don't know.

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) You don't know?

A. No.

Q. Okay. That's fine.

THE REPORTER: One at a time, please.

Q. (BY MR. COHEN) Okay. Let's go to page -- well, let me ask you just a few other questions before that.

What is an MBB?

A. It's the mobile or removable device that stores

4561

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 77

ballot information. Balloting. It's in the JBC.

Q. Okay. So when you send ballot --

A. It's the ballot box.

Q. When you take it from the precinct and it's all checked before it goes into the police officer's hands --

A. Uh-huh.

Q. -- and then the police officer brings it to the central counting area, did -- the MBB will be in there?

A. Correct.

Q. And then someone will open up the ballot box and use the MBB information to tally the votes; is that correct?

A. The ballot box --

MS. THOMAS: Objection; form.

THE WITNESS: Sorry.

A. The ballot box gets opened at the substation when the official surrender is made. So law enforcement only carries the ballot box, which is the MBB, which is this little card.

Q. (BY MR. COHEN) Okay. And they take that to the central counting place --

A. Right. It's in --

Q. -- and then --

A. -- a locked bag, along with all of the

Page 78

paperwork.

Q. And then that's what's -- on -- the information on that computer chip --

A. Uh-huh.

Q. -- is what your office uses to figure out who got what votes?

A. Correct.

Q. Okay. And how do you go about doing that?

A. First step is the seals. I mentioned the list of seals. The first step is, the seals get checked. Are we sure we have all of the ballot boxes? Is there two in this particular precinct, or is it just one? Are there any special exceptions that we need to think about? Do the number of names on the sign-up sheet match the number of ballots on the card?

And are there any other checks that we go through?

Any affidavits, with anything special we need to consider, like was there an emergency situation, where they have paper ballots that we have to take into consideration? Anything else. All of that is double-checked.

Then once we are clear of what -- what picture we have, then the ballot card, the -- there's a number on the MBB, as well. It gets written down by the

Page 79

counting station judges. Those judges make sure it's properly received and checked off. Then it goes to the counting station piece of it --

Q. Okay.

A. -- and it gets put into a reader that reads the card and puts it into the database -- it's a simple database -- the database and tally, that says, okay, for -- for this vote center, we have this many votes attributed to these precincts. It saves it up.

We feed through a number of cards before, typically, we accumulate it and then produce, for the public and media, a cumulative total. It may not be the final one. So it's -- and we do that multiple times during the night.

Q. How do you know that the computer properly recorded the votes on the MBB?

A. Well, a number of ways. There are audits that are done that night, okay, to compare what comes out of Tally with -- with what went into Tally. In other words, the -- an independent confirmation of what was the copy, or the information that was on the MBB, to make sure it came out of Tally correctly. So we do that audit. And that is a proofing audit that's done before the results are released.

Then we also do after-election-night

Page 80

audits, prior to the canvass, where we go back and we confirm every detail we can find. Many of these details that we've just talked about, about them, you know -- there are -- I mean, it's about -- elections are about human beings. There can be any number of stories. We go back and we confirm all of that, prior to the canvass.

An audit is -- it is far-ranging. It doesn't really have any boundaries, per se. We check whatever we need to check. Then when the canvass is prepared, that's the final. That's the official results.

Does that -- does that help you?

Q. So if I -- if I voted for Ms. Pressley but it recorded -- but the computer said I voted for Mr. Casar, how are you going to find that out?

A. Well -- all right. That gets back to the things that we were going to talk about earlier. There are three different tests that we perform, that would -- that would catch that prior or during voting. The first test that's going to -- and so let me tell you what the three tests are.

Q. Okay.

A. Hash code testing, parallel monitoring, and logic and accuracy testing.

4562

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 81

We -- and I've taught this all around the country. I believe that if you employ those three tests with electronic votiug, you have covered -- protected yourself against the criticisms about electronic voting, if you use those tests.

Hash code testing says you are using the software that is properly certified to be used in your state for that particular system and that there is nothing else resident on that software. No. 1.

No. 2, logic and accuracy testing, especially if you do it by hand with as much permutation and volume as you can possibly manage, tells you the general mistakes that could get made, before every election. A lot of jurisdictions don't take it L & A seriously. We take it extraordinarily seriously.

It will tell you that you have every candidate in the proper precinct; that you don't have them in the wrong precinct; that every race has all the candidates it's supposed to have, through every permutation and combination that you can of. And we're talking 900 formats in Travis County. It's a lot.

It also has componeut to it about proofing so that you know you've got it spelled correctly and pronounced correctly ou the audio. So L & A testing, incredibly importaut.

Page 82

And then finally, the one thing that we've added here in Travis County, for years, that, unfortunately, most places don't use, and it's called "parallel monitoring." And it addresses the kind of threat attack that says that, "Oh, well, in electronic voting systems, there may be something embedded in the software that I don't know about, that somebody planted in there, and that it's going to pop up at some unknown moment."

So the way parallel monitoring works is, you say, okay, we're going to test against this. We're going to -- we're going to trick the system into thinking that -- okay.

Well, the way it works is, at the very last minute, we go into our inventory of unit -- systems of -- or pieces of units that are designated to go out into the field for election day -- we also perform it for early voting, too -- and we say, okay, this random unit -- set of units right here, we're going to -- we're going to pick them out and we're going to say, okay, this group, we're going to keep for parallel monitoring. And we're going to send something else out into the field, but we're going to -- we're going to keep this and we're going to vote it randomly, during the day, according to a known set of data, all day long, under

Page 83

camera, so that this -- this set of equipment thinks it's out in the field. It thinks it's behaving, you know, normally. I mean, it -- in other words, it -- it doesn't know it's being specially observed. And it doesn't know it's been randomly picked out of what's been sent to the field.

So all day long, it's voted; and it's, typically, staff. It's kind of a fun thing. People go in with a list of candidates they're supposed to vote. It's double-checked so that we make sure we don't have human error, which was our number -- it is our No. 1 problem. And then at the end of the day, we go in and compare the known data of entry to what that system actually prodnces back out when you ask for a report from it. And you can tell if anything -- a Trojan horse, a something or other that was going to cause something to flip -- you can tell if that had happened or, you know, was -- if there is any record of that. So you know, did anything go wrong during the day. You can catch it at the time it happens. You can catch it whenever you run the report. So parallel monitoring, incredibly important.

Those -- with those three tests, that's how we know.

Q. Okay. So, basically, that tells you that the

Page 84

software that you're using is not subject to some of the viruses or Trojan horses that you feed into it, correct?

A. It's -- it --

MS. THOMAS: Objection; form.

A. -- doesn't say it's not subject to it. It says, for this election, we're going to go evidence-based; and we've proven, for this election, it's functioning correctly.

Q. (BY MR. COHEN) And none of the things that you -- that you were looking for existed?

A. Correct.

Q. Okay. You are aware that hacking in this -- in -- of computers has gotten completely pervasive? In other words, they're hacking into the Department of Defense records. They're hacking, you know, well, Sony. My God, you know.

A. Yes. I'm aware of those -- all of those stories.

Q. Yeah. So how do you know that your computers haven't been hacked?

A. Well, for one thing, you have to have a pathway, to hack.

Q. Yeah?

A. There is no pathway.

Q. What do you mean?

4563

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 85

A. Sony, the Department of Defense, all of those web-based situ -- circumstances that you look at -- looked at, they all have a pathway.

eSlate voting system in Travis County has no pathway. It's not connected to the Internet. It's not connected to anything. It's a closed system.

Q. So you feel --

A. So, first of all, you'd have to have a pathway.

There are still ways to get pathways, but we have thought that through and we've done everything we can to shut off any of the other pathways. You have to have a pathway.

Q. Okay. So based on your belief that you have to have a pathway -- and I am certain -- probably no one pretends a lot more about computers than I do, but I'm just -- I -- personally, I'm just -- this has never -- personally, I'm just amazed at all of the hacking and computer manipulation --

A. Scary.

Q. -- that's going on. And it's really scary if it's affecting who we elect to be our politicians. Do you agree with that?

A. Absolutely. Couldn't -- couldn't agree you more.

Q. Okay. And so you're doing your very best to

Page 86

prevent that from happening?

A. Yes.

Q. Okay. All right. So now let's go to -- what page am I on? -- in the log, in Exhibit 12, page 5.

A. Okay. Is this page 5?

Q. Yeah. So if you look at the entry of 12:19 p.m., it says "Open Election."

MS. THOMAS: Objection; form.

A. "Open Election."

MS. THOMAS: Okay.

A. Okay.

Q. (BY MR. COHEN) Do you see that?

A. Yes, I do.

Q. There's a logoff before that --

A. Uh-huh.

Q. -- but I don't see a login.

A. Right.

Q. So how does --

A. Well --

Q. -- someone do that?

A. -- it's right after that.

MS. THOMAS: Objection to form.

A. It's right after it.

Q. (BY MR. COHEN) Where is -- where is the logoff? I'm --

Page 87

A. It says "Open Election," "User Login."

Q. Okay. So what does "Open Election" mean? Why is that -- what --

A. I don't --

Q. -- does that actually tell me?

A. -- we'd need to ask somebody who's more familiar with the report.

Q. And you're going to give me the names of those people?

A. Yes, sir.

Q. And then later on, down at about 12:30, it says "Invalid/Corrupt MBB." What does that mean?

A. Oh, you can have an MBB that's -- doesn't read right, just like any -- I mean, it can happen. That's why we have multiple redundancy.

Q. Okay. So what do you do when you get a correct MBB?

A. You pull one of other mediums.

Q. Like what?

A. Well, there are two in the JBC and then there's one, each, in any of the eSlates.

Q. You pull a different MBB?

A. Yes.

Q. Oh, okay. But it's still an MBB you're looking at?

Page 88

A. Correct.

Q. Okay. And look -- I'm just -- further down, a little bit, it says "MBB Not Closed." Do you know what that means?

A. No. I'm sorry.

Q. "MBB User Action"? Do you know what that means, right --

A. I'm sorry. I don't.

Q. -- right below it?

A. Right. I don't.

Q. "MBB Inserted"?

A. Well, that would mean that the ballot box got inserted into the reader.

Q. You say -- you mean -- you think that means from some other source, not the one that was corrupt? Or do they put it --

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) -- the corrupt one, back in?

A. I don't -- I can't --

Q. You don't know?

A. I can't tell if it's --

Q. Okay.

A. -- a different BB -- MBB.

Q. Do you know what the data column at the bottom of the page means? "603 CVRs." What does that mean to

4564

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 89

you?

A. That's -- I don't. It's an ID number that could have to do with the MBB, but I don't.

Q. Oh. Okay. And "Poll Ballot Now," what does that mean?

A. "Ballot Now" is the by-mail program. So this would have been a by-mail --

Q. This MBB would --

A. -- ballot card.

Q. Oh, this MBB was a by-mail --

A. Exactly.

Q. -- card? So you just look at the ballots that came in, right?

A. Correct.

Q. That's how you determine what should have been on the MBB?

A. (No verbal response.)

Q. Why would --

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Why would there be an MBB on a mail-in ballot?

A. Oh, because they're tallied separately. Then you load them all together and then you put them into Tally. You take that ballot box and put it into Tally.

Q. I've got you.

Page 90

A. They're processed as one unit.

Q. And you preserve the mail-in ballots when you do that?

A. Correct.

Q. That's one of the -- Exhibit 7 or 8?

A. Yes, but --

Q. Okay.

MS. THOMAS: Objection; form.

A. -- you don't preserve this. You preserve this.

Q. (BY MR. COHEN) How do you make this 10, from 7?

MS. THOMAS: Objection; form.

Answer if you can, but --

A. It's complicated. This is what gets saved. This does not -- this does not get saved. It -- and the reason is because we have the paper. There's no need to create this image, because we have the paper.

This is what gets saved, to be counted. This is the format that you use, to put into the database, to count it.

Q. (BY MR. COHEN) Okay. And what you save, though, is the paper thing that came in the mail --

A. Correct.

Q. -- through the mail --

A. Yes.

Page 91

Q. -- that looks --

A. Yes.

Q. -- like Exhibit 7?

A. It is the paper ballot.

Q. Okay. Please turn to the next page. What does it mean that an MBB is not closed?

A. I'm sorry. I don't know.

Q. Okay. So we've got a couple of those on this page. And then what does it mean, at 12:31:35, that -- it's a "Duplicate polling place."

A. We have -- I'm -- I'm going to give you a little bit of information here. We have multiple MBBs that come from our early voting locations. That's standard. And the system is always going to tell you if it has more than one ballot box, wherever it is. Sometimes that's okay and you want to say, yes, it's a duplicate.

So given that -- and Randalls Research is an early voting location.

THE REPORTER: I'm sorry. Randalls Research what?

THE WITNESS: Randalls Research is an early voting location.

A. That's as far as I can get you --

Q. (BY MR. COHEN) Okay.

Page 92

A. -- with that answer.

Q. Okay. But you would not count a duplicate --

A. No. Well, yes, if it's -- if you're expecting five --

MS. THOMAS: I'm going to object. He didn't finish his question.

THE WITNESS: I'm sorry.

MS. THOMAS: Let him ask the question.

THE WITNESS: I'm sorry.

Q. (BY MR. COHEN) You would only -- are you telling me that you would only count the duplicate polling place information if it was an early voting MBB?

A. No.

MS. THOMAS: Objection; form.

A. No. You could have two ballot boxes from an election day polling place. But you would have a record that you -- you were expecting two ballot boxes; therefore, you would accept two. Right. We have records to -- to accept that. But Tally doesn't know anything. It's only a database. So it's going to ask you, "Oh, wait. I've already counted one ballot box from this location. Why are you giving me another one?" That's what that means.

Q. (BY MR. COHEN) Okay. That's what that entry is telling you?

4565

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 93

A. Yeah.

Q. Okay. Let's turn to page 8, at 3:24. Do you have any reason why there's two hours between a logoff and a login?

A. Nothing would be happening then.

Q. Okay.

A. Quiet.

Q. Page 9. I'm curious what this means. These things just seem irregular to me, so you have to clear them up.

MS. THOMAS: Objection --

THE REPORTER: I missed it. Can you --

Q. (BY MR. COHEN) It seems irregular to me, to have "Vote Adjustment Precinct"; so please tell me what that means.

A. "Vote Adjustment Precinct."

MS. THOMAS: Objection; form.

A. I see.

Q. (BY MR. COHEN) You see it all the way down that page, on page 9, correct?

A. Yes, I do. Hang on. I'm sorry. We would have to ask. I don't know.

Q. Okay. On page 14, at 4:45, it says "MBB already read by Tally" --

MS. THOMAS: Hang on just a second.

Page 94

Q. (BY MR. COHEN) Oh, I'm sorry. You're not there yet?

MS. THOMAS: She's not there.

Q. (BY MR. COHEN) Page 14. Are you there?

A. Yeah.

Q. Do you see at 4:15:45?

A. Yes.

Q. "MBB already read by Tally."

A. Right.

Q. What does that mean?

A. Well, that's telling you, "Are you sure you're not making a mistake?" We -- the -- Tally thinks it's already read this card.

Q. And so did -- what -- can you tell from the audit log what happened as a result of that inquiry?

A. I'm sure somebody who knows these might be able to tell, but I can't.

Q. Okay. That's fine.

Let's go to page 22. On page 22, here we are, again, with an "Invalid/Corrupt MBB."

A. Uh-huh.

Q. And the audit log doesn't ever tell us what happens because they found a corrupt MBB.

MS. THOMAS: Can you tell us where you are?

Page 95

THE WITNESS: Here it is.

MS. THOMAS: Okay.

Q. (BY MR. COHEN) Yeah. It's the second from the top. I'm sorry.

A. Okay.

Q. I haven't seen anywhere in this audit log what -- where it tells you what it did when it found a corrupt MBB. Do you -- is that...

A. Yeah. There would be other documentation that will tell you what happened. I can't tell you.

Q. Where would that documentation be?

A. In the counting station records.

Q. The county what?

A. In the counting station records --

Q. Okay.

A. -- of that night.

Q. And you have produced that for us?

A. Yes.

MS. THOMAS: Objection; form.

It all depends on what was covered by the order, so I don't know -- I can't say. So I'll have to go back and check. I just don't recall, and I didn't want her to be committing to something that she --

THE WITNESS: Okay.

MS. THOMAS: -- didn't know about. So

Page 96

I'm --

THE WITNESS: Okay.

MS. THOMAS: -- going to have to go back and look.

MR. COHEN: Okay.

Q. (BY MR. COHEN) You don't know whether you produced this or not?

I mean, I think what your lawyer is telling me is, your answer is that if you were --

A. That it should have been --

Q. -- required to produce it --

A. -- produced, yeah.

Q. -- you did.

A. Yeah. Yeah.

THE REPORTER: One at a time.

Q. (BY MR. COHEN) Okay. All right.

A. And that's what I'm thinking: This is so basic, it's there.

Q. Okay.

THE REPORTER: Please let him finish.

THE WITNESS: I'm sorry. Sorry.

Q. (BY MR. COHEN) Again, on page 23, if you go down by 8:42, there's another "Invalid/Corrupt MBB," and we still don't know what happened to that MBB.

A. Same thing.

4566

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 97

Q. Okay. And then there's another one a little further down, again. And then there -- it says "MBB already read by Tally." Do you see that? There's three of those in a row.

A. Uh-huh. Uh-huh.

Q. Do you have any idea what that -- what happened as a result of that?

A. I'm sorry. I don't.

Q. Okay. You don't have to know everything.

All right. Now let's go to page 26. And I know this is a little repetitious, but we're going to get there.

When you see -- at 8:53, there's another invalid or corrupt MBB, and I'm supposing your testimony is still that you don't know what happened --

A. No.

Q. -- with that MBB.

A. I don't remember.

Q. Okay. And again, on the next page, there's two more of those "Corrupt/Invalid MBBs."

A. Same answer.

Q. Same answer.

And then on page 29, there's another one. It's about four or five lines down.

A. Same answer.

Page 98

Q. All right. Okay. And then on page 42 -- I know it seems silly to you, but it's not.

A. It's all right.

Q. On page 42, you'll see, at 10:12, another corrupt MBB; and you're not going to be able to tell me what happened to that MBB?

A. Same answer.

Q. So you don't know when -- when we see --

A. I don't remember what -- I mean, corrupted MBBs are a little unusual. We seem to have had a little trouble that night --

Q. Yeah.

A. -- but I -- I -- I mean, you put it in once and maybe it -- you know, you put it in a second time and it reads just fine. You know how that is.

Q. Well, so you answered -- you answered my -- one of my questions was going to be, after I went through all of these, it's a little unusual to have so many invalid MBBs in an election tally, isn't it?

A. I've never heard of so many --

Q. Okay.

A. -- but perhaps we need to ask. There could have been something --

Q. If you've never heard of so many --

A. Yeah. Well --

Page 99

Q. -- I'm sure nobody has, correct?

A. Yeah. It --

MS. THOMAS: Objection; form.

A. I suspect there's something wrong with the reader, not the MBBs.

Q. (BY MR. COHEN) Okay. So you think -- your suspicion is that there was something wrong with the reader that night?

A. Correct.

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) And then later on, it says, "Duplicate polling place," later, down on that page 42. And I believe you testified already as to what that meant to you, but you don't know with this particular one. Is there any particular one, that was the --

A. Duplicate -- are you saying "Duplicate polling place"?

Q. Yeah, yeah.

A. Yes, I'm -- I'm unsure what it is.

Q. And the next page -- have you ever seen this many "Duplicate polling places" on one of your logs?

A. Uh-huh.

Q. That's pretty common?

A. Yeah.

Q. Okay. Because there's a bunch of them on the

Page 100

next page and on the next page. Are you sure you've seen this a lot, on the --

A. Yeah. Yeah. It's not unusual.

Q. Okay. It's not unusual to have a lot of "Duplicate polling place" entries on the audit log, correct?

A. No, it's not.

Q. All right. Let's see. This is page 57, second to the last page. If you will look on the bottom, it starts out January 13th, 2015, and it goes through July 5th, 2015.

MS. THOMAS: I'm sorry. Say that again.

THE WITNESS: I think he means these dates here.

Q. (BY MR. COHEN) Page 57. You see, at the bottom?

A. Okay.

Q. And it goes on to the next page, all the way till February 5th, 2015, at 11:17 a.m.

A. I am not --

MS. THOMAS: Can you repeat the question? I don't --

A. We're not finding it.

Q. (BY MR. COHEN) You don't find, on page 57 --

A. Huh-uh. 57 --

4567

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 101

Q. 1/13 is the date, 2015.

MS. THOMAS: You were -- said something like "July," so that's what I was...

A. Oh. Okay. So 1/13. Okay.

Q. (BY MR. COHEN) Do you see that?

A. Yes.

Q. It says "user logoff"?

MS. THOMAS: Uh-huh.

A. Okay.

Q. (BY MR. COHEN) Why is someone going in and out of the MBBs for two weeks, so far after the election? It's about seven days with no activity at all; just logging in and out of the machine. Do you have any idea?

A. Well, we do -- as I mentioned, we do a lot of audits. We will be preparing canvass reports. I think there's a lot of reasons. And the machine is going to keep track of any time we go in and out.

Q. Well --

A. You would have to ask them what they were doing.

Q. Okay.

A. It's public information.

Q. The first logoff was 1/13/2015, correct?

MS. THOMAS: Objection; form.

Page 102

Q. (BY MR. COHEN) Do you see what I'm referring to there?

A. It says that.

Q. Okay. It was -- it wasn't logged in again for another week. Can you explain that?

A. Two weeks.

Q. Two weeks. Yeah. Can you explain that?

A. No activity.

Q. Okay. Wait. Do you know what a DRE is?

A. I'm sorry. Can you say it again?

Q. A DRE?

A. DRE? Direct-recording electronic.

Q. Yeah. What is that? Explain it for us.

A. It's a voting system. Direct-recording electronic says that you're using an interface, an electronic interface, to record your choices. There's not a -- there's not a piece of paper. It's direct-recording electronic.

Q. So that goes right into the computer and there's no copy of a ballot cast?

A. Correct.

Q. Okay.

A. Not a paper copy.

Q. Not a paper copy.

A. Uh-huh.

Page 103

Q. But in the system that you're using, the hard system, there is a paper copy, correct?

A. No.

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Okay. There's no paper copy of the...

A. (Moved head side to side.)

Q. Okay. So when you do the recount, what do you look at to verify that the computer accurately recorded the votes?

A. Well, I'm not sure which answer you're looking for. It's -- you can print out copies of the cast vote records; so we did that. There are other ways to confirm the cast vote records without printing out, so I -- I don't know which one you want.

Q. Well, let me ask you this: Which one did you do in this runoff election?

A. Both.

Q. Okay. What is the other one?

A. When we were talking about the list of security steps that we go through and the audits that we go through, that's that lengthy list of all those audits. All the comparisons, the simple ones, like number of names to number of votes; you know, any -- anything that happened in the precinct; any affidavits that say, okay,

Page 104

perhaps we had a fleeing voter; perhaps we had one of our voting machines that went down. Any story in the precinct, you're going to include that. Spoiled ballots; any surrendered by-mail ballots. Anything that's going to be what you would call a "reconciling item," all of those would be considered as part of the audit. So that's what you would do, other than printing out and hand-tabulating the cast vote records.

Q. And so you printed out and tabulated the cast vote records?

A. Yeah. Correct.

Q. That's what the computer said the people voted?

A. Correct.

Q. That's what the computer says --

A. That's correct.

Q. -- the CVRs that were created at the time of the election, that's -- that's what the computer says, correct?

A. Correct. Well, both. The hand tally and the computer agreed.

Q. The hand tally of the computer records?

A. Correct.

Q. Yeah. Okay. So -- so the computer is creating a record; and if someone complains about the results, then you can count what the computer said?

4568

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 105

A. Right.

Q. I'm sorry. How does that -- how are you double-checking your computer when you're just counting what the computer said?

A. Well, because there are a lot of other audits that go into proving what went into it and was correct to begin with.

Q. So you double-check with all different kinds of things, to see if there's something that happened that would make the computer record unreliable?

A. Correct.

Q. Is that what you're saying?

A. Correct.

Q. Okay. So you go through a bunch of tests. You find that -- nothing unusual that would make you question the computer record; and so then you take the computer record as true. Am I saying it correct?

A. No.

Q. Did I get that right?

A. No.

Q. Okay.

A. No.

Q. That's what I thought you said. So you have a computer record, okay? And it's -- and you make copies of what the computer says each voter voted for --

Page 106

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) -- is that correct?

A. We normally wouldn't print out --

Q. The CV --

A. -- CVR records --

Q. Okay. How would you normally --

A. -- at all.

Q. -- do it?

A. Normally, we would follow our audit procedures for reconciling all of the particular categories that might happen to a ballot, everything, you know, from -- from the beginning, including watching over the parallel monitoring. All of those tests and controls that we put in place.

Q. So normally, you would just make sure nothing unusual happened; is that correct?

A. Well, I wouldn't --

MS. THOMAS: Objection; form.

A. I would categorize it as a little bit more tightly controlled than that, but okay.

Q. (BY MR. COHEN) Okay. And in this case, you're not -- you're not only -- you didn't see anything unusual that happened on the ground --

A. Everything balanced. We're talking fact-based.

Q. Yeah. What do you mean by "everything

Page 107

balanced"?

A. Balanced.

Q. What do you mean by that?

A. The number of ballots voted matched the number of people who were voting, in that entire picture.

Q. Okay. I --

A. That's what we're looking at.

Q. -- got that. But you don't know whether the computer accurately recorded who those people voted for, do you?

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Except what the computer tells you.

MS. THOMAS: Objection; form.

A. I have every reason to believe that the system operated correctly and accurately.

Q. (BY MR. COHEN) Okay. But you really don't know.

MS. THOMAS: Objection; form.

A. I have every reason to believe the system operated accurately and correctly --

Q. (BY MR. COHEN) That's because you have --

A. -- meaning --

Q. -- the same amount of votes --

A. -- because I have lots of --

Page 108

THE REPORTER: One at a time, please.

MR. COHEN: I'm sorry.

Q. (BY MR. COHEN) Go ahead. I'm sorry. I didn't mean to cut you off. I thought you were done.

So that's because you have the same amount of votes -- one example is -- as the votes that were -- that the computer says were cast. You have the same amount of people signing in.

MS. THOMAS: Objection; form.

A. Oversimplification.

Q. (BY MR. COHEN) Okay. Let me charge at it this way. You -- because of the systems that you have put in place that you think is the best way to be sure of this --

A. Uh-huh. Uh-huh.

Q. -- you think -- you have no reason to believe that the computer recorded the votes the way the people voted. Is that what you're saying?

MS. THOMAS: Objection; form.

A. I have every reason to believe the system behaved accurately and correctly. I have no indication, evidence, to show anything otherwise.

Q. (BY MR. COHEN) Okay. And you don't -- you don't have any evidence to show that the computer accurately recorded who everybody voted for?

4569

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 109

MS. THOMAS: Objection; form.

A. Every voter has a summary screen to verify what their choices were, before they cast the vote record. I think we've got every reason to believe it's an accurate, fair representation of what everybody voted.

And I -- I recognize that there are people who still want to grind that; but if we can just say, right now, I have every reason to believe that it is a fair and accurate system.

Q. (BY MR. COHEN) Okay.

MS. THOMAS: Mark, we've been going for an hour, so when you're at a stopping point, just let us know.

MR. COHEN: We could. I'm just -- yeah, okay. If you want to take -- it won't be much more. Like --

MS. THOMAS: Oh, that's fine. Yeah. I mean --

MR. COHEN: If you want to go through lunch or something and just take a short break right now, that's fine.

THE WITNESS: I'm good.

MS. THOMAS: What time it is it now?

MR. COHEN: Okay. Because -- it's 11:48.

MS. THOMAS: Do you think we can get

Page 110

done --

THE WITNESS: Like 12:30, a quarter of 1:00. That way -- unless Mr. Herring is going to have some more questions.

MR. HERRING: If I have any, it will be brief.

MS. THOMAS: You shall not.

MR. COHEN: Okay. Well, let's take a -- how much of a break do you want to take?

THE WITNESS: I'm good.

MS. THOMAS: Do you want -- okay. If she's ready to go, then let's go. We'll --

MR. COHEN: Well, let's take a five-minute break.

(Recess 11:47 a.m. to 11:57 a.m.)

Q. (BY MR. COHEN) Take another look at Exhibit 12, and then I'll be finished with this exhibit.

A. Okay.

Q. Go back to the second to the last page, 57. We were talking about all of these -- let me know when you're there.

See down at the bottom there, where it says at -- on January 13th, at 2:11, the user logged off?

A. Yes.

Page 111

Q. And then -- and February 5th, the user logged in.

A. Uh-huh.

(Sotto voce discussion between Ms. Pressley and Mr. Cohen.)

MR. COHEN: I've got it. Okay. That's why I didn't get the question right.

Q. (BY MR. COHEN) All right. Let's go up a little bit higher and see 12:43, where it says "Viewed/Printed Report."

A. Yes.

Q. On 1 -- on January 6th? Do you see that?

A. I do.

Q. Okay. This computer had a lot of really important stuff on it that shouldn't be open to anybody to have access to it, or anything like that, correct?

MS. THOMAS: Objection; form. Mischaracterizing --

Q. (BY MR. COHEN) -- except the people that were --

A. Yeah. Mischaracterizing. I --

Q. (BY MR. COHEN) You don't -- okay. So what I'm curious about is, there's a week between the last thing that was done on this log, audit log, and the logoff. Would you call that a security way to handle it, the

Page 112

best way to handle that, from a security point of view?

A. I would not make that --

MS. THOMAS: Objection; form.

A. Yeah, I would not make that characterization at all.

Q. (BY MR. COHEN) Yeah, you would think there was something wrong with that, right?

A. No, I would not --

MS. THOMAS: Objection; form.

A. -- think there's something wrong.

THE REPORTER: One at a time, please.

Q. (BY MR. COHEN) You wouldn't like the --

MS. THOMAS: Just give me a chance to make my --

THE WITNESS: Sorry. Okay.

MS. THOMAS: -- objection.

THE REPORTER: I need to get all of you.

MR. COHEN: Yeah.

A. (BY MR. COHEN) So it doesn't bother you that the computer was not logged -- was open to access for a week, before it was logged off on?

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Does that bother you? That doesn't bother you; is that correct?

A. I -- I --

4570

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 113

MS. THOMAS: Objection; form.

A. Okay. I -- I don't buy that it was left open. I think that's incorrect.

Q. (BY MR. COHEN) Oh. So the only other conclusion is, the person who kept the log didn't notice -- didn't enter an entry that they had logged off before that?

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Is that what you're saying?

A. No.

Q. Well, okay. Explain this to me. It was used on January 6th -- do you see that? -- at 12:43:16 p.m. Do you see that? "View/Printed Report."

A. Correct.

Q. There is no other entry until it was logged off on January 13th. Is that correct?

A. That's what the report says.

Q. Okay. Do you note believe the report?

MS. THOMAS: Objection; form.

A. I don't know what the coding means. We need to ask.

Q. (BY MR. COHEN) I'm sorry what did you say?

A. I don't know what the coding means. We need to ask.

Q. The coding means.

Page 114

I don't get that. Tell me what you mean by --

A. I don't know --

Q. -- you don't know --

A. I don't what this coding means.

Q. -- what the coding means.

A. I don't know what it means.

Q. Are you talking about the description?

A. Yes.

Q. Okay. So you don't know why it wasn't logged -- it's not entered as being logged off? Is that what you're saying?

A. Correct.

Q. Okay.

A. I don't know what this means.

Q. Okay. If it -- if this meant that the computer was not logged off for a week, would that cause you some concern?

A. I don't believe --

MS. THOMAS: Objection; form.

A. -- that's true.

MS. THOMAS: Give me a chance to object. Objection; form.

Q. (BY MR. COHEN) See, yeah, she objects to everything, so just don't pay attention. We will talk

Page 115

to the judge about it.

MS. THOMAS: Objection; form and sidebar.

Q. (BY MR. COHEN) So the question is, it would not bother you -- I'm just asking you. It would bother me, if it was my computer, but if it --

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) -- if it doesn't bother you -- just tell me whether it bothers you, if it's true that the computer stayed logged in for a seven days, without any activity.

A. I doubt it's true. I doubt it's true.

Q. You think the log doesn't -- the log is wrong.

A. Yeah.

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Okay. If you think the log is wrong, that's --

MS. THOMAS: Objection; form. Mischaracterizing what she said.

MR. COHEN: I'm asking her.

MS. THOMAS: No.

MR. COHEN: Yes, I --

MS. THOMAS: You're telling her what she said.

MR. COHEN: No. I said, "Do you think the log is wrong?" That's what I said.

Page 116

MS. THOMAS: Do you want to go back and look at the record?

MR. COHEN: That's what I -- okay.

MS. THOMAS: If you have a question, ask a question.

MR. COHEN: Okay. You can object. Keep your comments to yourself. Okay? You're not allowed --

MS. THOMAS: I can -- if you're mischaracterizing --

MR. COHEN: -- to make --

MS. THOMAS: -- her testimony --

MR. COHEN: I didn't ask why you made an objection.

MS. THOMAS: -- okay, I will --

MR. COHEN: I didn't ask you why you made an objection. You are not allowed to talk. Follow the Rules, please.

MS. THOMAS: I am going to follow the Rules.

Q. (BY MR. COHEN) My question is --

MS. THOMAS: Ask a question.

Q. (BY MR. COHEN) -- does it bother you that the computer is not -- it seems to be logged on for a week?

A. I don't think that's true.

Q. Okay. So are you telling me that you think the

4571

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 117

audit log is wrong?

MS. THOMAS: Objection; form.

A. I don't know.

MR. COHEN: I wish Judge Dietz had this case. You would be in so much trouble.

THE REPORTER: Is that on or off?

MS. THOMAS: It doesn't matter. He's got a lot of stuff on there that's appropriate for the judge to see.

Q. (BY MR. COHEN) Okay. Do CVRs have voting squares? Do you know what I mean by a "voting square"?

A. Like this?

Q. Yeah, like that.

A. No.

Q. Okay. Do CVRs have instructions on how to vote on them?

A. No.

Q. Do CVRs have the date of the election written on them?

A. I think so. It has the name of the election on it.

Q. Okay. But not the date of the election?

A. Well, the -- the date would be the name, but it doesn't have the date spelled out. So the --

Q. Right. That's my question.

Page 118

A. -- name of the runoff -- the name of the runoff election would be the -- I mean, you would infer the date.

Q. Okay. Does the CVR have a number on it so that you could make sure -- you can compare it to the number of -- for the voter?

A. What?

Q. Does the CVR have a serial number on it? Let me just ask it that way.

A. I'm not sure --

Q. Okay.

A. -- about -- I'm not sure how to answer your question.

Q. Does the Ballot Now system keep image -- store images of the ballot that the voter looks at when they're deciding which candidate to vote for?

A. Ballot Now would be the paper that people are voting on, so there's no -- there's no decision interface. It's the paper. Ballot Now does not keep an image of the paper.

Q. Is the CVR an official ballot? Does it say "Official Ballot" on it or...

MS. THOMAS: Objection; form.

A. I don't think so.

Q. (BY MR. COHEN) Does it meet the requirements

Page 119

of an official ballot, under the statutes?

A. According to the --

MS. THOMAS: Objection; form.

Go ahead.

Q. According to the EAC and Secretary of State, yes.

THE REPORTER: I'm sorry. Can you say --

THE WITNESS: According to the EAC and the Secretary of State, yes. It's an official ballot.

Q. (BY MR. COHEN) Okay. But that's -- that's what they say, but is there something in the statutes that say that?

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Do you know?

A. It's an official ballot.

Q. Okay. Do you know of a statute that says that a CVR is an official ballot?

A. I don't recall it, off the top of my head. I can look.

Q. I'll show you what's marked as Exhibit No. 11. I don't know where the actual number went.

MS. PRESSLEY: I know. You've got to number it.

MR. COHEN: Hold on just one second, all right?

Page 120

Q. (BY MR. COHEN) I'll show you what's marked as Exhibit No. 11. Tell me what that is.

A. I'm not sure. What is this?

Q. Well, does it look like it could be the CVR -- the recount CVR file?

A. I believe --

MS. THOMAS: Objection; form.

If you don't know what that is, just tell him.

A. I'm -- I'm sorry. I -- it -- the format --

MR. COHEN: Would you please stop coaching your witness?

MS. THOMAS: Well --

MR. COHEN: I'm going to call the -- you just told her, if she doesn't know what it is, what to answer.

MS. THOMAS: Well, but she already --

MR. COHEN: You can't do that.

MS. THOMAS: -- said she --

MR. COHEN: She is the one --

MS. THOMAS: -- doesn't know what it is.

MR. COHEN: -- testifying, not you. You -- you --

MS. THOMAS: She already said she doesn't know what it is.

4572

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 121

MR. COHEN: Then let her testify to that. That's fine. I don't want you saying anything. It's against the Rules.

MR. HERRING: Mr. Cohen, you need to lower your voice.

MS. THOMAS: You need to --

MR. COHEN: So please stop. I'm almost done. Just -- if you want to make 25 zillion ridiculous objections, you go right ahead; but don't tell her what -- don't make any comment, except "Objection, form."

MS. THOMAS: Mr. Cohen --

MR. COHEN: And that's all you get to do.

MS. THOMAS: -- if you've got a problem, take it to the judge.

MR. COHEN: Yeah.

MS. THOMAS: But right now --

MR. COHEN: Well, you're still doing it.

MS. THOMAS: -- she already told you --

MR. COHEN: You're still doing it. You're still violating the Rule.

MS. THOMAS: You're the one --

MR. COHEN: Why don't you just stop?

MS. THOMAS: If you have a problem, take it to the judge.

Page 122

MR. COHEN: I have a question for the --

MS. THOMAS: Ask her the --

MR. COHEN: -- for the witness.

MS. THOMAS: -- question, then.

MR. COHEN: I did. I asked her a question, and now that you've talked so many times and told her all what to say --

MS. THOMAS: I did not.

MR. COHEN: -- we don't really know what the question was anymore --

MR. HERRING: Mr. Cohen --

MR. COHEN: -- so I'll ask it again.

MR. HERRING: -- ask the question. Move on. Stop yelling.

Q. (BY MR. COHEN) Does that look, to you, like it could be the recount CVR file?

A. Maybe. Here is the -- Mark, here is what my problem is with it: I don't recognize the format, at all.

Q. Yeah. Okay. That's --

A. The data might be something I'd recognize, but this is completely unfamiliar to me.

Q. That's perfectly all right. Thank you.

Okay. Did your office have any recount activities on January 4th, 5th, or 6th?

Page 123

A. Gosh, I need a calendar. What is the 4th, 5th, and 6th?

Q. Well, let me just help you.

A. Okay.

Q. The recounts, I think, started at 11:00 a.m. on the 6th.

A. Okay.

Q. And what I'm after is, I want to know if your office did anything prior to the recount being conducted.

A. Oh. Well, sure.

Q. Okay. What did you do?

A. Well, we called around and lined up some people to be available for the recount. We organized the room so that it was set up for that, so there was some physical things that we had to do.

I did some work on it, because I had a conversation with Laura, twice, on the Sunday before, about how we could help. She was concerned about the amount of time and about the cost for doing it. And so I had said, "Okay. Maybe there are some things that we can do to organize it for you so it's quicker to get through."

And in my second conversation with her -- my first conversation, I tried to explain to her the

Page 124

differences between a recount and an audit. And I had suggested that an audit was a better way to go, and that suggestion was not taken. But in -- on that Sunday, we did have a bright idea that -- we figured out a way to make it quicker for her to be able to go in and pick out the precincts that she wanted, without having to deal with all the rest of the races. And so on Sunday, we went through and we printed out her cast vote records just for the District 4 runoff. And it was very clever, very cheap, very easy. We figured out that if we put a colored sheet of paper in between her precincts, then she could tell how big the precinct is, how little, so that she could decide where she wanted to start. So we printed out her CVRs, in advance, with an aqua piece of paper in between. So we did that in advance.

Then when we got there on Monday morning, a little before the 11 o'clock start, and told her we had come up with this fabulous idea that was going to be a big help to her -- and we discovered that that was not okay. Our efforts were not appreciated. So we trashed those, recycled it, and reprinted the whole thing again.

And other than some other details to get organized for it, some phone calls with the City, that's basically it.

Q. Okay. Were the MBBs used in the runoff, the

4573

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 125

same ones that were used in the general election?

A. No.

Q. Brand new ones?

A. Absolutely.

Q. Okay. So -- and did you print zero tapes directly after opening the polls for early voting?

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Well, let me ask -- what I'm really after is -- I know you did some zero tapes sometime before the polls opened --

A. Right.

Q. -- but did you do them again when the polls opened?

A. Okay.

MS. THOMAS: Objection; form.

A. Do you mean election day or early voting?

Q. (BY MR. COHEN) Both. First, early voting.

A. Okay. The answer is yes, standard procedure for early voting: tapes before, tapes after.

For election day, we have a separate procedure that's been prescribed to all of the counties who use vote centers. And we have a specific procedure that talks about how you run the zero tapes so that you know you have zero, and that's a full accounting. And then there is a specific procedure for doing the

Page 126

opening. That's prior to election day.

Then you have a procedure for printing the tape for election day and then printing the tape for after election day, that are abbreviated prints, that don't -- that don't require you to print the whole accounting.

Q. Okay. So my question was: Did you do zero tapes at each polling place, on the day of the election?

A. Yes.

MS. THOMAS: Objection; form.

Q. (BY MR. COHEN) Okay. Thank you.

A. Yes. Sorry.

Q. That's all right. I liked -- it was interesting.

Were tally tapes, result tapes, printed directly after the closing of the polls?

A. Yes. However, on election day, it's called an "access code," not a "tally tape."

Q. So explain to me how that works, please.

A. Yeah. On election night, longstanding law that says whatever method of voting you're using, as you close up the polls and leave that night, you leave a note on the door of the polling place that says how many people voted and what were the results of that election night, the races. It's a -- it's an old, old law that

Page 127

fits a much shorter ballot than what we have today. Nevertheless, we comply with that, the spirit of that law, and leave a note on the door that says, "Here's what happened in this precinct," and then we -- you know, with -- with information about "and here is the rest of the information for the night," so...

Q. Okay. So that's what you did on --

A. Yes.

Q. -- at the end of the voting, in each precinct?

A. Yes. Access code.

(Sotto voce discussion between Ms. Pressley and Mr. Cohen.)

Q. (BY MR. COHEN) How many workers that worked on tallying the votes, or workers in your office, actually have access codes to access the hard system?

A. A handful. I don't know the exact number. Not many.

Q. Okay. Just give me one more minute. I don't understand what she wants to know.

(Sotto voce discussion between Ms. Pressley and Mr. Cohen.)

Q. (BY MR. COHEN) So -- okay. So did -- let me go back over the result tapes again. Did you print the result tapes after the election?

A. Access codes.

Page 128

Q. Access codes.

A. And they did -- as far as I know, we put them on the door.

Q. What is the difference between a tally tape and an access code?

A. It comes from a different database, and it's a shorter version than what you would get -- it's like an abbreviated version. An access code is going to give you an abbreviated version of who all voted for what.

Q. Okay.

A. It might be easier to see the difference than for me to explain it.

Q. So that's why you told the poll people not to print the tally tapes?

A. Correct.

MR. COHEN: All right. We -- I'll pass the witness.

MS. THOMAS: Do you have anything else? He just passed the witness.

MR. HERRING: Okay. Yeah.

FURTHER EXAMINATION

BY MR. HERRING:

Q. What I'm going to do is just show you the notices that were posted on the polling places for Precinct 133 and some others. "Your polling place is

4574

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 129

now such-and-such."

A. Got it.

Q. Prove it up. That's all.

A. Okay.

Q. So let me show you what has been marked as Exhibit 6.

THE REPORTER: Uh-oh. We already have a 6.

THE WITNESS: We have a 6.

THE REPORTER: Can we do 16? Can we throw a "1" on it?

MR. HERRING: Let's do 16. Yeah, put a "1" on it.

THE REPORTER: Okay. So no 14 or 15.

MR. HERRING: So that will be 16.

MS. THOMAS: We don't have a 9, if you're wondering about a 9.

MR. HERRING: No. I don't like 9. I don't like 9.

(DeBeauvoir Exhibit No. 16 marked)

Q. (BY MR. HERRING) Is that the notice that was posted at the polling -- the voting location for Precinct 133, to indicate that the new polling place was Memorial United Methodist church?

A. Correct. It is.

Page 130

MR. HERRING: That's 16.

MR. COHEN: Oh, that's 16?

MR. HERRING: Yeah.

Do the same with that one.

(DeBeauvoir Exhibit Nos. 17 marked)

Q. (BY MR. HERRING) And I'll show you 17 and ask you to identify what's the notice to and what's the new location?

A. It says Highland Mall is the previous location and that the Travis County main location is the new one.

Q. Okay.

(DeBeauvoir Exhibit Nos. 18 and 19 marked)

Q. (BY MR. HERRING) And all of these that I'm showing you, were they all posted at the old voting location?

A. At the old location, correct.

18.

Q. And what is 19?

A. 19 is the location posted at McBee Elementary School, indicating that it was the old location; and the new location is Walnut Creek Elementary.

(DeBeauvoir Exhibit No. 20 marked)

Q. (BY MR. HERRING) And let me show you what's been marked 20.

A. A notice posted, indicating that Austin

Page 131

Brethren was the old location and that Lanier High School is the new location for the runoff election.

Q. And all of those were posted to assist voters?

A. Posted, correct.

Q. Were the new voting locations also available in multiple other forms, such as websites?

A. Correct. They're on our websites, they're in paper forms, they're on the County Clerk's website, the County website, the City website.

Q. Thank you.

MR. HERRING: Pass the witness.

MR. COHEN: No further questions at this time.

(Deposition concluded at 12:24 p.m.)

Page 132

CAUSE NO. D-1-GN-15-000374

LAURA PRESSLEY ) IN THE DISTRICT COURT
Contestant )
)
)
)
VS. ) TRAVIS COUNTY, TEXAS
)
)
)
GREGORIO "GREG" CASAR )
Contestee ) 201ST JUDICIAL DISTRICT
*******************************************
REPORTER'S CERTIFICATION
ORAL DEPOSITION OF DANA DEBEAUVOIR
MAY 11, 2015
*******************************************

I, KATHERINE A. BUCHHORN, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DANA DEBEAUVOIR, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on May 15, 2015, to the witness, DANA DEBEAUVOIR, c/o SHERINE E. THOMAS, for examination, signature, and return to SYMPSON REPORTING by June 4, 2015.

That the amount of time used by each party at the deposition is as follows:
MR. CHARLES HERRING, JR. - 0 Hours, 57 Minutes
MS. SHERINE E. THOMAS - 0 Hours, 0 Minutes
MR. MARK COHEN - 1 Hour, 33 Minutes

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

4575

Pressley vs. Casar
Dana Debeauvoir - May 11, 2015

Page 133

FOR THE CONTESTANT, LAURA PRESSLEY:
MARK COHEN
THE LAW OFFICES OF MARK COHEN & ROSE COHEN
805 W. 10th Street, Suite 100
Austin, Texas 78701
512.474.4424/512.472.5444 (fax)
mark@cohenlegalservices.com
FOR THE CONTESTEE, GREGORIO "GREG" CASAR·
MR. CHARLES HERRING, JR.
HERRING & IRWIN, L.L.P.
1411 West Avenue
Austin, Texas 78701
512.320.0665/512.519.7580 (fax)
cherring@herring-irwin.com
FOR THE DEPONENT, DANA DEBEAUVOIR:
SHERINE E. THOMAS
TRAVIS COUNTY
314 W. 11th Street
Austin, Texas 78701
512.854.9513/512.854.4808 (fax)
sherine.thomas@traviscountytx.gov

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 14th day of May, 2015.


_/s/ Katherine A. Buchhorn_____
KATHERINE A. BUCHHORN, Texas CSR 2788
CSR Expiration: 12/31/15
SYMPSON REPORTING
Firm Registration No. 696
7800 N. MoPac Expressway, Suite 120
Austin, Texas 78759
512-374-0596/512-697-8313 (fax)
office@sympsonreporting.com

Page 134

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition of DANA DEBEAUVOIR was/was not returned to the deposition officer on or before _____, 2015. If returned after the stipulated date, the original deposition was returned on _____;

If returned, the attached "Changes and Corrections" page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to SHERINE E. THOMAS, 314 W. 11th Street, Granger Building, Suite 420, Austin, Texas 78701, Custodial Attorney;

That $_____ is the deposition officer's charges to CHARLES HERRING, JR., HERRING & IRWIN, L.L.P., 1411 West Avenue, Suite 100, Austin, Texas 78701, attorney for GREGORIO "GREG" CASAR, for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.
Certified to by me this _____ day of _____, 20____.


_____
KATHERINE A. BUCHHORN, Texas CSR 2788
CSR Expiration: 12/31/15
SYMPSON REPORTING
Firm Registration No. 696
7800 N. MoPac Expressway, Suite 120
Austin, Texas 78759
512-374-0596/512-697-8313 (fax)
office@sympsonreporting.com

Page 135

CHANGES AND CORRECTIONS

WITNESS NAME: DANA DEBEAUVOIR

DATE: MAY 11, 2015

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

PAGE/LINE    CHANGE                     REASON CODE

Page 136

SIGNATURE


I, DANA DEBEAUVOIR, have read the foregoing deposition and hereby affix my signature that the same is true and correct, except as noted on the previous page.


_____
DANA DEBEAUVOIR
THE STATE OF _____)
COUNTY OF _____)
Before me, _____, on this day personally appeared DANA DEBEAUVOIR, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.
Given under my hand and seal of office this _____ day of _____, 20____.


_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____
COMMISSION EXPIRES: _____

REPORTER'S RECORD
VOLUME 3 OF 4 VOLUMES
TRIAL COURT CAUSE NO. D-1-GN-15-000374
COURT OF APPEALS NO. 03-15-00368-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/8/2015 12:49:51 PM
JEFFREY D. KYLE
Clerk

LAURA PRESSLEY                    )        IN THE DISTRICT COURT
    Contestant               )
                             )
v.                               )        201ST JUDICIAL DISTRICT
                             )
GREGORIO "GREG" CASAR            )
    Contestee                )        TRAVIS COUNTY, TEXAS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

HEARING ON A MOTION FOR SUMMARY JUDGMENT, MOTION FOR
SANCTIONS, MOTION TO STRIKE PLEADINGS, MOTION TO ENFORCE
RULE 11 AGREEMENT, AND MOTION TO COMPEL DISCOVERY

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

BE IT REMEMBERED, on the 26th day of
May, 2015, the following proceedings came on to be heard
in the above-entitled and numbered cause before The
Honorable Dan Mills, Judge presiding, held in Austin,
Travis County, Texas:

Proceedings reported by machine
shorthand.

**APPEARANCES**

FOR THE CONTESTANT, LAURA PRESSLEY:

**MR. MARK COHEN**
SBOT NO. 04508395
805 West 10th Street, Suite 100
Austin, Texas 78701
512-474-4424
Mark@cohenlegalservices.com

**MR. DAVID ROGERS**
SBOT NO. 24014089
LAW OFFICE OF DAVID ROGERS
1201 Spyglass Drive
Suite 100
Austin, Texas 78746
512-923-1836/512-201-4082 (fax)
darogers@aol.com

FOR THE CONTESTEE, GREGORIO "GREG" CASAR:

**MR. CHARLES HERRING, JR.**
SBOT NO. 095334100
HERRING & IRWIN, L.L.P.
1411 West Avenue
Suite 100
Austin, Texas 78701
512-320-0665/512-519-7580 (fax)
cherring@herring-irwin.com

FOR TRAVIS COUNTY CLERK, MS. DANA DEBEAVOIR, AND TRAVIS COUNTY VOTER REGISTRAR, MR. BRUCE ELFANT:

**MS. SHERINE E. THOMAS**
SBOT NO. 0074734
ASSISTANT COUNTY ATTORNEY
314 West 11th Street
Granger Building, Suite 500
Austin, Texas 78701
512-854-9513/512-854-4808 (fax)

I N D E X

|                              | Page | Vol. |
|------------------------------|------|------|
| MOTION FOR ATTORNEYS FEES    | 4    | 3    |
| MOTION FOR SUMMARY JUDGMENT  | 12   | 3    |
| REPORTER'S CERTIFICATE       | 57   | 3    |

MAY 26, 2015

THE COURT: Cause Number D-1-GN-15-000374, Laura Pressley, Contestant, versus Gregorio Casar, Contestee. We are here with various motions. We have summary judgment motions. We have motions for sanctions. We have motions to strike pleadings. We have motions to, basically, enforce a Rule 11 agreement regrading discovery costs unless that was resolved by Travis County and Ms. Pressley's side of the lawsuit.

Anything that I missed? Mr. Herring is here on behalf of Mr. Casar and Mr. Cohen is here on behalf Dr. Pressley.

MR. HERRING: Thank you. You have everything we have.

MR. COHEN: There's a Motion to Compel Discovery.

THE COURT: Right. I have -- I have --

MR. COHEN: Okay. You didn't mention it. So I just want to make sure. They have a protective order with respect to their motion, the County does. So that's all joined on what you're going to do. Both parties have briefed it pretty well. You're just going to have to make a decision.

THE COURT: Are you ready to proceed on the County's motion?

MR. COHEN: Summary judgment?

THE COURT: For the payment of the money.

MS. THOMAS: Judge, counsel did forward a check on Friday. We just need them to make sure it's written to the right person. Also, we would like the Court to entertain the attorneys fees, because it did require filing of a motion before they were willing to pay.

THE COURT: You asked for, like, $250 attorneys fees, something like that?

MS. THOMAS: I believe that is correct, Your Honor.

MR. COHEN: Your Honor, we have a dispute about whether they were charging too much. Rather than bring that to you, we eventually decided, well, it's a $500 difference, but it was a legitimate dispute. They didn't give us any backup to the invoice. They just sent an invoice. The people that were there -- I can't speak to that. I wasn't at the actual production session, but I'm told they were making copies with their own people and their own copies and charging us; just rinky dink stuff as far as I'm concerned.

THE COURT: When I read the motion, counsel, as you -- you've probably practiced a long time, as I have and Mr. Herring has. You well know -- all of

you well know, judges don't like to get involved in those kind of things, especially when you start reading, Did they take a lunch break? And, you know, the Court tried to accommodate your client's side by reducing the costs, and the County did, too. And then to see a discovery dispute come up about payment of fees and copiers and, you know, pointing fingers --

MR. COHEN: It was a legitimate dispute. We decided -- I decided, frankly, that it was not worth -- we shouldn't waste the Court's time on that today; and that if there's a dispute, it's over $500. There's a lot more money being spent in this case than $500.

THE COURT: So you want $250 in attorneys fees?

MS. THOMAS: Yes, Your Honor.

MR. COHEN: I just don't think there's any reason to warrant attorneys fees. There's no attorneys fees -- there's no provision in the law for you to award attorneys fees and there's no -- you know, as you well know, in order to award attorneys fees, there has to be some sanctionable conduct, and disputing and debating the amount of the bill is not something that you would normally award attorneys fees for.

MS. THOMAS: Your Honor, there was a series of exchanges with counsel on whether or not it was

appropriate to pay that amount. As you know, we went above and beyond by not only even accommodating their request to bring in their own printer. So the fight -- it required us to file a motion. That's all that we're asking for is the time spent to require them to pay, which didn't have to happen. And it's the same type of discovery issues we're seeing over and over with Ms. Pressley. So we ask that to deter the behavior in the future.

THE COURT: Sherine Thomas. I'm sorry. I didn't call your name since you were a party. Ms. Thomas with the County Attorney representing the County Clerk.

My inclination is to award the attorneys fees because the motion got filed and it wasn't resolved. So I don't think $250 is an extremely large amount of money for the filing of that pleading, and I had to spend the time reading it, too.

MR. COHEN: I understand, Your Honor, and there was a dispute. There was a legitimate dispute. It wasn't some frivolous thing. There was a legitimate dispute about what we were paying for. They did not give us a detailed accounting for where they got to that number. And so we had a little discussion internally and decided that it wasn't worth fighting about, and so we paid it.

So what I'm saying is, there was -- they didn't provide us with a backup to show that their bill was legitimate and for us to say, Well, now, we saw it this way. How did you see it? And the response was to file a motion. So they elected to file a motion that they really didn't have to file until we worked it out, and I shouldn't -- my client shouldn't have to pay their attorneys fees for doing that.

THE COURT: What do you say?

MS. THOMAS: Your Honor, we did lay it out for them; and, in fact, they were present. The question of lunch hours and things -- they were present during, and they know that our clients were working throughout the day. So that doesn't seem like a fair thing.

THE COURT: You say they were present? You're talking about Ms. Pressley?

MS. THOMAS: And her counsel.

THE COURT: And the lawyer, Mr. Rogers, was there?

MS. THOMAS: Mr. Rogers was there. In addition, Your Honor, when the check was delivered, it had a cover letter saying that they're giving us the check in the amount under protest. And so that means that this is still live in their minds, because that's what they asserted to us. And we ask the Court to

resolve the issue today so we don't have to be back here.

THE COURT: Mr. Rogers just appeared.

Mr. Rogers, you heard Ms. Thomas say you were present during the discovery when this issue of who was out for lunch and who was eating sandwiches and who had slow copiers and all the other things that were an allegation. Do you read those pleadings to be accurate?

MR. ROGERS: No, Your Honor, I don't. And while I was there for the whole time, one of the things that I can tell the Court was that, for a great deal of the time, the employees of the County Clerk's office left the area where we had our copier set up and went and made copies for the County Clerk's records on their own time and left the copiers alone. We did get somebody in there when somebody was leaving for a whole hour for lunch.

The clerk's office was kind enough to bring a substitute in there, but I would say somewhere between a third and a half of the time that we were there, the County Clerk's employees were making copies for the County Clerk's records. Their copies -- they gave us originals. We made copies and then they made copies of our copies for their records. I don't think my client should be charged for their making copies for their records, and that was a considerable amount of the time that was involved, Your Honor.

THE COURT: Well, it doesn't sound -- a check has been tendered, Mr. Cohen said. Sounds like maybe we ought to have a hearing and decide what really went on if there's a really legitimate contest. And then if I find bad behavior, then I'll sanction somebody for it. So you-all can decide what we're going to do. I think the attorney's fees should be paid or else we're going to have a hearing to determine whether sanctions should be imposed, and I'll hold that in abeyance and you-all can talk about it.

MR. COHEN: Your Honor, we don't want to have a hearing. We don't want to fight about the minutia. The only reason this is relevant is to the issue of attorney's fees and whether our dispute was reasonable and legitimate so that we didn't do anything sanctionable by it with them before they filed a motion. They elected to file a motion while we were discussing these matters.

THE COURT: It doesn't look like -- they thought or felt compelled to file a motion because apparently they couldn't -- they didn't have any sense that they were going to be resolved. If what Mr. Rogers is telling the Court, he still has some argument about what actually occurred. So I'm willing to give you a hearing, and you can bring witnesses and we can spend two

or three hours of attorneys' times. And if I find bad behavior, somebody's going to get sanctioned.

MR. COHEN: The reason I got paid --

THE COURT: You want to pay the attorney's fees?

MR. COHEN: -- was so we didn't have to have a hearing. If you order it, I've got to comply with your order, Your Honor. I'm just objecting to it.

THE COURT: I'm affording you the opportunity to have the hearing. That's what I'm affording you to do. Do you want to have the hearing or pay the attorney's fees?

MR. COHEN: We're going to just pay the attorneys fees.

THE COURT: So the attorneys fees will get paid. It's resolved. That's what we'll do with that.

MS. THOMAS: Your Honor, I have a draft order.

THE COURT: Have you seen a copy? Show him a copy of it.

MS. THOMAS: It says that the payment has already been received for the $836; that it was appropriate and that there's $250 in attorney's fees.

THE COURT: This order acceptable to you, Mr. Cohen?

MR. COHEN: It's not acceptable to me as far as the substance, but the form seems to be okay.

THE COURT: All right. Based upon your agreement, then I'll enter that. I'll enter that order is what we'll do.

All right. Now, the -- we have -- we have a Motion to Strike Pleadings which relates -- that's the -- that's the motion to strike the sixth amended petition, Mr. --

MR. HERRING: Judge, the motion was actually filed when they had filed either the fourth or fifth --

THE COURT: The fifth maybe.

MR. HERRING: And we have filed, now, the amended motion, and we're not seeking to strike those pleadings. So that's off the table. Our amended motion takes that request off.

THE COURT: We don't have that motion?

MR. HERRING: No.

THE COURT: So then probably the next easiest thing to do is deal with the summary judgment motion. Would counsel agree?

MR. HERRING: I think --

MR. COHEN: That's fine, Your Honor.

THE COURT: Since it's your summary

judgment motion, did you -- did you read all the pleadings that were filed this morning, Mr. Herring? There were pleadings sent. When I turned my phone on this morning, I had two more things that popped up on my phone.

MR. HERRING: Right.

THE COURT: When I got here to the courthouse this morning, one of the clerks was kind enough to have printed them. And I read them. I don't know whether you've read them.

MR. HERRING: I have glanced at them, and someone here at the table with me has read them. So I think we're ready to go.

THE COURT: So you're ready to speak to that?

MR. HERRING: At least one of those didn't relate to us. It goes back to the County.

THE COURT: Right. It deals with compelling some production, basically.

MR. HERRING: One of them addressed our Motion to Strike, which we're not seeking to strike. All we have pending on that front is the request for attorney's fees which would come after the summary judgment motion depending on the Court's ruling.

THE COURT: I have read all of your

motions. And I'll show you I've tagged them, as you can see, with little points. I read, you know -- I read all the stuff again this morning. So let me just say this. This is my observation. I'm not as smart as you are about all these DREs and CVRs and mobile ballot boxes and all that type of thing. But it seems to the Court that Dr. Pressley's lawsuit rises and falls or falls on the issue of whether CVRs are ballot images; whether that term CVR can be equated to a ballot image.

I read your expert's report that CVRs are, you know, some kind of data; that the other things are bits. I've read all your little -- I'm not saying yours, but what you proposed to the Court about all these legal distinctions, computer terminology. But what I want to ask Mr. Cohen that I don't know -- Mr. Rogers is here. I don't know who is going to speak for Dr. Pressley.

MR. COHEN: I will.

THE COURT: Before we start, do you agree that that seems to be the crux of whether you win or lose this lawsuit, that particular issue?

MR. COHEN: No, Your Honor. That is one of the issues. There's a statute that says that -- there's two statutes involved. They have to be read to be consistent with each other. 221.012 says that if the tribunal cannot ascertain the outcome of the election,

it's supposed to void the election. And that two point -- the other one is two point -- 221.003(a), which says that a Court can void the election based on its findings of certain things. And one of them is mistakes.

So we are contending that there are a lot of mistakes, and we have fact allegations and fact evidence, summary-judgment evidence that these mistakes occurred and that those mistakes are sufficient to prevent the Court from being able to ascertain the true outcome of the election. One of those mistakes is the counting CVRs without maintaining images of ballots.

THE COURT: But that's the bigger issue in terms of, if the Court determines that a CVR is the equivalent of a ballot image, you -- your client has had access to those, counted those, and those documents show what the tally came out where your client was, like, 1291 votes behind. I think it's 1291.

MR. COHEN: That's correct. If you determine that a CVR is equal -- is a ballot image, then that takes that off the plate. If you determine that it isn't, then there's -- there's no way to count votes at all, okay, and you have to redo the election. That's clear. But assuming for a minute that you can look at this CVR --

THE COURT: And I've looked --

MR. COHEN:  That's a ballot.  Assuming you can do that.  I can't do that, but assuming you can for a minute --

THE COURT:  It's more assuming that I think the law allows that to be viewed that way not what I particularly believe.  Does the law allow, based upon what I've read and seen, looked at all your argument --

MR. COHEN:  We'll talk about that as we go through the hearing.  To answer your question, if you assume that the -- if you conclude that a CVR is the same as a ballot, either as a matter of law or as a matter of fact, then all that's left in our case is to point out all the mistakes that were made that bring into question whether the outcome is a true outcome or not.

THE COURT:  And those would be the nine errors with the mobile ballot boxes and the periods of time with the closing and opening of these so-called tally sheets.

MR. COHEN:  Yes.

THE COURT:  Is that a fair summation?

MR. COHEN:  There's a few others that I just can't remember off the top of my head.

THE COURT:  You didn't like the closing of certain polling places.

MR. COHEN:  Yeah, that -- I've kind of

given up on that one.

THE COURT:  I was going to ask you some more about that, too, in terms of the fact that your client had notice and didn't protest.  It seems -- you pointed out there's nothing that says it's a waiver, but when everybody gets notice that we're going to decide where to go hold this runoff election -- and you and I both know the runoffs all produce generally lower votes.  So there's reasons to reduce the number of polling places.  I'm not the one writing this, because somebody else can grade my paper, too, that goes up the road.

MR. COHEN:  I am assuming that we cannot establish that votes were lost because of that.  Okay.  So the question -- what I'm getting at is, there's -- I have a list here right now, but not right in front of me.

THE COURT:  But it seems like there's three:  ballot images, CVR, mobile ballot boxes, and whatever errors that produced or didn't produce and those tally sheets being remaining open for periods of time -- you know, for a couple of hours without activity, several days without activity.  Those seem to be the more problematic things with -- that's my reading of what you offered.

MR. COHEN:  Those are the most ones.  You're right.  You pinpointed the ones that, in my view,

show that the computer was subject to manipulation for days at a time; that the clerk doesn't even -- has never seen that many invalid MMBs (sic) and doesn't think that the reader was working properly.  And so there are some serious mistakes that were made during the course of tallying the votes that bring into question whether or not the computer actually properly tallied the voter's selection on these ballots.

THE COURT:  No.  I understand.  That calls into question the legitimacy of the outcome.

MR. COHEN:  Yes.

THE COURT:  The tallies and mobile ballot box errors -- I'm not saying the other does.  We got -- we have a CVR that no one -- I mean, all I read from your expert -- he doesn't say that ballot image that -- where they finally go vote is not accurately transcribed into a different electronic format when it goes to a Cast Vote Record.  He just doesn't like the format.  He wants the format to be more expansive, have more bits of information.  And I understand the legal distinction that you're making.

MR. COHEN:  Yes.  There's other policy discussions.  We're getting out of step here.  Yeah.

THE COURT:  And I just wanted Mr. Herring to know that before he started with his -- since he's

going to go forward, and you get to respond.

MR. COHEN: He's jumping up because he wants to do his motion for summary judgment.

MR. HERRING: I'm actually enjoying it.

MR. COHEN: So I will have a more detailed response.

THE COURT: No. That's fine. We're close.

MR. COHEN: Two things: One is, there's no ballots without an image of the ballot. That's the law. Now, the question is whether a CVR satisfies that or not is a different issue. But without a ballot -- image of a ballot, there's no votes to count.

THE COURT: Correct. Only the absentee --

MR. COHEN: Yes.

THE COURT: There was a tie in the absentee ballots.

MR. COHEN: Or the mail-in.

THE COURT: Whatever it was.

MR. COHEN: And the other issue is, there was enough mistakes to bring into question the validity of the tallied counts. That's it.

THE COURT: Mr. Cohen, thank you.

Go ahead, Mr. Herring.

MR. HERRING: May it please the Court. Judge, I think you did a good job in helping save me time

in terms of what I need to present by honing in on the issues. You've heard most of this before. Let me mention -- with the Court's indulgence, I'll have Ms. Palvino speak after I do on the objection that we filed to the summary-judgment evidence that they presented. Essentially, it focuses on the purported expert who has zero expertise in election law, but I'll save that. She, also, is going to talk about these supposed errors in the other system. But I want to focus on the big issues.

Certainly, I want to start with the issue of CVR ballot image, because I think, as Mr. Rogers said during our first hearing -- he said, quote, the big central issue in this lawsuit is whether a CVR is a ballot image. And he said in that first hearing, quote, if you rule that way, that would obviously put a big hole in our case.

And we think they have a massive hole in their case, Judge, as a result of that. And let me -- I have a brief packet here from the summary-judgment evidence, if I may approach?

THE COURT: Yes, sir. I didn't -- I didn't print all your summary-judgment evidence. It was just -- there were too many pages. I figured you would -- I'd read your footnotes and see whether it referenced a

deposition or a document, but I did not go read all those pieces of paper.

MR. HERRING: You need to, Judge.

MR. COHEN: It's my policy, Your Honor --

MR. HERRING: It's right here.

MR. COHEN: It's my policy that I just don't go through all those things with the hearing on the Motion for Summary Judgment. I'm assuming that the Court is very smart enough to read it all and understand it without me regurgitating it. So it's going to be a short overview of what it says.

THE COURT: What I was looking for was a basis of the allegation or representations that were made. In other words, if you say there's some material fact that you want me to consider, then you reference that it's in a deposition or an exhibit list. And if one side represents it wrong, I assume the other side is going to tell me, Well, Judge, they're not telling you the truth. So I'm relying on the lawyers to do that rather than me reading it. Like Mr. Herring has a stack of pages here about three feet high.

MR. COHEN: We've got several boxes, also, Your Honor.

MR. HERRING: Three and a half feet, but I left -- I left the Motion for Summary Judgment response

in the boxes because, otherwise, it would fall over. I think what their defense is, is obfuscation through deforestation.

I think if you look at the real issues, the overwhelming majority of those documents are completely irrelevant and immaterial. So let me get back to the ballot image. The evidence in the record, Judge, is absolutely clear that every level of government says uniformly, ballot image equals CVR for electronic voting.

The first page in the packet I handed you is from the United States Election Assistance Commission. As you recall, Judge, we've talked about this before. That commission is a bipartisan commission established after the 2002 Help America Vote Act. It's bipartisan appointed by both parties in Congress through the president.

They have, then -- that commission has 37 advisors and it has 110 standards advisors, people throughout the country. So you have 37 of the foremost experts in election law and procedure and election computerization. And then you've got 110, the very, very best advisors, two from each state and then others.

For Texas, importantly, the two advisors are Dana DeBeauvoir, the County Clerk who ran this election, who they're attacking, and Keith Ingram, the

qualified in this field would not be making. That's probably the best example is his reliance on Ballot Now. There are some other examples that I'm happy to get into; but I think, overall, he's just -- he's not qualified.

THE COURT: You're lodging a challenge to his qualifications to render opinions, basically.

MS. PALVINO: Yes, Judge.

THE COURT: Okay. All right. I'll let Mr. Cohen speak to that and then make some decision on it after I hear him speak. Anything else --

MS. PALVINO: That's all I have.

THE COURT: -- Mr. Herring?

MR. HERRING: Pass for now, and we may have a comment.

THE COURT: We'll take a break and we're going to let the court reporter's change.

(Mary Lou Taylor, CSR, made a record of the remainder of the hearing).

**57**

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )

COUNTY OF TRAVIS )

       I, Laura H. Taylor, Official Court Reporter for the Family District Court of Travis County, Texas, do hereby certify the foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

       I further certify that the Reporter's Record truly and correctly reflects the exhibits, if any, admitted by the respective parties.

       I further certify that the total cost for the preparation of this Reporter's Record is $265.00 and was paid/will be paid by Mark Cohen.

       WITNESS MY OFFICIAL HAND this the 7th day of July, 2015.

/S/ Laura H. Taylor
Laura H. Taylor, CSR
Official Court Reporter
Family Court
P.O. Box 1748, Austin, Texas 78767
(512) 854-9054
Certification No. 1968
Date of Expiration of Current
Certification: 12/31/16

NO. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | 201ST JUDICIAL DISTRICT |

## CONTESTEE'S THIRD AMENDED MOTION FOR SANCTIONS

1.      Contestee Casar seeks recovery of reasonable attorney's fees and expenses, and other remedies authorized by Chapter 10 of the Texas Civil Practice and Remedies Code ("CPRC"). On May 19, 2015, Contestant Laura Pressley filed her Sixth Amended Original Contest ("Sixth Contest"). As with her previous Contest pleadings, the Sixth Contest contains claims, allegations, and contentions that violate CPRC § 10.001(2)-(3). On May 26, 2015, this Court granted Casar's no-evidence summary judgment motion, which establishes that Pressley failed to raise any genuine issue of material fact in response to Casar's motion. Additionally, during the May 26th hearings, counsel for Travis County and for County Clerk DeBeauvoir informed the Court that this case has cost Travis County (and therefore the taxpayers of Travis County) well in excess of $40,000. Accordingly, Casar requests that this Court award against Pressley and her counsel who has signed the Contests the recovery of fees, expenses, and other appropriate remedies provided by §§ 10.002 and 10.004.

### Allegations Concerning Ballot Images and Cast Vote Records

2.      As first asserted in her Original Contest pleading[1] and repeated through all six amended Contests,[2] Pressley alleges that Cast Vote Records (CVRs) are not "images of ballot

---

[1] See Original Contest of Election, ¶¶ 32-38.
[2] See Second Amended Contest, ¶¶ 31-37; Third Amended Contest, ¶¶ 43-53; Fourth Amended Contest, ¶¶ 43-53; Fifth Amended Contest, ¶¶ 49-59, 65; and   Amended Contest, ¶¶ 3, 13, 82, 84, 97-138.

cast" under the Texas Election Code. But Pressley has asserted no legal basis for those allegations. Instead, she has testified that it "makes sense to [her] as a layperson, kind of common knowledge, that an image is a picture of a ballot."[3] Her contention that a Cast Vote Record is not a Ballot Image is flatly inconsistent with the definition of that term as adopted and applied by the U.S. Election Assistance Commission, the Texas Secretary of State, Travis County, and the City of Austin. All of those governmental entities uniformly define a Cast Vote Record as being synonymous with a Ballot Image. Pressley's factual allegations and legal contentions to the contrary violate CPRC §§ 10.001(2) and (3).

### Allegations Concerning Zero Tapes

3.     In ¶ 42 of her Sixth Contest, Pressley alleges that "[re]view of Discovery documents provided by Travis County [show that] no Zero Tapes (showing the number of votes present on the Hart Voting equipment for each candidate when the polls open) were printed during Early Voting and no Zero Tapes were printed on Election Day of the Runoff." Pressley has similar allegations regarding the lack of Zero Tapes in ¶¶ 3, 8, 43, and 64 of the Sixth Contest and throughout her previous Contests.[4] At her deposition, however, Pressley testified that she didn't know if Zero Tapes were printed, where they were printed, or when.[5] In fact, Zero Tapes were printed.

4.     Moreover, Pressley attached the Zero Tapes of one District 4 precinct to her Sixth Contest. *See* Exhibit C to Pressley's Sixth Contest. Travis County also produced the remaining Zero Tapes for all other District 4 precincts to Pressley and her counsel at the document

---

[3] See Pressley Deposition, p. 58.
[4] See Original Contest, ¶ 14; Second Amended Contest, ¶¶ 11, 14; Third Amended Contest, ¶ 35; Fourth Amended Contest, ¶ 35; and Fifth Amended Contest, ¶ 41.
[5] See Pressley Deposition, p. 134.

production. Pressley's statements to the contrary are without evidentiary support and therefore violate CPRC §§ 10.001(3).

### Allegations Concerning Changes in Voting Locations

5. In her first five versions of her Contest, Pressley alleged that Travis County "illegally" disenfranchised several thousand District 4 voters simply because certain voting locations were changed or consolidated for the December 16, 2014 runoff election.[6] Pressley claims these voters were "disenfranchised" because these voting location changes may have "inconvenienced" some voters. Pressley testified that if a voter had to drive only 20 seconds to a new voting location, that 20-second drive would constitute voter disenfranchisement.[7] That factual allegation is specious, and Pressley has no legal support for her extreme and frivolous legal contention. Further, Pressley admitted in her deposition that she failed to attend the Austin City Council meeting at which the Council approved the voting locations for the runoff, and failed to have any of her ten campaign staffers attend, to object to the locations or request alternative locations.

6. Apparently recognizing the baseless nature of these allegations, Pressley has omitted those allegations from her Sixth Contest. Including those contentions in the previous five Contest pleadings violated CPRC §§ 10.001(2) and (3).

### Allegations Concerning Recount Irregularities

7. In versions one through five of her Contest, Pressley alleged that numerous procedural irregularities and Election Code violations occurred during the January 6, 2015

---

[6] See Original Contest, ¶ 13; Second Amended Contest, ¶ 13; Third Amended Contest, ¶¶ 12-23; Fourth Amended Contest, ¶¶ 12-23; and Fifth Amended Contest, ¶¶ 12-29.
[7] See Pressley Deposition, p. 100-101.

recount.[8] Specifically, Pressley claimed that Travis County improperly started the recount before the scheduled start time, that the number of voters on voters lists were not publicly reconciled with the recounted ballots, that CVRs were improperly used in the recount, and that the "sum total of those voting irregularities exceeds the number of votes by which the election was decided."

8. In her Sixth Contest, Pressley and her counsel chose again to include allegations regarding alleged recount irregularities.[9] These allegations included, among others, that CVRs were improperly used in the recount, and that Travis County Director of Elections Michael Winn committed a criminal violation by not allowing Pressley and her poll watchers to view the source, properties, and copying of the CVR files.[10]

9. As this Court recognized, allegations relating to the recount are legally irrelevant because this case is an election contest, not a recount contest.[11] Under § 221.003(a) of the Election Code, Pressley was required to show that the runoff election was not the "true outcome." Any claim or allegation that some alleged error during the recount could affect the "true outcome" of the election is legally frivolous. By incorporating those claims and legal contentions into her Contests, Pressley and her counsel violated CPRC § 10.001(2).

**Argument and Authorities**

10. Section 10.001 of the CPRC provides that the signer of a pleading is certifying that each claim, each allegation, and each denial is based on the signatory's best knowledge, information, and belief, formed after reasonable inquiry. Sections 10.002 and 10.004 authorize,

---

[8] See Original Contest, ¶ 26-44; Second Amended Contest, ¶ 26-44; Third Amended Contest, ¶¶ 41-66; Fourth Amended Contest, ¶¶ 41-66; and Fifth Amended Contest, ¶¶ 47-74.
[9] Sixth Amended Contest, ¶¶ 82-101.
[10] Sixth Amended Contest, ¶¶ 93-95.
[11] Order Sustaining Contestee's Special Exceptions to Contestant's Fourth Amended Contest, ¶ 7, April 13, 2015.

among other remedies, an award of reasonable attorney's fees and expenses against the person who signs the pleading or the represented party or both. Additionally, § 10.004(c)(2) authorizes the Court to order that those persons pay a penalty into court.

11.     As described above, Pressley's numerous Contests include many frivolous legal contentions and factual allegations that are wholly unsupported by evidence. Incredibly, Pressley and her counsel have continued to make some of these unfounded allegations in no less than *six* amendments to her Original Contest of Election. Those allegations have required Casar to incur substantial attorney's fees and expenses, and have required Travis County and the taxpayers to expend many of tens of thousands of dollars to address Pressley's unsupported allegations and demands.

12.     Casar requests that the Court award against Pressley and her counsel who signed the pleadings (i) the reasonable attorney's fees and expenses Casar has incurred in presenting this motion and in defending against the claims, allegations, and contentions identified above; (ii) a penalty into court; and (iii) that the Court issue an Order granting such other relief as the Court deems appropriate under Chapter 10 of the Texas Civil Practice and Remedies Code.

Respectfully submitted,

HERRING & IRWIN, L.L.P.
1411 West Avenue, Suite 100
Austin, Texas   78701
(512) 320-0665
(512) 519-7580 – Facsimile


By: /s/ Charles Herring, Jr.
    Charles Herring, Jr. – 09534100
    cherring@herring-irwin.com
    Lauren Ross – 24092001
    laurenbross@gmail.com

Kurt Kuhn – 24002433
Kurt@KuhnHobbs.com
KUHN HOBBS PLLC
3307 Northland Drive, # 310
Austin, Texas   78731
(512) 476-6000
(512) 476-6002 – Facsimile


Jessica Palvino – 24048780
jpalvino@mcginnislaw.com
McGINNIS LOCHRIDGE & KILGORE
600 Congress Ave., Ste. 2100
Austin, Texas   78701
(512) 495-6079
(512) 505-6379 – Facsimile

ATTORNEYS FOR CONTESTEE,
GREGORIO "GREG" CASAR


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing Contestee's Third Amended Motion for Sanctions has been delivered to counsel for Contestant by electronic service through the electronic filing manager, or if counsel is not registered with the electronic filing manager, by email, to Mr. Mark Cohen, 805 W. 10th, #100, Austin, Texas 78701 and Mr. David A. Rogers, Law Office of David Rogers, 1201 Spyglass Drive, Suite #100, Austin, Texas 78746, on this 12th day of June, 2015.


　　　/s/ Charles Herring, Jr.
　　　　Charles Herring, Jr.

Filed in The District Court
of Travis County, Texas

JUL - 2 2015

At ____9:00____ A.M.
Velva L. Price, District Clerk

NO. D-1-GN-15-000374

| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | 201ST JUDICIAL DISTRICT |

## Amended Summary Judgment Order

The Court has considered Contestee Casar's Amended Motion for Summary Judgment, Contestee's Supplement to his Amended Motion for Summary Judgment, Contestee's No-Evidence Motion for Summary Judgment, Contestant's Response to Contestee's Amended and Supplemental Motion for Summary Judgment, the exhibits cited in those documents, and the parties' arguments, and the Court FINDS and ORDERS as follows:

1. Casar's No-Evidence Motion for Summary Judgment is GRANTED.

2. Under Texas Election Code § 221.012(a), the Court DECLARES that the true outcome of the December 16, 2014 runoff election is that Contestee Gregorio "Greg" Casar was elected to the Austin City Council District.

3. Contestee Casar's motion for sanctions against Contestant Laura Pressley and her Counsel remains pending before the Court and will be considered and decided by the Court in a separate order.

4. This Order amends and replaces the Court's prior May 26, 2015 Order.

IT SO ORDERED.

SIGNED this the 24 day of ___June___, 2015.



JUDGE DAN MILLS



004101283

16

NO. D-1-GN-15-000374

| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | 201ST JUDICIAL DISTRICT |

## CONTESTEE GREGORIO "GREG" CASAR'S REQUEST FOR SUPPLEMENTAL CLERK'S RECORD

TO THE HONORABLE CLERK OF TRAVIS COUNTY:

Pursuant to Texas Rule of Appellate Procedure 34.5(c), Gregorio "Greg" Casar requests the clerk of this Court prepare a supplemental record containing a true copy of the proceedings in the trial court for transmission to the Third Court of Appeals in Austin, Texas. Casar requests the papers listed below, ***including exhibits,*** be included in the record:

| | DESCRIPTION | DATE FILED |
| --- | --- | --- |
| 1. | Contestee's Amended Motion for Sanctions | 05/22/15 |
| 2. | Contestee's Second Amended Motion for Sanctions | 06/04/15 |
| 3. | Notice of Withdrawal as Co-Counsel | 06/05/15 |
| 4. | Amended Summary Judgment Order | 06/24/15 |
| 5. | Sanctions Order | __/__/15 |
| 6. | Final Judgment | __/__/15 |
| 7. | Contestee's Request for Supplemental Clerk's Record | __/__/15 |

Please advise us when the supplemental record is complete. We would like a copy of the supplemental record and are prepared to pay the costs associated with preparing it.

Please also call if you have any questions or concerns.

1

Dated: July 15, 2015      Respectfully submitted,

<div></div>

| | |
|---|---|
| Jessica Palvino | By:_____/s/ Kurt Kuhn_____ |
|  State Bar No. 24048780 |  Kurt Kuhn |
|  jpalvino@mcginnislaw.com |   State Bar No. 24002433 |
| MᴄGɪɴɴɪs, Lᴏᴄʜʀɪᴅɢᴇ & Kɪʟɢᴏʀᴇ LLP |   Kurt@KuhnHobbs.com |
| 600 Congress Avenue, Suite 2100 |  Lisa Bowlin Hobbs |
| Austin, Texas 78701 |   State Bar No. 24026905 |
| (512) 495-6079 |   Lisa@KuhnHobbs.com |
| (512) 505-6379 (fax) | Kᴜʜɴ Hᴏʙʙs PLLC |
| | 3307 Northland Drive, Suite 310 |
| | Austin, Texas 78731 |
| | (512) 476-6005 |
| | (512) 476-6002 (fax) |

Charles Herring, Jr.
 State Bar No. 09534100
 cherring@herring-irwin.com
Lauren Ross
 State Bar No. 24092001
 laurenbross@gmail.com
Hᴇʀʀɪɴɢ & Iʀᴡɪɴ, L.L.P.
1411 West Avenue, Suite 100
Austin, Texas 78701
(512) 320-0665
(512) 519-7580 (fax)

*Counsel for Contestee, Gregorio "Greg" Casar*

**Certificate of Service**

   I hereby certify that, on July 15, 2015, and in compliance with the Texas Rules of Civil Procedure, a true and correct copy of this request has been served as follows:

Mark Cohen                   *via e-Service*
Tʜᴇ Lᴀᴡ Oꜰꜰɪᴄᴇ ᴏꜰ Mᴀʀᴋ Cᴏʜᴇɴ
805 West 10thStreet, Suite 100
Austin, Texas 78701

David A. Rogers                 *via e-Service*
Lᴀᴡ Oꜰꜰɪᴄᴇ ᴏꜰ Dᴀᴠɪᴅ Rᴏɢᴇʀs
1201 Spyglass Drive, Suite 100
Austin, Texas 78746

*Counsel for Contestant, Laura Pressley*

              /s/ Kurt Kuhn_____
              Kurt Kuhn

2

Filed in The District Court
of Travis County, Texas

JUL 2 3 2015

At _____ 10:53 ___ A.M.

Velva L. Price, District Clerk

NO. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY<br>Contestant | § § § | IN THE DISTRICT COURT |
| v. | § § | TRAVIS COUNTY, TEXAS |
| GREGORIO "GREG" CASAR<br>Contestee | § § § | 201ST JUDICIAL DISTRICT |

## Order

The Court has considered Contestee Casar's Third Amended Motion for Sanctions, Contestant Laura Pressley's ("Pressley") Response to Contestee's Third Amended Motion for Sanctions, Attorney David Rogers' ("Rogers") Response to Contestee's Motion for Sanctions, Contestee's Reply to Rogers' Response, Rogers' Sur-Reply to Rogers Response to Contestee's Third Amended Motion for Sanctions, the pleadings and evidence in the record, and all of the evidence and argument offered at the evidentiary hearings on June 18, 2015 and June 24, 2015. The Court FINDS and ORDERS as follows:

1. Contestee Casar's Motion for Sanctions is GRANTED.

2. The Court finds that sanctions against David Rogers are justified and proper under Chapter 10 of the Civil Practices and Remedies Code.

3. The Court finds that sanctions against Laura Pressley are justified and proper due to her participatory role in this litigation under Chapter 10 of the Civil Practices and Remedies Code.

4. Pursuant to Texas Civil Practice and Remedies Code § 10.004(c)(3), Contestee Casar shall recover from Contestant Laura Pressley individually monetary sanctions in the amount of $ 40,000.00.



004133693



19

5.     Pursuant to Texas Civil Practice and Remedies Code § 10.004(c)(3), Contestee Casar shall recover from Contestant's counsel David Rogers individually monetary sanctions in the amount of $ 50,000.00.

6.     If either Contestant Laura Pressley or Contestant's counsel David Rogers unsuccessfully appeal this Order, pursuant to Texas Civil Practice and Remedies Code § 10.004(c)(3), Contestee Casar shall also recover from Contestant Laura Pressley, if unsuccessful on appeal, and Contestant's counsel David Rogers, if unsuccessful on appeal, additional monetary sanctions in the amount of $ 25,000.00, if appealed to the Court of Appeals; $10,000.00; if a petition for review is filed in the Supreme Court of Texas; $15,000.00 if full briefing is requested by the Supreme Court of Texas; and $15,000.00 if oral argument is granted at the Supreme Court of Texas.  Contestant Laura Pressley shall pay these additional monetary sanctions only if she is unsuccessful on appeal, and David Rogers shall pay these additional monetary sanctions only if he is unsuccessful on appeal. These costs were derived from reviewing similar awards for cost of appeals in the following cases.  *Marsalise v. Wallace*, 2005 WL 1116010 (Tex. App.—Austin, May 12, 2005, no pet.); *R&R Resources Corp. v Echelon Oil & Gas, LLC.*, 2010 W L 5575919 (Tex. App.—Austin, Jan 14, 2011, pet denied) ; *John Kleas Co., Inc, v Prokop*, 2015 WL 1544797 (Tex. App.—Corpus, April 2, 2015, no pet.)

7.     Pursuant to Texas Civil Practice and Remedies Code §§ 10.002 and 10.004, Contestee shall recover from Contestant Laura Pressley and Contestant's counsel David Rogers his reasonable expenses of $ 7,794.44.  Contestant Laura Pressley and Contestant's counsel David Rogers shall be jointly and severally liable for these expenses.

8.    In compliance with Section 10.005 of the Civil Practice and Remedies Code, the Court makes the following Findings of Fact and Conclusion of Law supporting this Order of sanctions:

## FINDINGS OF FACT

9.    In November 2002, Travis County began using the Hart Intercivic eSlate system (the "Hart eSlate System") as an electronic voting system.

10.    Since November 2011, Travis County has used a countywide voting system that employs central voting centers. Instead of requiring voters to vote at their home precinct polling locations, vote centers allow all registered voters in Travis County the option of voting at any of the county's polling locations on Election Day.

11.    Pressley and Casar were among eight candidates for the District 4 seat of the Austin City Council at the November 4, 2014 general election. In the general election, Casar received the highest number of votes (3,272 or 38.63%), Pressley received the second-highest (1,826 or 21.56%), and the remaining votes were distributed among the other six candidates.

12.    Some voting locations in the City of Austin were changed between the general and the runoff elections as is normal practice for a runoff election. For the December 16, 2014 runoff, there were 136 citywide voting locations available to all City of Austin voters. The City of Austin gave the public notice of the voting locations for the runoff election and an opportunity to comment on the proposed locations. On November 13, 2014, the Austin City Council posted the agenda of the November 18, 2014 Special Called Meeting of the Austin City Council. The agenda included setting the run-off election and making provisions for the runoff election. On Tuesday, November 18, 2014,

the Austin City Council held the special called meeting and approved an ordinance ordering the runoff election. A list of all polling locations for the runoff was attached to the City Council's approved ordinance. The locations were also posted at City Hall and in the office of the City Clerk, as well as published in the newspaper. Additionally, the City of Austin and the Travis County Clerk websites both posted information about the runoff election and a list of polling locations.

13. At the November 18, 2014 Austin City Council meeting, neither Pressley nor any of her ten campaign workers attended the meeting to lodge any complaint or objections about the changes in voting locations. Pressley could have attended the meeting but did not. Over the years, she has attended and commented at 30 or more Austin City Council Meetings. She knows where the agendas are posted, knows how to read them in advance, and is familiar with the process for commenting at a Council meeting.

14. Casar won the December 16, 2014 runoff election by a margin of almost 65% to 35%; the difference in their vote totals was 1,291 votes. 4,417 votes were cast in the District 4 runoff election. Of those votes, 480 were mail-in ballots. The remaining 3,937 ballots were cast using Travis County's chosen electronic voting system, the Hart eSlate System.

15. As required by Chapter 122 of the Election Code, and after an analysis of the Hart eSlate System by a team of computer and election law experts, the Secretary of State reviewed, approved, and certified the Hart eSlate System. The Secretary of State found that the Hart eSlate System fully complied with Election Code requirements and, of particular relevance in this case, was "capable of providing records from which the operation of the system may be audited[.]"

16. On January 5, 2015, the day before Casar was to be sworn-in, Pressley filed a recount petition with the Secretary of State. Before the recount took place, County Clerk Dana DeBeauvoir offered to run an audit of the election results for Pressley. An audit would have provided much more detailed information about the electronic votes than a recount, including many of the questions Pressley has presented in this lawsuit. Pressley refused DeBeauvoir's offer and demanded a recount. An audit would have provided a reasonable opportunity to view issues raised in the lawsuit and would have allowed for a reasonable inquiry into many of the allegations alleged by the Contestant in this lawsuit to determine if there was merit to any of such claims.

17. On January 6, 2015, Travis County conducted a manual recount of all early, election day, mail-in, and provisional ballots. The recount confirmed the election result. Jay Brim, the Chair of the Recount Committee, and Dana DeBeauvoir, the Travis County Clerk, supervised the recount. For votes cast electronically, the recount team printed off the Cast Vote Records (CVRs), also called Ballot Images. Pressley witnessed the printing of the Cast Vote Records. All votes were then manually recounted. Mr. Brim found that the totals in all precincts matched those in the original canvas, and that the number of voters matched the number of ballots cast. He declared that Casar remained the victor of the election.

18. The Secretary of State had a representative present at the recount—Christina Adkins. During the recount, Pressley complained to Ms. Adkins that the Cast Vote Records were not "images of ballots cast," and pointed to the specific provisions of the Election Code that she believed were germane. Ms. Adkins witnessed the County's use of

23

the Cast Vote Records for the recount, disagreed with Pressley's interpretation of the Election Code, and refused to challenge the use of the Cast Vote Records in the recount.

19.     After the recount, Pressley lodged several complaints regarding the recount with the Secretary of State. One of Pressley's complaints was that she and her poll watchers were not allowed to be present at the printing of the ballots as Pressley believed she was entitled to view the source, properties, retrieval and counting of the ballots.  In its January 20, 2015 response letter to Pressley, the Secretary of State dismissed this complaint and confirmed that Pressley had been present when the "ballot images (also known as 'cast vote records')" were printed:

> You state that Travis County conducted activities such as extracting data from the Hart electronic voting system, compiling ballot images onto a centralized system, printing ballot images (also known as "cast vote records"), and sorting by mail ballots before the recount was scheduled to begin . . . .  [W]e agree with you that you and your representatives under Section 213.013(b) were entitled to be present at the printing of the ballot images, and when you raised this issue with the Travis County Elections Division, Travis County agreed to re-print the ballot images in the presence of you and your watchers.

20.     Responding to a subsequent complaint from Pressley, the Secretary of State again made the same point in another letter, dated January 27, 2015. That letter also noted that an inspector from the Secretary of State's office had confirmed the printing of the ballot images:

> You have stated that upon your arrival, you discovered that ballot images had already been printed. You alerted Travis County to the issue and reminded them that you and your watchers were entitled to be present at the printing. In response, Travis County began anew with the printing of the ballot images in the presence of you and your watchers, and only the ballot images printed in your presence were used in the recount. This information is confirmed by the

> inspector sent by our office to attend the recount. Therefore, our office believes you and your watchers were able to witness the printing of all ballot images used in verifying the vote count in your race.

21.     With the Hart eSlate System, the permanent record of the vote cast is known as a Cast Vote Record or CVR. A CVR is a data field representation depicting which votes were cast on each voting device. The Cast Vote Records are used for counting votes and a visual representation of the CVR can be printed in the event of a recount.

22.     The U.S. Election Assistance Commission is an independent, bipartisan commission charged with developing guidance to meet the requirements of the Help America Vote Act of 2002. It is charged by statute with adopting voluntary voting system guidelines and to serve as a national clearinghouse of information on election administration. In its Glossary of Key Election Terminology, the U.S. Election Assistance Commission defines "Cast Vote Record" as "a ballot image when used to refer to electronic ballots."

23.     The Texas Secretary of State defines "Cast Vote Record" as a Ballot Image. Ten days before Pressley filed this lawsuit, the Secretary of State expressly stated in its January 20, 2015 letter to Pressley that "ballot images" are also known as "cast vote records."

24.     As required by the Election Code, Travis County and the City of Austin used the Secretary of State's definitions when interpreting the Election Code in this case.

25.     On January 31, 2015, Pressley filed her Original Contest of Election against Casar, seeking to overturn the results of the runoff election for the Austin City Council District 4 seat. Pressley's Original Contest was signed by her counsel David Rogers.

26.     In paragraphs 32 through 38, the Original Contest alleged that the Hart eSlate

25

System did not comply with the Texas Election Code because it could print only Cast Vote Records, which Pressley claimed were not "images of ballots cast" under the Texas Election Code. In paragraph 13, the Original Contest alleged that Travis County disenfranchised District 4 voters because certain voting locations were changed between the general election and the runoff election. In paragraphs 14 and 15, the Original Contest alleged that Travis County did not print zero tapes and results tapes on Election Day as required by the Texas Secretary of State. In paragraphs 26 through 44, the Original Contest alleged that procedural irregularities occurred during the recount.

27. On February 18, 2015, Pressley filed her Second Amended Contest. In paragraphs 31 through 37, the Second Amended Contest alleged that the Hart eSlate System did not comply with the Texas Election Code because it could print only Cast Vote Records, which Pressley claimed were not "images of ballots cast" under the Texas Election Code. In paragraph 13, the Second Amended Contest alleged that Travis County disenfranchised District 4 voters because certain voting locations were changed between the general election and the runoff election. In paragraphs 11 and 14, the Second Amended Contest alleged that Travis County did not print zero tapes and results tapes on Election Day as required by the Texas Secretary of State. In paragraphs 26 through 44, the Second Amended Contest alleged that procedural irregularities occurred during the recount.

28. On February 27, 2015, Pressley filed her Third Amended Contest. In paragraphs 43 through 53, the Third Amended Contest alleged that the Hart eSlate System did not comply with the Texas Election Code because it could print only Cast Vote Records, which Pressley claimed were not "images of ballots cast" under the Texas Election Code.

In paragraphs 12 through 23, the Third Amended Contest alleged that Travis County disenfranchised District 4 voters because certain voting locations were changed between the general election and the runoff election. In paragraphs 35 and 37, the Third Amended Contest alleged that Travis County did not print zero tapes and results tapes on Election Day as required by the Texas Secretary of State. In paragraphs 41 through 66, the Third Amended Contest alleged that procedural irregularities occurred during the recount that materially affected the election results.

29.     On March 12, 2015, Pressley filed her Fourth Amended Contest. In paragraphs 43 through 53, the Fourth Amended Contest alleged that the Hart eSlate System did not comply with the Texas Election Code because it could print only Cast Vote Records, which Pressley claimed were not "images of ballots cast" under the Texas Election Code. In paragraphs 12 through 23, the Fourth Amended Contest alleged that Travis County disenfranchised thousands of District 4 voters because certain voting locations were changed between the general election and the runoff election. In paragraphs 35 and 37, the Fourth Amended Contest alleged that Travis County did not print zero tapes and results tapes on Election Day as required by the Texas Secretary of State. In paragraphs 41 through 66, the Fourth Amended Contest alleged that procedural irregularities occurred during the recount that materially affected the election results.

30.     On April 16, 2015, the deposition of Pressley took place. At her deposition, Pressley admitted that she could not identify a single voter who was disenfranchised by the change in voting locations for the runoff election. Pressley did testify she had spoken with people who claimed they had difficulty in voting, but she was not able to obtain even one affidavit from one voter who claimed to have been disenfranchised. Pressley

also admitted that she did not know what a Cast Vote Record was and that the U.S. Election Assistance Commission, the Texas Secretary of State, Travis County, and the City of Austin all reject her definition of "ballot image." Pressley also testified that she did not know if zero tapes had been printed, where they may have been printed, or when.

31.     On April 20, 2015, Pressley filed her Fifth Amended Contest. In paragraphs 49 through 59, the Fifth Amended Contest alleged that the Hart eSlate System did not comply with the Texas Election Code because it could print only Cast Vote Records, which Pressley claimed were not "images of ballots cast" under the Texas Election Code. In paragraphs 12 through 29, the Fifth Amended Contest alleged that Travis County disenfranchised thousands of District 4 voters because certain voting locations were changed between the general election and the runoff election. In paragraphs 41 and 43, the Fifth Amended Contest alleged that Travis County did not print zero tapes and results tapes on Election Day as required by the Texas Secretary of State. In paragraphs 47 through 74, the Fifth Amended Contest alleged that procedural irregularities occurred during the recount that materially affected the election results.

32.     Pressley filed her final and Sixth Amended Contest on May 19, 2015. In paragraphs 3, 13, 82, 84, and 97 through 138, the Sixth Amended Contest alleged that the Hart eSlate System did not comply with the Texas Election Code because it could print only Cast Vote Records, which Pressley claimed were not "images of ballots cast" under the Texas Election Code. In paragraphs 3, 4, 8, 42 through 52, and 64, the Fifth Amended Contest alleged that Travis County did not print zero tapes and results tapes on Election Day as required by the Texas Secretary of State. In paragraphs 82 through 101, the Fifth Amended Contest alleged that procedural irregularities occurred during the recount that

materially affected the election results. In paragraphs 93 and 94, Pressley alleged that Travis County Director of Elections Michael Winn committed a criminal violation by not allowing Pressley and her poll watchers to view the source, properties, and copying of the CVR files during the recount. Pressley dropped from her Sixth Amended Contest her allegations that Travis County disenfranchised thousands of District 4 voters because certain voting locations were changed between the general election and the runoff election.

33.     Travis County produced documents in this case on April 22 and 23, 2015. County Clerk Dana DeBeauvoir was deposed on May 11, 2015. The due date for the Motion for Summary Judgment response was May 19, 2015. On May 22, 2015, County Clerk Dana DeBeauvoir made changes to her deposition testimony.

34.     On May 26, 2015, after briefing and a hearing, this Court granted Casar's no-evidence summary judgment motion, which establishes that Pressley failed to raise any genuine issue of material fact in response to Casar's motion.

35.     Rogers had prior experience working on election contest cases. According to Rogers, most successful election contests involved a margin of victory of less than 50 votes.

36.     Before filing the Contests, Rogers had never heard of an election contest case in which a contestant had overcome a margin of victory of 1,291 votes.

37.     Before filing the Contests, Rogers was aware of the Texas Supreme Court decision in *Andrade v. NAACP*, 345 S.W.3d 1 (Tex. 2011), in which the Texas Supreme Court rejected an equal-protection challenge to the Hart eSlate System and held that "[t[he Secretary [of State] made a reasonable, nondiscriminatory choice to certify the

eSlate, a decision justified by the State's important regulatory interests."

38.    The Cast Vote Record is a "ballot image" as that term is used in the Texas Election Code.

39.    The U.S. Election Assistance Commission and Texas Secretary of State have consistently stated that for electronic voting, the Cast Vote Record is the Ballot Image. The Secretary of State stated this to Pressley explicitly in its January 20, 2015 letter to her.

40.    The City of Austin and Travis County define a Cast Vote Record as a Ballot Image.

41.    Texas Election Code § 52.075 gives the Secretary of State authority to prescribe the form and content of ballots for electronic voting machines.

42.    Texas Election Code § 129.002 of the Election Code gives the Secretary of State the authority to implement Direct Recording Electronic voting systems that utilize Cast Vote Records.

43.    Pressley and Rogers did not cite the 1990 Federal Election Commission Performance and Test Standards until the Sixth Amended Contest, and these standards do not distinguish a Ballot Image from a Cast Vote Record. The 2002 Federal Election Commission Report entitled "Voting Systems Standards Volume I – Performance Standards" defines Ballot Image as "an electronic record of all votes cast by the voter."

44.    Pressley and Rogers did not cite the 2007 Source Code Review of the Hart Intercivic Voting System until the Sixth Amended Contest, and this report does not distinguish a Ballot Image from a Cast Vote Record.

45.    The allegation that the consolidation or changing of voting locations for the runoff

election disenfranchised District 4 voters is not warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. *See Gonzalez v Villarreal*, 251 S.W.3d 763, 777-778 (Tex. App.—Corpus Christi 2008, pet. dism'd w.o.j.).

46.     There is no evidentiary support for the allegation that the consolidation or changing of voting locations for the runoff election disenfranchised District 4 voters.

47.     The Texas Secretary of State repeatedly rejected Pressley's complaints regarding alleged irregularities at the recount, including both at the recount itself and in multiple subsequent letters responding to Pressley's complaints.

48.     The allegation that irregularities allegedly occurred during the recount materially affected the outcome of the runoff election is not warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

49.     There is no evidentiary support for the allegation that irregularities that allegedly occurred during the recount materially affected the outcome of the runoff election. *See Gonzalez v Villarreal*, 251 S.W.3d 763, 777-778 (Tex. App.—Corpus Christi 2008, pet. dism'd w.o.j.).

50.     The allegations that Travis County Director of Elections Michael Winn committed a criminal violation are not warranted by existing law or by a non-frivolous argument for the extension, modification or reversal of existing law.

51.     There is no evidentiary support for the allegation that Travis County Director of Elections Michael Winn committed a Class A misdemeanor criminal violation by not allowing Pressley and her poll watchers to view the source, properties, and copying of the

CVR files at the recount. The Election Code provides that at a recount, the candidate and her representatives are entitled to be present "during the printing of the images [of ballots cast]." Pressley and her poll watchers were present while the Travis County recount team printed all of the CVRs for the recount. The Secretary of State confirmed this in its January 27, 2015 letter to Pressley, stating "Travis County began anew with the printing of the ballot images in the presence of you and your watchers, and only the ballot images printed in your presence were used in the recount. This information is confirmed by the inspector sent by our office to attend the recount. Therefore, our office believes you and your watchers were able to witness the printing of all ballot images used in verifying the vote count in your race."

52. Pressley and Rogers failed to exercise due diligence in investigating the evidentiary support for each of the allegations in the Contests before filing them.

53. Pressley testified that she does not know what a "Cast Vote Record" is.

54. Pressley acknowledged that the U.S. Election Assistance Commission, the Texas Secretary of State, Travis County, and the City of Austin all reject her definition of "ballot image."

55. Over 100 counties in Texas use the Hart eSlate System. County Clerk DeBeauvoir testified that, before this lawsuit, she had never heard anyone ever allege that CVRs are not ballot images for purposes of electronic voting. She also serves on the Standards Board for the U.S. Election Assistance Commission.

56. County Clerk DeBeauvoir fully complied with the Texas Election Code and Secretary of State procedures in conducting the general and runoff elections.

57. Pressley failed to exercise her right to comment on or object to any of the voting

location changes at the Austin City Council meeting.

58.      Consolidating voting locations between a general election and a runoff election is a routine and entirely legal and proper practice. Such changes occur for a variety of legitimate reasons, including to achieve cost and staffing efficiencies due to the lower voter turnout and fewer number of candidates generally associated with runoffs. In this election, a total of 304 candidates were on the ballot countywide at the November 4, 2014 general election. By contrast, in the runoff election in District 4, only four races were on the ballot: this Council race, the Mayor's race, and 2 school district races—a total of eight candidates.

59.      Because Travis County uses countywide voting centers, any voter in Travis County could vote at any one of the 136 voting locations across the county for the runoff election. In District 4 alone, there were 9 voting centers within the district, as well as 7 centers located within a five-minute drive of the district and 17 centers located within a ten-minute drive of the district.

60.      Pressley testified if a voter had to drive as little as 20 seconds to a new voting location, that voter was disenfranchised.

61.      Rogers did not identify a single witness who could or would testify that changes in voting locations had disenfranchised District 4 voters.

62.      When Pressley was deposed on April 16, 2015, she could not identify a single voter who was disenfranchised as a result of the changes in voting locations. Four days later, on April 20, 2015, she filed her Fifth Amended Contest, which alleged in Paragraph 29 that 1,108 voters, at least, were disenfranchised as a result of the change in voting location.

63. There is no evidentiary support for the allegation that the Austin City Council changed the voting locations for the runoff to disenfranchise any District 4 voters.

64. There is no evidentiary support for the allegation that the changes in the voting locations for the runoff resulted in the disenfranchisement of any District 4 voters.

65. There is no evidentiary support that any voter was actually prevented from voting at the new locations.

66. Paragraph 42 of Pressley's Sixth Amended Contest states that "[r]eview of Discovery documents provided by Travis County [shows that] no Zero Tapes (showing the number of votes present on the Hart Voting equipment for each candidate when the polls open) were printed during Early Voting and no Zero Tapes were printed on Election Day of the Runoff." Similar allegations are contained in ¶¶ 3, 8, 43, & 64 of the Sixth Amended Contest and in prior Contests.

67. Zero Tapes were produced to Pressley and Rogers by Travis County during their document production on April 22 and 23, 2015. Pressley's Sixth Amended Contest was filed on May 19, 2015.

68. Travis County printed zero tapes both before the runoff election and on the day of the runoff election. There is no evidentiary support for the allegation that zero tapes were not printed on the day of the runoff election.

69. Pressley and Rogers attached as Exhibit C to the Sixth Contest a zero tape that was printed on December 16, 2014, the day of the runoff election.

70. Results tapes were printed the day of the runoff election. There is no evidentiary support for the allegation that results tapes were not printed as required by the Texas Secretary of State.

34

71.　　Pressley took a personal and participatory role in this lawsuit. Pressley testified she personally authored portions of the Contests and their appendices. She estimated that she spent hours and hours working on the lawsuit and that she had worked until 3:00 a.m. drafting the Contests. Pressley was present at the deposition of County Clerk DeBeauvoir, as well as the two-day document production by the County Clerk's office.

72.　　Pressley testified at least three people assisted her in drafting discovery and with various other aspects of this election contest.

73.　　Pressley testified Contestee Casar has done nothing wrong in the conduct of the election.

74.　　Pressley testified she has assets and income sufficient to be able to pay a monetary sanction. Specifically, Pressley has: (1) approximately $30,000 to $40,000 that she has raised for the cost of pursuing this Contest and the appeal; (2) at least $170,000 in her business account for Pure Rain LLC, which is a Limited Liability Company of which she is the only owner; (3) real estate in Wyoming with a net value of between $10,000 and $25,000; (4) profit from a home that she and her husband recently sold for approximately $530,000; (5) annual sales of $50,000 to $60,000 per year from Pure Rain LLC; (6) annual income of approximately $130,000 to $160,000 from her husband's job as an engineer at Applied Materials; (7) a personal checking account valued at approximately $1,000; (8) her husband's personal account which is valued at approximately $5,000; and (9) savings of approximately $51,500 in legal fees which were owed to her attorney David Rogers. Additionally, Pressley has income earning capacity of over $100,000 per year based on her previous jobs.

75.　　Rogers has assets and income sufficient to be able to pay a monetary sanction.

Specifically, Rogers is a practicing attorney who charges approximately $350/hour. Additionally, Rogers testified he has the financial ability to be able to forgo legal fees of approximately $51,500 from Pressley.

**Findings of Fact Supporting Attorneys Fees**

76. During this litigation, Casar retained Charles Herring, Jr. and Lauren Ross of Herring & Irwin LLP and Jessica Palvino of McGinnis Lochridge & Kilgore LLP.

77. The services rendered by Charles Herring, Jr., Lauren Ross, and Jessica Palvino in defending Casar in this litigation were reasonable and necessary for these types of services in Travis County.

78. The fees charged by Herring & Irwin LLP and McGinnis Lochridge & Kilgore LLP in defending Casar in this litigation were $ 150,000.00.

79. The fees and rates charged by Charles Herring, Jr., Lauren Ross, and Jessica Palvino in defending Casar in this litigation were reasonable and customary for these types of services in Travis County.

## CONCLUSIONS OF LAW

80. Irregularities that allegedly occurred during the recount **did not materially affect** the outcome of the runoff election. *See Gonzalez v Villarreal*, 251 S.W.3d 763, 777-778 (Tex. App.—Corpus Christi 2008, pet. dism'd w.o.j.) (headnotes 10 and 11).

81. At the time the Original, Second Amended, Third Amended, Fourth Amended, Fifth Amended, and Sixth Amended Contests were filed, Rogers certified that to his best knowledge, information, and belief, formed after reasonable inquiry, that the allegation that irregularities that occurred during the recount materially affected the outcome of the runoff election was warranted by existing law or by a non-frivolous argument for the

extension, modification, or reversal of existing law or the establishment of new law.

82.     There is no evidentiary support for the allegation that irregularities that allegedly occurred during the recount materially affected the outcome of the runoff election. *See Gonzalez v Villarreal*, 251 S.W.3d 763, 777-778 (Tex. App.—Corpus Christi 2008, pet. dism'd w.o.j.).

83.     Rogers failed to conduct a reasonable inquiry into whether each allegation (that irregularities that allegedly occurred during the recount materially affected the outcome of the runoff election) was warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

84.     Rogers knew or should have known this allegation (that irregularities that allegedly occurred during the recount materially affected the outcome of the runoff election) was not warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

85.     A reasonable inquiry would have revealed irregularities that allegedly occurred during the recount **did not materially affect** the outcome of the runoff election.

86.     The allegations that irregularities that allegedly occurred during the recount materially affected the outcome of the runoff election were not supported by existing law and there was not a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

87.     By failing to conduct a reasonable inquiry into whether the legal contentions in the Contests were warranted by existing law or by a non-frivolous argument for the extension, modification or reversal of existing law, Rogers violated Section 10.001(2) of the Civil Practices and Remedies Code.

88.     By asserting legal contentions in the Contests that were not warranted by existing law or by a non-frivolous argument for the extension, modification or reversal of existing law, Rogers violated Section 10.001(2) of the Civil Practices and Remedies Code.

89.     This Court has authority to impose a sanction on David Rogers because of this violation of Section 10.001(2). This authority arises from Texas Civil Practice and Remedies Code Section 10.004, which states that "a court that determines that a person has signed a pleading or motion in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both."

90.     At the time that the Original, Second Amended, Third Amended, Fourth Amended, Fifth Amended, and Sixth Amended Contests were filed, Rogers and Pressley certified that, to the best of their knowledge, information, and belief, formed after reasonable inquiry, each allegation or other factual contention in the Contests had evidentiary support, including the allegation that irregularities that allegedly occurred during the recount materially affected the outcome of the runoff election.

91.     At the time that the Original, Second Amended, Third Amended, Fourth Amended, Fifth Amended, and Sixth Amended Contests were filed, Rogers and Pressley failed to conduct a reasonable inquiry into whether their allegation (that irregularities that allegedly occurred during the recount materially affected the outcome of the runoff election) had evidentiary support.

92.     At the time that the Original, Second Amended, Third Amended, Fourth Amended, Fifth Amended, and Sixth Amended Contests were filed, Rogers and Pressley knew or should have known their allegation that irregularities that allegedly occurred during the recount materially affected the outcome of the runoff election did not have

38

evidentiary support.

93.     The allegation that irregularities that allegedly occurred during the recount materially affected the outcome of the runoff election has no evidentiary support.

94.     By failing to make a reasonable inquiry into whether factual claims in the Contests had evidentiary support, Pressley and Rogers violated Section 10.001(3) of the Civil Practices and Remedies Code.

95.     By asserting factual claims in the Contests that Pressley and Rogers knew were without evidentiary support, Pressley and Rogers violated Section 10.001(3) of the Civil Practices and Remedies Code.

96.     This Court has authority to impose a sanction on David Rogers and on Laura Pressley because of this violation of Section 10.001(3). This authority arises from Texas Civil Practice and Remedies Code Section 10.004, which states that "a court that determines that a person has signed a pleading or motion in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both."

97.     Travis County Director of Elections Michael Winn did not commit a criminal violation by not allowing Pressley and her poll watchers to view the source, properties, and copying of the CVR files during the recount.

98.     At the time the Sixth Amended Contest was filed, Rogers certified that to the best of his knowledge, information, and belief, formed after reasonable inquiry, that the allegation that Mr. Winn committed a criminal violation by not allowing Pressley and her poll watchers to view the source, property, and copying of the CVR files was warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

99.     Rogers failed to conduct a reasonable inquiry into whether this allegation (that Michael Winn committed a criminal violation) was warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

100.    Rogers knew that this allegation (that Michael Winn committed a criminal violation) was not warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

101.    A reasonable inquiry would have revealed that Mr. Winn did not violate Texas Election Code § 33.061 by not allowing Pressley and her poll watchers to view the source and properties of the CVR files during the recount; that, under Election Code § 213.016, Pressley and her poll watchers were allowed to be and were present for the printing of the CVRs; and that nothing in the Election Code authorized Pressley or her poll watchers to view the source and properties of the CVR files, such as dates of the CVR files and origination.

102.    The allegations that Mr. Winn committed criminal violations were not supported by existing law and there was not a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

103.    By failing to conduct a reasonable inquiry into whether the legal contentions in the Contests were warranted by existing law or by a non-frivolous argument for the extension, modification or reversal of existing law, Rogers violated Section 10.001(2) of the Civil Practices and Remedies Code.

104.    By asserting legal contentions in the Contests that were not warranted by existing law or by a non-frivolous argument for the extension, modification or reversal of existing

40

law, Rogers violated Section 10.001(2) of the Civil Practices and Remedies Code.

105. This Court has authority to impose a sanction on David Rogers because of this violation of Section 10.001(2). This authority arises from Texas Civil Practice and Remedies Code Section 10.004, which states that "a court that determines that a person has signed a pleading or motion in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both."

106. At the time the Sixth Amended Contest was filed, Rogers and Pressley certified that, to the best of their knowledge, information, and belief, formed after reasonable inquiry, each allegation or other factual contention in the Contests had evidentiary support, including the allegation that Mr. Winn committed a criminal violation by not allowing Pressley and her poll watchers to view the source, property, and copying of the CVR files.

107. At the time that the Sixth Amended Contest was filed, Rogers and Pressley failed to conduct a reasonable inquiry into whether their allegation (that Mr. Winn committed a criminal violation by not allowing Pressley and her poll watchers to view the source, property, and copying of the CVR files) had evidentiary support.

108. At the time that the Sixth Amended Contest was filed, Rogers and Pressley knew that their allegation (that Mr. Winn committed a criminal violation by not allowing Pressley and her poll watchers to view the source, property, and copying of the CVR files) did not have evidentiary support.

109. The allegation that Mr. Winn committed a criminal violation by not allowing Pressley and her poll watchers to view the source, property, and copying of the CVR files has no evidentiary support.

110. By failing to make a reasonable inquiry into whether factual claims in the Contests had evidentiary support, Pressley and Rogers violated Section 10.001(3) of the Civil Practices and Remedies Code.

111. By asserting factual claims in the Contests that Pressley and Rogers knew were without evidentiary support, Pressley and Rogers violated Section 10.001(3) of the Civil Practices and Remedies Code.

112. This Court has authority to impose a sanction on David Rogers and on Laura Pressley because of this violation of Section 10.001(3). This authority arises from Texas Civil Practice and Remedies Code Section 10.004, which states that "a court that determines that a person has signed a pleading or motion in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both."

113. No credible evidence exists to prove that any Travis County voters were disenfranchised by the consolidation of voting locations between the general election, held on November 4, 2014 and the runoff election held on December 16, 2014.

114. At the time that the Original, Second Amended, Third Amended, Fourth Amended, and Fifth Amended Contests were filed, Rogers certified that to his best knowledge, information, and belief, formed after reasonable inquiry, that the allegation that Travis County illegally disenfranchised District 4 voters by consolidating voting locations was warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

115. At the time that the Original, Second Amended, Third Amended, Fourth Amended, and Fifth Amended Contests were filed, Rogers failed to conduct a reasonable inquiry in whether this allegation (that Travis County illegally disenfranchised District 4

voters by consolidating voting locations) was supported by existing law or a non-frivolous argument for extension, modification, or reversal of existing law or the establishment of new law.

116. At the time that the Original, Second Amended, Third Amended, Fourth Amended, and Fifth Amended Contests were filed, Rogers knew or should have known that this allegation (that Travis County illegally disenfranchised District 4 voters by consolidating voting locations) was unsupported by existing law or a non-frivolous argument for extension, modification, or reversal of existing law or the establishment of new law.

117. A reasonable inquiry would have revealed that existing law did not support the allegation that voters had been illegally disenfranchised by the consolidation of voting locations, and that there was not a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

118. By failing to conduct a reasonable inquiry into whether the legal contentions in the Contests were warranted by existing law or by a non-frivolous argument for the extension, modification or reversal of existing law, Rogers violated Section 10.001(2) of the Civil Practices and Remedies Code.

119. By asserting legal contentions in the Contests that were not warranted by existing law or by a non-frivolous argument for the extension, modification or reversal of existing law, Rogers violated Section 10.001(2) of the Civil Practices and Remedies Code.

120. At the time that the Original, Second Amended, Third Amended, Fourth Amended, and Fifth Amended Contests were filed, Rogers and Pressley certified that, to the best of their knowledge, information, and belief, formed after reasonable inquiry,

each allegation or other factual contention in the Contest had evidentiary support, including the allegations that Travis County illegally disenfranchised District 4 voters by consolidating voting locations.

121. At the time that the Original, Second Amended, Third Amended, and Fourth Amended Contests were filed, Rogers and Pressley failed to conduct a reasonable inquiry into whether these factual allegations (that Travis County illegally disenfranchised District 4 voters by consolidating voting locations) had evidentiary support.

122. At the time that the Original, Second Amended, Third Amended, and Fourth Amended Contests were filed, Rogers and Pressley knew that these factual allegations (that Travis County illegally disenfranchised District 4 voters by consolidating voting locations) had no evidentiary support.

123. At the time that the Fifth Amended Contest was filed, Rogers and Pressley knew that these allegations (that Travis County illegally disenfranchised District 4 voters by consolidating voting locations) did not have evidentiary support. Pressley testified four days prior to filing the Fifth Amended Contest that she could not identify a single voter who was disenfranchised due to the change in voting locations. Pressley testified that regardless of the fact that she could not obtain one affidavit from one voter attesting to disenfranchisement of voters, she made her claims based on statistical analysis of prior voting patterns and conversations she had with persons she could not identify.

124. The allegation that Travis County illegally disenfranchised thousands of District 4 voters by consolidating voting locations has no evidentiary support.

125. By failing to make a reasonable inquiry into whether factual claims in the Contests had evidentiary support, Pressley and Rogers violated Section 10.001(3) of the

Civil Practices and Remedies Code.

126.    By asserting factual claims in the Contests that Pressley and Rogers knew were without evidentiary support, Pressley and Rogers violated Section 10.001(3) of the Civil Practices and Remedies Code.

127.    This Court has authority to impose a sanction on David Rogers and Laura Pressley because of this violation of Section 10.001(3). This authority arises from Texas Civil Practice and Remedies Code Section 10.004, which states that "a court that determines that a person has signed a pleading or motion in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both."

128.    Travis County printed zero tapes and results tapes for the runoff election as required by the Texas Secretary of State. Some of the zero tapes were printed prior to the date of the run-off election held on December 16, 2014.

129.    At the time that the Original, Second Amended, Third Amended, Fourth Amended, and Fifth Amended Contests were filed, Rogers and Pressley certified that, to the best of their knowledge, information, and belief, formed after reasonable inquiry, each allegation or other factual contention in the Contest had evidentiary support, including the allegations that Travis County failed to print zero tapes and results tapes in accordance with the Texas Secretary of State's requirements.

130.    At the time that the Sixth Amended Contest was filed, Rogers and Pressley certified that, to the best of their knowledge, information, and belief, formed after reasonable inquiry, each allegation or other factual contention in the Contest had evidentiary support, including the allegations that "discovery documents provided by Travis County [shows that] no Zero Tapes (showing the number of votes present on the

Hart Voting equipment for each candidate when the polls open) were printed during Early Voting and no Zero Tapes were printed on Election Day of the Runoff."

131. At the time that the Original, Second Amended, Third Amended, Fourth Amended, and Fifth Amended Contests were filed, Rogers and Pressley knew that these allegations (that Travis County failed to print zero tapes and results tapes in accordance with the Texas Secretary of State's requirements) lacked evidentiary support.

132. At the time that the Original, Second Amended, Third Amended, Fourth Amended, and Fifth Amended Contests were filed, Rogers and Pressley failed to conduct a reasonable inquiry into whether these allegations (that Travis County failed to print zero tapes and results tapes in accordance with the Texas Secretary of State's requirements) had evidentiary support.

133. At the time that the Sixth Amended Contest was filed, Rogers and Pressley knew that these allegations (that Travis County failed to print zero tapes and results tapes in accordance with the Texas Secretary of State's requirements and that discovery documents provided by Travis County showed that no Zero Tapes were printed during Early Voting and no Zero Tapes were printed on Election Day of the Runoff) lacked evidentiary support. Zero Tapes were produced by Travis County during their document production on April 22 and 23, 2015. Pressley's Sixth Amended Contest was filed on May 19, 2015. Pressley and Rogers attached as Exhibit C to the Sixth Contest a zero tape that was printed on December 16, 2014, the day of the runoff election. County Clerk Dana DeBeauvoir testified in her deposition on May 11, 2015 that zero tapes and results tapes were printed.

134. The allegations that Travis County failed to print zero tapes and results tapes in

accordance with the Texas Secretary of State's requirements have no evidentiary support. Some of the zero tapes were not printed on December 16, 2014, the date of the runoff election.

135. The allegations that discovery documents provided by Travis County showed that no Zero Tapes were printed during Early Voting and no Zero Tapes were printed on Election Day of the Runoff has no evidentiary support.

136. By failing to make a reasonable inquiry into whether factual claims in the Contests had evidentiary support, Pressley and Rogers violated Section 10.001(3) of the Civil Practices and Remedies Code.

137. By asserting factual claims in the Contests that Pressley and Rogers knew were without evidentiary support, Pressley and Rogers violated Section 10.001(3) of the Civil Practices and Remedies Code.

138. This Court has authority to impose a sanction on David Rogers and Laura Pressley because of this violation of Section 10.001(3). This authority arises from Texas Civil Practice and Remedies Code Section 10.004, which states that "a court that determines that a person has signed a pleading or motion in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both."

139. The factors articulated by the Texas Supreme Court in *Low v. Henry*, 221 S.W.3d 609 (Tex. 2007), support an award of sanctions in this case.

140. The first *Low* factor, the good faith or bad faith of the offender, weighs in favor of awarding sanctions. Pressley's conduct during the case, including making false allegations of criminal activity against the Travis County Director of Elections Michael Winn, indicate that she was not acting in good faith.

141. The second *Low* factor, the degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense, weighs heavily in favor of sanctions. Pressley lost the election by a margin of 1,291 votes, a margin far greater than Rogers had ever seen and greater than has been overcome in the history of reported Texas jurisprudence. The Hart eSlate system, which Pressley alleges violated the Texas Election Code, was certified by the Texas Secretary of State and variations of the system have been used in other counties in Texas. There are two court decisions rejecting attacks on the Hart eSlate system. In the *Andrade v. NAACP* case, 345 S.W.3d 1 (Tex. 2011), the Texas Supreme Court found that "[t]he Secretary made a reasonable, nondiscriminatory choice to certify the eSlate, a decision justified by the State's important regulatory interests." In *Texas Democratic Party v. Williams,* No. A–07–CA–115–SS (W.D. Tex. Aug. 16, 2007), the Western District of Texas noted that the Secretary of State "made a reasonable, politically neutral, and non-discriminatory choice to certify the eSlate voting machines for use in elections, and nothing in the Constitution forbids this choice." Rogers was either aware of or failed to adequately investigate the legal and factual bases for Pressley's allegations.

142. The third *Low* factor, the knowledge, experience, and expertise of the offender, also weighs in favor of awarding sanctions. Rogers is an experienced attorney who has handled election contests previously and holds himself out as being knowledgeable regarding election contests. Pressley has a PhD in Chemistry, is actively involved in her community, and has appeared before Austin City Council at least thirty times. She was personally involved in drafting portions of the Contests and discovery.

143. The fourth *Low* factor, any prior history of sanctionable conduct on the part of the offender, is not applicable in this case.

48

144.    The fifth *Low* factor, the reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct, weighs in favor of awarding sanctions. Contestee Casar seeks the reasonable and necessary attorney's fees incurred in defending this election contest, and his attorneys are charging a reduced hourly rate. Casar has not yet paid any of his attorney fees.

145.    The sixth *Low* factor, the nature and extent of prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct, also weighs in favor of awarding sanctions. Contestee Casar is now a Council Member for the City of Austin, and has been required to divide his time between his duties as a Council Member and responding to Pressley's Election Contests. His city council annual salary is approximately $70,000.00.

146.    The seventh *Low* factor, the relative culpability of client and counsel, also weighs in favor of awarding sanctions. Pressley took a personal and participatory role in this lawsuit. She testified she drafted portions of the Contests, drafted discovery questions to Travis County for Rogers to decide how to use, and was, according to Rogers, the most hands-on client he's ever had.

147.    The eighth *Low* factor, the risk of chilling the specific type of litigation involved, also weighs in favor of awarding sanctions. There should not be a chilling effect from awarding sanctions in this case, as the purpose of sanctions in this case would be to encourage compliance with Chapter 10.

148.    The ninth *Low* factor, the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction, also weighs in favor of awarding sanctions. Pressley has assets and income potential due to her high level of education sufficient to

justify the award of sanctions. Rogers has the ability to earn income sufficient to justify the award of sanctions.

149. The tenth *Low* factor, the impact of the sanction on the offended party, including the offended person's need for compensation, also weighs in favor of awarding sanctions. Pressley testified she knew of nothing Contestee Casar did wrong in the conduct of the election. Because of Pressley's election contest, Contestee Casar has incurred more than $150,000 in attorney's fees and has been unable to fully devote himself to his role as City Councilmember. His annual income as a council member is far less than Ms. Pressley's.

150. The eleventh *Low* factor, the relative magnitude of sanction necessary to achieve the goal or goals of the sanction, also weighs in favor of awarding sanctions. The goals in awarding sanctions, according to the Texas Supreme Court in *Remington Arms v. Caldwell* are compensation, punishment, and deterrence. 850 S.W.2d 167 (Tex. 1993). The Texas Civil Practices and Remedies Code Section 10.004 states that the sanction must be limited to what is sufficient to deter repetition of the conduct or comparable conduct by others similarly situated. The same challenge to the Hart eSlate voting system that was brought by Pressley in this Election Contest could have been brought against any elected official in Austin, Travis County, or the hundreds of other counties in Texas that use the eSlate voting machine. It is important to deter these types of challenges to the Hart eSlate voting system, which has been fully approved and certified by the Texas Secretary of State.

151. The twelfth *Low* factor, burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs, have to date minimal impact in favor of awarding sanctions.

152.    The thirteenth *Low* factor, the degree to which the offended person's own behavior caused the expenses for which recovery is sought, also weighs in favor of awarding sanctions. Pressley admits that Casar did nothing wrong in the conduct of the election.

153.    Rogers and Pressley failed to show due diligence in violation of Section 10.002 of the Civil Practices and Remedies Code.

154.    All Conclusions of Law shall also be deemed to be Findings of Fact. To the extent any Conclusion of Law is a Finding of Fact or is a mixed question of law and fact, the same is found as a fact.

IT SO ORDERED.

SIGNED this the 23rd day of July, 2015.

_____
JUDGE DAN MILLS

Filed in The District Court
of Travis County, Texas

**JUL 2 3 2015**

At _____ *10:53* A.M.

Velva L. Price, District Clerk

NO. D-1-GN-15-000374

| | | |
|---|---|---|
| LAURA PRESSLEY | § | IN THE DISTRICT COURT |
| Contestant | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| GREGORIO "GREG" CASAR | § | |
| Contestee | § | 201ST JUDICIAL DISTRICT |

## Amended Final Judgment

On May 26, 2015, the Court entered a final summary judgment order granting Contestee Casar's No-Evidence Motion for Summary Judgment. On June 12, 2015, Contestee Casar timely filed his Third Amended Motion for Sanctions to amend the May 26, 2015 Order to include an award of sanctions. On June 24, 2015, the Court entered an Amended Summary Judgment Order that amended and replaced the May 26, 2015 Order. The Court now enters this Amended Final Judgment and FINDS and ORDERS as follows:

1. Contestee Casar's Third Amended Motion for Sanctions is GRANTED.

2. Pursuant to Texas Civil Practice and Remedies Code § 10.005, the Court entered an order on <u>July 23, 2015</u> that describes the conduct the Court has determined violated Texas Civil Practice and Remedies Code § 10.001, and explains the basis for the sanctions imposed. The Court incorporates by reference that Order herein.

3. Contestee Casar's No-Evidence Motion for Summary Judgment is GRANTED.

4. The Court incorporates by reference the June 24, 2015 Order granting Casar's No-Evidence Motion for Summary Judgment.



004133775



5. Under Texas Election Code § 221.012(a), the Court DECLARES that the true outcome of the December 16, 2014 runoff election is that Contestee Gregorio "Greg" Casar was elected as the Austin City Council District 4 member.

6. Pursuant to Texas Civil Practice and Remedies Code § 10.004(c)(3), Contestee Casar shall recover from Contestant Laura Pressley individually monetary sanctions in the amount of $ 40,000.00, together with postjudgment interest from the date of this Amended Final Judgment until paid at the rate of five percent (5.0%) per annum.

7. Pursuant to Texas Civil Practice and Remedies Code § 10.004(c)(3), Contestee Casar shall recover from Contestant's counsel David Rogers individually monetary sanctions in the amount of $ 50,000.00, together with postjudgment interest from the date of this Amended Final Judgment until paid at the rate of five percent (5.0%) per annum.

8. Pursuant to Texas Civil Practice and Remedies Code §§ 10.002 and 10.004, Contestee Casar shall recover from Contestant Laura Pressley and Contestant's counsel David Rogers jointly and severally his out-of-pocket expenses in the amount of $7,794.44, together with postjudgment interest from the date of this Amended Final Judgment until paid at the rate of five percent (5.0%) per annum.

9. If either Contestant Laura Pressley or Contestant's counsel David Rogers unsuccessfully appeals this Amended Final Judgment, pursuant to Texas Civil Practice and Remedies Code § 10.004(c)(3), Contestee Casar shall

also recover from Contestant Laura Pressley, if unsuccessful on appeal, and Contestant's counsel David Rogers, if unsuccessful on appeal, additional monetary sanctions in the amount of $ 25,000.00, if appealed to the Court of Appeals; $10,000.00, if a petition for review is filed in the Supreme Court of Texas; $15,000.00, if full briefing is requested by the Supreme Court of Texas; and $15,000.00, if oral argument is granted at the Supreme Court of Texas. These additional monetary sanctions shall be imposed jointly and severally on Contestant Laura Pressley and Contestant's counsel David Rogers, if both are unsuccessful on appeal.

10. Court costs are awarded in favor of Contestee Casar and against Contestant Laura Pressley, together with post-judgment interest from the date of this Amended Final Judgment until paid at the rate of five percent (5.0%) per annum.

11. This order finally disposes of all claims and all parties and is appealable.

12. All relief not expressly granted in this Amended Final Judgment is denied.

IT SO ORDERED.

SIGNED this the 23rd day of July, 2015.

_____
JUDGE DAN MILLS